**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------X

STUART FORCE, *et al.*,

                           Plaintiffs,

            -against-

THE ISLAMIC REPUBLIC OF IRAN, *et al.*,

                       Defendants.

Docket No:
16-CV-1468 (RDM)

-------------------------------------------------------------------X

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Plaintiffs respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their Motion for Default Judgment against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS") and the Syrian Arab Republic ("Syria") pursuant to 28 U.S.C. § 1608(e); and their request to refer the assessment of damages to a special master pursuant to 28 U.S.C. § 1605A(e).

## I.

**PROCEDURAL POSTURE**

    This is a civil action for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq*. Plaintiffs are the victims, estates and families of U.S. nationals injured or murdered in seven separate terror attacks between March 6, 2008 and March 8, 2016. Plaintiffs filed this action on July 16, 2016 against Defendants The Islamic Republic of Iran ("Iran"), The Iranian Ministry of Information and Security ("MOIS"), and The Syrian Arab Republic ("Syria"). (DE 1). Plaintiffs advance a cause of action under the FSIA, 28 U.S.C. § 1605A(c), as well as negligence and aiding and abetting under Israeli law. *Id.* at ¶¶ 116-51.

None of the Defendants filed an answer or otherwise appeared. The Clerk noted the defaults of the Defendants on November 14, 2017. (DE 23-4). Plaintiffs have moved for entry of default judgment by the Court against all Defendants. (DE 28). In the context of a default setting under 28 U.S.C. § 1608(e), that provision requires a court to enter default judgment against a non-responding foreign state only where "the claimant establishes his claim or right to relief by evidence that is satisfactory to the court." 28 U.S.C. §1608(e). Plaintiffs have presented evidence in the form of affidavits and documentary evidence, as well as credible expert reports from two experts concerning assistance to Hamas[1] and Palestinian Islamic Jihad ("PIJ") from Iran and MOIS (DE 31,32), two experts concerning Syria's assistance to Hamas and PIJ (DE 29, 30), a retired member of the Israel Defense Forces concerning the investigations into each of the terror attacks (DE 33), an Israeli lawyer concerning relevant Israeli law (DE 34), a psychiatrist and a medical expert concerning the mental and physical effects of the attacks on individual Plaintiffs (DE 35 Ex. 1-48; DE 41, 46, 53, 56, 73, 77), and a forensic economist concerning economic losses of individual Plaintiffs (DE 40, 45, 51, 68). From the entire record, this Court makes the following findings of fact and conclusions of law.

## II.

## FINDINGS OF FACT

### A.      The Terrorist Attacks

#### 1)      The Stabbing Murder of Taylor Force

1.      On the evening of March 8, 2016, an agent of Hamas, Bashar Mohamed Masalha, assisted by another Hamas agent and operative, Muhammad Aweida, arrived with a knife at the

---

[1] Hamas is an acronym for Harakat al-Muqawamah al-Islamiyya, or the Islamic Resistance Movement. *See* Declaration of Marius Deeb ("Deeb Decl.") (DE 30) ¶ 11.

Jaffa boardwalk, just south of Tel Aviv, and, acting on behalf of Hamas, began attacking pedestrians. Masalha stabbed to death 29-year-old Taylor Force and seriously injured at least ten others. The entire attack was accompanied by cries of "Allahu Akbar." Declaration of Arieh Dan Spitzen (Spitzen Decl. ¶¶ 128,129, 142).

2.     Taylor Force, a United States army veteran, was on a two day trip to Israel and the Palestinian territories with a group of M.B.A. students from Vanderbilt University's Owen Graduate School of Management. At the time of the stabbing attack, he was walking with some of his fellow Vanderbilt classmates along the Jaffa boardwalk, a popular seaside promenade for shopping and leisure. The group was on their way to dinner at a nearby restaurant. The terrorist-stabber Masalha was shot dead by police after being chased from the Jaffa Port along the Tel Aviv beach promenade. Spitzen Decl. ¶128, Declaration of Stuart Force (Stuart Force Decl.) ¶ 5, 6.)

3.     Masalha was from the village of Hajja near Nablus and had a history of being affiliated with Hamas and its Islamist ideology. He had just returned from a pilgrimage to Mecca. Spitzen Decl. ¶¶ 133, 136, 138-143.

4.     Immediately after the attack, Hamas took responsibility for the attack and for the terrorist. Spitzen Decl. ¶144. Photos and messages form Masalha's Facebook account were posted to the PALINFO website (identified with Hamas) already on March 8, the day of the attack. On March 10, a Hamas banner was posted on the same page, stating: *"Hamas announces that its son, the Shahid and holy warrior [Mujahid in arabic] Bashar Muhammad Masalha, carried out the heroic stabbing operation in Jaffa, in which a Zionist was killed and 10 others injured."* Spitzen Decl. ¶¶ 145-147

5.      The news website Mashreq News (an Iranian news website, supportive of the Hamas organization) wrote: "Masalha's friends say that he was extremely enthusiastic ('Mutahames') prior to the Umrah…" Attached to this news report is an excerpt from the Hamas announcement concerning Masalha, which was circulated online, saying: "The Hamas movement in Qalqilya District is eulogizing its son, the Shahid holy warrior." The website also says: "... The Hamas movement announced the death of the Shahid Masalha and described him as its son, a holy warrior Shahid, praising him for his courageous stabbing operation in Jaffa, which led to the death of an Israeli and to the injury of ten others. The Shahid was known in his village for his virtues and religious commitment…" Spitzen Decl. ¶ 149.

6.      Masalha's connection to Hamas and the movement was clear at his funeral. Mourners were seen bearing Hamas flags and enthusiastic cries of support for Ahmad Yassin, founder of Hamas, were heard. The funeral was of a religious Islamic character and was accompanied by numerous cries of 'Allah Akbar' as well as speeches praising Masalha's operation. Palestinian Authority security forces also arrested a number of the funeral's participants as part of a series of arrests of open Hamas supporters. Spitzen Decl. ¶ 150.

7.       Hamas leaders praised the attack stating it symbolized a continuation of the intifada and was a national response to the rights of Palestinians to defend themselves. Spitzen Decl. ¶ 151.

8.      This terror attack along the Tel Aviv Promenade was part of and bears the hallmarks of the fluctuating wave of Palestinian terror attacks in Israel, which began in September 2015 and continued until the end of 2016. Spitzen Decl. ¶¶ 51-69, 130, 160. Senior Hamas leaders made a practice of publicly inciting the Palestinian population to mount attacks in the form of stabbings, vehicular ramming attacks and even gunfire to the extent that the attackers

were able. In fact, in February 2016, the leader of Hamas at the time, Khaled Mash'al, encouraged the wave of terror attacks, characterizing them as "heroic operations" of the young men and women of the Intifada." Spitzen Decl. 51-69.

9.     Specifically, Hamas adopted a parallel system of operations during the 2015–2016 wave of terror, deploying lone terrorists by publicly instructing its operatives to mount attacks. Hamas and its leaders incited the Palestinian public, and continue inciting it, to perform terror attacks of various kinds in response to what the organization deems "harm to what Islam holds holy," and their phrasing employs extremist Islamic terminology. Such incitement falls upon receptive ears among those Palestinians who, even before, have been won over to extreme Islamist religious positions from the doctrines of Hamas and of the Muslim Brotherhood (as was the murderer in the case before us, Bashar Masalha). The terrorist then executes the organization's call and perpetrates the murder while emphasizing the religious Islamic character of the attack. Immediately afterward (a matter of hours) Hamas claims responsibility for the attack and publicly defines the terrorist as a son of the Hamas movement (that is, a Hamas activist operating as a representative of the organization). Id at ¶¶ 51-69, 144-149.

10.     Masalha was publically and proudly defined by the Hamas organization as "a son of the Hamas movement", receiving recognition by the organization as a rank and file operative sent to carry out the attack upon the urging, and on behalf of, the organization. Taylor Force was the victim of a Hamas terror attack. Id at ¶ 161.

## 2)     The Merkaz HaRav Yeshiva Shooting Attack in Which Avraham David Moses was Murdered and Naftali Shitrit was Injured

11.     On March 6, 2008, at approximately 8:30 p.m., Ala' Hisham Abu Dheim, a 26-year-old operative of Hamas's military wing Izz al-Din al-Qassam Brigades entered the Merkaz HaRav Yeshiva in Jerusalem. The terrorist was armed with a Kalashnikov assault rifle and nine

magazines, two guns (a Beretta and an FN) along with four magazines, and a commando knife. Acting on behalf of Hamas, Abu Dheim opened fire with an automatic weapon on hundreds of yeshiva students. Spitzen Decl. ¶¶ 188, 189. First, the terrorist shot through the windows at two students standing inside near the entrance. Next, he entered the Yeshiva building and shot two students descending the stairs. He then continued toward the library and shot students standing outside. Finally, he entered the library and commenced a systematic massacre of the students studying inside. *Id.* At ¶ 190.

12.     The entire event lasted between ten and fifteen minutes, at the end of which eight young boys, mostly high school students, were killed: Yohai Lifshitz (18), Yonatan Yitzhak Eldar (16), Yehonadav Haim Hirschfield (19), Neria Cohen (15), Segev Peniel Avihail (15), Avraham David Moses (whose family members are plaintiffs herein) (16), Roi Roth (18) and Doron Meherete (26). Ten other students were wounded, including plaintiff Naftali Shitrit, who was in high school at the time. *Id.* At ¶ 193.

13.     Students attempted to hide between bookshelves. The terrorist sought them out and shot them. The body of Avraham David Moses was found with that of his friend Segev Avihail. They were found covering and embracing each other, crouched between the rows of bookcases in the library. Declaration of Rivkah Martha Moriah (Rivkah Moriah Decl.) ¶ 46, See Spitzen Decl. ¶¶ 222-233. Naftali Shitrit hid in the stacks while hearing the gunshots. The terrorist shot him shot multiple times severely injuring him. Naftali Shitrit was taken to the hospital in critical condition. Declaration of Naftali Shitrit (Naftali Shitrit Decl.) ¶¶ 6-9 .

14.     The terrorist operated with the skill and precision of a trained and cold hearted assassin, exhibiting control handling his weapons, speedily loading and reloading magazines

while shooting and accurately targeting his victims at long and close range—acts that require skill and training. *Id.* At ¶ 191.

15.     An officer in the Paratroopers Brigade, Captain David Shapira, who lived near the Yeshiva, heard the shots, ran to the building and shot and killed the terrorist. *Id.* At ¶ 192.

16.     The terrorist was well trained and all the stages of the attack were meticulously planned. Careful intelligence and logistic preparations were made prior to the attack, including intelligence gathering, the selection of the target, acquisition of a variety of weapons, and training exercises with his weapons in the Hebron area. All are characteristics of the organized attacks perpetrated by terrorist organizations like Hamas *Id.* At ¶ 194, 195, 213-221.

17.     Following the attack, Hamas issued a statement that it "blesses the (Jerusalem) operation. It will not be the last." The official claim of responsibility for the Merkaz HaRav massacre by the Izz al-Din al-Qassam Brigades came two years after the attack, in a December 25, 2010 press conference with Abu Ubeida. *Id.* ¶¶ 204-205.

18.     The information office of the Hamas Al-Qassam Brigades also published a "special edition" of its Path of Glory (Darb al-Ezza) publication in commemoration of the twenty-third anniversary of the founding of Hamas. The eight page publication glorified Hamas attacks and attackers, and includes sections on Hamas weapons, operations, operatives, and more. One section is entitled, "For the First Time, Al Qassam Brigades Declared Responsibility for Six Jihadist Operations that led to the death of 15 Zionists." The publication includes a poster featuring a picture of the Merkaz HaRav shooter, Alaa Hisham Abu Dhaim, accompanied by text reading: "Ezzdeen Al-Qassam Brigades" and "Avenger of the Gaza Holocaust." It identified him as a Qassam Brigade Martyr ("The Qassmi Martyr") and noted that he "carried out al-Quds

[Jerusalem] heroic martyrdom mission." A separate text box describes "the operation by al Qassami Martyr 'Alaa abu Dhaim'." Declaration of Matthew Levitt (Levitt Decl.) ¶ 125

19.     Avraham David Moses and Naftali Shitrit were victims of a Hamas terror attack. Spitzen Decl. ¶¶ 234-237, Levitt Decl. ¶¶ 125-126.

### 3)     The August 2011 Rocket Attack Injuring Shmuel Brauner

20.     Between August 18 and August 19, 2011, Hamas and other terrorist organizations operating in the Hama controlled Gaza Strip bombarded Israeli civilian population centers with approximately 160 terrorist rockets. Spitzen Decl. ¶ 278. The rockets hit Israeli cities including Beersheva, Ashdod, Ofakim and Yavne. On August 19, Hamas or another terrorist organization operating in the Hamas controlled Gaza Strip launched a rocket into Israel which hit a synagogue in Ashdod. Plaintiff Shmuel Zev Shimon Brauner suffered severe shrapnel wounds and several others were also injured. Spitzen Decl. ¶¶ 278, 280, Declaration of Shmuel Brauner (Shmuel Brauner Decl.)

21.     The Grad rockets, which are standard rockets manufactured outside the Gaza Strip, were likely smuggled into Gaza by Iran for the use of terrorist organizations against the State of Israel. Iran was the primary weapons supplier of Grad rockets to Gaza's terrorist organizations, both during this period and prior to it. Spitzen Decl. ¶ 298

22.     The rocket barrage that was directed at civilians and communities in the State of Israel, that began on August 18, 2011 and continued for approximately one week, was carried out with the full agreement of the Hamas organization. Hamas gave a green light to other terrorist organizations in the Gaza Strip in general, and to the Popular Resistance Committees in particular, to fire dozens of rockets at civilian targets within the boundaries of the State of Israel. *Id.* ¶¶279-294

23.     During this period and to this day, Hamas was—and still is—the only authority in sole and effective control of everything that happens within the Gaza Strip. Hamas enforced its directives and authority over its activists and over the other terrorist organizations strictly, effectively, and aggressively, in such a manner that any firing began or ended on its orders. This principle has proven itself over the years since Hamas gained control of the Gaza Strip in June 2007, through the relevant period—August 2011—and up to the present day. *Id.*

24.     The November 2012 Rocket Attack Destroying the Parnas Family's Home.

25.     Between November 14 and 21, 2012, Hamas and other terrorist organizations operating in the Hamas controlled Gaza Strip bombarded Israeli civilian population centers with more than 1,506 rockets, some reaching as far as Jerusalem and Tel Aviv. The rocket fire made life unbearable for more than 3.5 million Israelis. Spitzen Decl. ¶¶ 300-301, 303-306.

26.     On November 21, 2012, the residence of Daniella Schwadron Parnass and her children, plaintiffs Noa Parnas, Dana Parnas and A.P. was hit by a rocket fired by Hamas or another terrorist group operating in Hamas controlled Gaza and sustained serious damage, including fire, water damage, broken windows and shrapnel damage. The damage was so extensive that the house was uninhabitable for approximately six months until repairs were completed. *Id.* ¶Daniella Parnass, and her children suffered psychological and emotional damage. *Id.*

27.     As the ruling entity in the Gaza Strip, Hamas has the ability to control and stop rocket fire from Gaza into Israel and is responsible for all rockets fired from Gaza into Israel. Spitzen Decl. ¶¶ 239-277, 303-306.

28.     The massive rocket attack on civilian Israeli communities from November 14 until the night of November 21, 2012 when the ceasefire went into effect was carried out mainly

by the operational terrorist wing of Hamas in cooperation with other terrorist organizations. These rocket attacks were the direct result of, and in response to, decisions and directives issued by Hamas. Id at ¶ 306.

### 5)    The Shooting and Stabbing Murder of Richard Lakin

29.    On the morning of October 13, 2015, agents and operatives of Hamas, Bilal Abu-Ghanem and Bahaa Alian, one armed with a gun and the other with a knife, boarded Jerusalem Bus number 78 and, acting on behalf of Hamas, began shooting and stabbing the passengers. Border Police officers and patrol policemen who arrived at the scene identified the terrorists and shot them, killing one terrorist, Bahaa' Muhammad Khalil Alyan, and seriously wounding the other, Bilal Omar Mahmoud Abu Ghanem. Spitzen Decl. ¶ 70

30.    Two Israelis were killed instantly and at least 16 others were wounded, among them Richard Lakin. Richard Lakin was shot in the head, and his abdomen slashed open slicing vital internal organs, cutting major blood vessels, and injuring his liver, pancreas, and spleen. The doctors placed him in a medically induced coma and on life support, in an attempt to stabilize the functioning of his injured internal organs. He remained in a medically induced coma and underwent multiple emergency surgeries during the two weeks following the attack before he died on October 27, 2015. *Id.* At 71. Declaration of Micah Lakin, (Micah Lakin Decl.) ¶¶ 1-2, 7, 10, Declaration of Manya Lakin ( Manya Lakin Decl.) ¶¶ 1,8, 11 12.

31.    The Bus 78 massacre was one of the first attacks in the 2015-2016 wave of terror in Israel, and set an example for those who perpetrated the attacks that followed. Spitzen Decl. ¶ 71. Hamas praised the attack, stating that it is "a message to anyone who harms our holy places," and calling for a continuation of "the intifadah." *Id.* At ¶ 102. Hamas further created a video

reenactment of the attack and published it on the Facebook page of one of its West Bank affiliates. *Id.* At ¶ 103.

32.    The advance planning, funds for the purchase of a weapon, statements by the terrorist to the police, his behavior and demeanor in custody, his previous incarceration as a Hamas operative, and his membership and activities in Hamas's Islamic Bloc all point to Abu Ghanem as a Hamas operative and Hamas's involvement in this attack. *Id.* At ¶ 79-103

33.    Abu Ghanem's Hamas membership was also made public after the attack in a written declaration published by "The Popular Front for the Liberation of Palestine" terror organization which stated that Abu Ghanem was a commander in the Izz al-Din al-Qassam Brigades. *Id.* At ¶ 104.

34.    Terrorist Bilal Abu Ghanem, was the terrorist who in fact shot and used a firearm during the attack. Abu Ghanem was a Hamas operative for several years prior to the massacre. He was described by the Hamas organization as a commander in the *Al-Kutla al-Islamiya* (Hamas's Islamic students' bloc) at the Al-Quds University in Abu Dis. In 2013, he was arrested, interrogated and imprisoned due to his illegal activity within the Hamas organization (the Islamic students' bloc at the university). Hamas declared him as a Hamas prisoner on its website. Spitzen Decl. at ¶ 126.

35.    Hamas, through its official spokesman, publicly praised the Bus 78 terrorists and massacre and described it as part of the wave of terror which they were encouraging. An official spokesman of Hamas issued calls to carry out further attacks similar to the Bus 78 massacre. *Id.*

36.    After the massacre, statements and pictures appeared in the Palestinian media depicting Abu Ghanem as a Hamas member, both in explicit words and in pictures, posters, and symbols that were made prominent in various publications by Hamas. *Id.*

37.     Hamas sources declared that one of the terrorists was a Hamas operative (a commander in the Islamic Bloc), effectively claiming responsibility for this attack though not saying this explicitly, in fear of Israeli retaliation and out of other considerations related to the safety and security of Hamas operatives. *Id.*

38.     Richard Lakin was the victim of a Hamas terror attack. *Id.* At ¶ 127.

### 6)     The Stabbing of Menachem Mendel Rivkin

39.     At approximately 11:00 p.m. on the night of January 27, 2016, an agent and operative of Hamas, Abada Abu Ras, arrived armed with a knife at a gas station in Givat Ze'ev just north of Jerusalem and acting on behalf of Hamas, attempted to murder Menachem Mendel Rivkin by stabbing him in the neck. Witnesses chased and subdued the terrorist. This terror attack was part of the same wave of terror attacks that plagued Israel from 2015-2016. Spitzen Decl. ¶¶ 162, 165-166.

40.     Abu Ras hails from the village of Bir Nabala near Jerusalem, a known Hamas stronghold. He is the son of senior Hamas operative, Dr. Azziz Abu Ras, who was among the founding Hamas members exiled to Marj al-Zohour, Lebanon in the early 1990's. *Id.* 172-173.

41.     Abu Ras planned this attack and declared his intentions to become a Shahid prior to the attack. *Id.* At ¶¶ 167-169, 14-175.

42.     Ubada Abu Ras's identification with the Hamas organization and its ideology were explicitly expressed on his social media pages. *Id.* At ¶ 176.

43.     On the day of the attack, January 27, 2016, a photo was posted on the Twitter account of the Hamas-affiliated PALDF web forum, depicting Ubada Abu Ras holding the green flag of Hamas. On the same day, Ubada Abu Ras posted a photo online, of a man wrapped in a keffiyeh (a traditional scarf usually worn around the head), holding a knife in his hand, and an

inscription in praise of stabbing attacks. The post also appeared on the Twitter account of the Hamas-affiliated PALDF web forum. *Id.*

44.     The fact Abu Ras and was being held for trial is consistent with Hamas taking only veiled responsibility for the attack. This is compatible with Hamas's policy not to claim explicit responsibility, when doing so might harm the organization's operatives or their families. *Id.* At ¶ 179, 36-50.

45.     Menachem Mendel Rivkin was severely injured as a result of a Hamas terror attack. *Id.* At ¶¶ 181-187.

### 7)     The Shooting of Yehuda Glick

46.     On the evening of October 29, 2014, an agent and operative of PIJ, Mu'taz Hijazi, armed with a gun, and acting on behalf of PIJ, identified Yehuda Glick as the target by name, and then shot him at point blank range outside of the Menachem Begin Heritage Center in Jerusalem where Yehuda Glick was attending a conference he had organized on behalf of the Temple Mount Foundation. The terrorist was an employee at the Center. Yehuda Glick was critically injured. Declaration of Yehuda Glick. (Yehuda Glick Decl.), Spitzen Decl. ¶¶ 316, 317, 320.

47.     Yehuda Glick is a known public activist whose activities aim to encourage Jews to visit the Temple Mount, and to realize the rights of all religions to pray at the Temple Mount. Spitzen Decl. ¶ 317.

48.     Mu'taz Hijazi, was killed in a shootout with Israeli police while attempting to avoid arrest. He had a history of terrorist activity having been released from Israeli prison in 2012 after serving 11 years for various security related offenses. *Id.* At ¶¶ 323-324.

49.     The assassination attempt on Yehuda Glick was a planned, premeditated terrorist attack. *Id.* At ¶ 325.

50.     Mu'taz Hijazi, was a known operative of the Palestinian Islamic Jihad with a long history of terrorist activity against Jews. *Id.* At ¶¶. 331-334

51.     Hijazi specifically targeted Glick, who is a symbol of the activity that encourages Jewish visits to the Temple Mount at a time when the matter of Jewish visits and prayers on the Temple Mount was the focal point of the terror wave. *Id.* At ¶ 325.

52.     Immediately after the assassination attempt on Yehuda Glick, and the killing of Mu'taz Hijazi, media outlets, Internet web sites (including web sites identified with the Palestinian Islamic Jihad), and Palestinian Islamic Jihad senior leaders—all referred to Mu'taz Hijazi as an operative of the Palestinian Islamic Jihad's operational arm, known as the Saraya al-Quds (Al-Quds Brigades). *Id.* At ¶ 335, See 331-342.

53.     PIJ openly and publicly claimed responsibility for the attack. *Id.* At ¶¶ 345-355.

54.     The assassination attempt on the life of Yehuda Glick was a planned, premeditated terrorist attack on behalf of the Palestinian Islamic Jihad organization, which claimed responsibility for the attack. The attack was executed by the terrorist Mu'taz Hijazi, an operative of the Palestinian Islamic Jihad's operational arm the Saraya al-Quds. *Id.* At ¶

**B.      Iran and MOIS's Role in Assisting Hamas in Israel**

        **a.      Iran as a State Sponsor of Terrorism**

55.     Plaintiffs' expert witness testimony concerning the assistance of Iran and MOIS to both Hamas and PIJ in Israel is compelling. From this evidence certain conclusions are clear. Iran and MOIS supported Hamas and PIJ by (1) facilitating recruitment, training and safe haven, and (2) providing financial assistance. Clawson Decl. and Levitt Decl. (DE 31, 32).

56.     Iran is now, and since 1984 has been continuously listed, on the U.S. State Department list of state sponsors of terrorism. The CIA has described Iran as "the foremost state sponsor of terrorism." Clawson Decl. at ¶ 27 (DE 32), Levitt Decl. at ¶ 58. (DE 31).

57.     It has been well-documented for decades that Iran has provided funding, weapons, and training for terrorism operations targeting United States and Israeli citizens, which has included support for Hamas and Palestinian Islamic Jihad ("PIJ"). *Id.* at ¶¶ 30-31 (DE 32); Levitt Decl. at ¶ 30. (DE 31).

58.     The MOIS, Iran's foreign and domestic intelligence service, is one of the principal organizations Iran has used to carry out its terrorist support activities. Clawson Decl. at ¶ 22. (DE 32).

59.     In providing support to Hamas and other terrorist groups, the MOIS acts as a ministry of the Iranian government whose activities are tightly and carefully controlled by the Iranian government through Iran's Supreme Leader and his representatives. The terrorism training provided to Hamas and other terrorist groups by the MOIS is an official policy of the Iranian government. *Id.* at ¶ 26.

60.     Iran supports anti-Israel terrorism of all sorts. In addition to its support for Hamas and PIJ, Iran has also offered to support unaffiliated individuals—sometimes referred to as "lone wolves"—who attack Israeli-related targets. For example, in February 2016, Iran's ambassador to Lebanon Mohammad Fathali promised to provide financial support to those killed attacking Israelis, stating: "The decision firstly includes giving an amount worth $7,000 (£5,028) to every family of a martyr of the intifada in Jerusalem." *Id.* at ¶ 28.

61.     U.S. State Department annual reports on terrorism frequently refer to Iran's role as a sponsor of terrorism and to its support for the terrorist organizations Hamas and PIJ. *Id.* at ¶ 27.

### b.     Iranian Support for Hamas

62.     The Islamic Resistance Movement (Arabic: Harakat al-Muqawama al-Islamiya), known by the Arabic acronym "Hamas," is a terrorist organization established in December 1987 by Palestinian Sunni Islamist militants opposing the establishment and existence of Israel. The organizing principle of Hamas was advocacy of terrorist attacks on Israeli civilians, with the goal of eliminating the State of Israel and establishing an Islamist state in all the territory that comprises Israel, the West Bank, and the Gaza Strip. *Id.* at ¶¶ 31-32; Levitt Decl. at ¶¶ 19-21. (DE 31).

63.     Hamas employs a three-pronged strategy to achieve this goal: (a) social welfare activity that builds grassroots support for the organization; (b) political activity that competes with the secular Palestinian Authority ("PA"), and (c) guerilla and terrorist attacks that target Israeli soldiers and civilians. *Id.*

64.     Since its founding, Hamas has committed countless acts of violence against both military and civilian targets, including bombings, suicide operations, and rocket and mortar attacks directed at Israeli civilian population centers, kidnappings, shooting attacks, stabbing attacks, and car ramming attacks. Hamas terror attacks are indiscriminate in nature because they are intended to terrorize not only the targeted individuals but the general Israeli population and to obtain concessions from the Israeli government. As such, Hamas attacks have killed innocent civilians from around the world, including civilians from the United States, the United Kingdom, Ukraine, Romania, China, among other nationalities. Hamas has purposely targeted many busy

civilian venues, including buses, bus and light rail stops, discotheques, restaurants, markets, universities, and even a hotel hosting a Passover Seder. *Id.* at ¶¶ 22-24.

65. From 2008 through early 2016, Gaza-based Palestinian terrorist groups, including Hamas, fired over 8,500 rockets into Israel. This rocket fire has been indiscriminate, targeting Israeli Jews and Arabs, foreign workers, and tourists alike. *Id.* at ¶¶ 25-26.

66. Hamas also carries out kidnapping operations for the express purpose of using the victim as leverage in prisoner swaps. *Id.* at ¶ 28.

67. Hamas also employs and inspires vehicular attacks and in addition to terror attacks it carries out itself, Hamas also actively calls for and incites others to commit violent acts. Hamas celebrates and praises attacks against Israel. *Id.* at ¶¶ 29, 39-40.

68. Hamas was named by the State Department as a Designated Foreign Terrorist Organization in the original list of such groups issued October 8, 1997. Clawson Decl. at ¶ 63. (DE 32).

69. Iran's relationship with Hamas has waxed and waned over the years, but Iran never cut off all its support for Hamas even when the relationship was cool, and when the relationship was warm, Iran provided Hamas substantial financial and military support. *Id.* at ¶ 33.

70. Without the significant funding it needs to carry out its terrorist, political, and social activities—which are interdependent and mutually reinforcing endeavors—Hamas could not function. Iran plays a critical role in funding, providing material support, arming, and training Hamas operatives. In addition to operational, social support infrastructure, and other expenses, Hamas also invests significant amounts of money in its radicalization and incitement campaigns. For example, Hamas runs summer camps training children in violence against

Israelis, produces radical textbooks, and operates media production companies and television channels that broadcast constant incitement against Israel. Levitt Decl. at ¶¶ 41, 42-48. (DE 31).

71.     Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to sustain the pace of such operations and provide legitimacy to acts of terrorism. *Id.* at ¶¶ 49-53.

72.     From about 1993 until the late 1990s, Iran and Hamas became very close as a result of Hamas' willingness to perpetrate terrorist activities and bus bombings. Iran urgently desired to disrupt the Middle East peace process, which appeared to be moving forward at the time, and Iran considered terrorist activities a way to do so. Therefore, Iran strongly and publicly encouraged Hamas to carry out such activities. Throughout this period, Hamas operatives received military training in Iran. Clawson Decl. at ¶ 34.

73.     During this time, Iran gave Hamas millions of dollars, in addition to the hundreds of millions of dollars that Iran spent supporting other terrorist groups. The money, among other things, supported Hamas' terrorist activities, for example, by bringing Hamas into contact with potential terrorist recruits and by providing legitimate front activities behind which Hamas could hide its terrorist activities. Iran typically paid generously for "results," which Hamas provided by committing numerous bombings during this time. *Id.* at ¶ 38.

74.     U.S. Courts have concluded that "Iran provides ongoing terrorist training and economic assistance to Hamas," and found that Iran has "provided material support and resources to Hamas and its operatives, for the specific purpose of carrying out acts of extrajudicial killing." Levitt Decl. at ¶ 67.

75.     The Iran-Hamas relationship cooled for a brief time, but deepened again in 2002. Clawson Decl. at ¶ 39.

76.     In July 2003, the Israeli Ministry of Foreign Affairs estimated that Iran provided Hamas with $3 million a year. *Id.* at ¶ 40; Levitt Decl. at ¶ 59.

77.     With a fall-off in Hamas terrorist activities largely due to a fierce Israeli campaign against Hamas, the Iran-Hamas relationship cooled briefly after 2003, but warmed again within a few years. In December 2005, Hamas' leader Khaled Mashal visited Tehran. *Id.* at ¶ 41.

78.     Iranian support, finances, and arms rose exponentially after Hamas won a plurality in the Palestinian parliament in 2006, and Iran reportedly pledged $250 million to Hamas's Prime Minister Ismail Haniya in 2006 and 2007. Although Egyptian authorities reportedly confiscated some of these funds, large sums of Iranian money flowed into the Gaza Strip earmarked for Hamas. *Id.* at ¶ 42.

79.     In November 2006, Israel's UN Ambassador reported that Iran had contributed $120 million to Hamas, and that 30 tons of weaponry had been smuggled into Gaza in just the past month. Levitt Decl. at ¶ 68.

80.     The Iran-Hamas relationship grew even closer after Hamas took complete control of the Gaza Strip in a 2007 coup, with Iran providing more money, arms, and training to Hamas. Clawson Decl. at ¶¶ 43-45.

81.     Iran's provision of substantial military training, arms, and money to Hamas continued throughout 2008 and 2009. Hamas personnel received extensive training in Iran, and many mortar shells and rockets fired by Hamas at Israel during 2008 were designed and manufacture by Iran. *Id.* at ¶¶ 45-47.

82.     In May 2008, Iran reportedly decided to increase its financial support for Hamas to $150 million for the second half of 2008. In early 2008, Hamas agreed to a ceasefire with Israel, during which time many reports suggest that smuggling—including arms smuggling—by tunnels from Egypt into Hamas-controlled Gaza increased substantially. *Id.* at ¶ 48.

83.     By December 2008, Hamas resumed terror attacks on Israeli civilians. Sharp Israeli retaliation turned into a substantial three-week military confrontation in late December 2008 and early January 2009. Soon after a ceasefire was arranged, Hamas leader Khaled Mashal visited Tehran in February 2009 and thanked Iran for its support during the conflict, calling Iran a "partner in victory." *Id.* at ¶ 49; Levitt Decl. at ¶ 54.

84.     As part of its weapons supply activities, Iran smuggled weapons through Sudan and Egypt, and Iran designed and provided Hamas rockets that could be fit through tunnels used to smuggle goods from Egypt into Gaza. Clawson Decl. at ¶¶ 50-52.

85.     The Lebanese-Hezbollah movement is another important intermediary Iran uses for smuggling arms into Gaza. *Id.* at ¶ 54.

86.     In 2010, the seizure by Cyprus of a ship carrying munitions led a UN Security Council committee to conclude that Iran had violated a Security Council ban on Iranian arms exports. In March 2011, the Israeli Navy intercepted a ship headed towards Egypt laden with more than 50 tons of weapons from Iran, including advanced anti-ship missiles, mortars, tens of thousands of rounds of ammunition for Kalashnikovs, and instruction manuals in the Persian language. The military supplies and weapons on these ships were believed to be destined to supply terror groups in Gaza to be used against Israel. *Id.* at ¶ 53; Levitt Decl. at ¶ 71.

87.     Iran's support for Hamas, including military support and weapons training, continued unabated in 2011. Clawson Decl. at ¶ 54.

88.     The Iran-Hamas relationship went through a rough spot in 2012, but Iranian funding for Hamas never completely stopped, particularly for Hamas's military wing. *Id.* at ¶ 55; Levitt Decl. at ¶¶ 73-74, 81-83.

89.     The Iran Hamas relationship improved during Hamas-Israel fighting in November 2012, and Iranian and Hamas officials became much blunter about Iranian support for Hamas rocket attacks on Israel. Clawson Decl. at ¶ 55.

90.     In November 2012, Iranian Parliament Speaker Ali Larijani told reporters: "We proudly say we support the Palestinians, militarily and financially." IRGC commander Mohammad Ali Jafari proclaimed that missile technology "has been transferred to the resistance, and an unlimited number of these missiles are being built." On November 21, Hamas Political Bureau Chairman Khaled Mashal thanked Iran for "arms and funding." *Id.*; Levitt Decl. at ¶ 72.

91.     The Iran-Hamas relationship improved further after the Egyptian military's July 2013 overthrow of the Morsi government which had been close to Hamas, leaving Hamas quite dependent on Iranian aid. Clawson Decl. at ¶ 57.

92.     Hamas-Iran relations were further strengthened in the course of 2014 as Hamas stepped up its terror activities. After Hamas's June 12, 2014 kidnap and murder of three teenagers including Naftali Fraenkel, Hamas rocket attacks and Israeli air strikes escalated into an Israeli invasion of Gaza that lasted from July 8 until August 26. Iran issued statements strongly supporting Hamas' activities during this time and in the aftermath. On September 29, 2014, Major General Ghola Ali Rashid of Iran's Armed Forces General Staff Headquarters stated: "Today some of our commanders are providing advisory assistance to Iraq and its army, in addition to the resistance in Lebanon, Hezbollah, and the Palestinian resistance movement." Iran's Supreme Leader Khamenei stated on November 25, 2014: "The Islamic Republic of Iran,

with divine grace, has not become prisoner of sectarian limitations and divisions. Just as it aids Shi'a Hizbollah in Lebanon, it aids Hamas and Islamic Jihad [PIJ] and other Sunni groups in Palestine." *Id.* at ¶ 58.

93.     On December 14, 2014, Abu Obeida, the spokesman for Hamas' military wing, the Izz ad-Din al-Qassam Brigades, expressed his thanks to Iran for supporting Hamas with money and weapons and providing it with rockets and anti-tank missiles. *Id.* at ¶ 59; Levitt Decl. at ¶ 57.

94.     In 2015, the Hamas-Iran relationship was strained as Iran's relationship with the oil-rich monarchies of the Persian Gulf deteriorated during that year. However, that by no means meant an end to Iranian material support for Hamas, which reportedly included tens of millions of dollars transferred to Hamas's Izz al-Din al-Qassam Brigades, training, military diving gear, advanced weaponry and electronic equipment. *Id.* at 87-88; Clawson Decl. at ¶ 60.

95.     Quite a few Hamas officials visited Tehran in 2017. The high point was an October 2017 visit by a Hamas delegation led by Hamas Political Bureau deputy head, Saleh Al Arouri, which met with Iranian Parliament Speaker Ali Larijani, Iran's Supreme National Security Council Secretary Admiral Ali Shamkhani, and Advisor to the Leader of the Islamic Revolution in Iran, Ali Akbar Velayati. Velayati stated: "We are proud of supporting the Palestinian resistance and Hamas Movement. The Iranian leadership and our people will continue to support the resistance led by Hamas and Islamic Jihad [PIJ]." *Id.*

96.     The Court accepts and adopts Dr. Clawson's expert opinion that Iran has supplied substantial material support to Hamas, including in the period 2008-2017. *Id.* at ¶ 61.

## C.     Iranian Support for PIJ

97.     PIJ was founded about 1981 by two Gaza residents who greatly admired the Iranian revolution, Fathi Shiqaqi and Abd al-Aziz Awda. PIJ's determination to attack Israelis helped it secure Iranian financial and material support. After the PIJ's leadership in was arrested in 1986-1987 and transferred to Lebanon, they came into direct contact with Iranian officials and formed close relations with the Iranian Revolutionary Guard and the Iranian-directed Hezbollah in Lebanon, and from this time PIJ increasingly adopted the use of terrorist actions, including suicide bombings, to promote its cause. These relations continued after PIJ moved its headquarters to Damascus in 1989, where it remains to this day. *Id.* at ¶ 62; Levitt Decl. at ¶¶ 90-94.

98.     PIJ operatives began training at Hezbollah camps in Lebanon under the supervision of Iranian Revolutionary Guards, and carried out some joint operations with Hezbollah against Israeli forces in south Lebanon in the 1990s. PIJ had soon established itself as one of the most violent and fundamentalist of all the Palestinian rejectionist groups. *Id.* at ¶¶ 95-96.

99.     After the 1993 Palestinian-Israeli deal under which most of Gaza was largely under the control of the Palestinian Authority, Iran stepped up its support for PIJ, providing millions of dollars for each attack on Israel. Clawson Decl. at ¶ 62.

100.     As early as 1993, PIJ leader Shiqaqi acknowledged that he received money and support from Iran, and that "the money and arms" were then channeled to operatives in Gaza and the West Bank. Levitt Decl. at ¶ 110. PIJ is widely recognized as a terrorist group and is known for executing terrorist attacks targeting Israeli civilians. The U.S. Treasury Department designated PIJ as a Specially Designated Terrorist ("SDT") in 1995, and the U.S. State

Department designated the group as a Foreign Terrorist Organization ("FTO") in 1997. *Id.* at ¶¶ 101, 107; Clawson Decl. at ¶ 63.

101.    While there was a dramatic drop-off in PIJ attacks in the late 1990s after the assassination of PIJ leader Shiqaqi, PIJ attacks picked up sharply with the beginning of the second Palestinian uprising in September 2000 and after the release of key PIJ operatives from jail in 2000 and 2001. For example, from September 2002 until October 2003, more than 440 terrorist attacks (including suicide bombings and other attacks) were attributed to PIJ, killing over 130 Israelis and wounding about 880 more. PIJ has carried out many more deadly terrorist attacks since that time. Levitt Decl. at ¶¶ 100-103, 109.

102.    According to American officials, Iran began paying PIJ millions of dollars in cash bonuses for each attack against Israel during the second Intifada that began in September 2000. *Id.* at ¶ 111.

103.    PIJ concentrates almost exclusively on terror attacks against Israel. PIJ has never been successful at raising substantial support in Gaza, and has long been seen in Gaza as being fully controlled by Iran. Clawson Decl. at ¶ 64.

104.    Since PIJ had no responsibilities for governing, it did not worry about Israeli retaliation for rocket attacks. PIJ was eager to launch rockets to show that it, unlike Hamas, was actively attacking Israel. What constrained PIJ from rocket launching was Hamas' crackdown if PIJ acted without a Hamas approval—Hamas did not want to take the blame, in the eyes of Gazans, for Israeli retaliation. The result was that Hamas would allow PIJ to act only during periods of active confrontation between Hamas and Israel. This is what happened in April 2008 (216 rockets launched, not all of which reached Israel), March 2012 (about 200), March 2014 (at

least 130), and most especially July-August 2014, when PIJ claimed it launched 3,000 rockets. *Id.* at ¶ 65.

105.    As the Iranian-Hamas relationship declined somewhat in the wake of the Syrian civil war in 2011, Iran increased its support to the PIJ. Levitt Decl. at ¶ 112.

106.    In November 2012, PIJ spokesman Daud Shihad stated on the Lebanese pro-Iranian channel Al Mayaden: "It is no secret that we say that the military assistance that Iran has provided to the Palestinian resistance, from A to Z, from a rifle round to a rocket, is assistance from the Islamic Republic." PIJ Secretary-General Ramadan Abdullah told Al Jazeera television: "Iran has given us all the support, the arms that serve the resistance—all the world knows that its principal source is Iran, or weaponry that has arrived with Iranian financing… weapons that have reached the [Gaza] Strip arrived via Egypt of today or of former times, and this will continue for the future too." *Id.* at ¶ 66.

107.    In May 2013, Shihad told al-Monitor: "All of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ…everyone knows that Iran is financing us." He added that "the largest share" of financial and military support to Palestinian terror groups was coming from Iran. Levitt Decl. at ¶ 113.

108.    The U.S. State Department reported in 2013 that Iran is the primary sponsor of weapons and funding to the PIJ. *Id.* at 30. PIJ leaders frequently visited Tehran, where they met top Iranian officials. For example, on February 5-6, 2014, PIJ leader Ramadan Abdullah met with Iranian President Hassan Rouhani, Iranian Foreign Minister Javid Zarif, and Iranian Parliament Speaker Ali Larijani. *Id.* at ¶ 114; Clawson Decl. at ¶ 68.

109.    PIJ was also actively trying to extend its activities to the West Bank. That became particularly important for PIJ after the Israeli-Hamas Gaza ceasefire in August 2014. At that

time, Iranian Brigadier General Mohammad Reza Naqdi, commander of Iran's Basij force confirmed that "arming the West Bank has started and weapons will be supplied to the people of this region." This was the context for the October 29, 2014 terrorist shooting of Yehuda Glick in Jerusalem by Moataz Haejazi, whom PIJ claimed was a member of the group. *Id.* at ¶ 67; Levitt Decl. at ¶ 115.

110.    On October 14-20, 2014, just a few weeks before the terrorist shooting of Yehuda Glick in Jerusalem, PIJ leader Abdullah met Iran's Supreme Leader Ali Khamenei, who according to the official Iranian Press TV, "once again emphasized the necessity for planning to provide the West Bank of River Jordan with the necessary equipment to counter the occupying regime of Israel." Palestinians consider Jerusalem to be in the West Bank. PIJ leader Abdullah also met Iran's Supreme National Security Council Secretary Ali Shamkhani, who pledged: "Rebuilding Gaza and improving its defense capabilities…are on Iran's agenda." Abdullah also met former Iranian president and Expediency Council Chairman Ali Akbar Hashemi Rafsanjani, who told him: 'If you want Israel to fall to its knees of its own, then you have to plan new steps that will take them by surprise." Clawson Decl. at ¶ 68.

111.    In 2015, Iran and PIJ had a tense moment as PIJ refused Iran's request to condemn Saudi Arabia for its intervention in Yemen, but they soon patched up relations. During May 1-6, 2016, PIJ leader Abdullah saw Iran's defense minister, foreign minister, president, and Supreme Leader in Tehran. On December 15, 2016, Abdullah once again saw the Iranian Supreme Leader, with each pledging their commitment to "resistance" as the only route for Gaza. *Id.* at ¶ 69.

112.    The Court accepts and adopts Dr. Clawson's expert opinion that Iran has supplied substantial material support to PIJ, including in the period 2014-2016. *Id.* at ¶ 70.

113.    The Court also accepts and adopts Dr. Levitt's expert opinion stated as follows:

Over the course of many years, Iran has provided significant financial and material support to both Hamas and PIJ, among other groups, without which neither group could have carried the kind of sophisticated and effective terrorist attacks for which they have become known. This support enables these groups to carry out a wide range of attacks from shootings and stabbings and bombings, to kidnappings and car ramming's and rocket attacks. These attacks sometimes target soldiers but often civilians, in an effort to terrorize the Israeli population and seek the establishment of an Islamic state in the place of Israel. While Iranian support for Hamas and PIJ has fluctuated, it has never fully ceased. Without Iran's support—including funding, weapons and more—groups like Hamas and PIJ would never be able to carry out the scale and scope of incitement and terrorism for which they have become famous. Levitt Decl. at ¶ 128. Without the significant funding it needs to carry out its terrorist, political, and social activities—which are interdependent and mutually reinforcing endeavors—Hamas could not function. Iran plays a critical role in funding, providing material support, arming, and training Hamas operatives. In addition to operational, social support infrastructure, and other expenses, Hamas also invests significant amounts of money in its radicalization and incitement campaigns. For example, Hamas runs summer camps training children in violence against Israelis, produces radical textbooks, and operates media production companies and television channels that broadcast constant incitement against Israel. Levitt Decl. at ¶¶ 41, 42-48. (DE 31).

## D.    Impact of FSIA Terrorism Judgments Against Iran

114.    Despite the fact that Iranian leaders pay close attention to civil terrorism suits, Iran has so far not been dissuaded from providing financial support for terrorism. Nevertheless,

the financial pressure of past court judgments remains an element in Iran's calculation about whether and how to support terrorism. *Id.* at ¶¶ 71-74.

115. Iran has recently taken a more active stance in some terrorism-related cases. After years in which Iran has not contested such actions, Iran has engaged lawyers in several recent suits. Even so, Iran has not decreased its support for terrorism, but has dramatically increased and widened its support for terrorists, terrorist organizations, and terrorist activities throughout the world. Iran is blatant in its support of terrorism. *Id.* at ¶¶ 75-80.

116. Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they generally assume that whatever is written about Iran reflects a unified government policy of the country from which a comment originates. Iranian officials have shown themselves to be sensitive to the damages levied against Iran, and they are well aware that such damages have been a common feature in actions against Iran for its support of terrorism against Americans. *Id.* at ¶ 81.

117. Were this Court not to impose damages for a spectacular terrorist act, Iranian government officials would interpret that as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans. *Id.*

118. On the other hand, were this Court to impose substantial damages, Iranian officials would interpret that as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans. *Id.*

**E.      Syria's Role in Assisting Hamas in Israel**

**a.      Syria's Support for Hamas**

119. Plaintiffs' expert witness testimony concerning Syria's assistance to Hamas in Israel is also compelling. From this evidence certain conclusions are clear. Syria has supported

Hamas by (1) facilitating the recruitment and training of Hamas, providing a safe haven and affording political credibility, and (2) providing financial assistance.

120.    Syria's relationship with Hamas has been useful to Syria in asserting its role as the 'champion of Palestinian resistance.' Syria was aligned with Hamas in opposing the Oslo Accords. Thus Syria intensified its support for Hamas, particularly for engagement in terrorism, with the view that terrorism would help Syria fight the peace process and manipulate its own peace negotiations with Israel. The tactic of terrorism had the dual goal of harming Israel and its citizens and undermining the Palestinian Authority's influence among Palestinians. By leveraging Pan-Arab and anti-Israeli sentiments along with championing Palestinian rights, Syria was able to gain regional status and legitimacy. Declaration of Benedetta ("Berti Decl.") ¶¶ 18-23. (DE 29), Declaration of Marius Deeb ("Deeb Decl.") ¶17 (DE 30).

121.    After 1993, Syria also became the de facto political and communication base of all the main factions—secular and religious—that opposed Fatah and the Oslo Accords. Syria sponsored the creation of the Alliance of Palestinian Forces (APF), an umbrella group that included ten anti-Oslo factions, Hamas and the PIJ being the two Islamist, non-secular members. Berti Decl. at ¶ 24.

122.    Syria's relationship with Hamas developed in the early 1990s when Hamas opened an office in Damascus. Its military wing, known as the Izsz al-Din al-Qassam Brigades established an operational headquarters. Hamas military leaders in Syria worked closely with Syrian intelligence. Hamas gradually boosted its presence in Syria, a process that culminated in Hamas' decision to move its Political Bureau to Damascus in 2000. The relationship grew throughout the 2000s, becoming even stronger after Hamas' takeover of the Gaza strip in 2007. *Id.* At ¶ 25, 27.

123.    From 2000-2012 the safe haven provided by Syria to the Hamas and its senior leadership strengthened it as an organization. The leader of Hamas, Khalid Mash'Al moved permanently to Damascus in 2003 and Syria provided Hamas with a safe base from which to conduct its foreign relations, communicate to the world, host its military leaders and at times plan its violent operations and fundraise. It was a center for Hamas's terrorist functions –from strategic planning to command and control. In no other regional capital has Hamas had so much freedom to maneuver. In fact the Syrian government facilitated the group's political role organizing, for example, meetings in Damascus with Iranian President Mohammad Khatami and other high level Iranian officials. Id at. 28, Deeb Decl. at ¶15, 18, Berti Decl. at ¶ 47.

124.    The support which Syrian provided to Hamas, by giving the organization and its leaders safe haven, allowing it to operate its military headquarters in Damascus and giving it access to other resources such as unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy proved significant for the terror organization's overall operational infrastructure. Hamas's external leadership based in Damascus grew so powerful that it was able to control and direct operational decisions. The resources provided by Syria enable Hamas to develop into a more sophisticated organization. *Id.* at ¶ 19.

125.    Damascus provided safe operational space to not only Khaled Mash'al, but to Musa Abu Marzouq , and Imad al-Alami, another of Hamas's historical leaders who, from Damascus oversaw Hamas's relationship with external allies, including Iran and Syria as well as military activities. To put this in perspective, these individuals were all designated as Specially Designated Global Terrorists (SDGTs) in 2003 by the United States Department of the Treasury. The fact that three out of the top six Hamas figures so designated in 2003 were based in

Damascus is powerful evidence of how central Syria was in terms of providing safe haven for Hamas. *Id.* at 15, Berti Decl. at 34 (3).

126.    Syria's support for Hamas, including the safe haven it provided and the unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy was also a factor in the success of Hamas terrorist operations during the Second Intifada which was launched in September of 2000. At its peak, between 2001 and 2001 some of the most lethal suicide attacks against restaurants, night clubs and Universities in Israel were linked to operatives residing in Syria. *Id.* at 20, Berti Decl. at ¶ 41.

127.    In the years after the end of the Second Intifada in 2005, and despite the dismantling of all Israeli communities in Gaza, Hamas continued its terrorist activities against Israel. Decisions at the highest level, concerning both military and political activities, including armed operations in the West Bank were directed from its Damascus headquarters. This included, orchestrating the kidnapping of Israeli soldier Gilad Schalit in 2006, orchestrating the Hamas takeover of Gaza in 2007, and the provocation that led to the 2008-2009 conflict in Gaza. During the war, all Syrian cell phones received continuous updates calling for their support as if it was a surrogate Syrian war. In January, 2010, Hamas leader Khalid Mash'al delivered a speech in Beirut in which he stated that it was Syrian support during that conflict that made it possible for Hamas to win the war. *Id.* at ¶ 21.

128.    Military activities planned and organized from Damascus were not forcefully or systematically cracked down by the Syrian regime. To the contrary, Syria remained supportive of Hamas's militant activities. Berti Decl. at ¶ 45.

129.    Syria has served as a conduit to channel money to finance Hamas's military operations and terrorist attacks. As an example, Jamal Muhammad Farah al-Tawil—Hamas

military commander in the West Bank—is reported to have received money for the group's attacks from Hamas leaders in both Damascus and Beirut. They were reportedly transferred through the ad-hoc charity the Al-Islah Charitable Society. *Id.* at ¶ 52.

130.   Weapons shipments originating from Iran are reported to have been transferred on several occasions through Syria (and from there to Gaza, passing through Sudan/Sinai)—with Syria being a key channel through which to smuggle and obtain weapons. Hamas's rocket and missile arsenal has grown through the use of parts thought to originate in Syria or Iran and smuggled in through tunnels from Egypt. *Id.* at ¶ 53-54.

131.   Syrian support waned starting in 2012 when Hamas's support for rebel forces in the Syrian civil war caused a rift between Hamas and Syria. Deeb Decl. ¶ 22, Berti Decl. ¶ 56.

106.   Despite this, Hamas continues to enjoy the benefits of Syria's widespread support it received prior to 2012. The substantial organizational support, military and terrorist capabilities, strategies and training Syria provided to Hamas strengthened and legitimized the group while helping it to develop into a major player in the Palestinian political and military scene. Hamas's capabilities as they stand today are a product of the past support given by the Syrian regime. Syrian support was a major force multiplier for Hamas. Hamas continues to benefit from the effects of this support to this day. Deeb Decl. ¶¶ 22-24, Berti Decl. ¶¶ 59-60.

132.   The tactical know-how which Hamas gained while under Syrian protection is directly responsible for the Hamas terrorist attacks we see today. Deeb Decl. ¶ 24.

133.   The effects of Syria's support for Hamas will continue to be relevant for years to come. Berti Decl. ¶ 60.

134.   The Court accepts and adopts Dr. Berti's expert opinion that Syria has supplied substantial material support to Hamas, and that the continuous support which Syria provided to

Hamas in the previous years contributed to giving the group the military edge and sophistication it needed to be able to carry out successful violent operations to this day. "In plain terms, without Syria's significant support, Hamas would not be the powerful, deadly organization it is today." Berti Decl. ¶ 66.

135.    The court also accepts and adopts Dr. Deeb's expert opinion that the tactical know how which Hamas gained while under Syrian protection is directly responsible for the Hamas terrorist attacks we see today. The terrorist operations at issue in this case were all possible because of this Syrian role. Deeb Decl. ¶ 25.

**b.    Syrian Support for PIJ**

136.    PIJ was formed in 1981, founded by Fathi Shaqaqi and Abd al Aziz Awda who were influenced by the ideology of the Islamic Revolution in Iran led by al-Khomeni. PIJ was established from the Gaza strip to serve as a revolutionary Islamist vanguard organization focused on armed struggle against Israel and dedicated to the "Liberation of Palestine. Deeb Dec. ¶26, Berti Decl. ¶ 30.

137.    Syria offered assistance to the Palestinian Islamic Jihad (PIJ, or Harakat al-Jihad al-Islami fi-Filastin, literally the Movement of the Islamic Jihad in Palestine). Like Hamas, PIJ is also a designated Foreign Terrorist Organization (FTO) in the United States and its current leader, Ramadan Shalah (Ramadan Abdullah Shallah), is a "Specially Designated Terrorist" under US legislation. *Id.* At ¶ 29.

138.    After PIJ's leader Fathi Shaqaqi's deportation from Gaza to Lebanon in 1988, the group's leader invested in boosting PIJ's presence in both Lebanon and Syria, where the Islamic Jihad established a Damascus-based office in 1989, in the process increasing contacts with both

the Iranian and Syrian governments. Since then, the group has maintained a permanent base in Syria, with Damascus serving important political and operational functions. *Id.* at 32.

139.    Syria's support for Hamas and PIJ over an extended period of time has been significant on a number of levels. After 1993 PIJ moved its main headquarters outside of the Palestinian Territories to Damascus and the group's senior leadership chose the Syrian capital as its base. For example, founder Fathi Shaqaqi himself was based in Syria in the years between the late 1980s/early 1990s and his death in November 1995. After Shaqaqi's assassination, Ramadan Shalah took over the leadership of the organization, in the process leaving the United States to take up residence in Damascus. *Id.* At ¶ 35.

140.    Syria has been a safe base for PIJ allowing the group's leadership in Damascus to meet with its counterparts based in the West Bank and Gaza in order to discuss political and strategic matters. *Id.* At ¶ 36.

141.    The advantage of this safe haven extends beyond granting Hamas and the Palestinian Islamic Jihad the physical premises from which to operate. By hosting these groups, Syria offered symbolic validation, political support, legitimacy and freedom of maneuver, all of which enabled PIJ and Hamas to grow and develop, to boost regional status and credibility, as well as to increase their military capabilities and solidify themselves as major players in the Palestinian arena. *Id.* At ¶ 37.

142.    PIJ leadership conducted a vast array of communication, political, fundraising, and operational activities from Damascus. For example, in a 2005 Press Statement, the US Department of Treasury stated: "According to a significant volume of information available to the U.S. Government, PIJ leadership in Damascus, Syria controls all PIJ officials, activists and terrorists in the West Bank and Gaza." *Id.* At ¶ 44.

143.    Planning and coordination between Hamas, PIJ and other factions occurred in Damascus, then trickled down at the ground level in Gaza and the West Bank, with the objective of increasing the coordination of these groups' attacks and other armed activities. During the Second Intifada, senior PIJ operatives arrested in the West Bank by Israeli Defense Forces— including Taabat Mardawi and Ali Saffuri—were directly linked to PIJ's leadership in Damascus, reportedly receiving operational directions and, at times, funds from the Syria-based leaders. *Id.*

144.    Damascus's support for PIJ enabled its armed capabilities and activities as well. *Id.* At ¶ 51.

145.    PIJ's positive relationship with Damascus continues to this day. While the Syrian regime's involvement in a protracted and bloody internal conflict has limited the degree of support that the state is able to offer to PIJ, the Palestinian Islamic Jihad has not formally distanced itself from Syria since the beginning of the 2011 Syrian revolution and the group has repeatedly denied to plan to either sever ties or move its headquarters out of Damascus. Likewise, despite repeated international appeals, the Syrian government has never taken permanent steps to oust PIJ. *Id.* At ¶ 57.

146.    The evidence shows that at the time of the October 29, 2014 terrorist attack where Yehuda Glick was critically injured, the PIJ was sheltered and headquartered in Syria with the consent of the Syrian government. Berti Decl. ¶¶ 44, 57.

# III.

# CONCLUSIONS OF LAW

## A.      Burden of Proof

147.    The FSIA specifies that a court cannot enter a default judgment against a foreign state, or a political subdivision thereof, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[2] Section 1608(e) provides protection to foreign states from unfounded default judgments rendered solely upon a procedural default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950-51 (11th Cir. 1996).

148.    For a plaintiff to prevail in a FSIA default proceeding, the plaintiff must present a legally sufficient prima facie case, *i.e.*, "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 98 (D.D.C. 2002). Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). In evaluating the plaintiff's proofs, a court may "accept as true the plaintiff's uncontroverted evidence," *Estate of Botvin v. Islamic Republic of*

---

[2] This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d). Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfied the court."); *see also Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (a FSIA default winner must prove damages like any other default winner).

*Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007); *see also Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000), and a plaintiff may establish proof by affidavit. *See Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). While a plaintiff needs to demonstrate a prima facie case to obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages by clear and convincing evidence. *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 48 (D.D.C. 2003).

149.    Thus, to prevail on their FSIA claims, Plaintiffs must demonstrate a prima facie case of liability. With regard to their claims for punitive damages, Plaintiffs must present clear and convincing evidence. By their failure to appear and defend themselves, Iran, MOIS, and Syria put themselves at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to the Court to prove its allegations. In fact, the Court finds that Plaintiffs have presented satisfactory evidence to prove liability and damages, including punitive damages against all three Defendants.

## B.    Service

150.    Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) provides for service on a foreign state and subsection (b) provides for service on an agency or instrumentality of a foreign state. To determine whether a foreign entity should be treated as the state itself or as an agency or instrumentality, courts apply the core functions test: if the core functions of the entity are governmental, it is treated as the state itself; and if the core functions are commercial, it is treated as an agency or instrumentality. *Roeder*, 333 F.3d at 234.

151.    In this case, service upon all Defendants was perfected under § 1608(a), which governs service on foreign states.[3] Obviously, Iran and Syria are foreign states. MOIS is considered to be the foreign state itself because its core functions are governmental, not commercial. *See Roeder*, 333 F.3d at 234.

## C.    Jurisdiction

152.    The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in *the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428,* 443 (1989). Accordingly, this Court lacks jurisdiction over Iran, MOIS, and Syria unless one of the FSIA's enumerated exceptions applies. Here, the state-sponsored terrorism exception to sovereign immunity applies. 28 U.S.C. § 1605A(a). Additionally, the FSIA was amended in 2008 to provide a private cause of action by which a foreign state that sponsors terrorism can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages. *Id.* § 1605A(c).

153.    Section 1605A(a) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death that:

> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

---

[3] Service upon Syria was accomplished via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into Arabic) to its agent via international courier service, evidenced by a return-receipt dated November 14, 2016. (DE 20 ) Service upon Iran and MOIS was accomplished via 28 U.S.C. § 1608(a)(4) through diplomatic channels on July 19, 2017. The diplomatic notes provide appropriate proof of service as to both Iran and MOIS. (DE 20).

28 U.S.C. § 1605A(a)(1). A U.S. court will hear a claim under FSIA if: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act"; (2) "the claimant or the victim was, at the time the act . . . occurred" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment"; and (3) if the act occurred in the foreign state against which the claim has been brought, the foreign state has been afforded "a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." *Id.* § 1605A(a)(2)(A).

154.    Section 1605A(c) also provides a private right of action to recover damages for state-sponsored terrorism:

> Private Right of Action.—A foreign state that is or was a state sponsor of terrorism . . . shall be liable to—
>
> (1) a national of the United States,
>
> (2) a member of the armed forces,
>
> (3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
>
> (4) the legal representative of a person described in paragraph (1), (2), or (3),
>
> for personal injury or death caused by acts described in subsection (a)(1) [i.e., the provision of material support or resources for hostage taking, torture, or extrajudicial killing] . . . . In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c). For persons covered by the private right of action in § 1605A(c) state law claims are not actionable.

155.   Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly. Significantly, the law of a plaintiff's U.S. state no longer controls the nature of the liability and damages that may be sought when a foreign government is sued: Congress has provided the "specific source of law" for recovery. *See Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004).[4] By providing for a private right of action and precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in cases decided under state law. *Compare Jackovich v. Gen. Adjustment Bureau, Inc., 326* N.W.2d 458, 464 (Mich. Ct. App. 1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. Ct. App. 2006) (citing OCGA § 51-12-5.1(b), noting that punitive damages are available under Georgia law); *compare* 28 U.S.C. § 1605A(c) (providing for solatium damages under the FSIA) and Mich. Comp. Laws Ann. § 600.2922(6) (wrongful death damages under Michigan law include damages for loss of society and companionship of the deceased) *with Young Men's Christian Ass'n v. Bailey*, 146 S.E.2d 324, 341 (Ga. Ct. App. 1965) (wrongful death action under Georgia law does not provide damages for grief of survivors) *and Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (under D.C. law, a plaintiff in a wrongful death action may not recover for grief); *see Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29-30 (D.D.C. 1998) (noting many differences in the law of solatium among the states).

---

[4] Further, federal courts look to the Restatement (Second) of Torts, and not state law, to provide content to Congress's express intentions. *See, e.g., Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (accepting the Restatement (Second) of Torts as "delineat[ing] the controlling substantive law" for intentional infliction of emotional distress "as a proxy for state common law").

156.    Because the injured or murdered victims of each of the seven terror attacks in this case were United States nationals,[5] § 1605A(a)(2)(A)(ii)(I) provides that the sovereign immunity of Iran and Syria is waived and these victims' and their families' claims can be heard. *See* U.S. Passport of Taylor Force; U.S. Passport for Avraham David Moses; Certificate of U.S. Citizenship for Naftali Shitrit; U.S. Passport of Shmuel Brauner; U.S. Passports of Daniella Parnas, Noa Parnas, Dana Parnas and A.P.; U.S. Passport of Richard Lakin; U.S. Passport of Menachem Mendel Rivkin; U.S. Passport of Yehuda Glick. DE (82, Ex. 2, 6, 7, 10, 17; DE 84, Ex. 36).

157.    Plaintiffs Stuart Force, Robbi Force, Kristin Force, Nehama Brauner, Mordechai Brauner, Esther Brauner, Yafa Glick, Neriya Glick, Shlomo Glick, Hallel Glick, SG the minor child of plaintiff Yehuda Glick, Micah Lakin, Manya Lakin, Rivkah Moriah, David Moriah, Aviad, Moriah, CM and NM, minor siblings of victim Avraham David Moses, Naftali Moses, Elisha Dan Moses, AM and ODM, minor siblings of the victim Avraham David Moses, the minor children of plaintiff Menachem Mendel Rivkin SSR, MMR, RMR, SZR, Gila Rachel Shitrit, Meiri Shitrit, Oshrat Shitrit, Noya Shitrit, Yedidya Shitrit, and the minor siblings of plaintiff Naftali Shitrit AS, ES and HS are United States citizens and, therefore, liability and damages are assessed under § 1605A(c), providing a private right of action for U.S. nationals. *See* U.S. Passports and Certificates of Citizenship. (DE 82 and 84).

158.    The following Plaintiffs are not U.S. nationals: CYB and MHB, the minor children of plaintiff and victim Shmuel Brauner; RT and TT, the minor children of plaintiff and victim Yehuda Glick; Atara Moriah, Tzur Moriah, Eytan Moriah Ifat Cohen and Chagit Gibor,

---

[5] Under the FSIA, a U.S. national is defined as "a citizen of the United States." *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

sibling of victim Avraham David Moses; Bracha Rivkin, the wife of victim Menachem Rivkin; and Yaakov Shitrit, the father of victim Naftali Shitrit. Although these non-U.S. nationals do not have a private right of action under § 1605A(c), nevertheless, jurisdiction and waiver of sovereign immunity are satisfied as to these Plaintiffs because their injured or murdered family members were U.S. citizens as required under § 1605(a)(2)(A)(ii)(I).

## D.       Liability to U.S. Citizen Plaintiffs

159.    The five elements necessary to establish liability under FSIA's state-sponsored terrorism exception are:

> (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages."

*Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (quoting 28 U.S.C. § 1605A(a)(1), (c). The third and fourth elements are satisfied when a plaintiff proves a theory of liability and justifies the damages s/he seeks, generally "through the lens of civil tort liability." *Rimkus v. Islamic Republic of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 399-401 (D.D.C. 2015).

160.    Section 1605A(h)(3) defines "material support or resources" to have "the meaning given that term in section 2339A of title 18." Section 2339A provides:

> "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel..., and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). To determine whether a defendant sovereign has provided material support to terrorism, courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act. *See e.g., Ben Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008). The types of support that have been identified as "material" have included, for example, financing and running camps that provided military and other training to terrorist operatives, *see, e.g.*, *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); *Sisso v. Islamic Republic of Iran*, No. 05-0394, 2007 WL 2007582, at *5-6 (D.D.C. July 5, 2007); allowing terrorist groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 549-50 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven,[6] *see, e.g., Id.* Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 WL 2007582, at *6; or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and/or financial resources necessary to plan and carry out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert

---

[6] See *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as the Sudan "affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders," it provided a safe haven).

testimony that the "attack might have been possible, but it would not have been as easy" without defendant's support).[7]

161.    The U.S. Citizen Plaintiffs have presented evidence satisfactory to the Court in support of all elements of a claim under § 1605A against Iran and Syria. Iran[8] and Syria[9] are

---

[7] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g., Ben-Rafael*, 540 F. Supp. 2d at 44 (in a FSIA case against Iran concerning a bombing at the Israeli embassy in Argentina by the terrorist group Hezbollah, the court relied on the testimony of an expert from the Washington Institute for Near East Policy and found that "Iran exercised control over Hezbollah through its intelligence agency"); *Wachsman*, 537 F. Supp. 2d at 90 (in a suit against Iran concerning the execution of a U.S. citizen in Israel by Hamas, the court relied on the testimony of an "expert in Islamic terrorism" and found that Iran provided military and terrorist training for approximately 400 Hamas operatives through its Revolutionary Guard); *Sisso*, 2007 WL 2007582, at *5 (in a suit against Iran concerning a Hamas suicide bombing in Israel, the court relied on testimony from two experts associated with the Washington Institute for Near East Policy in finding, "Iran has financed and run camps that provide military and other training to Hamas operatives," and "Iran further supports Hamas's terrorist activities with direct funding"); Valore *v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (in a case against Iran regarding a Hezbollah bombing of a U.S. military barracks in Lebanon, the court relied on testimony of "a renowned expert on Iranian affairs" and an expert working for the Project for the Research of Islamist Movements and The International Policy Institute for Counterterrorism, finding that "Hezbollah was a creature of the Iranian government, acting almost entirely under the order of the Iranians and being financed almost entirely by the Iranians"). This Court notes and accepts those findings as consistent with, and supportive of, the findings in this matter.

[8] The term "state sponsor of terrorism" is defined in § 1605A as:
a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. [§] 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. [§] 2371), section 40 of the Arms Export Control Act (22 U.S.C. [§] 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

28 U.S.C. § 1605A(h)(6). Iran has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since January 19, 1984, see U.S. Department of State, State

*(continued next page)*

state-sponsors of terrorism, and these Plaintiffs are U.S. citizens. The critical issue in this case is whether Iran and Syria, and its officials acting within the scope of their employment, provided material support and resources to Hamas and PIJ in Israel.

162.    Iran and Syria did provide material support and resources to Hamas and PIJ in Israel, which contributed to the seven terror attacks in this case. Plaintiffs provided satisfactory evidence that Defendants are legally responsible for each of these terror attacks due to the longstanding material support provided by Iran and Syria to Hamas and PIJ that allowed these groups to grow and flourish into terrorist organizations. The evidence demonstrated that each of the victims in these attacks were injured or murdered as part of an intentional Hamas or PIJ plan to injure or murder citizens in order to intimidate a civilian population and/or affect government policies.

163.    Further, Hamas and PIJ are agents of Iran and Syria due to the material support provided by Iran in furtherance of Hamas's and PIJ's mission to disrupt the Israeli-Palestinian peace process. The evidence demonstrates that during the time leading up to the terror attacks in this case, Iran supported Hamas and PIJ by:

---

Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 03/29/2018), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 03/29/2018).

[9] Syria has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since December 29, 1979, see U.S. Department of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 03/29/2018), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 03/29/2018).

(1)    Providing political and ideological support for Hamas and PIJ through public statements in support of its mission and terrorist activities, specifically with respect to Israel;

(2)    Providing monetary support totaling hundreds of millions of dollars;

(3)    Providing support in the form of weapons intended for use in the West Bank and Gaza Strip. One attempted delivery of weapons was the on the Klos-C ship, which was intercepted by the Israeli Navy; and

(4)    Providing support through weapons smuggled to Hamas and PIJ.

Levitt Decl. (DE 31); Clawson Decl. (DE 32)

164.    The evidence also demonstrates that during the time leading up to the terror attacks in this case, Syria supported Hamas and PIJ by:

(1)    Providing a safe haven for Hamas and PIJ and locations for headquarters in Damascus, where they can engage in open meetings and fundraising;

(2)    Training Hamas and PIJ members in the use of terrorist tactics;

(3)    Providing a location where Hamas and PIJ could openly recruit members;

(4)    Providing a public political platform and legitimacy due to Hamas's and PIJ's presence in Damascus;

(5)    Providing financial support directly through funds transmitted to the Hamas and PIJ headquarters in Damascus; and

(6)    Assisting in funneling weapons shipments by allowing them to be transported through Syria.

Berti Decl. (DE 29); Deeb Decl. (DE 30)

165.    The foreign policy of both the Iranian and Syrian governments has been to support Hamas and PIJ in Israel in order to disrupt the Israeli-Palestinian peace process. Both Iran and Syria supported Hamas and PIJ due to their animosity toward Israel and provided funds and weapons to allow Hamas and PIJ to carry out their missions. It was foreseeable, therefore, that Hamas and PIJ would use the training, money, and weapons provided by Iran and Syria to carry out terrorist attacks against civilians in Israel, such as the injured and murdered victims in this case. Although no evidence has been provided directly linking a weapon or dollar provided

by Iran and Syria to these seven specific terror attacks, both Iran and Syria knew of Hamas's and PIJ's tactics and ideological goals and supported those efforts. Each of the seven terror attacks and resulting injuries and deaths was a foreseeable consequence of Iran and Syria's aid and support to Hamas and PIJ in Israel.

166.    In sum, jurisdiction over Iran and Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and the U.S. citizen Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

**F.      Liability to Non-U.S. Citizen Plaintiffs**

167.    The Court must apply District of Columbia choice of law rules to determine which jurisdiction's substantive law governs.

> The FSIA does not contain an express choice-of-law provision [for plaintiffs not covered by § 1605A(c)]. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs [not covered by § 1605A(c)] may bring state [or foreign] law claims that they could have brought if the defendant were a private individual.

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) (applying D.C. choice of law principles); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 42-44 (D.D.C. 2016) (discussing D.C. conflict of law rules). The District of Columbia applies a blend of "governmental interests analysis" (i.e., which jurisdiction's policies would be most advanced by having its law applied) and the "most significant relationship test" (looking to the factors in the Restatement (Second) of Conflict of Laws). *Oveissi*, 573 F.3d at 842.

> The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties";

and (4) "the place where the relationship, if any, between the parties is centered."

*Id.* (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). In *Oveissi*, the court concluded that French law applied to the claims of the American-citizen grandchild of an Iranian citizen assassinated in France. *Id.* In *Thuneibat* the court held that Jordanian law applied to the claims of non-American family members of an American citizen killed in a suicide bombing in Jordan. 167 F. Supp. 3d at 44.

168.    Here, the injuries occurred in Israel; the conduct causing the injuries occurred in Israel, the Palestinian territories, Iran, and Syria; the non-U.S. Citizen Plaintiffs are and always have been Israeli citizens; and there is no legal relationship between any of the non-U.S. Citizen Plaintiffs and any of the Defendants, Hamas, or PIJ. Accordingly, the Court finds that Israel has the greatest interest in having its laws apply and the most significant relationship to the events. Israeli law will therefore apply to the claims of the non-U.S. Citizen Plaintiffs.

169.    In determining the scope of applicable foreign tort law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Thuneibat*, 167 F.3d at 44. Plaintiffs submitted the Declaration of Dr. Boaz Shnoor, an attorney and law professor in Israel. *See* Declaration of Boaz Shnoor ("Shnoor Decl.") (DE 34). Additionally, another court in this district has evaluated the requirements for negligence under Israeli law. *See Wultz v. Islamic Republic of Iran, 755 F. Supp. 2d 1 (D.D.C. 2010).*

170.    The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14-15 (1972); *see also Wultz*, 755 F. Supp. 2d at 57-58. Negligence requires a finding of the same elements as U.S. law: duty, breach, causation, and injury. Shnoor Decl. ¶ 15; *Wultz*, 755 F. Supp. 2d at 57-58. Duty under Israeli law is divided into "duty in fact and notional duty." *Wultz*, 755 F. Supp. 2d at 58. "[E]very person owes a duty to all

persons whom . . . a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36, 2 LSI (New Version) 15 (1972). A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact. *See Wultz*, 755 F. Supp. 2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence. *Id.* at 58-59. Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the occurrence of the particular damage." *CA 145/80 Vaknin v. Beit Shemesh Local Council 37(1) PD 113, 125-26 (1982) (Isr.); see also Wultz*, 755 F. Supp. 2d at 59.

171.    The Court finds that the non-U.S. Citizen Plaintiffs have demonstrated Defendants were under a duty to the victims because, as discussed above, the injury and killing of the victims were foreseeable consequences of providing material support for Hamas and PIJ and supporting Hamas's and PIJ's efforts to disrupt the Israeli-Palestinian peace process. For the same reasons that the Court finds sufficient evidence to tie Iran and Syria to terrorist actions by Hamas and PIJ above, it finds that a duty existed between Iran and Syria and the Plaintiffs and their families because their injuries were foreseeable consequences of the aid and support.

172.    A breach of the duty of care occurs when a party with a duty fails to take "reasonable precautionary measures." *Vaknin*, 37(1) PD at 131. Reasonable precautions are determined by balancing the interests of the plaintiff with that of the tortfeasor and considering the public interest in the continuation or cessation of the alleged tortious actions. *See Wultz*, 755 F. Supp. 2d at 62. The Court finds Iran and Syria beached their duty of care to the Plaintiffs by

engaging in the continuous support and financing of Hamas and PIJ, despite knowledge of Hamas's and PIJ's terrorist actions in Israel.

173.    The Non-U.S. Citizen Plaintiffs have adequately demonstrated that but for the support provided by Iran and Syria, Hamas and PIJ would not have been able to develop into the cohesive, organized, and deadly organizations that's they are today. And, as discussed with duty, the terror attacks that injured or killed the victims in this case were a foreseeable consequence of the provision of support by Iran and Syria. The Non-U.S. Citizen Plaintiffs have established negligence and aiding and abetting of Hamas and PIJ by Iran and Syria under Israeli law.

## G.     Damages for U.S. Citizen Plaintiffs

174.    Damages for a private action for proven acts of terrorism by foreign states under FSIA § 1605A(c) may include economic damages, pain and suffering, solatium, and punitive damages. 28 U.S.C. § 1605A(c). Accordingly, those who survived an attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. Valore, 700 F. Supp. 2d at 82-83. For victims who "suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million. Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 49 (D.D. C. 2012)(citing Valore, 700 F. Supp.2d at 85).

### 1)     Pain and Suffering

175.    Determining the appropriate amount of pain and suffering damages depends upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length

of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012).

176.    Courts do not award pain and suffering damages for Plaintiffs who were killed in an attack if their death was instantaneous. *Elahi*, 124 F. Supp. 2d at 112. It is the Plaintiffs' burden to prove that the decedent consciously experienced time between an attack and his or her death, or else a court must deny pain and suffering damages. *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 244 (D.D.C. 2012); *see also Thuneibat*, 167 F. Supp. 3d at 39 n.4 (declining to award survival damages where the plaintiffs "submitted no evidence . . . showing that either of the [v]ictims suffered any pain and suffering prior to their deaths in the suicide bombings"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 42-43 (D.D.C. 2014) (declining to award survival damages where "[n]o one testified that any of the deceased victims survived the blast itself for any period of time, and the evidence indicates that they likely did not"). Courts have awarded varying amounts of pain and suffering damages, depending upon the length of the suffering. *See, e.g., Braun v. Islamic Republic of Iran*, No. 15-1136, 2017 WL 79937, at *12 (D.D.C. Jan. 9, 2017) (awarding $1,000,000 for pain and suffering lasting two hours); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hour).

### a.    The Estate of Taylor Force

177.    Plaintiffs presented the expert report of Dr. Alan Friedman regarding the injuries sustained by Taylor Force during the attack and the likely pain and suffering before his death. (DE 46). Based on Dr. Friedman's Taylor experienced pain and suffering as a result of his wounds prior to losing consciousness. Taylor was alive during the attack and died of

hypovolemic shock. The wounds on his face suggest that he first suffered this wound and then the fatal wound in his neck. Taylor bled into his lungs and drowned in his own blood. It is Dr. Friedman's opinion that Taylor did not lose consciousness instantly and that he was aware that he was being attacked. "Shortness of breath is extremely uncomfortable to say the least, and it is also likely that he suffered from this prior to losing consciousness."

178.    The Court determines that Taylor Force's Estate is entitled to a fifty percent increase beyond the usual $1,000,000 award for pain and suffering of a victim who died shortly after the terror attack, and accordingly orders that Plaintiffs pay to Avraham's Estate the amount of $1,500,000 for pain and suffering.

### b.    The Estate of Avraham David Moses

179.    Plaintiffs presented the expert report of Col. Spitzen regarding the sequence of the Merkaz HaRav Yeshiva massacre and the likely pain and suffering of Avraham David Moses before his death. Based on Col. Spitzen's report at paragraphs 222-233, (DE 33) and the declaration of Naftali Shitrit (DE 76), who was also shot and injured in the library of the yeshiva where Avraham was murdered, it is clear that the boys in the library heard gunfire in the yeshiva and were aware that a terrorist attack was in progress. The boys in the library attempted to hide between the stacks in the library, and they could hear the terrorist shatter the library's glass door with gunfire and enter the room. As the terrorist came closer, firing his automatic rifle at each student he encountered, the boys could hear the terrorist move from aisle to aisle, bursts of gunfire, screams, groans, and sudden moments of silence. At times the terrorist would shout, and with each burst of gunfire, the smell of gunpowder in the room became thicker. For nearly ten minutes, Avraham hid in fear, heard the terrible sounds of his friends and classmates being slaughtered, anticipating and finally knowing that he would be the next to be shot. Naftali Shitrit

described the intense pain of being shot, which Avraham likewise certainly endured until he ultimately died from massive loss of blood.

180.    For a 16-year-old facing the intensifying fear of death, ten minutes would be an eternity, and the excruciating pain of witnessing the sound of his friends being murdered and then being repeatedly shot is indescribable. The Court determines that Avraham's Estate is entitled to a fifty percent increase beyond the usual $1,000,000 award for pain and suffering of a victim who died shortly after the terror attack, and accordingly orders that defendant's pay to Avraham's Estate the amount of $1,500,000 for pain and suffering.

### c.      The Estate of Richard Lakin

181.    Plaintiffs presented the declaration of Dr. Alan Friedman regarding the likely pain and suffering of Richard Lakin before his death. Based on Dr. Friedman's report, (DE 56) and the declarations of Manya Lakin (DE 54) and Micah Lakin (DE 55) it is clear that Richard Lakin knew that he had been in a terrorist attack and suffered the pain from his injuries. Mr. Lakin had a bullet wound to his head and was bleeding, suffered massive bleeding from stab wounds to his stomach, and had among other internal injuries a lacerated pancreas. Mr. Lakin was conscious when the paramedics arrived and tried to fight them thinking they were terrorists. Micah Lakin Decl. at ¶¶ 8-9. According to Dr. Friedman's report Mr. Lakin was still conscious and breathing spontaneously when he was brought into the hospital. According to Dr. Friedman Mr. Lakin experienced pain and suffering a result of his wounds suffered on October 13, 2015 prior to losing consciousness.

182.    The Court will depart upward from the baseline amount of $5,000,000 and grant the Estate of Richard Lakin $8,000,000. *See Wultz v. Islamic State of Iran*, 864 F. Supp. 2d 24, 37-39 (D.D.C 2012).

### d.      Naftali Shitrit

183.      Plaintiffs presented the expert report of Col. Spitzen regarding the sequence of the Merkaz HaRav Yeshiva massacre (DE 33), the declaration of Naftali Shitrit (DE 76), a who was also shot and injured in the library of the Merkaz HaRav yeshiva and the Declaration of psychiatrist Dr. Rael Strous (DE 35, Ex. 44) in support of Naftali's claim for the pain and suffering he endured and continues to endure to this day from the wounds suffered in the terrorist attack.

184.      According to Mr. Spiten's report, (DE 33, ¶¶ 222-233), it is clear that the boys in the library heard gunfire in the yeshiva and were aware that a terrorist attack was in progress. The boys in the library attempted to hide between the stacks in the library, and they could hear the terrorist shatter the library's glass door with gunfire and enter the room. As the terrorist came closer, firing his automatic rifle at each student he encountered, the boys could hear the terrorist move from aisle to aisle, bursts of gunfire, screams, groans, and sudden moments of silence. At times the terrorist would shout, and with each burst of gunfire, the smell of gunpowder in the room became thicker. Boys hid in fear, hearing the terrible sounds of his friends and classmates being slaughtered, anticipating and finally knowing that he would be the next to be shot.

185.      Naftali Shitrit described his fear and the intense pain of being shot. "I realized the gunman was systematically going from one stack to the next. I was hiding in one of the last stacks in the room. I kept on hearing gunshots, then shouts and screams, then silence from the stacks near me. I heard my friends being shot. He shot me a few times. I was huddled up on the floor, next to the wall. I think he shot me many times. It all happened so fast. The feeling was one of shock, like an electric current going through me. I felt that my blood was slowly seeping out and I felt like I was losing all my blood. My breathing became difficult." Naftali Shitrit Decl. ¶¶ 6-12.

186.    Dr. Alan Friedman, (DE 77) reports that Naftali suffered six gunshot wounds. His diaphragm, liver colon and left ureter were lacerated, he was shot through his right arm, in his right thigh lacerating the femoral artery which caused immediate and copious bleeding, a laceration to the tibial nerve and wounds to his left thigh and calf. Naftali was in the ICU for one week and in the hospital for the next month. He was in a lot of pain, and at one point in an isolation ward due to an infection. Naftali was in a rehabilitation ward for two months before being discharged home. Dr. Friedman states that Naftali still has gait abnormality, weakness and sensory loss in the feet and legs, and back pain. This pain will limit any employment, and puts him at risk for early spinal arthritis or stenosis. According to Dr. Friedman, Naftali's injuries put him at risk for future injuries. These injuries are permanent and causally related to the wounds suffered during the terrorist attack on March 6, 2008.

187.    According to Dr. Strous, Naftali evidences depression accompanied with some signs of PTSD following the terrorist attack. He is well aware of how close he was to death. The injury led to a lengthy and painful rehabilitation process with obvious effects on his personality and emotional development. He remains in treatment for depression which affects him in various areas of his life. Naftali clearly expresses how his life has been affected. Despite the treatment he has and is receiving, it is not expected that his mood issues affecting many areas of his life will resolve in the short term, and they will continue to affect him for a long period of time. )DE 35, Ex. 44).

188.    Plaintiffs have presented evidence to the court's satisfaction that Naftali Shitrit has experienced, continuously suffered and will continue to suffer the severe physical and emotional trauma and consequences of the wounds he received during the shooting. The Court

will depart upward from the baseline amount of $5,000,000 and grant Naftali Shitrit $12,000,000. *See Wultz v. Islamic State of Iran*, 864 F. Supp. 2d 24**,** 37-39 (D.D.C 2012).

### e.      Shmuel Brauner

189.     Plaintiffs presented the declaration of Dr. Alan Friedman regarding the pain, suffering and prognosis for plaintiff Shmuel Brauner due to the injuries he sustained as a result of the terrorist rocket attack that hit in Ashdod on August 19, 2011. Plaintiffs also presented the declaration of Dr. Rael Strous a psychiatrist regarding the psychological and emotional trauma suffered by Mr. Brauner as well as Mr. Brauner's sworn affidavit.

190.     Dr. Friedman reports that Mr. Brauner was struck in his back by shrapnel from a GRAD missile fired from Gaza that landed within 4 meters of him. The shrapnel exited through the front of his abdomen. Mr. Brauner suffered a ruptured kidney, lacerations to his bowel and small intestine. He was also struck by shrapnel in the right thigh and knee. Mr. Brauner never lost consciousness. He endured several surgeries, was hospitalized for 10 days and to this day continues physical therapy. At the time Mr. Brauner suffered chest pain, abnominal, knee and thigh pain, and foot pain. Per Dr. Friedman, Mr. Brauner has only one kidney, which may or may not cause problems down the line, chronic pain and sensory loss, gait abnormality with pain, back pain that will make it difficult to obtain employment requiring lifting or bending, and is at risk for early spinal arthritis or spinal stenosis. As he ages is now also at a higher risk of developing chronic back pain and an inability to physically perform at the level of age-related peers. He also exhibits loss of enjoyment for eating and actual avoidance of pain with eating.

191.     Dr. Rael Strous, (DE 35, Ex. 5) a psychiatrist who examined Mr. Brauner reports that Mr. Brauner denies any previous psychiatric or psychological treatment or evaluation prior to the injury. However, he has received treatment since the rocket attack and his injuries due to

the intensity of his psychological and emotional response. Due to his ongoing intense dysfunctional emotional and traumatic response to the missile and subsequent injury, and his inability to return to baseline psychological function, after about six months following the event, he was sent for psychiatric day treatment in Netanya. He describes spending close to a year in day treatment for severe PTSD. He was seen in numerous contexts which verified the diagnosis and prescribed a course of treatment including medication, and a recommendation for sheltered accommodation for severe PTSD. Mr. Brauner underwent 2 years of treatment in Tel Hashomer hospital which included both medication and psychotherapy. This was accompanied nevertheless by almost constant anxiety as described by him and his family.

192.    Mr. Brauner reports he experienced unbearable pain and fear after his injuries even though he was receiving morphine. He was distraught due to the pain and "wanted to die." His life was so affected he was unable to perform the most basic and minimal tasks. Shmuel Brauner Decl. ¶¶ 10-15. Mr. Brauner also reports a loss of appetite, loss of enjoyment of life, the enjoyment of being with his children, he has no patience and no ability to interact socially. He has developed an intense hatred for his body and cannot look at his scars. He is suffers from insomnia and continues to this day to receive counseling. Shmuel Brauner Decl. ¶¶ 16-36.

193.    Plaintiffs have presented evidence to the court's satisfaction that Shmuel Brauner has experienced, continuously suffered and will continue to suffer the severe physical and emotional trauma and consequences of the wounds he received as a result of the Hamas rocket attack. The Court will depart upward from the baseline amount of $5,000,000 and grant Shmuel Brauner $12,000,000. *See Wultz v. Islamic State of Iran*, 864 F. Supp. 2d 24, 37-39 (D.D.C 2012).

**f.    Parnass Family**

194.    **Daniella Schwadron Parnas:** Plaintiffs presented the declaration of Dr. Rael Strous regarding the psychological and emotional trauma suffered by plaintiff Daniella Schwadron Parnass when her home was destroyed by a Hamas Rocket attack in November of 2012 as well as the Daniella Parnass's own sworn declaration. (DE 69).

195.    For victims who "suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million. Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 49 (D.D. C. 2012)(citing Valore, 700 F. Supp.2d at 85).

196.    According to Dr. Strous, (DE 35, Ex. 34), Daniella Parnass reports that she exhibited intense frustration after the attack. For two years she was unable to sleep, was constantly worried, and guilty. She had a diminished appetite for eight months until her house was repaired. She was frustrated and irritable, and would speak in unfocused and inappropriate manners.

197.    It is Dr. Strous's opinion that Daniella Parnass suffered marked anxiety and depression following the partial destruction of her home from a missile landing on it in 2012. She clearly expresses how her life has been significantly affected in several ways since the trauma. Despite the treatment she has and is receiving, it is not expected that her mood and anxiety issues affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her for a long period of time.

198.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Daniella Parnass $2,000,000.

199.    **AP:** AP is the minor child of Daniella Parnass. Plaintiffs presented the declaration of Dr. Rael Strous, (DE 35, Ex. 32) as well as the Declaration of his mother Daniella Parnass

regarding the psychological and emotional trauma he suffered as a result of the missile attack that destroyed his home in 2012.

200.    According to Dr. Strous, A.P. is a 12-year-old male with signs and symptoms of anxiety following his response to a missile destroying his home in 2012. His anxiety affected his social and school functioning. This was identified by the relevant school authorities and he was placed in a school environment which could manage his anxiety in an appropriate manner. His anxiety response was intense and affected his behavior to a significant extent, and even though over the years that have passed he has improved considerably, certain anxiety that affects many of his social and academic functioning remain and will continue to impact his life for a long period of time.

201.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant AP $2,000,000.

202.    **Noa Parnas:** Plaintiffs presented the declaration of Dr. Rael Strous, (DE 35, Ex. 35) as well as the sworn declaration of Noa Parnas regarding the psychological and emotional trauma he suffered as a result of the missile attack that destroyed his home in 2012.

203.    Noa Parnas reports that after the initial disorientation and stress of dealing with change after the missile attacks, and rebuilding their home, she began to suffer from various long-term effects—many of which she indicates still affect her today. She continues to suffer from anxiety, poor sleep, migraine headaches, a need to travel far from Israel. She feels unsafe in Israel.

204.    She reports she has become a more angry and frustrated person since the missile damage and trauma.

205.     According to Dr. Strous, Noa Parnas suffered some mild anxiety and depression following the partial destruction of her home from a missile landing on it in 2012. She clearly expresses how her life was initially affected in several ways since the trauma. It appears that she minimizes effects on her life and has managed some of her difficult emotional responses by the need to leave the country and memories of traumas experienced. Despite the time that has lapsed since the event and the considerable improvement that she experienced since the event, there are many aspects of the trauma that she experienced that will continue to affect many aspects of her functioning for a long period of time.

206.     Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Noa Parnas $2,000,000.

207.     **Dana Parnas:** Plaintiffs presented the declaration of Dr. Rael Strous, (DE 35, Ex. 33) as well as the sworn declaration of Dana Parnas (DE 67) regarding the psychological and emotional trauma he suffered as a result of the missile attack that destroyed his home in 2012.

208.     According to Dr. Strous, Dana Parnas exhibits signs and symptoms of mild depression, anxiety and PTSD following her response to a missile destroying her home in 2012. While her emotional response and was intense and painful and affected her behavior to a significant extent, over the years that have passed, she has improved considerably.

209.     Dana Parnas suffered anxiety and depression following the partial destruction of her home from a missile landing on it in 2012. She clearly expresses how her life was initially affected in several important ways since the trauma. Despite the time that has lapsed since the event and the considerable improvement that she experienced since the event, there are many aspects of the trauma that she experienced that will continue to affect many aspects of her interpersonal functioning for a long period of time.

210.   Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Noa Parnas $2,000,000.

### g)   Menachem Mendel Rivkin

211.   Plaintiffs presented the declaration of Dr. Alan Friedman (DE 73), Dr. Rael Straus (DE 35, Ex. 38) and the plaintiff Menachem Rivkin's (DE 72) sworn declaration regarding the pain, suffering and prognosis for plaintiff Menachem Mendel Rivkin due to the injuries he sustained as a result of the terrorist stabbing attack. Plaintiffs also presented the declaration of Dr. Rael Strous and the sworn declaration of Bracha Rivkin (DE 71) concerning the psychological and emotional trauma suffered by witnessing the terrorist stab her husband.

212.   Menachem and Bracha Rivkin who at the time was six months pregnant were on their way to a restaurant when the terrorist approached Mr. Rivkin from behind and stabbed him twice in the back. Dr. Friedman reports Mr. Rivkin suffered a left pulmonary artery laceration. Mr. Rivkin was hospitalized in both the ICU and the Cardiothoracic surgical ward. He was and is until this day in severe pain, reporting frequent burning in his chest. He tires easily, and has difficulty breathing. He has multiple scars, which cause pain and abnormal sensations such as fasciculation, dyspnea on even mild exertion, sensory loss and an inability to lie flat on his back or left side - causing splinting.

213.   According to Dr. Friedman Mr. Rivkin suffers from neuropathic pain which is much harder to control than a 'regular' sensory neuropathy. These pains, as described above, impeded his daily activity. Having only one lung puts him at extreme risk of pulmonary failure should anything happen to his right lung. This may be something as common as pneumonia or less commonly, cancer or other lung processes. Should these occur, he might need artificial ventilation (short or long-term) or even more drastic maneuvers (lung transplant). It is Dr.

Friedman's opinion that that his symptoms are causally related to the injuries sustained during the terrorist attack on January 27, 2016. At this point, Dr. Friedman believes all of the injuries are permanent.

214.    Dr. Strous reports that following the injury, Mr. Rivkin experienced significant changes in mood and anxiety levels with distinct post-traumatic symptoms affecting his social and occupational behavior. From his description of his life in the aftermath of the stabbing, he is still far from returning to baseline functioning despite the passage of time since the stabbing event.

215.    He suffered significant pain, mood effects and anxiety following his stabbing in 2016. He clearly expresses how his life has been severely affected considering his injury and subsequent effects. He has become guarded, is suffering from sleep difficulties and nightmares and breathing difficulties. He is reminded of the terror attack at any opportunity and has difficulty using public transportation. He is significantly irritable and has anger outbursts. He is not able to concentrate at work. Despite the treatment he received, it is not expected that his mood and anxiety issues affecting many areas of his personal and interpersonal functioning will resolve in the short term, and they will continue to affect him for a long period of time.

216.    According to Dr. Strous, Bracha Rivkin exhibited signs and symptoms of depression, anxiety and PTSD following her husband's stabbing and almost death in 2016. She witnessed the event and observed her husband's slow lapse into unconsciousness. The aftermath of the event led to a marked change in her mood and anxiety levels with her experiencing significant post-traumatic effects over the past year in addition to social dysfunctional behavior. Mrs. Rivkin reports nightmares, hypervigilance if anyone runs near her, flashbacks, a fear of returning to the place where the stabbing took place, decreased social life, and guilt for

suggesting they eat at that particular place. Due to her difficulty coping with the trauma of witnessing her husband's stabbing and almost death, she attended trauma counselling to deal with her anxiety and post-traumatic symptoms. In addition, she met with a psychiatrist approximately a year after the traumatic event since she felt that the psychological counselling was not helping her enough with her disturbing thoughts and subsequent effects on her life.

217.    Mrs. Rivkin clearly expresses how her life has been significantly affected in light of her husband's injury and subsequent effects. Despite the treatment she received, it is not expected that her anxiety issues affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her for a long period.

218.    Plaintiffs have presented evidence to the court's satisfaction that Menachem Mendel Rivkin has experienced, continuously suffered and will continue to suffer the severe physical and emotional trauma and consequences of the wounds he received during the stabbing attack. The Court will depart upward from the baseline amount of $5,000,000 and grant Menachem Mendel Rivkin $12,000,000.

219.    The court further finds that plaintiffs have presented evidence to the court's satisfaction that Bracha Rivkin experienced and will continue to suffer PTSD, anxiety and stress, and that this stress affects all aspects of her life preventing her from functioning as she did prior to the attack. Accordingly the court will depart upward from the baseline amount of $1,500,000 and grant Bracha Rivkin $2,000,000 in compensatory damages for the emotional pain and suffering associated with her witnessing the terrorist stabbing attack.

### h.    Yehuda Glick and the Estate of Yafa Glick

220.    Plaintiffs presented the declaration of Dr. Alan Friedman (DE 53), Dr. Rael Straus (DE 35, Ex. 16) and the plaintiff Yehuda Glick's sworn Declaration (DE 52) regarding the pain,

suffering and trauma associated with the injuries he sustained as a result of the terrorist stabbing attack. Plaintiffs also presented the declaration of Dr. Rael Strous (DE 35) concerning the psychological and emotional trauma suffered by the late Yafa Glick who witnessed the terrorist shoot her husband at point blank range.

221.     Yehuda Glick was shot at point blank range by a terrorist. Dr. Friedman reports that Mr. Glick suffered multiple gunshot wounds. He did not regain consciousness for 10 days. He spent 5 days in the ICU and then two more weeks in the surgical unit. He then was sent for rehabilitation for a few months in an apartment in Jerusalem. His rehabilitation included speech therapy, physiotherapy, occupational therapy, dietician and rehabilitation medicine.

222.     While in the hospital he underwent the following surgeries: Removal of two right lung lobes and resection of 20 cm of intestine. He also had left wrist and arm fractures. His spine/vertebra and seven ribs were struck by bullets, and he had seven bilateral rib fractures. He endured a lengthy hospitalization, and months of physical therapy. Mr. Glick suffered and continues to suffer extreme physical pain as a result of these injuries. He suffered prolonged and severe pain at the time of his injuries and treatments. Many of the treatments themselves were painful, and he has undergone numerous surgical procedures which themselves were painful requiring strong pain relievers.

223.     Dr. Strous reports that Mr. Glick recalls that for the first few months he endured continuous intense pain with very little helping him. His physical pains continue to this day and he has to try hard not to let it affect his function. Dr. Strous has diagnosed Yehudah Glick with signs and symptoms of mild depression and mild anxiety and moderate to severe PTSD following the severe injuries from the terror shooting in 2014. The injury lead to severe pain in the initial period followed by more chronic pain. This affected his mood and anxiety levels with

significant post-traumatic effects since. Yehudah Glick suffered devastating injuries and was close to death. He clearly expresses how his life has been severely affected due to the injury and subsequent effects. Despite his position in communal life, he continues to suffer. It is not expected that his anxiety issues will resolve in the short term, and they will continue to affect him for a long period of time.

224.    Yafa Glick was present the night her husband was shot. She has tragically since passed away. On the night of the shooting she heard the terrorist say that her husband was the enemy of Al Aksa and then heard the shots. She thought that she was next. This was overwhelmingly frightening for her. After the shots were fired there was silence. She was scared to get out. She opened her door and saw her husband's jacket and telephone on the ground. She then saw her husband lying on his left side on the ground. She recalls the trauma her husband suffered at the hospital. Over time, with the intervention of the psychiatrist for her husband, she realized that she was developing all the symptoms of PTSD herself.

225.    Dr. Strous reports that Yafa Glick suffered serious depression and post-traumatic symptoms as a direct result of her husband's near-death experience after he was targeted and shot in the chest in a terror attack. She clearly expressed how her life has been seriously adversely affected. Despite the treatment she received, it was not expected that her mood and anxiety issues affecting many areas of her personal and interpersonal functioning in such a profound manner would have resolved in the short term. She was treated by psychiatrists and placed on medication. Tragically on 23 June 2017 Mrs. Glick attempted suicide by hanging. Following her suicide attempt, she remained in a vegetative state with anoxic brain damage. The court has notified by counsel that Mrs. Glick recently passed away.

226.     Plaintiffs have presented evidence to the court's satisfaction that Yehuda Glick has experienced, continuously suffered and will continue to suffer the severe physical and emotional trauma and consequences of the wounds he received during the shooting attack. The Court will depart upward from the baseline amount of $5,000,000 and grant Yehuda Glick $12,000,000.

227.     The court further finds that plaintiffs have presented evidence to the court's satisfaction that the late Yafa Glick experienced depression and PTSD as a result of witnessing the shooting attack on her husband. Accordingly the court will depart upward from the baseline amount of $1,500,000 and grant the Estate of Yafa Glick $2,000,000 in compensatory damages for the emotional pain and suffering associated with her witnessing the terrorist stabbing attack.

### 2)      Economic Damages

228.     The Estate of Taylor Force, the Estate of Yafa Glick, Shmuel Zev Brauner and Naftali Moses seek economic damages for financial losses they purportedly sustained as a result of the terror attacks.

229.     Title 28 U.S.C. § 1605A entitles victims of state-sponsored terrorism to economic damages. For the most part, the calculation of economic damages is straight-forward and requires only proof of loss. Loss of accretion damages are generally calculated in FSIA terrorism cases by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Stethem*, 201 F. Supp. 2d at 87.

### a)      The Estate of Taylor Force

230.     Plaintiffs have presented the expert report of forensic accountant Michael Soudry, M.B.A., calculating the recoverable economic loss to the estate as a result of the murder of

Taylor Force in the terrorist attack on March 8, 2016 with future losses adjusted to 2017 present value. (DE 45). Mr. Soudry determined the present value of the cumulative economic loss to the estate as a result of the attack to be $584,230.00. The Court accepts and adopts Mr. Soudry's findings and report in full, and finds that the Estate of Taylor Force is entitled to an award of $584,230.00 for economic loss against the Defendants.

### b)     The Estate of Yaffa Glick

231.    In addition to the declarations of Yehuda Glick, Hallel Glick and Dr. Strous about the impact of the terrorist shooting of her husband on Yaffa Glick, the Estate of Yaffa Glick has presented the expert report of forensic accountant Michael Soudry, M.B.A., calculating the recoverable economic loss to the estate as a result of Yehuda Glick being shot and injured in the terrorist attack on October 29, 2014, with future losses adjusted to 2018 present value. (DE 51). Mr. Soudry determined the present value of the cumulative economic loss to the estate as a result of the attack to be $301,947. The Court accepts and adopts Mr. Soudry's findings and report in full, and finds that the Estate of Yaffa Glick is entitled to an award of $301,947 for economic loss against the Defendants.

### c)     Shmuel Brauner

232.    Plaintiff Shmuel Brauner's claim for economic damages is supported by his own declaration and those of his family, the expert report of Dr. Strous regarding the impact of the terrorist rocket attack on Shmuel Brauner, and the expert report of forensic accountant Michael Soudry, M.B.A. Mr. Soudry calculated the present value of Shmuel Brauner's lost earnings due to the attack to be $1,862,613, and the present value of his lost household services from the attack to be $108,124. Thus, the present value of the cumulative economic loss suffered by Plaintiff Shmuel Brauner from the terror attack is $1,970,737. The Court accepts and adopts Mr.

Soudry's findings and report in full, and finds that Plaintiff Shmuel Brauner is entitled to an award of $1,970,737 for economic loss against the Defendants.

### d)     Naftali Moses

233.    Plaintiff Naftali Moses's claim for economic damages is also supported by his own declaration and those of his family, the expert report of Dr. Strous regarding the impact of his the terrorist murder of his son, and the expert report of forensic accountant Michael Soudry, M.B.A. Mr. Soudry calculated the present value of Naftali Moses's lost earnings due to the attack to be $778,686. The Court accepts and adopts Mr. Soudry's findings and report in full, and finds that Plaintiff Naftali Moses is entitled to an award of $778,686 for economic loss against the Defendants.

### e)     Rivkah Martha Moriah

234.    Plaintiff Rivkah Martha Moriah's claim for economic damages as a result of the terrorist attack and injuries to her son Naftali is supported by her declaration. Rivkah Moriah Decl. ¶ 71 (DE 63, Ex. 1-4) She has supported her claim with salary records as well as an explanation and calculations for her analysis and determined her future lost earnings from January 2018 until her expected age of retirement is 429,000 NIS or past and future lost wages of $199,930 U.S. dollars. The Court accepts and adopts Mr. Soudry's findings and report in full, and finds that Plaintiff Rivkah Moriah Moses is entitled to an award of $199,930 U.S. dollars.

### 3)     Solatium

235.    The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1426 (8th ed. 2004). "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings

and loss of decedent's comfort and society." *Flatow*, 999 F. Supp. at 29. Damages for solatium are awarded to close family members. *Id.* at 30-31. "[M]ental anguish, bereavement and grief resulting from the fact of decedent's death constitute the preponderant element of a claim for solatium." *Id.* at 30.

236.     Unlike the plaintiffs' medical and economic damages, "solatium damages, by their very nature, are unquantifiable." *Braun*, 228 F. Supp. 3d at 85 (internal quotation marks omitted) and as such, assessing a monetary figure to the multiple layers of harm that a terror victim or the family of a terror victim suffers is extremely difficult. In determining the "reasonable estimate," courts may look to expert testimony and prior awards in the dozens of civil terrorism decisions rendered pursuant to the FSIA. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Haim v. Islamic Rep. of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.).

237.     This Court has developed a commonly accepted standardized framework for awarding solatium damages to family members of deceased victims, known as the *Heiser* damages framework. *See Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *See also, e.g.*, *Acosta*, 574 F. Supp. 2d at 29 ("This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims."); *Thuneibat*, 167 F. Supp. 3d at 51 (applying *Heiser* damages framework).

238.    In accordance with this framework, solatium awards in terrorism cases are to "be determined [primarily] by the nature of the relationship and the severity and duration of the pain suffered by the family member and the severity and duration of the pain suffered by the family member." *Brewer v. Iran*, 664 F. Supp. 2d 43, 55 (D.D.C. 2009) (Huvelle, *J.*) (quoting *Haim*). "Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings." *Estate of Heiser v. Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) (Lamberth, *J.*). Surveying cases dating back to 1998 and written by several different judges, *e.g.*, *Cicippio v. Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998) (Jackson, *J.*), Judge Lamberth concluded: [C]ourts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed. *Heiser*, 466 F. Supp. 2d at 269 & n.24 (footnotes omitted); *see Wultz v. Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (Lamberth, *C.J.*). Courts award half these amounts to family members of persons who are injured rather than killed. *Id.*

239.    This formula, the foundation of the so-called "*Heiser* framework," merely supplies the baseline and may be subject to upward or downward adjustments as appropriate under the circumstances. Upward adjustments from the *Heiser* baseline are appropriate given 1) "evidence establishing an especially close relationship between the plaintiff and decedent," 2) "medical proof of severe pain, grief or suffering," or 3) "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Braun*, 228 F. Supp. 3d at 85.

240.    With regard to terror attacks that result in distress resulting from injury to loved ones—rather than death—the *Heiser* framework has been applied to value average solatium

awards in such cases at half of the value that would be granted to family members of a deceased victim. *Wultz*, 864 F.Supp. 2d at 39.

### a)      Force Family

241.      The terrorist stabbing spree on the Tel Aviv Promenade where Taylor Force was murdered was a brutal and shocking event for the Force family that will affect them for the rest of their lives.

242.      The Force family members claiming solatium are Stuart Force, Robbi Force and Kristen Force. All are U.S. citizens. (DE 82). They support their claims by their sworn Declarations, describing each of their experiences and struggles coping with the terror stabbing of their son and brother Taylor in 2016 while he was on a school trip to Israel, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 42, 43, 44; DE 82; DE 35, Ex.7-9).

243.      The terror attack where Taylor was brutally murdered has had a devastatingly profound and lasting effect on his entire family. Taylor Force was a 2009 West Point graduate, and a veteran of Afghanistan and Iraq. He was pursuing his MBA at the Owen Graduate School of Management at Vanderbilt University. On March 8, 2016 Taylor was walking on the boardwalk in Tel Aviv with friends while on a school trip to Israel when he was viciously attacked and stabbed to death by a terrorist. The cruel, violent and random circumstances surrounding the attack and the details of his death were agonizing for his family with whom he enjoyed a particularly close relationship. His sister lost her other half. To this day the images of Taylor's blood at the scene continue to affect the family's lives and increase their pain and suffering. His murder was unexpected, gruesome, and a horrific blow to this family. The evidence presented clearly establishes that from the day they received the devastating news until

today, the family has experienced and continues to experience severe grief and suffering. The family is still traumatized by Taylor's death, never forgetting the loss, and the hole it has left in their lives. He is the last thing they think about when they go to bed and the first thing they think about when they wake up. It is not uncommon to be awakened at night to a "Taylor" dream.

244.    The severe emotional and psychological effects on each of these members of Taylor Force's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

245.    Based upon the foregoing, the Court determines that, with regard to the Force family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to family members for the death of a child and sibling and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $7,500,000 in solatium damages to Stuart Force, $7,500,000 in solatium damages to Robbi Force, and $3,750,000 to Taylor Force's sister Kristen Force.

### b)    Rivkin Family

246.    The terrorist stabbing attack where Menachem Mendel Rivkin was critically injured was a brutal and shocking event, made more so by the fact it was witnessed by Mr. Rifkin's wife who was six months pregnant at the time. It was a shocking event that the evidence shows has and will continue to affect the family for the rest of their lives.

247.    The Rivkin family members claiming solatium who are U. S. citizens are Menachem Mendel's minor children SSR, MMR, RMR and SZR. (DE 82, 84). They support their claims by psychiatric evaluations, diagnoses and impressions provided by Dr. Strous describing their experiences and struggles coping with their father's stabbing. (DE 35 Ex.37, 39, 40).

248.    The terror attack where Menachem Mendel Rivkin was brutally attacked has had a devastatingly profound and lasting effect on his entire family, but in particular on his young children. They saw their father in the hospital after the attack, and their own emotional lives were severely affected by the circumstances of their father's injury and his condition. They experienced anxiety and social difficulties as well. The severe emotional and psychological effects on each of these members of Menachem Mendel Rivkin's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

249.    Based upon the foregoing, the Court determines that, with regard to the Rivkin family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to children of surviving terror victims, and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $2,250,000 in solatium damages to SSR, $2,250,000 to MMR, $2,250,000 to RMR and $2,250,000 to SZR.

### c)    Glick Family

250.    The Glick family members claiming solatium who are U.S. citizens are Yehuda Glick's wife, the Estate of the late Yafa Glick, and his children, Neriya Glick, Shlomo Glick, Hallel Glick, and S.G. Their claims are supported by affidavits of Yehuda Glick and other family members that describe each of their experiences and struggles coping with the terror shooting of Yehuda Glick in 2016, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 35 )

251.    The terror attack on Yehuda Glick and his injury had a profound and devastating effect on his family. Unlike most such attacks that broadly target a group or citizens at large, the attack on Yehuda Glick was a direct assassination attempt against Yehuda Glick as a

representative figure among religious Israeli Jews. The absence of a measure of randomness that accompanies most terror attacks intensified the fear, anxiety, and depression felt by each member of Yehuda Glick's family.

252. The most profound and destructive effect was experienced by Yehuda Glick's wife, Yafa Glick, who became emotionally and physically ill as a result of the attack on her husband, unable to overcome the grief and pain she felt from the event and its aftermath. Yafa became debilitated and never returned to her former self, until her own untimely demise on January 1, 2018. Yehuda Glick's three oldest sons, Neriya, Shlomo and Hallel Glick, all spent extended periods of time at their father's side after the attack, and their own emotional, social, and family lives were severely affected by the circumstances of their father's injury and his condition. Yehuda Glick's son, S.G., likewise suffered tremendously, unable to properly attend school for six months, and experiencing anxiety and social difficulties as well. The severe emotional and psychological effects on each of these members of Yehuda Glick's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

253. Based upon the foregoing, the Court determines that, with regard to the Glick family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to family members of surviving terror victims, and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $6,000,000 in solatium damages to the Estate of Yafa Glick, $2,250,000 in solatium damages to Neriya Glick, $2,250,000 in solatium damages to Shlomo Glick, $2,250,000 in solatium damages to Hallel Glick, and $2,250,000 in solatium damages to S.G.

### d)      Lakin Family

254.    The Lakin family members claiming solatium who are U.S. citizens are Micah Lakin and Manya Lakin. (DE 82). Their claims are supported by their sworn affidavits that describe each of their experiences and struggles coping with the terrorist shooting and stabbing attack that ultimately claimed their father's life after two heart wrenching weeks in the hospital fighting for his life, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 55, 54; DE 35, Ex. 17, 18).

255.    What became known as the Bus 78 Massacre where Richard Lakin was brutally shot and stabbed, ultimately succumbing to his wounds has left a profound effect on his children Micah and Manya Lakin and their families. Richard Lakin was a loving father and a grandfather who enjoyed an especially close relationship with his two children and their families. On October 13, 2015 he was attacked on Bus 78 in Jerusalem when two terrorists boarded the bus and proceeded to shoot and stab the passengers. Two passengers were killed and several others were wounded. In their declarations Micah and Manya Lakin describe the circumstances surrounding the attack on their father and its effect on their lives. The terrorists shot Mr. Lakin in the head, sliced open his abdomen, and cut vital organs damaging his, pancreas, liver and spleen. He was conscious when the paramedics arrived. Mr. Lakin was taken to the hospital in critical condition with the knife blade still lodged in his upper abdomen. Mr. Lakin was put into a medically induced coma attached to ten machines while the doctors battled to save his life. He never recovered, dying from his wounds two weeks later. His children suffered the day of the attack, waiting, not being able to contact him, and wondering if he was on that bus only to find out that he was in the hospital. They suffered watching their father struggle for his life and they, along with their families continue to suffer to this day. The evidence presented establishes that the violent circumstances surrounding the attack, and the trauma of their father's subsequent

hospitalization caused and continues to cause his family severe grief and pain affecting their daily lives, their health, their work and their relationships. The grandchildren have been traumatized by the brutal way in which they lost their grandfather. His loss still haunts them to this day. (DE 55, 54)

256.     The severe emotional and psychological effects on each of these members of Richard Lakin's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

257.     Based upon the foregoing, the Court determines that, with regard to the Lakin family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to family members for the death of a parent and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $4,500,000 in solatium damages to Micah Lakin and $4,500,000 solatium damages to Manya Lakin.

### e)     Shitrit Family

258.     The Shitrit family members claiming solatium who are U.S. citizens are Naftali's mother Gila Shitrit, and his siblings Meiri Shitrit, Oshrat Shitrit, Noya Shitrit, Yedidya, Shitrit an AS, ES and HS. Their claims are supported by their individual declarations and those of the parents that describe each of their experiences and struggles coping with the terror shooting that almost took the life of their beloved son and brother, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 35, Exh 41-46, 48; DE 74, 75, 78, 79, 81).

259.     The terror attack at the Merkaz HaRav had a profound effect not only on Naftali Shitrit but on his entire family. The sudden attack, the carnage and the loss of life of young boys and men studying in a library represents such a random act that their fear and anxiety and

depression was intensified. The uncertainty of not knowing whether Naftali was alive caused great stress and anxiety.

260.    Gila Shitrit, Naftali's mother indicates that the trauma and disruption to the rest of her family was immense. Initially this was due to the fact that Naftali was in very serious condition and at times his life was in danger. The stress to Gila Shitrit was immense as she was five months pregnant at the time. Adding to the stress, both parents were by Naftali's side in the hospital in Jerusalem while the rest of the children were home far away in Sederot. A neighbor came to sleep with the children at night. Ultimately the family was uprooted and moved to Jerusalem to be with Naftali throughout his hospitalization and recovery. The family spent extended periods at their son's side after the attack and their own emotional, social and family lives were severely affected. Their lives centered on Naftali for two years to the point that his siblings who were also suffering from the trauma did not address their own fears and anxiety. As a result the anxiety, depression manifested itself years later in some of Naftali's siblings. His youngest sibling who was born during Naftali's recovery grew up in the shadow of the trauma and anxiety.

261.    The severe emotional and psychological effects on each of these members of Naftali Shitrit's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

262.    Based upon the foregoing, the Court determines that, with regard to the Shitrit family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to family members of surviving terror victims, and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $3,750,000 in solatium damages to Gila Shitrit, $2,250,000 in solatium damages to Meiri Shitrit,

$2,250,000 to Oshrat Shitrit, $2,250,000 to Noya Shitrit, $2,250,000 to Yedidya, Shitrit and $2,250,000 to AS, $2,250,000 to ES and $2,250,000 to HS.

### f)      Moses and Moriah Families

263.    The family members of Avraham David Moses claiming solatium damages who are U.S. citizens are Naftali Moses, Rivkah Moriah, David Moriah, Elisha Dan Moses, N.M., C.M., A.M., O.D.M., and Aviad Moriah. Their solatium claims are supported by affidavits that describe each of their experiences and struggles coping with Avraham's murder at the Merkaz HaRav Yeshiva massacre, as well individual psychiatric evaluations and diagnoses provided by Dr. Strous.

264.    The Merkaz HaRav Yeshiva terror massacre, in which eight young students were murdered and more were injured by a Hamas gunman in the main study hall and library of a Jewish religious school, was a national tragedy in Israel of tremendous significance. The collective grief and national attention also served to intensify the emotional and psychological impact that Avraham's murder would have on the Moses and Moriah families in the immediate aftermath of the attack and in the months and years that would follow.

265.    Avraham was the first-born son of Naftali Moses and Rivkah Moriah, who were married from 1990-1999. They had another son together, Avraham's brother, Elisha Dan Moses, who was just two years younger than Avraham, but who attended school with Avraham until Avraham began high school. David Moriah became Avraham's stepfather when he married Rivkah in 2002, when Avraham was 10-years-old. David devoted significant time with Avraham to develop a close paternal relationship, and played a significant role in Avraham's life in growth for the next six years. David already had six children by his first marriage who lived with David at the time Avraham and his mother joined David's household, and they all developed a love for

and connection with Avraham that they considered to be more like a sibling, rather than a stepsibling, relationship. Among David's prior children, only Aviad is a U.S. citizen.

266.    After their marriage, David and Rivka had two children together: N.M. and C.M. Avraham's father Naftali Moses also remarried, and he and his new wife also had two children together prior to the terror attack: A.M. and O.D.M. Thus, N.M., C.M., A.M., and O.D.M. are all half-siblings of Avraham.

267.    Despite the somewhat complicated history and makeup of Avraham's family, Avraham was a special and beloved boy who was able to make each member of his family feel that they had a unique and close relationship with him. Avraham was very bright and talented, and he had the kind of wholesome character and charm that made others feel good. The same special innocence and beauty of Avraham that brought each member of his family so close to him, also deepened the sense of loss and tragedy they felt when he was suddenly and savagely murdered, huddling with his friend in the library and clutching a sacred religious book he had been studying when the sound of the terrorist's gunfire caused him to attempt to hide.

268.    When David and Rivkah Moriah learned that Avraham was missing in the wake of the attack, they when from hospital to hospital hoping to find their son still alive. When they arrived at the Yeshiva, Naftali and Elisha Dan Moses had already been delivered the devastating news. The trauma of seeing the scene of the massacre and identifying Avraham's body would never completely leave each parent's mind, and even haunted the siblings who later learned what had happened. The following day of massive crowds attending lengthy eulogies for Avraham and seven other young students, saying their final goodbyes and watching eight fresh graves being filled and covered side-by-side, was only the beginning of a process of mourning and grief that each of Avraham's family members endures to this day.

269.    The family members had many difficulties coping with the trauma of Avraham's murder, and relationships began to deteriorate. Ultimately, the Moriah family was unable to recover, and David and Rivkah divorced in May, 2015. The stress and strain of Avraham's murder caused each of his family members to suffer both emotionally and psychologically, and affected their ability to function in school, socially, and professionally. The severe emotional and psychological effects on Avraham's family members and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

270.    Based upon the foregoing, the Court determines that, with regard to the Moses and Moriah families, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework, and to increase these awards by fifty percent. Accordingly the Court orders that Defendants shall pay $6,000,000 in solatium damages to Naftali Moses, $6,000,000 in solatium damages to Rivkah Moriah, $6,000,000 in solatium damages to David Moriah, $3,750,000 in solatium damages to Elisha Dan Moses, $3,750,000 in solatium damages to Aviad Moriah, $3,750,000 in solatium damages to N.M., $3,750,000 in solatium damages to C.M., $3,750,000 in solatium damages to A.M., and $3,750,000 in solatium damages to O.D.M.

### g)    Brauner Family

271.    The family members of Shmuel Brauner claiming solatium damages who are U.S. citizens are his wife, Nechama Brauner, and his parents, Mordechai Brauner and Esther Brauner. (DE 82). Their solatium claims are supported by Shmuel Brauner's affidavit and their own affidavits that describe the impact that Shmuel Brauner's injury in the terror rocket attack on a synagogue has had on their lives, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 35, Ex. 2-5; DE 39, 38 37, 36).

272.    The tragic effects of Shmuel Brauner on his wife and parents have been tremendously difficult. The sudden transformation of Shmuel from a young, bright, and able-bodied man to a severely injured figure that would require months of surgeries and treatment has dramatically changed their lives. The changes in Shmuel's mood and his continued suffering have also dramatically affected his wife and parents' relationship with him. Nechama, Mordechai, and Esther Braun have also suffered severe emotional and psychological damage as a result of Shmuel's injuries, as reported in the expert reports of Dr. Strous, which the Court accepts and adopts in full.

273.    Based upon the foregoing, the Court determines that, with regard to the Brauner family Plaintiffs, it is appropriate to depart upward from the usual solatium awards provided under the *Heiser* framework to family members of surviving terror victims, and thus to increase these awards by fifty percent. Accordingly, the Court orders that Defendants shall pay $6,000,000 in solatium damages to Nechama Brauner, $3,750,000 in solatium damages to Mordechai Brauner, and $3,750,000 in solatium damages to Esther Brauner.

### 4)     Punitive Damages

274.    The FSIA specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A(c). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Bodoff*, 907 F. Supp. 2d at 105; *see also* Restatement (Second) Torts § 908(1)-(2) (1977). The purpose of punitive damages is two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future. *See Eisenfeld v. Islamic Republic of Iran*, 172

F. Supp. 2d 1, 9 (D.D.C. 2000). "This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed." *Flatow*, 999 F. Supp. at 33.

275.    Considering these factors, the Court finds an award of punitive damages is warranted. First, support for Hamas's and PIJ's terrorist activities is horrific and condemnable. Second, Defendants clearly intended to cause significant harm in multiple ways when they provided material support to Hamas and PIJ, known terrorist organizations that routinely carry out brutal attacks on innocent civilians. Third, prior damages have been awarded to deter Iran and Syria from related actions against civilians.

276.    Different courts calculate punitive damages using a variety of methods. One approach is to multiply a defendant's annual contributions to terrorism by a factor of between three and five. *See Roth*, 78 F. Supp. 3d at 406. Other courts award punitive damages based on a ratio between punitive and compensatory damages, *see, e.g., Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 31 (D.D.C. 2014), while others simply award a fixed amount per victim. *See, e.g., Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (awarding $150 million each to the estates of two victims).

### a.      Force Family

277.    The death here was that of a sterling young man on the cusp of his life. He committed no offense except to be visiting in Israel as part of an American University's M.B.A. program. He was murdered without regard to his individual personhood. In that sense, his murder was senseless. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Iran and Syria.

### b.      Moses and Moriah Families

278.    The death here was of a young man on the cusp of life. A high school student brutally slain while studying in the library. He was murdered without regard to his individual personhood and in that sense his murder was senseless. The boys at this school committed no offense. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### c.      Shitrit Family

279.    Thankfully Naftali Shitrit survived the massacre at the Merkaz Harav yeshiva. But he did not escape the physical trauma he suffered from being shot multiple times and almost killed, and he did not escape the psychological trauma he suffered waiting and hiding hearing gunshots and people screaming, while the terrorist searched for new victims. To this day Naftali Shitrit will never escape the physical and emotional reminders from the senseless act committed at the Merkaz HaRav Yeshiva where 8 boys were murdered and a number of others, including him, critically injured. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### d.      Brauner Family

280.    Shmuel Brauner is a young man who was walking by his synagogue when a rocket that was fired by Hamas from Gaza at the civilian population in Israel landed and he was injured by flying pieces of shrapnel. Shmuel Brauner almost died. He was injured not because of his personhood but in a senseless random attack. He committed no offense, yet he and his young family suffer the consequences to this day. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### e.  Parnas Family

281. The Parnas family's home was destroyed by a missile indiscriminately fired at the civilian population from Gaza. This was a senseless act designed to kill and create terror. To this day they suffer the trauma from this attack. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### f.  Lakin Family

282. The death here was that of a kind elderly gentleman, a grandfather on the bus on his way to an appointment. He committed no offense except to be on the bus in Israel. He was injured, ultimately succumbing to the wounds sustained in the attack, without regard to his individual personhood. In that sense, his murder was senseless. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Iran and Syria.

### g.  Rivkin Family

Menachem Mendel Rivkin was a man on his way to dinner with his wife who was six months pregnant at the time a terrorist attacked him from behind stabbing him twice. He was not attacked because of his personhood but in a senseless random act. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### h.  Glick Family

283. Yehuda Glick suffered and was attacked for exercising his right to speak and for being a symbol of the fight for religious freedom for all faiths. For this he was the target of an assassination attempt. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### H.      Damages for Non-U.S. Citizen Plaintiffs

284.    Because the Non-U.S. Citizen Plaintiffs do not have a direct cause of action under 28 U.S.C. § 1605A(c), their entitlement to compensatory damages depends on Israeli law. As Dr. Shnoor explains, Israeli law provides that an immediate family member of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim. *See* Shnoor Decl. at ¶ 59. (DE 34) The harm suffered by a secondary victim, such as the Non-U.S. Citizen Plaintiffs in this case, is compensable if (1) the family member witnessed the event or its consequences, (2) there is a time and space proximity between the two harms, and (3) the secondary victim suffers severe harm that disrupts daily function. *Id.* As described by Plaintiffs' expert, Dr. Shnoor, the Court understands that Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function. Shnoor Decl. ¶ 59; *see also Estate of Botvin*, 873 F. Supp. 2d at 245; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009) ("Under Israeli law emotional injury suffered as a result of the death of a loved one is generally not compensable unless it manifests as a psychiatric illness.").

### a.      Moriah Family Members

285.    The non-U.S. citizen family members of Avraham David Moses claiming damages are Avraham's stepbrothers and stepsisters, Chagit Moria Gibor, Eytan Moriah, Ifat Moria Cohen, Atara Moria Katz, and Tzur Moriah. Their claims are supported by the affidavit of their father, David Moriah, as well as their own affidavits, which describe the close family relationship that developed between Avraham and his stepsiblings after their father married Avraham's mother and became a part of their household in 2002. In addition, Plaintiffs have

provided the psychiatric evaluations and expert reports of Dr. Strous, which detail his psychiatric evaluations and diagnoses of each of these individuals.

286.    As described above, the Merkaz HaRav Yeshiva terrorist massacre was a national tragedy, but the public and collective feeling of grief could not have approached the intense personal pain and grief experienced by the families of the victims, including Avraham's stepbrothers and stepsisters. Although Avraham's family did not witness the attack, they all witnessed its consequences first-hand as they learned of Avraham's fate in the middle of the night, attended the long hours of intense and emotional public eulogies, and said farewell to Avraham before watching as the bodies of Avraham and seven other young students were lowered into the earth. Photographs of the pools of blood in the library where Avraham was slain and of his own blood-saturated clothing were sufficient to convey a sense of the savagery of the event.

287.    The intimate admissions of the recurring pain and difficulties that Chagit, Eytan, Ifat, Atara, and Tzur have experienced in the months and years after that terrible night due to Avraham's murder demonstrate that the injury they have suffered is severe enough to warrant damages under Israeli law. The tragedy precipitated a profound change in each of these Plaintiffs' social interactions and family relationships. They each describe an inability to adequately process and cope with their grief, which was clearly negatively affected by the fact that the siblings of seven other victims were mourning the loss of their biological brothers from the same event, while their family bond and relationship with Avraham lacked that genetic component. Yet the grief and pain of losing a stepbrother they had grown to love as their own, in such an unexpected and horrible way, deeply affected the ability of each of these Plaintiffs to live life with a positive outlook, and to be motivated to act and succeed each day. The severe

emotional and psychological effects on each of these members of Avraham's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

288.   Based upon the foregoing, the Court determines that these Plaintiffs are entitled to fifty percent increase beyond the usual $2,500,000 FSIA damages award for a plaintiff whose sibling was killed in a terror attack, and accordingly orders that Defendants pay $3,750,000 in damages to Chagit Moria Gibor, $3,750,000 in damages to Eytan Moriah, $3,750,000 in damages to Ifat Moria Cohen, $3,750,000 in damages to Atara Moria Katz, and $3,750,000 in damages to Tzur Moriah.

### b.      Shitrit Family

289.   The non-U.S. citizen family member of Naftali Shitrit claiming damages is his father Yaakov Shitrit. He supports his claim with a sworn declaration regarding his close relationship with Naftali. The declarations of Naftali's siblings and mother also inform this discussion. In addition, Mr. Shitrit has provided a psychiatric evaluations and expert report of Dr. Strous, which detail his psychiatric evaluations and diagnoses. (DE 35, Ex. 47).

290.   As described above, the Merkaz HaRav Yeshiva terrorist massacre was a national tragedy, but the public and collective feeling of grief could not have approached the intense personal pain and grief experienced by the families of the victims, including Naftali's father. Although Yaakov did not witness the attack, he experience the consequence as he waited and learned of Naftali's fate.

291.   The intimate admissions of the recurring pain and difficulties that the family endured after that terrible night demonstrate that the injury they have suffered is severe enough to warrant damages under Israeli law.

292.     Based upon the foregoing, the Court determines that Yaakov Shitrit is are entitled to a fifty percent increase beyond the usual $2,500,000 FSIA damages award for a plaintiff whose sibling was killed in a terror attack, and accordingly orders that Defendants pay $3,750,000 in damages.

### c.      Brauner Family

293.     The non-U.S. citizen family members of Shmuel Brauner claiming damages are his children, C.Y.B. and M.H.B. Their claims are supported by the affidavit of Nechama Brauner and the expert report of Dr. Strous regarding C.Y.B. and M.H.B.

294.     C.Y.B. and M.H.B. have suffered harm by Shmuel's injury and continuing disability caused by the terrorist rocket attack on his synagogue. Because Shmuel's injury is ongoing, the ongoing harm to his minor children is clearly related in time and space to the harm suffered by Shmuel. Moreover the harm to C.Y.B. and M.H.B. is indeed sufficiently severe to permit an award under Israeli law as it affects their daily lives in their social interactions, their daily feeling of insecurity and dependency on their mother, and their capabilities in school. These difficulties are also discussed in Dr. Strous's expert report, which this Court accepts and adopts in full.

295.     Based upon the foregoing, the Court determines that C.Y.B. and M.H.B. are entitled to a fifty percent increase beyond the usual $1,500,000 FSIA damages award for a plaintiff whose parent was injured in a terror attack, and accordingly orders that Defendants pay $2,250,000 in damages to C.Y.B. and $2,250,000 in damages to M.H.B.

### d.      Rivkin Family

296.     The non-U.S. citizen family member of Menachem Mendel Rivkin is his wife Bracha. Her claim is supported by her sworn affidavit (DE 71) and that of her husband the victim

Mehachem Mendel Rivkin as well as Dr. Rael Straus (DE 35) concerning the psychological and emotional trauma suffered by witnessing the terrorist stab her husband.

297.    According to Dr. Strous, Bracha Rivkin exhibited signs and symptoms of depression, anxiety and PTSD following her husband's stabbing and almost death in 2016. She witnessed the event and observed her husband's slow lapse into unconsciousness. The aftermath of the event led to a marked change in her mood and anxiety levels with her experiencing significant post-traumatic effects over the past year in addition to social dysfunctional behavior. Mrs. Rivkin reports nightmares, hypervigilance if anyone runs near her, flashbacks, a fear of returning to the place where the stabbing took place, decreased social life, and guilt for suggesting they eat at that particular place. Due to her difficulty coping with the trauma of witnessing her husband's stabbing and almost death, she attended trauma counselling to deal with her anxiety and post-traumatic symptoms. In addition, she met with a psychiatrist approximately a year after the traumatic event since she felt that the psychological counselling was not helping her enough with her disturbing thoughts and subsequent effects on her life.

298.    Mrs. Rivkin clearly expresses how her life has been significantly affected in light of her husband's injury and subsequent effects. Despite the treatment she received, it is not expected that her anxiety issues affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her for a long period.

299.    The court finds that plaintiffs have presented evidence to the court's satisfaction that Bracha Rivkin experienced and will continue to suffer PTSD, anxiety and stress, and that this stress affects all aspects of her life preventing her from functioning as she did prior to the attack. Accordingly the court will depart upward from the baseline amount of $4,000,000 and

grant Bracha Rivkin $6,000,000 in compensatory damages for the emotional pain and suffering associated with her witnessing the terrorist stabbing attack.

### e.      Glick Family

300.     The non-U.S. citizen family members of Yehuda Glick are two minor foster children RT and TT. Their claims are supported by the Declaration of Yehuda Glick and a report from Dr. Rael Strous (DE 35) concerning the emotional and psychological trauma suffered by the two children as a result of the shooting and injuries to Yehuda Glick. This was seen in the varying degrees of their depressive behavior. Yehuda Glick's injuries were so severe that he and his wife were gone for significant periods of time. RT had to be cared for by another family. She had been fostered by the Glicks for 10 years and the shooting was very traumatic, disrupting her family unit. She was withdrawn, her academic performance suffered, and she required therapy. Her mood only improved somewhat when Yehuda Glick and his wife came home. TT was also affected. She received counseling and therapy, and suffered academically as well. The shooting caused her stress and anxiety regarding her family unit.

301.     The court finds that plaintiffs have presented evidence to the court's satisfaction that RT and TT will continue to suffer, especially now that they have to deal with the death of their foster mother. Accordingly the court will depart upward from the baseline amount of $1,500,000 and grant RT $2,250,000 and TT $2,250,000.

## IV.

### CONCLUSION

302.     The deaths of Taylor Force, Richard Lakin and Avraham David Moses are tragic events for which money can never compensate their families. The serious injuries suffered by Shmuel Brauner, Mehachem Mendel Rivkin, Naftali Shitrit and Yehuda Glick are also senseless

traumatic and tragic events for which money can never fully compensate them or their families. The destruction of Daniella Parnass's home by missiles fired indiscriminately at civilian populations and the resultant emotional trauma can also never be fully compensated.

303.    However the Court finds that Iran and Syria provided material support to Hamas and facilitated the stabbing attack where Taylor Force was murdered, the Bus 78 attack where Richard Lakin was wounded and later died, and the Merkaz Harav yeshiva massacre where Avraham David Moses was murdered and Naftali Shitrit was critically injured. The Court further finds that Iran and Syria provided support to Hamas and facilitated the stabbing attack on Menachem Mendel Rivkin and the rocket attacks that injured Shmuel Brauner and Daniella Schwadron Parnass. The Court further finds that Iran and Syria provided material support to the Palestinian Islamic Jihad (PIJ) and facilitated the assassination attempt of Yehuda Glick. Damages will be awarded in accordance with these findings.

Dated:   Brooklyn, New York
              March 29, 2018

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the Plaintiffs*

by:   _____
         Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via ECF on all counsel of record herein.

Dated:   Brooklyn, New York
        March 29, 2018

                                               _____
                                               Robert J. Tolchin