**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TAYLOR FORCE, *et al.*,<br><br>*Plaintiff*,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>*Defendant.* | Civil Action No. 16-1468 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This civil action for compensatory and punitive damages arises under the terrorism

exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  The fifty-

seven plaintiffs are the victims of seven separate terrorist attacks that took place in Israel

between March 6, 2008 and March 8, 2016, and their family members.  Most of the plaintiffs are

U.S. citizens (including dual U.S.-Israeli nationals), although some are not.  Defendants include

the Islamic Republic of Iran, the Iranian Ministry of Information and Security ("MOIS"), and the

Syrian Arab Republic.  Plaintiffs assert that their injuries were caused by Iran and Syria's

provision of material support to two terrorist organizations—Hamas and Palestinian Islamic

Jihad ("PIJ").

To establish subject-matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism

exception to the FSIA, 28 U.S.C. § 1605A(a).  The forty-four U.S.-citizen plaintiffs, *see* Dkt. 87

at 41, also rely on another provision of the statute to supply a federal cause of action: They argue

that Iran and Syria violated § 1605A(c) by providing "material support" to Hamas and PIJ,

which, in turn, engaged in the extrajudicial killing (or attempted extrajudicial killing) of U.S.

nationals in the seven attacks at issue.  Dkt. 1 at 28–31 (Compl. ¶¶ 116–31).  Plaintiffs also assert

claims for negligence and aiding and abetting under Israeli law.  *Id.* at 31–34 (Compl. ¶¶ 132–51).  None of the Defendants has answered or otherwise appeared in this action.  Consequently, at Plaintiffs' request, the Clerk of the Court entered defaults against all three Defendants.  Dkt. 23; Dkt. 24.

Plaintiffs subsequently moved for the entry of a default judgments against the Islamic Republic of Iran, MOIS, and the Syrian Arab Republic, Dkt. 91, and for the appointment of a special master to conduct damages proceedings, Dkt. 85 at 1, 21–22.  As explained below, the U.S. national plaintiffs, with the exception of the Parnases, have established their right to relief against Iran, but not Syria, under 28 U.S.C. § 1605A(a).  The Court further concludes that the non-U.S.-citizen plaintiffs—with the exception of M.H.B and Y.A.L.B., who were born after the attack that injured their father—are entitled to recover under the law of Israel for negligence and aiding and abetting.  The Court will, accordingly, **DENY** the motion for entry of default judgment as to all claims by the Parnases without prejudice.  The Court will also **DENY** the motion for entry of default judgment as to all claims by M.H.B. and Y.A.L.B., who are represented by their parents, Schmuel and Nechama Brauner, without prejudice.  As to the remaining fifty-one Plaintiffs, the Court will **GRANT** the motion as to their claims against the Syrian Arab Republic, the Islamic Republic of Iran and MOIS, *see* 28 U.S.C. § 1608(e), and will **APPOINT** a special master to hear their damages claims and to report to the Court recommending the appropriate award as to those plaintiffs.

## I.  INTRODUCTION

Plaintiffs, forty-four U.S. nationals (or their estates) and thirteen non-U.S. nationals bring this action for damages against the Islamic Republic of Iran, MOIS, and the Syrian Arab Republic.  They allege that both countries "gave substantial aid, assistance[,] and encouragement

to . . . Hamas and PIJ . . . with the specific intention of causing and facilitating the commission of acts . . . including the terrorist attacks at issue." Dkt. 1 at 14, 18 (Compl. ¶¶ 53, 66). Plaintiffs effected service on the Syrian Arab Republic on November 14, 2016, Dkt. 15, and on the Islamic Republic of Iran and the MOIS on July 19, 2017, Dkt. 20. None of the Defendants has answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared. *See* Dkt. 21; Dkt. 22. Accordingly, at Plaintiffs' request, the Clerk of the Court declared all Defendants in default on November 14, 2017. *See* Dkt. 23; Dkt. 24.

Plaintiffs now seek entry of a default judgment with respect to liability against all three Defendants pursuant to Federal Rule of Civil Procedure 55. Dkt. 91. Even in a garden variety case, the entry of a default judgment "is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc*., 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—at a minimum—satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that the Court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is more narrowly circumscribed. By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d). *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)

("*Owens IV*"), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, No. 17-1268, 2020 WL 2515440 (U.S. May 18, 2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).   In a case, such as this, alleging that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).   But the Court must do so in light of Congress's purpose in enacting § 1605A—that is, to "compensate[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)) (first alteration in original)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens IV*, 864 F.3d at 785.   This means that, to obtain a default judgment against Iran, MOIS, and Syria, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens IV*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, *Owens IV*, 864 F.3d at 809 ("the pass-through approach remains viable"), by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Against this backdrop, the Court held a two-day hearing on liability, Dkt. 104; Dkt. 105, and received additional evidentiary submissions, Dkts. 21–84, as well as proposed findings of fact and conclusions of law from plaintiffs, *see* Dkt 87 (Proposed Findings of Fact); Dkt. 85 (Memorandum of Law).   In the course of the hearing, the Court applied the Federal Rules of Evidence, but did so on the understanding that, first, it has "the authority—indeed, . . . the

obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*, 774

F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (modifications in

*Han Kim*), and, second, that the Court need not "step into the shoes of the defaulting party and

pursue every possible evidentiary challenge," *Owens IV*, 864 F.3d at 785.  Recognizing that

expert testimony is not only entirely proper, but often sufficient, *id.* at 788, and even

indispensable in "terrorism cases . . . because firsthand evidence of terrorist activities is difficult,

if not impossible to obtain," *id.* at 787, the Court also considered the extensive expert testimony

Plaintiffs presented.[1]   Whether through expert testimony or other competent evidence, the Court

must ultimately determine whether the Plaintiffs have "substantiate[d] [the] essential element[s]

of jurisdiction" with admissible evidence.  *Id.* at 786.

The Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

Plaintiffs' evidentiary presentation included testimony from five experts and a dozen

exhibits.  *See* Dkt. 104, Dkt. 105.  The Court heard from Dr. Matt Levitt, an expert on "Iranian

sponsorship of terrorism including Hamas and [PIJ]," Dkt. 104 at 10 (Levitt); Colonel Arieh

Spitzen, an expert on "Palestinian terror groups that operate within the Palestinian territories," *id.*

at 53 (Spitzen); Dr. Benedetta Berti, the head of policy planning for the Secretary General of

NATO, Dkt. 105 at 5, 8 (Berti), and an expert on Syrian support for Hamas and PIJ, *id.* at 8

(Berti); Dr. Patrick Clawson, an expert on Iranian support for Hamas, *id.* at 60 (Clawson); and

Dr. Marius Deeb, an expert on Syrian support for terrorism, specifically for Hamas and PIJ, *id.* at

96–97 (Deeb).

---

[1]  The Court has reviewed the qualifications of Plaintiffs' expert witnesses and concludes that
each is qualified to offer the opinions discussed below.  Dkt. 104 at 10 (Levitt); *id.* at 53
(Spitzen); Dkt. 105 at 8 (Berti); *id.* at 60 (Clawson); *id.* at 96–97 (Deeb).

Based on the testimony of these witnesses, trial exhibits, and declarations submitted by Plaintiffs, the Court finds as follows:  First, Iran provided Hamas and PIJ with significant support in the form of arms and financial assistance, as well as training and technical expertise. Second, Syria provided both groups with a safe operational base from which to run their organizations.  Third, Hamas carried out six of the seven terror attacks at issue: (1) the March 8, 2016 stabbing of Plaintiff Taylor Force, which resulted in his death; (2) the January 27, 2016 stabbing of Plaintiff Menachem Mendel Rivkin, which resulted in severe physical injuries; (3) the October 13, 2015 bus massacre, which resulted in the death of Plaintiff Richard Lakin; (4) the August 19, 2011 rocket attack, which led to the injury of Schuel Brauner; (5) the November 21, 2012 rocket attack, which resulted in emotional injury to Plaintiffs Daniella Parnas, Noa Parnas, Dana Parnas, and A.P; (6) the March 6, 2008 Shooting at Merkaz HaRav Yeshiva, which resulted in the death of Plaintiff Avraham David Moses and severe physical injury to Plaintiff Naftali Shitrit.  Fourth, the Court concludes that PIJ carried out the October 28, 2014 shooting of Yehudah Glick, resulting in his severe physical injuries.

## A.     Iran's Material Support to Hamas and PIJ

### 1.     *Overview of Iran's Proxy Strategy*

Since the Islamic Revolution in 1979, the Islamic Republic of Iran, led by its Supreme Leader, has actively opposed Israeli interests in the Middle East.  Dkt. 32 at 7–8, 10–14 (Clawson Decl. ¶¶ 19, 27–28, 30).  One of the primary means by which Iran conducts this geopolitical strategy is by supporting non-state actors, including Hamas and PIJ, which share Iran's opposition to Israeli interests in the region.  *Id.* at 14 (Clawson Decl. ¶¶ 30–31); Dkt. 31 at 10–11 (Levitt Decl. ¶¶ 19, 22) (Hamas's opposition to Israel); *Id.* at 46–47 (Levitt Decl. ¶¶ 90–91, 93).  Iran has also, at times, encouraged individuals sharing Iran's goals of destroying the

state of Israel to conduct "lone wol[f]" attacks and has offered money to the families of suicide

bombers who terrorize Israeli civilians. *Id.* at 13 (Clawson Decl. ¶ 28). As a result, the United

States has, since 1984, continuously designated Iran as a state sponsor of terrorism. *Id.* at 10

(Clawson Decl. ¶ 27).

        2.    *Iran's Material Support to Hamas*

        Hamas is both an acronym for "Harakat al-Muqawama al-Islamiya," which translates to

"Islamic Resistance Movement," and is an Arabic word meaning "zeal." Dkt. 31 at 10 (Levitt

Decl. ¶ 19) (italics and internal quotation marks omitted). Founded in 1987, Hamas aims to

"establish[] in [Israel's] place an Islamist state." *Id.* at 10–11 (Levitt Decl. ¶¶ 19, 22). Hamas

"employs a three-pronged strategy to achieve this goal: (1) social welfare activity that builds

grassroots support for the organization, (2) political activity that competes with the secular

Palestinian Authority," and (3) "terrorist attacks that target Israeli soldiers and civilians." *Id.* at

10 (Levitt Decl. ¶ 19).

        Hamas deploys a wide variety of types of attacks, "from shooting[s], bombing[s],

stabbing[s], and vehicular attacks, to suicide operations and rocket barrages fired at Israeli

civilian population centers." *Id.* at 12 (Levitt Decl. ¶ 23). While the intended goal is to terrorize

the Israeli population, Hamas's attacks have killed individuals from around the world, including

"from the United States, the United Kingdom, Ukraine, Romania, China, the Philippines and

Sweden." *See id.* at 11 (Levitt Decl. ¶ 22). "Without the significant funding it needs to carry out

its terrorist, political, and social activities—which are interdependent and mutually reinforcing

endeavors—Hamas could not function." *Id.* at 21 (Levitt Decl. ¶ 41). "Estimates of Hamas'[s]

total annual budget range from $30 million to $90 million a year." *Id.* at 23 (Levitt Decl. ¶ 45)

Although the extent and nature of Iran's support for Hamas has varied over time, there is near-universal agreement that Iran has provided "critical" material support—in the form of cash, weapons, and training—for Hamas's terrorist activities since at least the mid-1990s. *Id.* at 21 (Levitt Decl. ¶ 41); *see also id.* at 29 (Levitt Decl. ¶¶ 58–59); Dkt. 32 at 14 (Clawson Decl. ¶ 30); Dkt. 31 at 38 (Levitt Decl. ¶ 76); *id.* at 37 (Levitt Decl. ¶¶ 73–7) (explaining that, even during a falling out over the Syrian civil war, "Iranian funding for Hamas never completely stopped"). Both Hamas and Iran have repeatedly acknowledged the support that Iran provides. *See, e.g.*, Dkt. 31 at 27 (Levitt Decl. ¶¶ 54–55) (collecting exemplary statements from Hamas leadership); Dkt. 32 at 23–24 (Clawson Decl. ¶ 58) (quoting Supreme Leader Khameini saying that "Iran . . . aids Hamas . . . in Palestine"). Beyond finances and weapons, "Iran also provides logistical support to Hamas and military training to its members," and oversees training camps in its own territory and in Lebanon for the purpose of training Hamas members. *Id.* at 29 (Levitt Decl. ¶ 58 (citation omitted)).

Iran began providing financial and logistical support for Hamas in the 1990s because of "Hamas'[s] willingness to perpetrate terrorist activities and bus bombings"—attacks that Iran encouraged and praised. Dkt. 32 at 14–15 (Clawson Decl. ¶¶ 35, 37). In these years, "Iran gave Hamas millions of dollars," which supported Hamas's terrorist activities, and "provid[ed] legitimate front activities behind which Hamas could hide its terrorist activities." *Id.* at 15 (Clawson Decl. ¶ 38); *see also* Dkt. 31 at 29–30 (Levitt Decl. ¶ 59) (summarizing different countries' estimates)*.* During this period, Iran paid Hamas "generously" for successful terrorist attacks. Dkt. 32 at 15 (Clawson Decl. ¶ 38). Iran also began smuggling rockets and weapons to Hamas in Gaza through tunnels between Egypt and Gaza. *Id.* at 19 (Clawson Decl. ¶ 50)

(quoting Yoram Cohen & Matthew Levitt, Washington Institute for Near East Policy, *Hamas Arms Smuggling: Egypt's Challenge* (March 2, 2009), available at https://www.washington institute.org/policy-analysis/view/hamas-arms-smuggling-egypts-challenge); Dkt. 31 at 34 (Levitt Decl. ¶ 66).  Iran also specially designed rockets that could fit through these tunnels for the purposes of smuggling them from Egypt into Gaza.  Dkt. 32 at 19 (Clawson Decl. ¶ 51).

In 2006, Hamas won a plurality of seats in the Palestinian parliament, prompting "Iranian support, finances, and arms [to] r[i]se exponentially."  *Id.* at 16 (Clawson Decl. ¶ 42). Israel's Intelligence and Terrorism Information Center reported that Iran "pledge[d] . . . $250 million to Hamas's Prime Minister Ismail Haniya in 2006 and 2007."  *Id.* (citing Intelligence and Terrorism Information Center, Iranian Support of Hamas 20–21 (Jan. 2009)).  In 2007, the Iran-Hamas relationship grew even closer after . . . Hamas took complete control of the Gaza Strip." *Id.* at 17 (Clawson Decl. ¶ 43).  Since 2008, "Gaza-based Palestinian groups have fired over 8,500 rockets into Israel," and Hamas has claimed credit for at least some of these attacks.  Dkt. 31 at 13 (Levitt Decl. ¶ 25).  Iranian officials, in turn, have claimed credit for providing Gaza-based groups with the technical expertise to "produce these missiles by themselves in large quantities."  *Id.* at 36 (Levitt Decl. ¶ 72 (citation omitted)); *see also* Dkt. 32 at 20–21 (Clawson Decl. ¶ 53) (detailing multiple intercepted efforts to smuggle arms into Gaza between 2009 and 2011 and those efforts' links to the Iranian government); Dkt. 31 at 34–37 (Levitt Decl. ¶¶ 66, 68, 72) (detailing, from multiple intelligence sources, Iran's provision of weapons to Hamas, specifically, from 2008 to 2012).

Around 2012, relations between Hamas and Iran cooled for several years as they took opposite sides of the Syrian Civil War, with Iran backing the Syrian regime led by Bashar Al-Assad and Hamas supporting certain rebel groups.  Dkt. 31 at 37 (Levitt Decl. ¶ 73).  "[Y]et,

Iranian funding for Hamas never completely stopped," *id.* (Levitt Decl. ¶ 74), and even as Iran decreased its support for Hamas's political activities, its military activities were "not as badly affected." *Id.* at 37–38 (Levitt Decl. ¶ 74).  By 2014, however, relations with Iran improved and Hamas found itself in an escalating conflict with Israel, during which many "of the arms Hamas deployed were the products of the Islamic Republic of Iran." *Id.* at 38 (Levitt Decl. ¶ 76 (quotation marks and citation omitted)).  That year, Israel intercepted a cargo ship believed to be headed to the Gaza Strip, carrying "40 M-302 rockets, 180 mortars, and approximately, 400,000 rounds of ammunition," all "hidden inside crates of cement labeled 'Made in Iran.'" *Id.* at 14 (Levitt Decl. ¶ 27) (citing Israeli Ministry of Foreign Affairs, *Missile Shipment from Iran to Gaza Intercepted*, (Mar. 5, 2014), https://mfa.gov.il/MFA/PressRoom/2014/Pages/Missile-shipment-from-Iran-to-Gaza-intercepted-5-Mar-2014.aspx).  And, by 2015, Iran was reported to be sending literal "suitcases of cash . . . to Hamas'[s] military wing in Gaza," *id.* at 42 (Levitt Decl. ¶ 84) (citation omitted), and was reportedly continuing to "provid[e] missile technology that Hamas used to construct its own rockets and [to] help[] [Hamas] rebuild tunnels destroyed in the conflict with Israel." Dkt. 31 at 39 (Levitt Decl. ¶ 78) (citation omitted).

Accordingly, based on the unrebutted testimony offered by the Plaintiffs' experts, the Court finds that Iran provided material support in the form of arms, training, funds, and technology to Hamas at least from 2006 to 2016.

### 3.   *Iran's Material Support to PIJ*

PIJ—short for Palestinian Islamic Jihad or Al-Jihad Al-Islami fi Filastin—grew out of a Palestinian student movement in Cairo led, most notably, by Fathi Shiqaqi.  Dkt. 31 at 46–47 (Levitt Decl. ¶¶ 90, 93).  Shiqaqi, inspired by the 1979 Iranian Revolution, "believed that a campaign of spectacular terrorist attacks against Israel in the name of revolutionary Islam would

inspire popular revolt" and lead to the destruction of Israel.  *Id.*; *see also id.* at 46 (Levitt Decl. ¶ 91).  PIJ began carrying out attacks—financed by "Iran's mullahs"—against Israeli soldiers in the mid-1980s.  *Id.* at 47 (Levitt Decl. ¶ 93).  By the 1990s, PIJ operatives were training at Iranian-backed Hezbollah camps in Lebanon, under "under the supervision" of Iranian Islamic Revolutionary Guards stationed in that country.  *Id.* at 48 (Levitt Decl. ¶ 95).  PIJ executed "a deadly string of terrorist attacks" in Israel up until Shiqaqi's assassination in October 1995, which created "a void in the organization so deep that," by 1997, "the group barely function[ed]."  *Id.* at 50–51 (Levitt Decl. ¶ 101) (citation omitted).  Following the collapse of Israeli-Palestinian peace talks in 2000, PIJ bomb makers and recruiters were released en masse from jail, leading to the group's resurgence.  *Id.* at 51 (Levitt Decl. ¶ 102).  From September 2002 to October 2003, PIJ "carried out over 440 terrorist attacks, including suicide bombings . . . , killing over 130 Israelis and wounding approximately 880 more."  *Id.* (Levitt Decl. ¶ 103).  The U.S. Department of State has, accordingly, designated PIJ as a foreign terrorist organization each year since 1997.  *Id.* at 52–53 (Levitt Decl. ¶ 107).

There is evidence that Iran has been funding PIJ since as early as 1993, *Id.* at 54 (Levitt Decl. ¶ 110), but Iran's support of PIJ increased as PIJ carried out more successful attacks in the early 2000s, *id.* at 53 (Levitt Decl. ¶ 108) (explaining Iran's promise to increase funding for PIJ by 70 percent in 2002 "to cover the expense of recruiting young Palestinians for suicide operations" (citation omitted)); *see also id.* ("Tehran instituted an incentive system in which millions of dollars in cash bonuses are conferred to [PIJ] for successful attacks.").  In 2011, as the "wedge" was developing between Hamas and Iran over the Syrian civil war, Iran further increased its support for PIJ.  *Id.* at 54–55 (Levitt Decl. ¶ 112).

Iran's support for PIJ has included "weapons, training, and funding." *Id.* at 55 (Levitt Decl. ¶ 112) (quoting U.S. Dep't of State, Bureau of Counterterrorism, Country Reports on Terrorism 2014 (June 2015)).  In 2014, Israeli authorities intercepted a ship carrying mortars, bullets, and rockets "destined for Hamas and PIJ in Gaza" that were packed in containers featuring "seals of the Iranian postal company." *Id.* (citations omitted).  This is consistent with PIJ's own spokesman's acknowledgment that "[a]ll of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ." *Id.* (Levitt Decl. ¶ 113) (citation omitted); *see also id.* at 56 (Levitt Decl. ¶ 115) (collecting statements confirming Iran's support for PIJ).

In August 2014, Israel and Hamas brokered a ceasefire in Gaza, increasing PIJ's interest in expanding its activities to the West Bank. Dkt. 32 at 28 (Clawson Decl. ¶ 67).  In mid-October 2014, PIJ leader Ramadan Abdullah Mohammad Shallah traveled to Tehran to meet with a series of high-ranking Iranian officials, including Supreme Leader Khamenei. *Id.* at 28–29 (Clawson Decl. ¶ 68).  These meetings, which took place just two weeks before the shooting of Plaintiff Yehuda Glick in Jerusalem by a PIJ member, focused on the need for PIJ to expand into the West Bank. *Id.* at 28 (Clawson Decl. ¶¶ 67–68).

Accordingly, the Court finds that Iran provided material support to PIJ until at least the end of 2014.

**B.      Syria's Material Support to Hamas and PIJ**

1.      *Overview of Syria's Proxy Strategy*

Syria's government has "long held the belief that becoming involved [in] and having a strong influence on the dynamics of the Israeli-Palestinian conflict is an important foreign policy interest for Syria." Dkt. 29 at 11 (Berti Decl. ¶ 21).  Syria has, since the 1970s, been ruled by the

Al-Assad family and their allies, who are members the minority Alawi (Shia) sect.  *Id.* at 10–11

(Berti Decl. ¶¶ 19–21).  Accordingly, the Syrian government has had a "constant need to

legitimize its power" to both the Sunni majority in Syria and to Sunni regimes in the region.  *Id.*

(Berti Decl. ¶ 20).   To do so, the Syrian government has tried to be "seen as a key champion of

Palestinian rights."  *Id.*

This geopolitical strategy also aligns with Syria's own interests vis-à-vis Israel.  "[T]he

two countries have been in a state of latent (and at times open) conflict since 1948."  *Id.*  During

the Six-Day War in 1967, Israel seized portions of the Golan Heights, which had previously been

under Syrian control.  *Id.*  Syria has consistently demanded "the return of the areas of the Golan

Heights that have been under Israeli control as a result of . . . the Six-[D]ay war."  *Id.*

Accordingly, while "in principle" Syria is not opposed to "a political settlement" of Israel's

conflicts with it or the Palestinians, it has, "in practice . . . demonstrated its willingness to

criticize and derail any peace process or negotiations" that it finds to be unfavorable.  *Id.* at 11

(Berti Decl. ¶ 21).  For example, in 1993, "Syria became the de facto political and

communication base of all the main factions" opposing the Oslo Accords, *id.* at 12 (Berti Decl. ¶

24), which were a series of agreements signed between the Palestinian Liberation Organization

and Israel that created the Palestinian Authority, Dkt. 30 at 5 (Deeb Decl. ¶ 16).  Due in part to

Syrian President Hafez Al-Assad's "personal . . . antagonism" with PLO and Fatah leader Yassar

Arafat, Syria "sponsored the creation of the Alliance of Palestinian Forces," an umbrella group

of organizations—including both Hamas and PIJ—that opposed to the Oslo Accords.  Dkt. 29 at

12 (Berti Decl. ¶ 24).

2.      *Syria's Support to Hamas*

Syria's relationship with Hamas dates back to at least the early 1990s, when Hamas "opened an office in Damascus." *Id.* at 12 (Berti Decl. ¶ 23).  That relationship was strengthened by Hamas's participation in Syria's coordinated campaign opposing the Oslo Accords in 1993. *Id.* at 12–13 (Berti Decl. ¶ 24).  By the early 2000s, Hamas had moved its political bureau to Damascus, *id.* at 13 (Berti Decl. ¶ 25), and three of the group's top leaders—all of whom were classified as Specially Designated Global Terrorists by United States Department of Treasury— had relocated to Damascus, *id.* at 19–20 (Berti Decl. ¶ 34).  In 2002, one Israeli newspaper reported that Syria "offer[ed] aid as an incentive for Hamas . . . to resume and intensify suicide attacks against Israel . . . , following efforts to diffuse the conflict."  *Id.* at 25–26 (Berti Decl. ¶ 45) (citing Ze'ev Schiff, *Sources Say Syria Pushing Hamas to Renew Attacks*, Ha'aretz (May 20, 2002), available at http://www.haaretz.com/sources-say-syria-pushing-hamas-to-renew-attacks-1.44698).

Until 2012, Damascus served as a "safe base," enabling Hamas to "conduct its foreign relations, communicate to the world, host its military leaders . . . [, and] plan its violent operations and fundraise."  *Id.* at 15 (Berti Decl. ¶ 28); *see* Dkt. 30 at 5–6 (Deeb Decl. ¶ 19) (Damascus was Hamas's "safe haven").  From its operational base in Damascus, Hamas directed attacks in the West Bank and Gaza, Dkt. 29 at 23 (Berti Decl. ¶ 41), conducted foreign relations, *id.* at 15 (Berti Decl. ¶ 28), and trained operatives at a camp near Damascus, *id.* at 31 (Berti Decl. ¶ 55).  Hamas's base in Damascus "grew so powerful that it was able to control and direct operational decisions, at times even going against the wishes of Hamas's leaders within Gaza." Dkt. 30 at 6 (Deeb Decl. ¶ 19).  The Syrian regime did not "forcefully or systematically crack[]

down" on these activities but, instead, according to Professor Berti, "remained supportive of Hamas's militant activities." Dkt. 29 at 25 (Berti Decl. ¶ 45).

In addition, Hamas used its operational base in Syria to fundraise in and to smuggle arms through that country, providing operational support for its activities in Gaza. *Id.* at 29–30 (Berti Decl. ¶¶ 52–54). Hamas's military commander in the West Bank, Jamal Muhammad Farah al-Tawil, for example, received funds from Hamas leaders in Damascus via an "ad-hoc charity set up by al-Tawil." *See id.* at 29 (Berti Decl. ¶ 52). As Professor Berti further explained, Hamas routed "weapons shipments originating from Iran . . . through Syria []and from there to Gaza." *Id.* at 29–30 (Berti Decl. ¶ 53). Hamas's arsenal has also grown "through the use of parts 'thought to originate in Syria.'" *Id.* at 30 (Berti Decl. ¶ 53) (citation omitted). More generally, "Syrian sponsorship and support has enabled Hamas . . . to at times carry out military training in Syria . . . where operatives have acquired essential tactical skills and knowledge enabling them to carry out ever more sophisticated attacks." *Id.* at 31 (Berti Decl. ¶ 55).

Hamas and Syria's relationship has, however, been "strained" since 2012 when Hamas began supporting rebel forces against the Assad regime in the Syrian Civil War. Dkt. 30 at 7 (Deeb Decl. ¶ 22); *see* Dkt. 29 at 32–33 (Berti Decl. ¶ 56) (discussing their gradual distancing from one another). Due to the increasing violence used by the Syrian regime against its Sunni population during the civil war, Hamas eventually left Damascus and relocated its political headquarters outside of Syria. Dkt. 29 at 32–33 (Berti Decl. ¶ 56). In 2016, Hamas even "publicly denounce[ed]" Syria's "tactics and its attacks against the civilian population." *Id.* at 33 (Berti Decl. ¶ 56) (citation omitted).

Despite Hamas's falling out with Syria, the support that Syria provided to Hamas prior to 2012 "solidified Hamas's organizational structure and transformed it into a leading terrorist

organization with the sophistication needed to carry out terror attacks."  Dkt. 30 at 9 (Deeb Decl.

¶ 30); *see* Dkt. 29 at 34 (Berti Decl. ¶ 59).  And, by "hosting [Hamas], Syria offered symbolic

validation, political support, legitimacy and freedom of [movement], all of which enabled

[Hamas] to grow and develop, to boost regional status and credibility, as well as to increase [its]

military capabilities and solidify [itself] as [a] major player[] in the Palestinian arena."  Dkt. 29

at 21 (Berti Decl. ¶ 37).  "The substantial organizational support [that] Syria [once] provided to

Hamas . . . ultimately enabl[ed] it to rise in status and sophistication."  *Id.* at 34 (Berti Decl. ¶

59–60).  Thus, according to Professor Berti, "the effects of Syria's support . . . will continue to

be relevant for years to come."  *Id.*

The Court therefore finds that Syria provided support, in the form of an undisturbed

operational base in that country from which Hamas raised funds, trained operatives, smuggled

arms, and conducted its political and foreign relations activities, until at least 2012.

3.      *Syria's Support to PIJ*

PIJ similarly benefitted from a safe operating base in Syria and the political legitimacy

and regional influence that came with Syria's welcome.  *See id.* at 21 (Berti Decl. ¶ 37).  PIJ

established its Damascus office in 1989 and, "[s]ince then, the group has maintained a permanent

base in Syria."  *Id.* at 17 (Berti Decl. ¶ 32).  PIJ leadership in Damascus "control[led] all PIJ

officials, activists and terrorists in the West Bank and Gaza."  *Id.* at 25 (Berti Decl. ¶ 44)

(quoting U.S. Dep't of Treasury, *Treasury Designates Charity Funneling Money to Palestinian*

*Islamic Jihad* (April 5, 2005), available at https://www.treasury.gov/press-center/press-

releases/Pages/js2426.aspx).  From Damascus, PIJ leadership also "conducted a vast array of

communication, political, fundraising, [and] operational activities."  *Id.*  PIJ, like Hamas, has

also maintained a training facility—which reportedly also contains weapons depots—near

Damascus. *Id.* at 31 (Berti Decl. ¶ 55). Beyond merely "open[ing] Damascus" to PIJ, the Syrian regime has, at times, "worried about [PIJ] and [its] leaders' security." *Id.* at 18 (Berti Decl. ¶ 34.1).

Unlike Hamas, PIJ aligned itself with the Syrian government, rather than rebel factions, during the Syrian civil war and thus continues to enjoy Syria's support. *Id.* at 33 (Berti Decl. ¶ 57). Accordingly, the Court finds that Syria has provided support to PIJ in the form of a safe operational base from which it has been able to freely fundraise, train operatives, and direct attacks until at least 2018, when Plaintiffs moved for default judgment.

**C.     March 8, 2016 Stabbing**

   1.     *Killing of Taylor Force*

At approximately 6:20 p.m. on March 8, 2016, Bashar Muhammad Abd al-Qader Masalha exited a mosque and began stabbing passersby in the Port of Jaffa, just south of Tel Aviv. Dkt. 33 at 49–50 (Spitzen Decl. ¶¶ 128–29). He first stabbed a couple of Russian tourists near the mosque, *id.* at 50 (Spitzen Decl. ¶ 129), before moving "in the direction of the Promeade along the Tel Aviv coast shouting 'Allahu Akbar,'" *id.* Masalha approached a group of American tourists on the boardwalk and repeatedly stabbed Plaintiff Taylor Force (a U.S. Citizen) in the neck, chest and back. *Id.*; *see also* Dkt. 44 at 2 (S. Force Decl. ¶ 12). At the time of the attack, Taylor, a West Point graduate and U.S. army veteran, was on a trip to Israel with a group of M.B.A. students from Vanderbilt University's Owen Graduate School of Management. Dkt 33 at 49 (Spitzen Decl. ¶ 128); Dkt. 44 at 1–2 (S. Force Decl. ¶¶ 5, 6). He died from his injuries on the way to the hospital. Dkt. 44 at 2 (S. Force Decl. ¶ 12). Before Masalha was stopped and killed by the police, he injured ten others. Dkt. 33 at 47–48; Dkt. 33 at 51 (Spitzen Decl. ¶ 129).

The estate of Taylor Force (a U.S. Citizen) is a plaintiff in this case.  Dkt. 1 at 5 (Compl. ¶ 5).  His father, Stuart Force, mother, Robbi Force, and sister, Kristen Force—all of whom are U.S. citizens—also seek damages for the "severe psychological, emotional and other personal injuries" they suffered as a result of his death, including loss of consortium and loss of solatium.  Dkt. 1 at 5–6, 31 (Compl. ¶¶ 5–7, 128); *see also* Dkt. 42 (K. Force Decl.); Dkt. 43 (R. Force Decl.); Dkt. 44 (S. Force Decl.).

2.      *Attribution to Hamas*

According to Colonel Arieh Dan Spitzen, an expert on Palestinian affairs and society and Palestinian Islamic terrorist groups, including Hamas, there is an "unmistakable connection between the attack and the Hamas organization."  Dkt. 33 at 4, 55 (Spitzen Decl. ¶¶ 1, 144).  In support of his conclusion, he offers three observations.

*First*, Spitzen explains that the attack along the Tel Aviv Promenade "b[ore] the hallmarks" of a Palestinian terror attack incited by Hamas, *id.* at 61 (Spitzen Decl. ¶ 160), and was "part of [a] . . . wave of Palestinian terror attacks in Israel[] which began in September 2015 and continued until the end of 2016," *id.* at 18–24, 51 (Spitzen Decl. ¶¶ 51–69, 130).  During this "wave" of attacks, senior Hamas leaders routinely called on "the Palestinian population to mount attacks in the form of stabbings, vehicular ramming attacks, and even gunfire" against Israelis. *Id.* at 20 (Spitzen Decl. ¶ 57).  In February 2016, Khaled Mash'al, the leader of Hamas at the time, described these attacks as "heroic operations of the young men and women of the Intifada." *Id.* (citation omitted).

*Second*, Masalha's background reveals that he was influenced by Hamas's ideology. Masalha was from the village of Hajja.  *Id.* at 53–55 (Spitzen Decl. ¶¶ 136, 138–143).  Spitzen, who reviewed Masalha's Facebook page, testified that "during the months immediately

18

preceding the terrorist attack" Masalha displayed an "increasing religious fervor."  Dkt. 104 at 64

(Spitzen).  For instance, "he listened for a long period of time" to the sermons of Sheikh Arifi, a

member of the Muslim Brotherhood (of which Hamas is a branch), who espoused "radical

Islamic religious" ideology consistent with that of Hamas.  *Id.* at 65 (Spitzen); Dkt. 33 at 54–55

(Spitzen Decl. ¶¶ 139, 143).  From Masalha's Facebook activity, Spitzen deduced that, "about a

month before the attack, Masalha was already publicly acknowledging that he sought to die as a

shahid [martyr]."  Dkt. 33 at 55 (Spitzen Decl. ¶ 141).

*Finally*, and most significantly, Hamas took responsibility for the attack.  *See id.* at 55–56

(Spitzen Decl. ¶ 144).  The day of the attack, photos and messages from Masalha's Facebook

account were posted to the PALINFO website, which is identified with Hamas.  *Id.* at 56–57

(Spitzen Decl. ¶ 147).  Two days later, a banner was posted on the same website, stating:

"Hamas announces that its son, the Shahid and holy warrior [Mujahid in Arabic] Bashar

Muhammad Masalha, carried out the heroic stabbing operation in Jaffa, in which a Zionist was

killed and 10 others injured."  *Id.* (Spitzen Decl. ¶¶ 145–147).  Masalha's connection to Hamas

and the movement was made even clearer at his funeral.  *Id.* at 58 (Spitzen Decl. ¶ 150).

According to Spitzen, mourners "were seen bearing Hamas flags and enthusiastic cries of

support for Ahmad Yassin, founder of Hamas, were heard."  *Id.*  The funeral included "speeches

praising Masalha's operation."  *Id.*  "Palestinian Authority security forces[] also arrested a

number of the funeral's participants as part of a series of arrests of open Hamas supporters."  *Id.*

at 58–59 (Spitzen Decl. ¶ 150).

In light of the above, the Court concludes that Taylor Force was the victim of a Hamas

terror attack.

**D.      January 27, 2016 Stabbing**

      1.      *Stabbing of Menachem Mendel Rivkin*

At around 11:00 p.m. on January 27, 2016, a seventeen-year-old boy named Abada (Ubada) Abu Ras attacked Plaintiff Menachem Mendel Rivkin ("Menachem")—an American citizen—with a knife in the town of Givat Ze'ev. *See* Dkt. 72 at 1 (M. Rivkin Decl. ¶¶ 1–3); *see also* Dkt. 104 at 69 (Spitzen). Menachem and his wife had parked their car at a gas station and were walking to the restaurant next door. Dkt. 71 at 1 (B. Rivkin Decl. ¶ 3). Unbeknownst to them, Abu Ras had been following them. *Id.* Abu Ras appeared "[s]uddenly, out of nowhere," and stabbed Menachem two times in the upper left side of his back with a 16 cm knife that he had concealed in his clothing and then fled the scene. Dkt. 72 at 1 (M. Rivkin Decl. ¶ 3); Dkt. 33 at 62–63 (Spitzen Decl. ¶¶ 163, 165). The attack happened so fast that Bracha did not even see Abu Ras before he was running away. Dkt. 71 at 1 (B. Rivkin ¶ 4). Menachem called out that he had been stabbed and collapsed on the ground. *Id.* at 2 (M. Rivkin Decl. ¶ 4). His wife ran to get help and "pounded on the door" of the restaurant. Dkt. 71 at 1–2 (B. Rivkin Decl. ¶ 5). Menachem was eventually "rushed into an ambulance" and taken to Sha'are Tzedek Hospital. Dkt. 72 at 2 (M. Rivkin Decl. ¶¶ 5–6). Abu Ras attempted to flee the scene but was overpowered by other people present and handed over to security forces when they arrived. Dkt. 33 at 63 (Spitzen Decl. ¶ 165).

      As a result of his wounds, Menachem lost consciousness for one-and-a-half days. *Id.* at 2 (M. Rivkin Decl. ¶¶ 6–7); *see also* Dkt. 71 at 2 (B. Rivkin Decl. ¶ 10). He suffered "massive internal bleeding." Dkt. 72 at 2–3 (M. Rivkin Decl. ¶¶ 8, 11); *see also* Dkt. 73-1 at 1 (Friedman Medical Report). Menachem was treated in the ICU for four days and was discharged from the hospital after eight days. *Id.* at 2 (M. Rivkin Decl. ¶ 9); *see also* Dkt. 73-1 at 2 (Friedman

Medical Report).  Afterwards, Menachem remained at home for three months because of his "weak physical and emotional state."  Dkt. 72 at 3 (M. Rivkin Decl. ¶ 12).  During this time, he continued to experience difficulty breathing and was twice hospitalized for breathing complications arising from the attack.  *Id*. at 3 (M. Rivkin Decl. ¶ 12).  To this day, Menachem "often experience[s] terrible pain" in the location of his scar from the stabbing.  *Id*. at 3 (M. Rivkin Decl. ¶ 14).  The attack still "haunts" him psychologically as well.  *Id*. at 3 (M. Rivkin Decl. ¶ 15); *see also* Dkt. 35-38 at 7 (Strous Psychiatric Evaluation of M. Rivkin).

The attack also deeply affected Menachem's wife and children, all of whom are also plaintiffs in this action.  Bracha Rivkin, Menachem's wife, who is an Israeli citizen, alleges that the attack caused her "severe emotional and psychological injuries."  Dkt. 1 at 21 (Compl. ¶ 79).  She was six months pregnant at the time.  Dkt. 71 at 1 (B. Rivkin ¶ 2).  Bracha and Menachem's children—S.S.R., M.M.R., R.M.R., and S.Z.R.—all of whom are American citizens, also seek damages for their mental and emotional anguish.  *See* Dkt. 1 at 30–31 (Compl. ¶ 127); Dkt. 71 at 3–4 (B. Rivkin Decl. ¶¶ 15, 17–22) (describing effect of attack on their children); Dkt. 72 at 4–5 (M. Rivkin Decl. ¶¶ 18–22) (same).

2.    *Attribution to Hamas*

Based on Abu Ras's background and statements published on Hamas websites after the attack, Colonel Spitzen attests that the stabbing of Menachem Rivkin was linked to Hamas.  *See* Dkt. 33 at 61–72 (A. Spitzen Decl. ¶¶ 162–187).

To begin, Spitzen explains that the attack was planned in advance.  Spitzen relies, in particular, on two photos that Abu Ras uploaded to his Facebook page before the attack.  The first, posted "[s]everal days prior to the attack," showed him "masked and sitting in a car with emojis of smiley faces and knives."  *Id.* at 64 (Spitzen Decl. ¶ 169).  The second, posted the night

21

of the attack, was accompanied by the following caption: "I ask Allah to grant me the *Shahada*

(death of shahid- martyrdom)." *Id.* at 62 (Spitzen Decl. ¶ 163).  According to Spitzen, these posts

show that Abu Ras "inten[ded] to execute the attack during which he was hoping to die" as a

martyr.  *Id.*  Abu Ras, moreover, had confided his plan to his cousin.  *Id.*  He originally intended

to stab an Israeli soldier "at an IDF checkpoint (known as Al-Jib Crossing), not far from his

village, near Givat Ze'ev." *Id.* (Spitzen Decl. ¶ 164).  When Abu Ras arrived at the checkpoint,

however, he "noticed that the soldiers . . . were inside the guard post which made it more

difficult . . . to attack them," so "he turned along a side path to a gas station in Givat Ze'ev in

order to find a Jew, stab him[,] and kill him." *Id.* at 62–63 (Spitzen Decl. ¶ 164).

Spitzen further opines that Abu Ras carried out the attack because of his Hamas ideology.

Abu Ras's father, Aziz Mustafa Abd al-Qader Abu Ras, is a "known Hamas operative," who has

been "arrested several times by the Israeli security forces."  *Id*. at 66 (Spitzen Decl. ¶ 173).  In

fact, Aziz Abu Ras was among the "450 Hamas members deported in 1992" to Lebanon who are

considered the "fathers of the Hamas organization."  Dkt. 104 at 69–70 (Spitzen).  At the

evidentiary hearing, Spitzen testified, moreover, that it is clear that Hamas's ideology was also

deeply ingrained in Abu Ras.  *Id.* at 70–71 (Spitzen).  Based on the forensic evidence in Abu

Ras's police file, Spitzen noted that Abu Ras's Facebook page "looks like a Hamas website."  *Id*.

Prior to the attack, he had uploaded multiple posts expressing admiration for the perpetrators of

terrorist attacks (including stabbings) and his desire to die as a martyr.  Dkt. 33 at 67–68 (Spitzen

Decl. ¶ 174).  He also "posted photographs that indicate[d] support for Hamas, [and] support for

the Izz a-Din al-Qassam Brigades," including pictures of "himself carrying the Hamas flags."

Dkt. 104 at 71 (Spitzen).

22

Multiple other sources confirm Abu Ras's connection to Hamas.  On the day of the attack, a photo was posted to a Hamas-affiliate website depicting Abu Ras holding a Hamas flag. Dkt. 33 at 68 (Spitzen Decl. ¶ 176).  According to Spitzen, "Hamas social media" also made Abu Ras's affiliation "crystal clear," with references such as, "[l]ike father like son."  Dkt. 104 at 72 (Spitzen).  Finally, on Abu Ras's own website, which was eventually taken down, a "statement appears in which [] Hamas took responsibility and called him a son of the movement."  *Id.* Although Hamas "wouldn't take official responsibility" during the period of time that these statements of support appeared, Spitzen explains that this was to protect Abu Ras.  *Id.* at 73 (Spitzen).  Had Hamas claimed responsibility, Abu Ras would have faced an additional count in his indictment for "membership [in] an illegal organization.  *Id.*  By suspending its claim of responsibility, Hamas enabled Abu Ras to accept a plea bargain in which the "count of membership in a terrorist organization" was not included.  *Id.*

In light of the above, Spitzen opines that Abu Ras "identif[ied] with Hamas and its ideology[] and committed the [attack] in response to the call of the organization."  Dkt. 33 at 69– 70 (Spitzen Decl. ¶ 178).  The Court credits Spitzen's testimony and concludes that Abu Ras carried out the stabbing in furtherance of Hamas's ideology and terrorist agenda.

## E.    October 13, 2015 "Bus 78 Massacre"

### 1.    *Killing of Richard Lakin*

On the morning of October 13, 2015, two Hamas operatives, Bilal Omar Mahmoud Abu Ghanem and Bahaa' Muhammad Khalil Alyan, boarded Egged bus number 78 in the Armon Hanatziv neighborhood of Jerusalem.  Dkt. 33 at 24–25 (Spitzen Decl. ¶ 70).  Abu Ghanem was armed with a gun, and Alyan carried a knife.  *Id.* at 27 (Spitzen Decl. ¶ 74).  They hid their weapons under their clothing and waited for the bus to pick up other passengers.  *Id.* at 32

(Spitzen Decl. ¶ 83).  When the bus became full, Abu Ghanem proceeded to the back, where he shot passengers at close range.  *Id.* (Spitzen Decl. ¶ 84).  Alyan used his knife to stab passengers near the front of the bus.  *Id.*  Survivors later reported that the two shouted, "Alluh Akbar" while attacking passengers, an expression "of the superiority of Allah and His ones" that is "frequently used . . . by Islamist terrorists."  *Id.* at 33 (Spitzen Decl. ¶ 84 & n.41).

When the bus driver realized what was happening, he stopped the bus and opened the doors so that passengers could escape.  *Id.*  (Spitzen Decl. ¶ 85).  Abu Ghanem and Alyan shut the doors, however, and continued to stab and shoot the passengers trapped inside.  *Id.*  Colonel Spitzen testified that, even after "the bullets in the gun had been depleted and the knife had broken inside one of the passenger's bodies," Abu Ghanem and Alyan "tried to suffocate the passengers with their bare hands."  Dkt. 104 at 58 (Spitzen).  The massacre ended when Border Police officers and patrol policemen arrived at the scene and shot both men, killing Alyan.  Dkt. 33 at 24–25 (Spitzen Decl. ¶ 70).[2]

Nine passengers were injured and two died, including Richard Lakin.  *Id.* (Spitzen).  Lakin was shot in the head and stabbed in the stomach.  *Id.* (Spitzen).  He was taken to the hospital unconscious and in critical condition.  *Id.* (Spitzen).  Two weeks later, on October 27, 2015, Lakin succumbed to his injuries.  *Id.* (Spitzen).  The estate of Richard Lakin (a U.S. Citizen), is a plaintiff in this case.  Dkt. 1 at 7 (Compl. ¶ 16).  His son, Micah Lakin Avni, and daughter, Manya Lakin—both of whom are U.S. citizens—also seek damages for the "severe psychological, emotional and other personal injuries" they suffered as a result of his death,

---

[2]  Colonel Spitzen testified that his account of the terror attack is based upon "the court file of Abu Ghanem, the file of the Israel police, which contained both forensic findings as well as interrogations of . . . Abu Ghanem himself, and questioning of passengers and passersby who were on the scene."  Dkt. 104 at 58 (Spitzen).

including loss of consortium and loss of solatium.  *Id.* at 31 (Compl. ¶ 128); *see also* Dkt. 54

(Manya Lakin Aff.); Dkt. 55 (Micah Lakin Aff.).

       2.    *Attribution to Hamas*

       The Bus 78 massacre was part of a wave of terror attacks that began in September 2015,

in the midst of the Jewish High Holidays.  Dkt. 33 at 25 (Spitzen Decl. ¶ 71).  Although Alyan

did not have any known Hamas affiliation, Abu Ghanem was a known Hamas operative, who

had been imprisoned from September 2013 to October 2014 for his involvement in the Islamic

Bloc, the student wing of Hamas.  *Id.* at 48 (Spitzen Decl. ¶ 126); *see also id.* at 35–36 (Spitzen

Decl. ¶¶ 91, 94–96); Dkt. 104 at 63 (Spitzen).  During his 2013 police interrogation, Abu

Ghanem also admitted that he had "relations with senior members of the military wing of

Hamas," one of whom was his cousin.  Dkt. 104 at 59–60 (Spitzen).  Hamas, for its part, publicly

claimed Abu Ghanem as an operative of the organization on its website and referred to him as a

Hamas prisoner.  Dkt. 33 at 38 (Spitzen Decl. ¶ 100).  After the bus attack, Hamas published that

Abu Ghanem was a "commander in the Islamic Bloc at Al-Quds University in Abu Dis."  *Id.*

       Abu Ghanem denied principal responsibility for the attack, however, after he was

captured.  He gave the following account: The night before the attack, Alyan visited him at work

and told him that he (Alyan) had 20,000 shekels for purchasing a firearm to carry out a terror

attack.  *Id.* at 26–27 (Spitzen Decl. ¶ 73).  The two were not previously acquainted.  *Id.* at 29

(Spitzen Decl. ¶ 78).  Abu Ghanem agreed to take part if Alyan obtained the weapon.  *Id.* at 27

(Spitzen Decl. ¶ 73).  The two men met again the next morning at Abu Ghanem's workplace,

where they found a knife to use during the attack.  *Id.* (Spitzen Decl. ¶ 74).  Later that same

morning, Abu Ghanem visited Alyan's work place, where Alyan showed him the firearm that

Alyan had purchased the night before and how to operate it.  *Id.*  Before boarding Egged bus

number 78, the men agreed that Alyan would carry the knife and Abu Ghanem would carry the gun. *Id.* Because Alyan was shot and killed by the police, Abu Ghanem's statement is the only source of information regarding the planning and execution of the attack. *Id.* at 28 (Spitzen Decl. ¶ 75).

Colonel Spitzen opines that Abu Ghanem's account is unreliable. In Colonel Spitzen's expert opinion, "Abu Ghanem stood to benefit by placing most of the responsibility for initiating and planning the attack upon his dead partner." *Id.* By pleading ignorance, Abu Ghanem was also able to "conceal details that might harm [Hamas], its modes of operations[,] and its operatives." *Id.* at 29 (Spitzen Decl. ¶ 77). Moreover, Colonel Spitzen testified at the evidentiary hearing that Abu Ghanem's version of events is directly undermined by his conduct during the attack itself.

*First,* Colonel Spitzen explained that it was implausible that Abu Ghanem "[had seen] the gun for the first time about half an hour prior to the terrorist attack[] and received oral instructions . . . how to use the gun." Dkt. 104 at 61 (Spitzen). Abu Ghanem "shot 14 bullets without stopping," and "[h]e hit the torsos of the passengers exactly where he directed the bullets." *Id.* (Spitzen). In Colonel Spitzen's expert opinion, Abu Ghanem displayed the skill of a "highly trained" shooter. Dkt. 104 at 61 (Spitzen). Colonel Spitzen further testified that, given "the dynamics of terrorist attacks" and "the socioeconomic status of [Abu Ghanem] and [Alyan]," it is also implausible that Alyan purchased the firearm for 20,000 shekels ($6,000 USD). *Id.* at 62 (Spitzen). That would have been the equivalent of six-months' salary. *Id.* (Spitzen). Instead, Colonel Spitzen concluded that, given the expense and difficulty of procuring a gun and bullets, "it is quite clear and conceivable" that the money "came from a Hamas source," and the weapon was likely "purchased from an accomplice of Hamas." *Id.* (Spitzen).

26

*Second*, Colonel Spitzen observes that the sophistication of the attack belied Abu Ghanem's statement that he had met Alyan only the night before and that the men had not previously planned or trained to carry out the attack.  As Colonel Spitzen notes in his declaration, the fact that the two men were able quickly to trap passengers inside the bus and attempted to flee the scene by driving the bus demonstrates a high level of planning and forethought.  *Id.* at 29–30 (Spitzen Decl. ¶ 78).  Abu Ghanem, moreover, "carried out the attack [in the manner] of a person who was highly trained, [and] who had received training and knew how to use the gun."  *See* Dkt. 104 at 61 (Spitzen).  And given that "[o]ne cannot even go do target practice in the geographical areas where [Abu Ghanem] and [Alyan] reside" because of the presence of Israeli soldiers, Colonel Spitzen concludes that Abu Ghanem must have been "driven to isolated areas" to train, which requires "accomplices" and which "cost[s] a great deal of money."  *Id.* at 63 (Spitzen).  Based on the above, Colonel Spitzen draws the following conclusions:

> [T]he acquaintance between Alyan and Abu Ghanem was much deeper than what the latter described in his interrogation[]; [t]he planning of the attack was more thorough and extensive than what Abu Ghanem was willing to admit in his interrogation, and it is highly likely that the funding of the attack, the acquisition of the weapons were used during the attack, and the training towards it were all done within the framework of a structured organization, in this case, Abu Ghanem's Organization, Hamas.

Dkt. 33 at 30–31 (Spitzen Decl. ¶ 79).

The Court credits Colonel Spitzen's testimony.  Given Abu Ghanem's documented membership in Hamas, the sophistication of the attack (which involved the purchase of a firearm and an escape plan), and the skill with which Abu Ghanem wielded his firearm, the Court finds that, at the very least, Hamas provided Abu Ghanem the necessary training to carry out the attack.  That would be consistent with Hamas's practice of recruiting Islamic Bloc operatives to join the ranks of its operational terrorist arm, the Izz al-Dinn al-Qassam Brigades.  *Id.* at 38

(Spitzen Decl. ¶ 109).  It is likely, moreover, that Abu Ghanem was, in fact, a member of Hamas's operational terrorist arm at the time of the attack and engaged in the attack at its behest. Indeed, shortly after the attack, an official spokesman of Hamas "issued calls to carry out further attacks similar to the Bus 78 massacre."  *Id.* at 48 (Spitzen Decl. ¶ 126).

## F.     October 28, 2014 Shooting

### 1.     *Injury to Yehudah Glick*

At approximately 10:00 p.m. on October 29, 2014, Mu'taz Ibrahim Khalil Hijazi shot Plaintiff Yehudah Glick several times at close range as Glick was leaving the Menachem Begin Heritage Center in Jerusalem.  Dkt. 33 at 122 (Spitzen Decl. ¶ 316).  Glick is a known public advocate for the right of all people—and those of Jewish faith in particular—to pray at the Temple Mount.  *Id.* (Spitzen Decl. ¶ 317).  At the time of the attack, Glick was a U.S. citizen, *see* Dkt. 82-7 (Passport), but he has since "renounced his American citizenship" after being elected to the Israeli Knesset, Dkt. 1 at 6 (Compl. ¶ 12).  On the day of the attack, Glick was attending a conference that he had organized on behalf of the Temple Mount Heritage Foundation at the Menachem Begin Heritage Center.  Dkt. 33 at 122 (Spitzen Decl. ¶ 317).  Hijazi, was employed as an assistant chef at the Center.  *Id.* at 123 (Spitzen Decl. ¶ 318).  That evening, surveillance cameras captured Hijazi leaving the Center by scooter at 9:37 p.m. and returning half an hour later to the courtyard.  *Id.* (Spitzen Dec. ¶ 319).

When the conference ended, Glick exited the Center and headed to his car.  *Id.* (Spitzen Decl. ¶ 320).  Hijazi approached Glick on his scooter and said, "I am shooting you because you are an enemy of Al Aqsa."  Dkt. 52 at 4 (Y. Glick Decl. ¶ 20).  He then shot Glick four times in the center of his body.  *Id.* (Y. Glick Decl. ¶ 21).  After the attack, Hijazi fled by scooter.  Dkt.

33 at 122 (Spitzen Decl. ¶ 316).  He was later identified, apprehended, and killed in a shootout

with the police on the morning of October 30, 2014.  *Id.* at 124–25 (Spitzen Decl. ¶¶ 323–24).

 Glick was brought to the hospital in critical condition.  *Id.* at 123 (Spitzen Decl. ¶ 320).

The shooting caused "significant injury to [his] liver, spine, and small and large intestines," and

the bullets also "punctured a lung, entered [his] throat, and damaged one of [his] hands."  Dkt. 52

at 4 (Y. Glick Decl. ¶ 24).  He was placed in a medically induced coma for ten days and stayed at

the hospital for twenty-five days.  *Id.* at 5 (Y. Glick Decl. ¶¶ 25–26, 32).  Glick attests that, to

this day, he experiences "continual anxiety" and "constant pain in [his] arm, back and abdomen."

*Id.* at 7 (Y. Glick Decl. ¶ 46).

 The attack also deeply affected Glick's family members.  The estate of his wife, Yaffa

Glick, and his children and foster children, Neria David Glick, Shlomo Glick, Hallel Glick, S.G.,

R.T. and T.T., are also plaintiffs in this action.  Dkt. 1 at 6–7 (Compl. ¶¶ 12–15).  R.T. and T.T.

are Israeli citizens.  Dkt. 87 at 41.  The rest of the family members are U.S. citizens.  They allege

that they suffered "severe psychological and emotional injuries" as a result of the attack and,

specifically, in coping with its aftermath.  Dkt. 1 at 22 (Compl. ¶ 85).

  2. *Attribution to PIJ*

 Colonel Spitzen opines, based on police reports of the incident and Hijazi's background,

that "[t]he assassination attempt on Yehuda[h] Glick was a planned, premeditated terrorist attack"

by a PIJ operative.  Dkt. 33 at 125 (Spitzen Decl. ¶ 325).  Colonel Spitzen notes that Hijazi's

conduct during the attack was "calculated" and "show[ed]" expertise.  *Id.* (Spitzen Decl. ¶ 326).

Hijazi "specifically targeted Glick," a Jewish advocate; he purposefully left the Center "before

the conference concluded, most likely in order to bring [his] weapon;" he shot Glick multiple

times at point blank range; he calmly "escaped the scene of the attack on his scooter;" and he

"revealed his combat skills and self-control when the security forces came to arrest him, and "[h]e climbed a tall vantage point—the house roof—from which he tried to shoot the forces." *Id.* at 125–26 (Spitzen Decl. ¶¶ 325–27).   According to Colonel Spitzen, Hijazi likely joined PIJ while he was incarcerated.  Hijazi served a total of eleven years for setting fire to electrical cabinets in Jerusalem for "nationalist reasons," *id.* at 127 (Spitzen Decl. ¶ 331), and for multiple assaults he committed against prison guards and fellow prisoners while he was incarcerated, *id.* at 127 (Spitzen Decl. ¶ 332).   Court documents from his case reveal that, as early as 2004, a prison service officer testified that Hijazi belonged to PIJ.  *Id.* at 127–28 (Spitzen Decl. ¶ 333). As Colonel Spitzen explains, "[i]t is extremely common for prisoners to join terror organizations while serving time in Israeli prisons."  *Id.* at 128 (Spitzen Decl. ¶ 334).

Colonel Spitzen further attests, based on his review of social media affiliated with PIJ, that PIJ claimed credit for the attack.  *See id.* at 128 (Spitzen Decl. ¶ 335) ("Immediately after the assassination attempt . . . , media outlets, internet web sites (including web sites identified with the Palestinian Islamic Jihad), and Palestinian Islamic Jihad senior leaders—all referred to [Hijazi] as an operative of the [PIJ] operational arm, known as the Saraya al-Quds (Al-Quds Brigades).").  Notably, after the attack, the Al-Quds Brigades' website published a poster "depicting [Hijazi] with Fathi Shiqaqi, the [PIJ] historic leader and founder in the background." *Id.* at 129 (Spitzen Decl. ¶ 338).  On October 31, 2014, the day after Hijazi was killed, PIJ "organized a march in Gaza in support of . . . [Hijazi]," which included the "burning of Israeli and American flags."  *Id.* at 130 (Spitzen Decl. ¶ 341).  The Al-Quds Brigades' website went so far as to publish the following statement on January 4, 2015: "Our martyr, the mujahid Mu'taz Hijazi, son of Jerusalem, guardian of the will of his teacher, martyr Fathi Shiqaqi, on the 19th

anniversary (of his demise), has taken revenge on those who tried to harm and befoul the Al-Aqsa Mosque." *Id.* at 139–40 (Spitzen Decl. ¶ 338).

In light of the above, the Court concludes that the assignation attempt on Yehudah Glick was carried out by a PIJ operative.

**G.    August 19, 2011 Rocket Attack**

1.    *Physical Injury to Schmuel Brauner*

Between August 18th and 22nd of 2011, Hamas and other terrorist organizations fired "Grad rockets" from the Gaza Strip into Israel.  Dkt. 33 at 106–07 (Spitzen Decl. ¶¶ 278–281); Dkt. 104 at 76 (Spitzen).  More than 100 rockets were fired over this four-day period, affecting civilians in "Israeli communities near the border of the Gaza Strip."  Dkt. 33 at 107–08 (Spitzen Decl. ¶ 280).  The attack was part and parcel of Hamas's strategy to inflict terror on Israeli civilians after Israel imposed restrictions on the flow of goods and persons from the Gaza Strip following Hamas's takeover of Gaza in 2007.  *See id.* at 96–97 (Spitzen Decl. ¶¶ 252–53). Colonel Spitzen describes "Hamas's policy with respect to rocket launching" as follows:

> The organization itself fired rockets and allowed other organizations to fire rockets toward communities in Israel when such actions were in line with its objectives at a given time.  On the other hand, it forced its operatives and the operatives of other organizations to respect ceasefires when it suited its goals.

*Id.* at 98 (Spitzen Decl. ¶ 256).  This period of rocket attacks, for example, ended when Egypt helped broker a ceasefire.  *Id.* (Spitzen Decl. ¶ 257).

On the morning of August 19, 2011, two rockets landed near a synagogue in Ashdod, where Plaintiff Schmuel Brauner was attending services.  Dkt. 39 at 2 (S. Brauner Decl. ¶ 7). The first missile landed but did not explode.  *Id.*  The second missile exploded in the synagogue's courtyard, injuring Schmuel and several others.  *Id.*; Dkt. 87 at 56; Dkt. 33 at 107–08 (Spitzen Decl. ¶ 280).  According to Schmuel, he and other civilians ran out of the synagogue

when the first missile landed.  Dkt. 39 at 2 (S. Brauner Decl. ¶ 7).  Before he could reach cover, however, the second missile landed and exploded within four meters of him.  *Id*.  As a result of the explosion, shrapnel entered his back and exited through his stomach.  *Id*.  Schmuel was immobile and "in excruciating pain," but he never lost consciousness.  *Id*. (S. Brauner Decl. ¶¶ 7–8).  He was taken to Kaplan Medical Center in Rehovot.  *Id*. (S. Brauner Decl. ¶ 10).  His physical injuries included "a ruptured kidney, lacerations to his bowel and small intestine," and other shrapnel wounds to his right thigh and knee.  Dkt. 87 at 56.  Schmuel spent ten days in the hospital, during which he endured several surgeries.  *Id*.  To this day, he suffers physical discomfort as well as psychological and emotional trauma.  *See id*.; Dkt. 35-5 (Dr. Rael Stous Medical Rpt.).

The attack also severely impacted Brauner's family.  His wife, Nechama Brauner, and parents, Mordechai and Esther Brauner—all of whom are U.S. citizens—seek solatium damages for their mental and emotional anguish as a result of Shmuel's injuries.  Dkt. 87 at 80–81; *see also* Dkt. 35-2 (N. Brauner Psych. Eval.); Dkt. 35-3 (E. Brauner Psych. Eval.), Dkt. 35-4 (M. Brauner Psych. Eval.).  Shmuel and Nechama Brauner also bringing claims for solatium damages on behalf of their minor children, C.Y.B., M.H.B., and Y.A.L.B., Dkt. 1 at 9 (Compl. ¶¶ 28–29), all of whom are Israeli citizens,[3] Dkt. 87 at 88.  C.Y.B. was not yet a year old when his father was injured.  Dkt. 35-6 at 1.  M.H.B. and Y.A.L.B. were born after the attack.  *Id*.  Nechama

---

[3]  The record is ambiguous as to whether the children are also U.S. citizens, as they were born abroad to two married U.S. citizens, but the record does not disclose whether either Schmuel or Nechama ever resided in the United States prior to the children's birth, such that they would be U.S. citizens at birth. *See* 8 U.S.C. § 1401. Because Plaintiffs do not ask the Court to find that the children have U.S. citizenship, *see* Dkt. 87 at 88 (Proposed Findings of Fact ¶ 293), the Court will proceed on the understanding that the children are not U.S. citizens.

attests that, as a result of the attack, Shmuel is mostly absent from his children's lives, and this has "greatly affected their upbringing."  Dkt. 38 at 5 (N. Brauner Decl. ¶ 26).

      2.    *Attribution to Hamas*

      Several terrorist organizations based in the Gaza Strip fired rockets towards Israel during the period of time when the rocket attack on the Ashdod Synagogue took place, and the identity of the specific terrorist group that launched the particular missile causing Shmuel Brauner's injuries is unclear.  Dkt. 33 at 112 (Spitzen Decl. ¶¶ 292–93).  In fact, more than one terrorist organization has claimed responsibility for the attack because it was "considered a success"—"a direct hit on the synagogue[,] . . . caus[ing] extensive damage to property and people, and . . . receiv[ing] wide coverage in the media."  *Id.* (Spitzen Decl. ¶ 293).  The Court credits Colonel Spitzen's conclusion, however, that Hamas was ultimately responsible for the attack, *id.* at 113 (Spitzen Decl. ¶ 295), based on the fact that Hamas "was—and still is—the only authority in sole and effective control of everything that happens within the Gaza strip," *id.* (Spitzen Decl. ¶ 296).  According to Colonel Spitzen, Hamas enforced its authority "over the other terrorist organizations strictly, effectively, and aggressively, in such a manner that *any firing began or ended on its orders*."  *Id.* (emphasis added).  Spitzen persuasively concludes that, even if another terrorist organization had launched the rocket that injured Schmuel, it must have received authorization from Hamas before doing so.  *See* Dkt. 104 at 76 (Spitzen) ("Hamas which controls the Gaza Strip is the only party that enables or facilitates the firing of these missiles.").  The Court, accordingly, finds that Hamas was ultimately responsible for the August 19, 2011 rocket attack that injured Schmuel Brauner.

**H.      November 21, 2012 Rocket Attack**

1.      *Emotional Injury to Daniella, Noa, Dana, and A. Parnas*

Between November 14, 2012 and November 21, 2012, terrorist groups operating in the

Gaza Strip launched approximately 1,500 rockets at civilian targets in Israel during "Operation

Pillar of Defense," a military operation carried out by the Israeli Defense Forces in the Gaza

Strip.  Dkt. 33 at 114–15 (Spitzen Decl. ¶ 301); Dkt. 104 at 76–77 (Spitzen).  The onslaught of

missile attacks "started as a result of the assassination . . . of . . . a very senior ranked terrorist,

Ahmad Jabari, who was the chief of staff of Hamas."  Dkt. 104 at 77 (Spitzen).  According to the

bomb disposal expert's report and police reports, a 122 mm Grad rocket landed in Timorim,

Israel, Dkt. 33 at 114 (Spitzen Decl. ¶ 300–01), a village "approximately 40 kilometers aerially

from the Gaza Strip" on November 21, 2012, at 10:18 a.m, Dkt. 140 at 76–77 (Spitzen); Dkt. 33

at 114–15 (Spitzen Decl. ¶ 300).  The rocket hit the home of Plaintiff Daniella Schwadron

Parnas,[4] where she resided with her three children, Noa Parnas, Dana Parnas, and A.P.  Dkt. 33

at 114 (Spitzen Decl. ¶ 300); Dkt. 69 at 1 (D. Parnas Decl. ¶ 5).  Their home sustained "heavy

damage."  Dkt. 33 at 114 (Spitzen Decl. ¶ 300).  The explosion left the home with no roof and

broken windows.  Dkt. 69 at 4 (Daniella Parnas Decl. ¶ 32).

Plaintiffs Daniella Schwadron Parnas, Noa Parnas, Dana Parnas, and A.P., all of whom

are U.S citizens, Dkt. 82-22; Dkt. 82-23; Dkt. 83-24, seek damages for the "severe psychological

and emotional injuries" they suffered as a result of the November 21, 2012 rocket attack on their

home, Dkt. 1 at 28 (Comp. ¶ 112).  None of the Parnas plaintiffs suffered any physical injuries,

---

[4]  The Court adopts the spelling of "Parnas" as it appears in the complaint, Dkt. 1 at 4 (Compl.),
Daniella Parnas's declaration, Dkt. 69 at 1 (D. Parnas Decl.), and Dr. Strous's psychiatric
evaluation, Dkt. 35-34 at 1 (Daniella Parnas Psych. Eval.).  Colonel Spitzen's declaration spells
the plaintiffs' last name as "Parnass."

*see id.*, nor were they at home when the rocket struck, *see* Dkt. 69 at 1–2 (Daniella Parnas Decl.

¶¶ 7–12).  Each has, nevertheless, submitted a declaration and a psychiatric evaluation attesting

to his or her psychological harm.  *See* Dkt. 67 (Dana Parnas Decl.); Dkt. 69 (Daniella Parnas

Decl.); Dkt. 70 (N. Parnas Decl.); Dkt. 35-32 (A.P. Psych. Eval.); Dkt. 35-33 (Dana Parnas

Psych. Eval.); Dkt. 35-34 (Daniella Parnas Psych. Eval.); Dkt. 35-35 (N. Parnas Psych. Eval.).

Daniella attested that, at the time of attack, she was running an errand at a nearby

supermarket.  Dkt. 69 at 1–2 (Daniella Parnas Decl. ¶¶ 8–9).  When the rocket siren sounded,

and she was "forced to run for cover" at a nearby bomb shelter.  Dkt. 1 at 27 (Compl. ¶ 110).

She then "heard a very loud 'BANG'" and knew that a rocket had fallen nearby.  Dkt. 69 at 2

(Daniella Parnas Decl. ¶ 10).  Upon leaving the shelter, she saw a tree burning and

"immediately" realized the fire was coming from her house.  *Id.* (Daniella Parnas Decl. ¶ 11).

Daniella attested that she was "terrified" because her 82-year-old mother was still inside her own

home, which "is connected" to Parnas's "house by a door."  *Id.* at 1-2 (Daniella Parnas Decl. ¶¶

5, 13).  Parnas's mother was later found "standing in the hallway [of her home] in a state of

shock and confusion."  *Id.* at 2 (Parnas Decl. ¶ 14).   Parnas's psychiatric evaluation revealed that

she initially felt "overwhelming anxiety and fright," and now experiences "symptoms of

depression, anxiety and PTSD following the shock and stress" of the incident.  Dkt. 35-34 at 2, 7

(Daniella Parnas Psych. Eval.).

Daniella's daughters, Noa and Dana were both serving in the army at the time of the

attack.  Dkt. 69 at 1 (Daniella Parnas Decl. ¶ 7).  Dana watched online as her "entire house

[went] up in flames."  Dkt. 67 at 1 (Dana Parnas Decl. ¶ 5).  She then called Noa to tell her about

the incident.  Dkt. 70 at 2 (Noa Parnas Decl. ¶ 8).  Both were "hysterical" after the attack, Dkt.

35-33 at 2 (Dana Parnas Psych. Eval.); Dkt. 70 at 2 (Noa Parnas Decl. ¶ 9), and their psychiatric

evaluations reveal that they now suffer from depression and anxiety as a result, Dkt. 35-33 at 2 (Dana Parnas Psych. Eval.); Dkt. 35-5 at 5 (N. Parnas Psych. Eval.).

Finally, A.P. was seven years old at the time of the November 21, 2012 rocket attack. Dkt. 35-32 at 1 (A.P. Psych. Eval.).  He was staying with a nearby relative at the time.  Dkt. 69 at 1 (Parnas Decl. ¶ 7).  A.P.'s psychological evaluation found that, after the attack, he suffered from anxiety that affected his social and school functioning.  Dkt. 35-32 at 4 (A.P. Psych. Eval.). A.P. has "improved considerably," but his anxiety will continue to affect "his social and academic functioning."  *Id.* at 4–5.

  2. *Attribution to Hamas*

The rocket that blew up the Parnas's home was fired on the last day of "Operation Pillar of Defense."  Dkt. 33 at 114–15 (Spitzen Decl. ¶ 301).  Due to the direct hit and the media attention that the attack garnered, multiple organizations came forward to claim credit for the attack, including the Izz a-Din al-Qassam Brigades, the operational wing of Hamas.  *Id.* at 116 (Spitzen Decl. ¶¶ 304–05).  In Colonel Spitzen's expert opinion, however, "Hamas's responsibility for the attack is not contested."  *Id.* at 117 (Spitzen Decl. ¶ 306).  To the contrary, Spitzen concludes, based on the timing of the attack and Hamas's control of the Gaza Strip, the the rocket attacks during that period were "the direct result of . . . decisions and directives issued by the Hamas leadership."  *Id.*  As noted above, Hamas initiated the rocket attacks because Israel killed "Ahmad Ja'abri, the head of Hamas's operational terrorist wing."  *Id.* at 115 (Spitzen Decl. ¶ 302).  The same day that Israel killed Ja'abri, "Hamas gave a greenlight to all of the [terrorist] organizations in the Gaza Strip to start" Operation Pillar of Defense.  Dkt. 104 at 77 (Spitzen). The Court credits Colonel Spitzen's expert opinion that Hamas authorized the attack and finds

Hamas responsible the rocket launch that destroyed Plaintiffs Daniella Parnas, Noa Parnas, Dana Parnas, and A.P.'s home.

I.      **March 6, 2008 Shooting at Merkaz HaRav Yeshiva**

     1.      *Attack*

On March 6, 2008, at approximately 8:30 p.m., Ala' Hisham Abu Dheim, a 26-year-old Izz al-Din al-Qassam Brigades operative, entered the Merkaz HaRav Yeshiva in Jerusalem.  Dkt. 33 at 72 (Spitzen Decl. ¶ 188).  He was armed with a Kalashnikov assault rifle with nine compatible magazines, two guns (a Beretta pistol and an FN pistol) with four compatible magazines, and a commando knife.  *Id.* (Spitzen Decl. ¶ 189); *see also* Dkt. 104 at 84 (Spitzen). On his way to the Yeshiva, Abu Dheim concealed his weapons in a cardboard box and exploited the fact that there was no security guard at the entrance at the time.  Dkt. 33 at 72−73 (Spitzen Decl. ¶ 189).

Before Abu Dheim even entered the building, he opened fire on Yeshiva students in the front plaza with his Kalashnikov assault rifle, killing one student and injuring several others.  *Id.* at 73, 86 (Spitzen Decl. ¶¶ 190, 223).  He then shot through the windows of the building at two students standing inside near the entrance and shot them again to ensure that they were dead.  *Id.* at 86 (Spitzen Decl. ¶ 224).  Upon entering the building, Abu Dheim shot two students descending the stairs.  *Id.*  He then proceeded toward the library, opening fire on students standing outside.  *Id.* at 73 (Spitzen Decl. ¶ 190).  The sound of gunshots and shouts of a terrorist attack preceded Abu Dheim's arrival in the library, so students had time to attempt to hide.  *Id.* at 86−87 (Spitzen Decl. ¶¶ 225−26).

When Abu Dheim arrived at the library, he launched a "systematic massacre."  *Id.* at 73 (Spitzen Decl. ¶ 190); Dkt. 104 at 84–85 (Spitzen).  According to eyewitnesses, Abu Dheim

sought out students who were hiding behind bookshelves and shot them.  Dkt. 33 at 73–74

(Spitzen Decl. ¶ 191).  Eyewitnesses also recount that he operated with the "skill and precision of

a trained and cold-hearted assassin" and that he "exhibit[ed] control handling his weapons,

speedily load[ing] and reload[ing] magazines while shooting and accurately targeting" the

victims "at long and close range."  *Id.*  Captain David Shapira, an officer in the Paratroopers

Brigade who lived near the Yeshiva, and Rabbi Yitzhak Dadon, a student at the Yeshiva at the

time, both attempted to stop Abu Dheim.  *Id.* at 73–74 (Spitzen Decl. ¶ 192).  Eventually,

Captain Shapira shot and killed Abu Dheim.  *Id.*  The entire event—from the time he began

killing until when he had been taken out—lasted between ten and fifteen minutes.  *Id.* (Spitzen

Decl. ¶ 193).  Eight boys, mostly high school students, were killed, including Plaintiff Avraham

David Moses.  *Id.*  In addition, ten students were wounded, including Plaintiff Naftali Shitrit.  *Id.*

2.    *Killing of Avraham David Moses*

Avraham David Moses was studying with his friend, Segev Avihail, when the attack

began.  *Id.* at 87 (Spitzen Decl. ¶ 227).  The boys were alerted to the attack by the shouts and

burst of gunfire outside the building and attempted to hide under a "table/shelf" near the library

entrance.  *Id.*  Based on the bullet marks on the floor, the boys were likely shot and killed from a

close range while hiding huddled together in this location.  *Id.*  According to Rabbi Dadon's

timeline, it is "highly probable" that the boys were in their hiding space for seven to eight

minutes before they were killed.  *Id.* (Spitzen Decl. ¶ 228).  Avraham was sixteen years-old.  *Id.*

at 74 (Spitzen Decl. ¶ 193).

The estate of Avraham David Moses (a U.S. citizen), is a plaintiff in this case.  Dkt. 1 at 8

(Compl. ¶ 19).  His mother, Rivkah Martha Moses; father, Naftali Andrew Moses; step-father,

David Moriah; siblings, Elisha Dan Moses, N.M., C.M., O.D.M., and A.M**.**; step-brother, Aviad

Moriah—all of whom are U.S. citizens—as well as his step-siblings, Z.G.M., Hagit Gibor

Moriah, Eitan Yoel Moriah, Yifat Moriah, and Atara Nesia Moriah—all of whom are Israeli

citizens—also seek damages for the "severe psychological, emotional and other personal

injuries" they suffered as a result of his death, including loss of consortium and loss of solatium.

*Id.* at 7–8, 31 (Compl. ¶¶ 18–23, 128).

       3.     *Injury to Naftali Shitrit*

Plaintiff Naftali Shitrit, a U.S. citizen, Dkt. 84-4 at 1, was a high school student at the

time of the attack.  Dkt. 76 at 1 (N. Shitrit Decl. ¶ 3).  Upon hearing gunshots, Naftali "hid

behind one of the stacks in the library"—one of the last in the room.  *Id.* at 2 (N. Shitrit Decl.

¶ 6).  He realized that "the gunman was systematically going from one stack to the next" when

he heard "gunshots, then shouts and screams, then silence from the stacks near [him]."  *Id.* (N.

Shitrit Decl. ¶ 7).  After coming across Naftali's hiding place, Abu Dheim shot Naftali multiple

times.  *Id.*  Naftali was brought to the hospital in critical condition, and he was unconscious for a

week.  *Id.* at 3 (N. Shitrit Decl. ¶ 24, 26).  Five months after the attack, he traveled to the U.S. for

additional reconstructive surgery.  *Id.* at 5 (N. Shitrit Decl. ¶ 46).  To this day, Naftali suffers

severe and permanent physical and emotional injuries.  *Id.* at 5–7 (N. Shitrit Decl. ¶¶ 48–53).

Naftali is a plaintiff in this case, as are his mother, Gila Rachel Shitrit (a U.S. citizen);

father, Yaakov Shitrit (an Israeli citizen); and siblings, Meiri Shitrit, Oshrat Shitrit, N.S., Y.S.,

A.S., E.S., and H.S. (all of whom are U.S. citizens).  Dkt. 1 at 8–9 (Compl. ¶¶ 24–27).  His

family members seek damages for the mental and emotional anguish they suffered as a result of

his injuries.  *See id.* at 31 (Compl. ¶ 128).

       4.     *Attribution to Hamas*

The Court credits Colonel Spitzen's conclusion that Hamas was responsible for the March 6, 2008, shooting at the Yeshiva.  Colonel Spitzen identifies two specific reasons for his conclusion.  *First*, and foremost, Hamas claimed credit for the attack.  *Id.* at 78−82 (Spitzen Decl. ¶¶ 202−13).  An anonymous Hamas official immediately contacted Reuters, acknowledging that Hamas was responsible.  *Id.* at 78 (Spitzen Decl. ¶ 202).  Following that announcement, Abu Ubeida, the spokesman of the Izz al-Din al-Qassam Brigades, suspended the organization's claim of responsibility, but neither affirmed nor denied responsibility.  *Id.*  He stated, instead, that "[t]he time has not yet come for claiming responsibility."  *Id.*  The official claim for responsibility by the Izz al-Din al-Qassam Brigades came two years after the attack, in a December 25, 2010 press conference with Abu Ubeida.  *Id.* at 78 (Spitzen Decl. ¶ 203); Dkt. 104 at 88–89 (Spitzen).  According to Colonel Spitzen, the delay is consistent with Hamas's policy of delaying a claim of responsibility out of consideration for the security of other Hamas operatives and accomplices.  Dkt. 33 at 79 (Spitzen Decl. ¶ 204).

*Second*, Colonel Spitzen concludes, based on eyewitness accounts of the account and police statements, that Abu Dheim "had been well trained and was not acting alone."  Dkt. 33 at 74 (Spitzen Decl. ¶ 194).  According to Spitzen, "all stages of the attack were 'meticulously planned'" and "demonstrate characteristics of organized attacks carried out by terrorist organizations, like Hamas."  *Id.*  The Yeshiva, for example, "was a strategic target that was carefully selected . . . because of its prominence as a learning institutes for religious studies and its location, at the main entrance to Jerusalem."  *Id.* at 75 (Spitzen Decl. ¶ 196).  Moreover, the sophistication of the attack indicates that "[c]areful intelligence and logistic preparations were made prior to the attack, including intelligence gathering, acquisition of a variety of weapons, shooting practice and concealing the weapons on the way to the target."  *Id.*

The Court, accordingly, finds that the Merkaz HaRav massacre was conducted by Hamas.

### III.  CONCLUSIONS OF LAW

Under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exception.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject matter jurisdiction on federal district courts to hear certain terrorism-related claims, *see* 28 U.S.C. § 1330(a), and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65.  The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the clerk of the court and the U.S. Department of State—to effect service on a foreign state.  *See* 28 U.S.C. § 1608.

The Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear.  First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction hear the case and to order any relief.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable").  Second, with respect to the substance of a plaintiffs' state or federal law claims, as noted above, the FSIA precludes courts from entering a default judgment against a foreign state unless the court is satisfied that

the plaintiff has established her "right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86. And, because "the entry of a default judgment is not automatic," courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6 (footnote omitted).

Each of these inquiries, in turn, implicates a slightly different standard of proof. To establish subject-matter jurisdiction, an FSIA "plaintiff bears an initial burden of production to show [that] an exception to immunity, such as § 1605A, applies." *Owens IV*, 864 F.3d at 784. "Although a court gains jurisdiction over a claim against a defaulting defendant when a plaintiff meets his burden of production, the plaintiff must still prove his case on the merits." *Id.* To do so, the plaintiff must "establish his . . . right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This provision's "protection against an unfounded default judgment" does not altogether "relieve[] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer "admissible evidence" sufficient to "substantiate [the] essential element[s]" of her claim. *Owens IV*, 864 F.3d at 785–86 (quotations omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

As explained below, the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claim and personal jurisdiction over the Islamic Republic of Iran, MOIS, and the Syrian Arab Republic.[5] The Court also concludes that the U.S. national plaintiffs have carried

---

[5] Because the MOIS is itself a "governmental" entity, it is properly "considered the foreign state itself," and not merely an "instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003); *see also TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 300 (D.C. Cir. 2005) (explaining that "an entity that is an 'integral part of a foreign state's political structure' is to be treated as the foreign state itself" for purposes of "determining the proper method of service under the FSIA" (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994))).

their burden of establishing a right to relief under the federal cause of action established in

§ 1605A, and that the Israeli plaintiffs—with the exception of M.H.B. and Y.A.L.B.—have

carried their burden of establishing a right to relief under the law of Israel.  Finally, the Court

will defer until the damages stage the determination whether each of the plaintiffs has established

the necessary familial relationship to recover individual damages and, if so, the damages to

which each is entitled.

**A.    Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims**

"[T]he [federal] district courts . . . have original jurisdiction" over "any nonjury civil

action against a foreign state" asserting "any claim for relief in personam with respect to which

the foreign state is not entitled to immunity under" the FSIA.  28 U.S.C. § 1330(a).  The Court,

accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if,

and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied.

As explained below, Plaintiffs have carried their burden of establishing the Court's subject-

matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state

is not immune from the jurisdiction of the federal and state courts in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or
> death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft
> sabotage, hostage taking, or the provision of material support or resources for such
> an act if such act or provision of material support or resources is [(5)] engaged in
> by an official, employee, or agent of such foreign state while acting within the scope
> of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The exception, moreover, applies only to suits in which two additional

requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S.

armed forces, or a U.S. government employee or contractor at the time the act of terrorism

occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Second, the foreign state must be designated as a

state sponsor of terrorism both at the time the act occurred (or was so designated as a result of

the act) and at the time the lawsuit was filed (or was so designated within the six-month period

preceding the filing of the suit).[6]  *Id.* § 1605A(a)(2)(A)(i)(I); *see also Owens IV*, 864 F.3d at

763–64.

Several of the conditions for subject-matter jurisdiction are easily addressed in this case.

First, Plaintiffs expressly seek only monetary relief, costs and expenses, and attorneys' fees.  *See*

Dkt. 1 at 35 (Compl. Prayer).  Second, Iran and Syria were designated as a state sponsors of

terrorism in 1984 and 1979, respectively, *see* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of

Secretary of State George P. Shultz) (Iran); *Gates v. Syrian Arab Republic*, 646 F.3d 1, 2 (D.C.

Cir. 2011) (Syria), and remain so designated to this day, *see* U.S. Dep't of State, *State Sponsors

of Terrorism*, available at https://www.state.gov/j/ct/list/c14151.htm (last visited May 25, 2020).

Moreover, because the MOIS is properly considered "an integral part" of the "foreign state[]" of

Iran's "political structure," *TMR Energy Ltd*., 411 F.3d at 300 (quoting *Transaero, Inc.*, 30 F.3d

at 151), and because § 1605A focuses on whether "the foreign state was designated"—and not

whether each named defendant was separately designated—the Court concludes that the

designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation

requirement as to both defendants.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I).  Third, at the time the

relevant acts occurred, all eleven of the direct victims and thirty-four of the family members

---

[6]  Section 1605A(a)(2) also requires that the foreign state have received "a reasonable
opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state
against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement
is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in
Iran or Syria.

were U.S. nationals (the Court will address the Israeli national plaintiffs below). *See supra* Part II.C-I.

As a result, the only substantial jurisdictional question left for the Court is whether Plaintiffs' claims are for "personal injury or death that [were] caused by . . . act[s] of torture, extrajudicial killing . . . hostage taking, or the provision of material support or resources" by an "official, employee, or agent of" Iran or Syria.  28 U.S.C. § 1605A(a)(1).  For the reasons explained below, the Court concludes as follows: (1) Hamas and PIJ committed acts of "extrajudicial killing" within the meaning of the International Convention Against the Taking of Hostages and the Torture Victim Protection Act; (2) because the Parnases' claims are for emotional harms arising out of an attempted extrajudicial killing in which no one was injured (and none of the Parnases were even placed physical peril), they cannot state a claim for recovery for their injuries; (3) Iranian and Syrian officials and their agents provided "material support or resources" for the extrajudicial killings that caused Plaintiffs' injuries within the meaning of 18 U.S.C. § 2339A; and (4) Iran and Syria's provision of material support caused the injuries or deaths of the eleven victims.  Plaintiffs' claims against Iran and Syria, therefore, fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

1.      *"Personal Injury or Death . . . Caused By" Defendant's Conduct*

The FSIA effects a waiver of sovereign immunity for claims seeking to recover for "personal injury or death that was caused by" certain terrorist acts or the provision of material support for such acts.  28 U.S.C. § 1605A(a)(1).  Plaintiffs Taylor Force, Menachem Rivkin, Yehudah Glick, Richard Lakin, Avraham Moses, Naftali Shitrit, and Shmuel Brauner all died or suffered significant physical injuries as a result of terrorist attacks committed by Hamas or PIJ, Dkt. 44 at 2 (S. Force Decl. ¶ 12; Dkt. 39 at 2–3 (S. Brauner Decl. ¶¶ 7–14); Dkt. 52 at 4–5

(Yehuda Glick Decl. ¶¶ 21–26); Dkt. 66 at 4 (N. Moses Decl. ¶ 29); Dkt. 54 at 1 (M. Lakin Decl.

¶ 1); Dkt 72 at 1 (M. Rivkin Decl. ¶ 1); Dkt. 76 at 2–3 (N. Shitrit Decl. ¶¶ 9–10, 21–26), and

their claims to recover for those injuries satisfy the personal injury requirement of

§ 1605A(a)(1).  Because the statute is understood to encompass claims by family members of

those injured or killed for the distress caused by their relative's injuries, also known as solatium

actions, *see* 28 U.S.C. § 1605A(c); *see also Salzman v. Islamic Republic of Iran*, No. 17-1745,

2019 WL 4673761 at *12 (D.D.C. Sept. 25, 2019), the relatives of Taylor Force, Menachem

Rivkin, Yehudah Glick, Richard Lakin, Avraham Moses, Naftali Shitrit, and Shmuel Brauner

also satisfy the personal injury requirement of § 1605A(a)(1).  Family members seeking solatium

damages are considered to be bringing a particular variety of an intentional infliction of

emotional distress claim, *see Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54–55

(D.D.C. 2012) ("*Oveissi II*"), and are considered to be bringing "claims for personal injury," *id.*

at 55.  Thus, the Parnases, who seek to recover for the purely emotional harm they suffered based

on an intentional infliction of emotional distress theory of liability, similarly advance a claim for

"personal injuries" caused by the Defendants' provision of material support.

    2.    *Hamas and PIJ's Acts of Extrajudicial Killing*

       To fall within the FSIA's waiver of sovereign immunity, Plaintiffs' "personal injur[ies]

or death[s]" must also have been "caused by an act of torture, extrajudicial killing, aircraft

sabotage, hostage taking, or the provision of material support or resources for such an act."  28

U.S.C. § 1605A(a)(1).  The FSIA looks to the Torture Victims Protection Act of 1991 ("TVPA")

to define "extrajudicial killing."  28 U.S.C. § 1605A(h)(7).  Under the TVPA, "extrajudicial

killing" means

        a deliberated killing not authorized by a previous judgment pronounced by a
        regularly constituted court affording all the judicial guarantees which are

recognized as indispensable by civilized peoples.  Such term, however, does
not include any such killing that, under international law, is lawfully carried out
under the authority of a foreign nation.

TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  As the D.C. Circuit has explained, this

definition "contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized

by a previous judgment pronounced by a regularly constituted court."  *Owens IV*, 864 F.3d at

770.

>           a.           Killing or Attempted Killing

To begin, the March 8, 2016 stabbing, October 13, 2015 bus massacre, and March 6,

2008 shooting, which resulted in the deaths of Taylor Force, Richard Lakin, and Avraham David

Moses, respectively, indisputably constitute extrajudicial killings.  No one, however, was killed

in the October 29, 2014 shooting, the January 27, 2016 stabbing, or the 2011 and 2012 rocket

attacks.  *See supra* Parts II.F, D, G–H.  That then poses the question of whether the TVPA's

definition of extrajudicial killings reach attacks in which no one died.  In other words: does the

statute cover attempts?  Decisions from this district and from other jurisdictions have held that it

does.  *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *Gill*

*v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017).

Although the text of § 1605A does not address attempts, courts resolve statutory

"ambiguities flexibly and capaciously" in light of the text, history, and remedial purpose of the

statute to compensate those injured in terrorist attacks.  *Van Beneden v. Al-Sanusi*, 709 F.3d

1165, 1167 & n.4 (D.C. Cir. 2013).  The statute permits recovery for "personal injur[ies] or death

. . . caused by . . . an act of . . . extrajudicial killing."  28 U.S.C. § 1605A(a)(1).  Several

decisions from this district have held that individuals who are injured but not killed in an attack

that results in the death of others may recover for their injuries under § 1605A.  *See, e.g.*,

*Karcher*, 396 F. Supp. 3d at 58; *Salzman v. Islamic Republic of Iran*, No. 17-2475, 2019 WL

4673761, at *12 (D.D.C. Sept. 25, 2019); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 6, 14 (D.D.C. 2011); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011). Those injuries were, in the ordinary sense, "caused by" the "act of . . . extrajudicial killing"—a bombing, for example, might kill some of the victims and maim others. *See Salzman*, 2019 WL 4673761 at *12. In that scenario, both sets of victims would suffer "personal injury or death . . . caused by an act of . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1)—that is, to continue the example, the bombing was, in fact, an act of extrajudicial killing and that act caused both the deaths and the injuries. "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim*, 774 F.3d at 1048, and that rationale extends to both injured and killed victims, *see Salzman*, 2019 WL 4673761, at *12.

Although a closer question, the Court is also persuaded that the waiver of sovereign immunity includes attempted extrajudicial killings that result in serious physical injuries, even if no one is killed in the attack. As Judge Kollar-Kotelly explained in *Karcher v. Islamic Republic of Iran*, "[t]he text of Section 1605A(a)(1) does not expressly address attempts to commit acts that are listed in that provision," but it does "strip[] immunity" both for "personal injury or death that was caused by an act of . . . extrajudicial killing . . . *or the provision of material support or resources for such an act*." 396 F. Supp. 3d at 57–58. "Nothing on the face of Section 1605A(a)(1)," Judge Kollar-Kotelly continued, "requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured." *Id.* Finding further support in both the legislative history of the statute and the D.C. Circuit's admonishment that the FSIA be "interpret[ed] . . . flexibly and capaciously," Judge Kollar-Kotelly held that "material support for an incomplete act of

extrajudicial killing falls within the scope of Section 1605A(a)(1)." *Id.* at 57 (alteration in original). Several courts others have taken this same approach, "f[inding] that injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)." *Id.* at 58; *see also Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019); *Gill*, 249 F. Supp. 3d at 99.

Here, the attacks on Rivkin, Glick, and Brauner were brutal and, in each case, evidenced an intent to kill. Rivkin was stabbed twice in his upper torso with a 16 cm knife, Dkt. 33 at 62 (Spitzen Decl. ¶ 163); Dkt. 72 at 2 (M. Rivkin Decl. ¶¶ 6–7), and he lost consciousness for a day and a half, Dkt. 72 at 2 (M. Rivkin Decl. ¶¶ 6–7). Glick was shot four times and suffered injuries to his liver, spine, intestines, lung, ribs, hand, and throat. Dkt. 52 at 4 (Yehudah Glick Decl. ¶ 24). He was placed in a medically induced coma for 10 days. *Id.* at 5 (Yehudah Glick Decl. ¶¶ 25–26). Brauner survived the rocket attack, but suffered grievous wounds; a piece of shrapnel entered his back and exited through his stomach, rupturing his kidney and requiring its removal along with that of part of his colon. Dkt. 39 at 2–3 (S. Brauner Decl. ¶¶ 7–8, 10–11). Compensating the victims of such brutal attacks, which were designed to cause the victims' deaths, to inflict suffering, and to inspire terror, directly furthers the purpose of the terrorism exception to the FSIA. *Van Beneden*, 709 F.3 at 1167 & n.4 ("Guided by the [FSIA's] text and purpose, we interpret its ambiguities flexibly and capaciously").

At least on the present record and based on the current briefing, however, the Court is not persuaded that the terrorism exception is sufficiently capacious to include the missile attack that struck the Parnases' house and caused them related emotional distress. That missile did not kill or wound anyone. *See* Dkt. 67 at 1–2 (D. Parnas Decl. ¶¶ 5, 8). Nor were any of the Parnas Plaintiffs home—or even in the immediate vicinity—when the missile struck. *See* Dkt. 69 at 1–2

(Daniella Parnas ¶¶ 7–11).  Concluding that the terrorism exception permits federal district courts to assert jurisdiction over foreign states in these circumstances would constitute a substantial expansion on the law as applied to date and threatens to open the door to a broad array of claims that Congress never contemplated.

Although courts must, in general, resolve jurisdictional questions before reaching the merits, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998), in the present context, the questions of jurisdiction and the merits merge.  The jurisdictional test and the federal cause of action are, in relevant respects, the same, *see Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (explaining that § 1605A(c) "creates a cause of action for the same conduct that gives rise to jurisdiction under the terrorism exception"), and the identical language found in § 1605A(c) and § 1605A(a)(1) must be given the same effect, *see Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context.").  Thus, if the Parnases' claims fail under § 1605A(c), they also fail under § 1605A(a)(1).

Section 1605A(c) does not itself provide the "substantive basis" for claims brought under the FSIA private right of action.  *Maalouf v. Islamic Republic of Iran*, No. 16-0280, 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020).  Courts must, instead, "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to outline the boundaries of [plaintiffs'] theories of recovery."  *Id.* (quoting *Oveissi II*, 879 F. Supp. 2d at 54) (alteration in original).  Here, Plaintiffs allege that the Parnases "suffered severe psychological, emotional and other personal injuries as a result of the 2012 [t]errorist [r]ocket [a]ttack."  Dkt. 1 at 30 (Compl. ¶ 127).  The closest common-law analogues to that claim that the

Court can discern are claims for intentional infliction of emotional distress or for assault, but neither claim is established on the facts present here.

As explained in the Restatement (Second) of Torts, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  Restatement (Second) of Torts § 46.  "[A]n act of terrorism . . . is by its very nature considered extreme and outrageous conduct."  *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012); *see also Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8, 22 (D.D.C. 2009).  The Parnases, moreover, have offered evidence of their severe emotional distress.  *See*, *e.g.*, Dkt. 35-32 (Strous Report concerning A.P.); Dkt. 35-33 (Strous Report concerning Dana Parnas); Dkt. 35-34 (Strous Report concerning Daniella Parnass); Dkt. 35-35 Strous Report concerning Noa Parnas).  The problem they face, however, is that § 1605A(c) does not establish a stand-alone federal law tort for intentional infliction of emotional distress; rather, as applicable here, it creates a tort "for personal injury or death that was caused by an act of . . . extrajudicial killing."  28 U.S.C. §§ 1605A(a)(1) & (c).  "[W]ell-established principles of law," then, fill the interstices of that federal law claim.  *Maalouf*, 2020 WL 805726, at *5 (quoting *Oveissi II*, 879 F. Supp. 2d at 54).  The Court must, accordingly, look to the tortious conduct at issue—material support for an act of extrajudicial killing—and apply the Restatement to that conduct.

Under the Restatement, "conduct which is tortious because intended to result in bodily harm"—for present purposes, "intended to result in" the extrajudicial killing of innocent people—"does not make the actor liable for an emotional distress which is the only legal consequence of his conduct."  Restatement (Second) of Torts § 47.  To be sure, the destruction of

the Parnases' home was, in some sense, a "legal consequence of" Hamas's conduct.  But the

FSIA does not provide a stand-alone claim for injuries to property or emotional distress resulting

from such a loss.  *See* 28 U.S.C. § 1605A(d) (permitting recovery for "foreseeable property loss"

only after a successful claim for personal injury has been brought).  As a result, in the absence of

some "personal injury or death" resulting from the rocket attack, 28 U.S.C. § 1605A(a),

established principles of law do not support a claim for emotional distress alone resulting from

that attack.[7]  In this important respect, the Parnases' claims differ from those of Rivkin, Glick,

and Brauner, who were all the targets of attempted extrajudicial killings and who each suffered

grave physical injuries, thus supporting their claims and the claims of their family members for

emotional distress damages.

Victims of failed attempts to inflict bodily harm do have a remedy under tort law (and, at

least at times, under the FSIA), but it is under an assault (rather than intentional infliction of

emotional distress) theory, and it provides recovery only for "emotional distress [that] consists of

an apprehension of the immediate infliction of an intended harmful or offensive contact."

Restatement (Second) of Torts § 47 cmt. a (citing Restatement (Second) of Torts § 21–34).  To

prevail on an assault theory for attempted extrajudicial killing under the FSIA, a plaintiff must

show that the "(1) [defendants] acted intending to cause a harmful contact with, or an imminent

apprehension of such a contact by, those attacked[,] and (2) those attacked were thereby put in

such imminent apprehension."  *Schertzman Cohen*, 2019 WL 3037868, at *5 (quoting *Wultz v.*

*Islamic Republic of Iran*, 864 F. Supp. 2d 24, 35 (D.D.C. 2012)) (alterations in original).  None

of the Parnases, however, were home or even in the immediate vicinity at the time of the attack,

---

[7]  The Restatement provides the following (unfitting) illustration: "A, who is annoyed by the barking of B's pet dog, shoots at the dog intending to kill it.  He misses the dog.  B suffers severe emotional distress.  A is not liable to B."  Restatement (Second) of Torts § 47 cmt. a, ill. 2.

nor do they assert that they were put in "imminent apprehension" of physical harm.  *See* Dkt. 69 at 1–2 (Daniella Parnas ¶¶ 7–11).

The Court is, therefore, unpersuaded on the current record and briefing that the FSIA's terrorism exception should be construed to encompass attempted extrajudicial killings in which no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm.  Permitting recovery under such circumstances would open the door to a cascade of claims for emotional distress that are unmoored to the types of grievous injury, death, or imminent, life-altering peril resulting from the uniquely heinous acts that Congress elected to redress: torture, extrajudicial killing, aircraft sabotage, and hostage taking.  28 U.S.C. 1605A(a)(1).  Absent some evidence that Congress intended to open that door—or even briefing on the question—the Court will not do so.

      b.    <u>Deliberated</u>

With respect to the remainder of the Plaintiffs' claims, they must show that the attacks that caused their injuries were "deliberated," in order to qualify as an "extrajudicial killing."  "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse."  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016) ("*Owens III*") (citing Webster's Third New International Dictionary 596 (1993); 4 The Oxford English Dictionary 414 (2d ed. 1989); Black's Law Dictionary 492 (9th ed. 2009)), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part and remanded on other grounds sub nom. Opati v. Republic of Sudan*, No. 17-1268, 2020 WL 2515440 (U.S. May 18, 2020).  Here, there is ample evidence that the attacks in question were planned.  For example, more than one of the perpetrators had expressed their desires to die as martyrs on social media in advance of the attacks, *see, e.g.*, Dkt. 33 at 55 (Spitzen Decl. ¶ 141) (discussing attacker that killed Taylor Force); *id.* at 67 (Spitzen

Decl. ¶ 174), and one even posted a photo of himself "masked and sitting in a car with emojis of smiley faces and knives" "[s]everal days prior to the attack" in which he stabbed one of the Plaintiffs, *id.* at 64 (Spitzen Decl. ¶ 169) (discussing Menachem Rivkin's attacker)*.*  Similarly, Colonel Spitzen explained that the Bus 78 attack was the product of significant planning, training, and forethought, given the efficiency with which the two attackers were able to trap and kill passengers.  *Id.* at 29–30 (Spitzen Decl. ¶ 78); Dkt. 104 at 61 (Hrg. Tr. 61:2–25).  With respect to the shooting of Yehudah Glick, Colonel Spitzen explained that the evidence demonstrated that "[t]he assassination attempt . . . was a planned, premeditated terrorist attack."  Dkt. 33 at 125 (Spitzen Decl. ¶ 325).  Similarly, Colonel Spitzen explained that the attack on the yeshiva was "meticulously planned," "demonstrate[d] characteristics of organized [terrorist] attacks" and showed signs of "careful intelligence and logistic preparations . . . made prior to the attack."  *Id.* at 74–75 (Spitzen Decl. ¶¶ 194, 196).

The rocket attacks were also "deliberated."  According to Colonel Spitzen, Hamas has a "policy with respect to rocket launching" and does so—or permits other Gaza-based groups to do so—only "when such actions [are] in line with its objectives."  *Id.* at 98 (Spitzen Decl. ¶ 256); *see also id.* at 113 (Spitzen Decl. ¶ 296) (explaining that Hamas enforced its authority "over the other terrorist organizations strictly, effectively, and aggressively, in such a manner that *any firing began or ended on its orders*" (emphasis added)).  In particular, the 2011 attack on the synagogue was part of coordinated rocket campaign during a particularly active period of conflict with Israel.  *See id.* at 106–07 (Spitzen Decl. ¶¶ 278–80).

Finally, there is no evidence whatsoever that any of these attacks were authorized "by a prior judgment affording judicial guarantees o[f] due process," *Foley*, 249 F. Supp. 3d at 202; *see also Owens IV*, 864 F.3d at 770, or that it was "lawfully carried out under the authority

of a foreign nation." TVPA § 3(a).  To the contrary, for several of the attacks, either Hamas or

PIJ, both non-state actors, claimed credit.  Dkt. 33 at 55–56 (Spitzen Decl. ¶ 144) (Taylor Force);

*id.* at 38 (Spitzen Decl. ¶ 100) (Bus 78 massacre); *id.* at 128 (Spitzen Decl. ¶ 335) (Yehudah

Glick); *id.* at 78 (Spitzen Decl. ¶ 202) (March 2008 attack).    And, with respect to the remaining

attacks, the Court credits Colonel Spitzen's unrebutted conclusion that Hamas was responsible.

*See supra* Parts II.D & II.H–I.

*   *   *

The Court, accordingly, concludes that, with the exception of the destruction of the

Parnases' home, all of the attacks at issue qualify as "extrajudicial killing[s]" under 28 U.S.C.

§ 1605A(a)(1).

3. *Iran's Provision of Material Support for Hamas and PIJ's Acts of Extrajudicial Killing*

The FSIA's terrorism exception applies when a plaintiff seeks money damages for

"personal injury or death that was caused by . . . the provision of material support or resources

for" an "act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking," so long as that

support was provided by "an official, employee, or agent of such foreign state while acting

within the scope of his or her office, employment, or agency."  28 U.S.C. 1605A(a)(1).  Section

1605A(h)(3) defines "material support or resources" by reference to 18 U.S.C. § 2339A, the

criminal material support statute.  Section 2339A defines "material support or resources" to

mean

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

55

18 U.S.C. § 2339A(b)(1).

The Court has found that, during the years leading up to and surrounding the attacks at issue, Iran provided tens—if not hundreds—of millions of dollars' worth of currency to Hamas and PIJ.  *See supra* Part II.A.  Iran also provided substantial operational capacity to both groups, including rockets and other weapons, weapons technology, and training of operatives.  *See id*.  The Court therefore concludes that Iran provided both Hamas and PIJ "material support" in the form of, *inter alia*, "currency," "training," "expert . . . assistance," and "weapons" within the meaning the FSIA.  *See* 28 U.S.C. § 1605A(h)(4); 18 U.S.C. § 2339A(b)(1).

4.    *Syria's Provision of Material Support for Hamas and PIJ's Acts of Extrajudicial Killing*

Plaintiffs rely on a slightly different theory to establish Syria's provision of material support to Hamas and PIJ.  Plaintiffs' evidence establishes that Syria offered both Hamas and PIJ safe bases from which to grow and mature as organizations and to carry out their operations, although Syria withdrew that sanctuary for Hamas in 2012.  The provision of this safe haven assisted both the growth and development of the two groups generally and their capacities to carry out the attacks at issue.  *See* Dkt. 29 at 28–29 (Berti Decl. ¶ 50).  Those courts that have considered the question have held that safe haven can, at least at times, fall within the material support statute's prohibition on the provision of "safehouses" to terrorist organizations.  *See Rux v. Republic of Sudan*, 461 F.3d 461, 470–71 (4th Cir. 2006); *Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) ("*Owens I*").

In *Rux v. Republic of Sudan*, 461 F.3d 461 (4th Cir. 2006), for example, the Fourth Circuit considered whether Sudan's provision of safe haven to Osama bin Laden and other al Qaeda operatives amounted to "material support" under the FSIA. *Id.* at 470–71.  The *Rux* plaintiffs offered evidence that, among other things, the Sudanese government and Osama bin

Laden and al Qaeda had jointly owned and operated banks and other companies in that country, "gave [a]l Qaeda special authority to avoid paying taxes and duties ordinarily due to the Republic of the Sudan," permitted the "use of a diplomatic pouch to send explosive materials belonging to Osama bin Lad[e]n for [a]l Qaeda outside the Republic of Sudan," and allowed al Qaeda to "operate training camps" in Sudan "for the purpose of training terrorists" to "manufacture bombs and [other] explosives." *Id.* at 468–69. Sudan appeared in the case and argued that the term "safehouses" in the material support statute must be construed to include only discrete physical structures, not the more abstract and amorphous harboring that only a sovereign state can provide. *Id.* at 470–71. The Fourth Circuit rejected that "restrictive interpretation" and held that Sudan had provided a "safehouse," relying in part on a decision from this district holding that, "[i]nsofar as the government of the Republic of Sudan affirmatively allowed and/or encouraged al-Qaeda . . . to operate [its] terrorist enterprise[] within its borders, and thus provided a base of operations for the planning and execution of terrorist attacks . . . Sudan provided a 'safehouse' within the meaning of 18 U.S.C. § 2339A, as incorporated in 28 U.S.C. § 1605(a)(7)." *Id.* at 471 (quoting *Owens I*, 412 F. Supp. 2d at 108).

In *Owens I*, the decision relied upon in *Rux*, Judge Bates was presented with allegations of similar conduct by Sudan in support of al Qaeda, as well as additional allegations that the Sudanese government "employed al Qaeda to manufacture chemical weapons," offered military protection for weapons shipments to and from al Qaeda in an out of the country, and provided other special treatment in the form of preferential immigration treatment and protection from arrest by local law enforcement authorities. 412 F. Supp. 2d at 106–07. Judge Bates found that "many of the[se] alleged acts do in fact fit within several of the section 2339A categories" and

rejected Sudan's argument that "safehouses" should be narrowly construed so as not to cover such harboring by a sovereign state. *Id.* at 107–08.

The Court is persuaded by and adopts the conclusion that the term "safehouse," as used in the material support statute, includes foreign governmental encouragement or assent to terrorist organizations setting up shop within their borders. Here, Plaintiffs' experts testified that both Hamas and PIJ conducted significant aspects of their operations from within Syrian territory and that these Syrian bases of operations helped both groups grow in their operations and influence. Whether the Syrian government encouraged any specific activity linked to terrorism within its borders is, at least on the present record, less clear than the link was in *Owens I* and *Rux*. Nevertheless, the Court is satisfied on the present record that the term "safehouses," as used in § 2339A, sweeps in Syria's conduct here.

Plaintiffs rely on declarations and live testimony from Dr. Berti and Dr. Deeb, who this Court qualified as expert witnesses on the topics of "Syrian support for Hamas and [PIJ]." Dkt. 105 at 8–9 (Berti); *see also id.* at 96–97 (Deeb). "The testimony of expert witnesses is of crucial importance in terrorism cases, because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain." *Owens IV*, 864 F.3d at 787 (internal citations omitted). Direct evidence is often unavailable as "[p]erpetrators of terrorism typically lie beyond the reach of the courts" and actively "avoid detection," and "[e]yewitnesses in a state that sponsors terrorism" are both hard to locate and "may be unwilling to testify for fear of retaliation." *Id.* As in this case, "sovereigns themselves often fail to appear and to participate in discovery." *Id.* "[R]eliance upon secondary materials" and the testimony of experts "is often critical" in order to make up for this "dearth of firsthand evidence" in "establish[ing] the factual basis of a claim under the FSIA terrorism exception." *Id.*

Plaintiffs experts testified that Syria is and has been "one of the most authoritarian societies in the world." Dkt. 105 at 45 (Berti). As a result, "[a]ny political organization that wants to operate in Syria needs to have more than the blessing but the open facilitation of the government." *Id.* Both PIJ and Hamas maintained operational bases in Damascus for well over a decade before the first of the attacks the injured plaintiffs. *See* Dkt. 29 at 12–13 (Berti Decl. ¶¶ 23–25) (explaining that Hamas established an office in Damascus in the early 1990s and moved its political bureau there in the early 2000s); *id.* at 17 (Berti Decl. ¶ 32) (explaining that PIJ has "maintained a permanent base in Syria" since 1989). From those bases, both groups were able to facilitate fundraising and arms smuggling through Syria, as well as plan and coordinate terrorist attacks with their members in Gaza. *Id.* at 15, 23, 29–30 (Berti Decl. ¶¶ 28, 41, 52–54); Dkt. 30 at 5–6 (Deeb Decl. ¶ 19). Hamas also set up a camp near Damascus to train its operatives. Dkt. 29 at 31 (Berti Decl. ¶ 55). Because Israel would face greater risks if it sought to encroach on Syrian sovereignty by targeting Hamas and PIJ leaders in Damascus than targeting leaders in Gaza, Hamas and PIJ were able to conduct all of these operations in Damascus with lessened fear of reprisal from Israel or fear of prosecution for "arms dealing, money laundering, terrorism," or similar offenses. *See* Dkt. 105 at 19 (Berti). The benefits of operating in Syria, rather than Gaza, were a "very important force multiplier for Hamas." *Id.* at 19–20 (Berti)

The evidence also shows that Syria "affirmatively allowed" the two groups to establish themselves in the Syrian capital. Not only did the regime not "forcefully or systematically crack[] down" on Hamas's activities, Dkt. 29 at 25 (Berti Decl. ¶ 45), it offered affirmative support for and endorsement of Hamas's activities. Syria and Hamas had, since the 1990s, been political partners in opposing various Israeli-Palestinian peace negotiations, *see* Dkt. 105 at 100–

01 (Deeb); *id.* at 16–17 (Berti), and, after coming to power in 2000, Bashar Al-Assad only

further increased support for Hamas, just as the organization was relocating its important

political bureau to Damascus, *see id.* at 17–18.  Moreover, as Dr. Berti explained, the Syrian

government, "[o]n many occasions," "made statements with respect to wanting to guarantee

Hamas and its leaders['] safety."  Dkt. 105 at 19 (Berti).  Those leaders that Syria sought to keep

safe included three individuals classified as Specially Designated Global Terrorists by United

States Department of Treasury and who had relocated to Damascus.  Dkt. 29 at 19–20 (Berti

Decl. ¶ 34).

The Syrian government also offered important political support to Hamas, and there is

some evidence that Syria provided financial support to Hamas.  In 1999, Syrian President Hafez

al-Assad arranged for Hamas leaders to join a meeting in Damascus between him and Iranian

President Mohammad Khatami.  Dkt. 29 at 27 (Berti Decl. ¶ 47).  Over the following decade,

Hamas continued to meet with Iranian officials in Damascus, *id.* as Iran funneled untold millions

of dollars to the group, *see* Part II.A.  A few years later, in 2002, it was reported that Syria

offered Hamas and PIJ aid in exchange for increased attacks against Israel.  Dkt. 29 at 25–26

(Berti Decl. ¶ 45).  Dr. Berti also testified—although without mentioning dates or quantities—

that Syria was not only a thoroughfare for rockets and rocket parts to Gaza from Iran, but it also

directly provided rocket parts to Hamas.  Dkt. 105 at 50–51 (Berti).  Similarly, while there is a

"debate" about the "extent" and "consisten[cy]" of Syrian financial support to Hamas, "there[]

[are] many reports that indicate financial" support.  *Id.* at 21–22 (Berti).

PIJ's relationship to Syria is "similar to that of Hamas;" Dkt. 105 at 24–25 (Berti), like

Hamas, it had found a safe haven in Damascus by the 1990s, *see* Dkt. 29 at 17 (Berti Decl. ¶ 32),

which allowed it to grow and to gain in strength over the decades that followed, Dkt. 105 at 24–

25 (Berti).  In Syria, PIJ operated a camp where it trained operatives that engaged in suicide

attacks.  *See id.* at 32, 35 (Berti).  Syria also "talked about providing security for [PIJ's]

leadership," and, when "confronted or asked about" their support for PIJ, "the answer has not

been no."  *Id.* at 46 (Berti).  Although the Syrian government has claimed that its support was

limited to "political and social activities," *id.*, PIJ, unlike Hamas, does not have substantial

operations of that sort.  *See id.* at 24–25 (Berti).

      The evidence of Syria's active encouragement of PIJ and Hamas's operations in

Damascus does not rise to the level of support that the courts found in *Rux* or *Owens I* that Sudan

provided to al-Qaeda.  But given Syria's authoritarian government, the openness and duration of

Hamas and PIJ's operations in Damascus, Syria's ability to expel Hamas as soon as it suited the

Syrian government to do so, Dkt. 105 at 36 (Berti), and the other evidence of Syrian support, the

Court finds that Syria did "affirmatively allow" or "encourage" Hamas and PIJ to operate there

and thus provided a "safehouse" within the meaning of the FSIA.  *Owens I*, 412 F. Supp. 2d at

108; *cf. Han Kim*, 774 F.3d at 1049–51 (permitting a finding of liability under the FSIA's

terrorism exception without any direct evidence based on expert testimony that North Korea

typically tortured and killed individuals in labor camps and the inference that North Korea did

the same in plaintiff's particular case).

      5.    *Causation*

      The Court must also consider whether Plaintiffs' injuries were "caused by" provision of

material support to Hamas and PIJ.  28 U.S.C. § 1605A(a)(1).  Plaintiffs need not show that Iran

or Syria "specifically knew of or intended its support to cause" the particular attacks in question,

*Owens IV*, 864 F.3d at 798, or even that Iran or Syria's material support was a "but for" cause of

their injures, *Kilburn*, 376 F.3d at 1128.  Instead, the FSIA requires only a "showing of

'proximate cause,'" which is satisfied where a Plaintiff can show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). This inquiry thus "contains two similar but distinct elements." *Owens IV*, 864 F.3d at 794. "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury." *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). "Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Id.* (quoting same).

Plaintiffs have not offered evidence that either Iran or Syria's support was tied to each of the attacks that caused their injuries.  But such a "nexus" is not necessary because funds—and, in certain instances, arms and other support—are fungible, and the FSIA could hardly be interpreted to condition Plaintiffs' recovery on Hamas and PIJ's "careful bookkeeping." *Kilburn*, 376 F.3d at 1130.  Here, Plaintiffs' have shown that Iran's financial and military aid to the two groups was essential to each group's operating capacity and that, without Iran's backing, both groups would be substantially weakened.  *See* Part II.A.  Thus, Iran's support to both PIJ and Hamas was a substantial factor in the eight attacks that caused the Plaintiff's injuries.

Similarly, when asked by the Court whether "Hamas would have been in a position to have committed the terrorist attacks that are at issue in this case . . . if it were not for Syria's provision of material support," Dr. Berti opined that "without the type of support that Syria has provided to Hamas, Hamas would not be what it is today from a political, social and military perspective" and that "the attacks that [were] perpetrated . . . are tightly connected to the role Syria played."  Dkt. 105 at 51–52 (Berti); *see also id.* at 53 (Berti) (explaining that "the answer wouldn't be very different" with respect to PIJ, but noting that PIJ is a "smaller, less

sophisticated organization").  Although Hamas did leave Syria after it took the side of the Sunni

rebels in the Syrian civil war in 2012, *id.* at 36 (Berti), Plaintiffs have shown that "the continuous

support which Syria provided to Hamas in the previous years contributed to giving the group the

military edge and sophistication it needed to be able to conduct and carry out successful violent

operations" for many years thereafter, up to and including the 2016 attacks at issue here.  *See*

Dkt. 29 at 35–36 (Berti Decl. ¶ 66).  Thus, Syria's support was also a substantial factor in the

attacks that caused Plaintiffs' injuries.

       This, then, leaves the question whether Plaintiffs' injuries resulting from the attacks at

issue were "reasonably foreseeable" or "natural consequence[s]" of Defendants' conduct.  *Owens*

*IV*, 864 F.3d at 794.  On this issue, too, the record is clear.  Iran not only supported these groups,

they actively encouraged them to carry out attacks on civilians in Israel as part of a broader

geopolitical strategy and provided both groups with the weapons and know-how to do so

effectively.  *See supra* Part II.A.  Although Syria's support took a different form, it, too, was part

of a broader geopolitical strategy that supported Hamas and PIJ's operations and necessarily

understood that Syrian support would enable them to carry out attacks on civilians in Israel.  *See,*

*e.g.*, Dkt. 29 at 25–26 (Berti Decl. ¶ 45)   The death and injury to innocent people and the

suffering of their families was, by any measure, foreseeable.  *Owens IV*, 864 F.3d at 797–98

(finding the 1998 embassy bombings by al Qaeda to be a reasonably foreseeable consequence of

Sudan's offer in 1991 to shelter Osama Bin Laden); *see also Salzman,* 2019 WL 4673761, at

\*14.  Finally, although Syria's support for Hamas waned in 2012, Dkt. 105 at 36 (Berti), it was

entirely foreseeable that Syria's earlier support in making Hamas what it is today would lead to

deaths and injuries several years after 2012.

       6.     *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is required to show that those Plaintiffs who are U.S. nationals are entitled to relief under the federal cause of action the Congress enacted in 2008 as part of the National Defense Authorization Act. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605(c)). Although the federal cause of action was added to the FSIA in 2008, "§ 1605A(c) operates retroactively" and "plainly applies . . . to the pre-enactment conduct of a foreign sovereign." *Owens IV*, 864 F.3d at 815. There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley*, 249 F. Supp. 3d at 205, and a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of " any such person. 28 U.S.C. § 1605A(c).

This one exception affects the claims of the non-U.S. national (Israeli national) plaintiffs in this case. For jurisdictional purposes, this fact is non-consequential, because the waiver of foreign sovereign immunity applies so long as "the claimant *or* the victim was, at the time of the" terrorist attack, a U.S. national, member of the armed forces, or government employee. 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added). The federal cause of action, however, is more restrictive and limits plaintiffs to those who are themselves U.S. nationals, members of the armed services, or government employees. 28 U.S.C. § 1605A(c). Accordingly, the Court concludes that, subject to a showing that they suffer compensable losses, the U.S.-national plaintiffs have, for the reasons described above, carried their burden of demonstrating that they are entitled to

relief under § 1605A(c).  The Court will separately analyze whether the Israeli plaintiffs have stated a cause of action.

## B.  Personal Jurisdiction

The Court also concludes that it has personal jurisdiction over the Islamic Republic of Iran, MOIS and the Syrian Arab Republic.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference," *id.*:

> (1)    by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2)    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3)    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4)    if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic

channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case. *See* Dkt. 17 at 1. No "special arrangement" governs service between the United States and Iran or Syria, and neither country is party to an international convention on service of judicial documents. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 77–78 (D.D.C. 2017). As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from "the clerk of the court to the head of the ministry of foreign affairs of the foreign state." 28 U.S.C. § 1608(a)(3). On September 13, 2016, Plaintiffs initiated service as to all Defendants under § 1608(a)(3), Dkt. 5; Dkt. 6, and, at Plaintiffs' request, the clerk of court, mailed the relevant documents to Syria, Iran, and MOIS on September 27, 2016. Dkt. 7. On October 12, 2016, Plaintiffs notified the Court that the documents to Iran and MOIS were undelivered. Dkt. 8. The documents to Syria, however, were delivered on November 14, 2016. Dkt. 14.

Plaintiffs then proceeded to serve Iran and MOIS pursuant to § 1608(a)(4). That provision requires service by mail from the clerk of court to the Secretary of State, who must then transmit the required material "through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a)(4). The Department of State must then send "the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the

clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on October 31, 2016.  Dkt. 9.  The clerk mailed these materials to the State Department on May 26, 2017.  Dkt. 19.  On September 14, 2017, the State Department notified the Clerk that the documents had been delivered to the Islamic Republic of Iran and to MOIS.  Dkt. 20.  As the Department explained, "[b]ecause the United States does not maintain diplomatic relations with the government of Iran," the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on July 18, 2017. *Id.* at 1, 4.  The Swiss Embassy reported that the Iranian Ministry of Foreign Affairs "refused" to accept the documents that same day.  *Id.* at 4.  After the Islamic Republic of Iran failed to respond, the clerk entered a default.  Dkt. 23.

Because Plaintiffs accomplished service pursuant to 28 U.S.C. § 1608(a)(3) on the Syrian Arab Republic and pursuant to 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran and MOIS, the Court possesses personal jurisdiction over all three defendants.  *See* 28 U.S.C. § 1330(b).

## C.    Liability for State Law Claims

In addition to suing under federal law, Plaintiffs assert several state law claims.  As to most of the plaintiffs, these claims are redundant of their federal law claims and do not provide any additional right to recover.  As noted above, however, thirteen of the plaintiffs (including Yehudah Glick, who has renounced his U.S. citizenship) are not U.S. nationals, members of the U.S. armed forces, or U.S. employees or contractors, *see* Dkt. 109 (Yehudah Glick renunciation of U.S. citizenship); Dkt. 57 at 1 (Atara Katz Decl. ¶ 1); Dkt. 61 at 1 (Eytan Moriah Decl. ¶ 1); Dkt. 62 at 1 (Ifat Cohen Decl. ¶ 2); Dkt. 64 at 1 (Tzur Moriah Decl. ¶ 1); Dkt. 59 at 1 (Chagit Gibor ¶ 1); Dkt. 80 at 1 (Yaacov Shitrit Decl. ¶ 1); Dkt. 71 at 1 (B. Rivkin Decl. ¶ 1); Dkt. 52 at

1 (Yehudah Glick Decl. ¶ 1); Dkt. 38 at 1 (N. Brauner ¶ 4) (C.Y.B., M.H.B., and Y.A.L.B); *see*

Dkt. 82 (omitting C.Y.B., M.H.V., and Y.A.L.B. from list of individuals with U.S. passports).

These plaintiffs, therefore, are not entitled to recover under the § 1605A(c) private right of

action.  They can, however, seek to recover damages under state tort law.  *See Owens IV*, 864

F.3d at 809.  Because the U.S.-national plaintiffs are entitled to relief under the federal law cause

of action, the Court will limit its consideration of the state law claims to the thirteen non-U.S.-

national plaintiffs.

Historically, the state-sponsored terrorism exception to the FSIA was not understood to

create a federal cause of action against foreign states (as opposed to state officials) but, rather, to

operate merely as a "pass-through" for state law claims.  *Id.* at 764 (quoting *Pescatore v. Pan*

*Am. World Airways, Inc.*, 97 F.3d 1, 12, (2d Cir. 1996)); *see also Cicippio-Puleo v. Islamic*

*Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004).  When Congress amended the law to

provide a federal cause of action, *see* National Defense Authorization Act for Fiscal Year 2008 §

1083, it did not upset the prior law permitting plaintiffs to assert state law claims after clearing

the hurdle of foreign sovereign immunity, *see Owens IV*, 864 F.3d at 807–09.  Although most

plaintiffs proceeding under the state-sponsored terrorism exception to the FSIA need not rely on

state tort law, the "pass-through approach remains" a "viable" option for those who are unable to

invoke the federal cause of action, *id.* at 809, such those thirteen plaintiffs who are Israeli

nationals. Dkt. 38 at 1 (N. Brauner ¶ 4) (C.Y.B., M.H.B., and Y.A.L.B); Dkt. 57 at 1 (Atara

Katz Decl. ¶ 1); Dkt. 61 at 1 (Eytan Moriah Decl. ¶ 1); Dkt. 62 at 1 (Ifat Cohen Decl. ¶ 2); Dkt.

64 at 1 (Tzur Moriah Decl. ¶ 1); Dkt. 59 at 1 (Chagit Gibor ¶ 1); Dkt. 80 at 1 (Yaacov Shitrit

Decl. ¶ 1); Dkt. 71 at 1 (B. Rivkin Decl. ¶ 1); Dkt. 52 at 1 (Yehudah Glick Decl. ¶ 1).

1.      *Choice of Law*

In the absence of a federal cause of action, the Court must first consider what law applies.

Because "[t]he FSIA does not contain an express choice-of-law provision" but, rather, specifies

that "a foreign state stripped of its immunity 'shall be liable in the same manner and to the same

extent as a private individual under like circumstances,'" the Court must apply the choice of law

rules of the forum state.  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009)

("*Oveissi I*") (quoting 28 U.S.C. § 1606).  The Court will, accordingly, apply District of

Columbia choice of law principles.

The District of Columbia uses a choice-of-law rule that "blend[s] a 'governmental

interest analysis' with a 'most significant relationship' test."  *Id.* at 842 (quoting *Hercules & Co.,

Ltd. v. Shama Rest. Corp.*, 566 A.2d 31, 40–41 & n.18 (D.C. 1989)).  Under the governmental

interest analysis, the Court "must evaluate the governmental policies underlying the applicable

laws and determine which jurisdiction's policy would be most advanced by having its law

applied to the facts of the case under review."  *Id.* (quoting *Hercules & Co*, 566 A.2d at 41).

And, under the most significant relationship test, the Court must consider the following four

factors taken from the Restatement (Second) of Conflict of Laws: (1) "the place where the injury

occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e],

residence, nationality, place of incorporation and place of business of the parties"; and (4) "the

place where the relationship, if any, between the parties is centered."  *Id.* (quoting Restatement

(Second) of Conflict of Laws § 145(2) (1971)).  Section 145 of the Restatement "also references

the factors in Section 6 of the Restatement, which include the needs of the interstate and the

international systems, the relevant policies of the forum, the relevant policies of other interested

states, certainty, predictability and uniformity of result, and ease in the determination and

application of the law to be applied." *Dammarell v. Islamic Republic of Iran*, 01-2224, 2005 WL 756090, at *18 (D.D.C. Mar. 29, 2005) (citing Restatement (Second) of Conflict of Laws § 145 (1971)); *see also Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011) ("*Owens II*"), *aff'd in part and vacated in part on other grounds*, 864 F.3d. 751 (D.C. Cir. 2017).

Here, there are two potential sources of law that might govern the Israeli-national plaintiffs' claims: the law of the forum state (the District of Columbia) and the law of the plaintiffs' domicile and the place of the attacks at issue (Israel). Plaintiffs contend that Israeli law should govern the Israeli plaintiffs' claims, and the Court agrees.

This case does not raise a conflict between various domestic jurisdictions; rather, the Court must decide whether to apply D.C. law or the law of a foreign jurisdiction, Israel. In *Dammarell v. Islamic Republic of Iran*, the district court applied the law of the U.S.-plaintiffs' state of domicile—rather than that of Lebanon—to a suit brought by American victims of the 1983 bombing of the United States Embassy in Beirut. 2005 WL 756090 at *20. As the district court explained, "the injuries in [that] case [were] the result of a state-sponsored terrorist attack on a United States embassy and diplomatic personnel[,] [and the] United States has a unique interest in its domestic law . . . determining damages in a suit involving such an attack." *Id.*; *see also Oveissi I*, 573 F.3d at 843 ("We have no doubt that the United States has a strong interest in applying its domestic law to terrorist attacks on its nationals, especially when, as was the case in *Dammarell*, the attacks are 'by reason of their nationality.'"). That principle, moreover, is supported by the Restatement (Third) of Foreign Relations Law, which recognizes a country's "jurisdiction to prescribe law with respect to 'certain conduct outside its territory by persons not its national *that is directed against* the security of the state or against a limited class of other interests,'" and notes that "this principle is 'increasingly accepted as applied to terrorist . . .

attacks *on a state's nationals by reason of their nationality . . . .*"  *Id.* (quoting Restatement

(Third) of Foreign Relations Law § 402(3) & 402 cmt. g) (emphasis in *Oveissi I*) (citation to

*Dammarell* omitted).

Although agreeing with this summary of the governing law, the D.C. Circuit declined to

apply domestic U.S. law in *Oveissi I*.  There, in contrast to *Dammarell*, the victim of the

assassination was not a U.S. national, there was no evidence that the assailants knew that the

victim's grandchild—the plaintiff in *Oveissi I*—was a U.S. national, and there was no evidence

that "the United States or its nationals were in any other way the object of the attack."  *Id.* at 374.

The evidence, to the contrary, showed that the assassination occurred in France, and was

intended "to deter French intervention in Lebanon."  *Id.* (emphasis omitted).  In short, "if any

country was the object of the attack, it was France."  *Id.*  The D.C. Circuit, therefore, concluded

that French law should govern.  *Id.*

Although not identical, the present case is closer to *Oveissi I* than it is to *Dammarell.*  All

seven attacks occurred in Israel.  And, as in *Oveissi I*, there is no evidence that "the United States

or its nationals were in any . . . way *the object*" of any of the attacks, although the direct victims

were all U.S. nationals at the time of the attacks.  *Id.* (emphasis added).   This case is, moreover,

on all fours with *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21 (D.D.C. 2017), *rev'd*

*in part on other grounds*, 892 F.3d 348 (D.C. Cir. 2018), where the district court applied the

principles discussed above and held that Israeli law, rather than D.C. law, was appropriate.  *Id.* at

39.  There, the court concluded that "Israel ha[d] the greatest interest in having its laws apply and

the most significant relationship to the events" because "the injury occurred in Israel; the conduct

causing the injury occurred in Israel, the Palestinian territories, [and] Iran . . . ; [the plaintiff] is

and always has been an Israeli citizen; and there is no legal relationship between [the plaintiff]

and any of the defendants or Hamas." *Id.* The same considerations are present here with respect

to the non-U.S.-national/Israeli plaintiffs. Not only did all the relevant events occur in Israel and

these particular plaintiffs are Israeli citizens, the direct victims on which their claims are

predicated were all U.S. citizens who permanently resided in Israel, including some with dual

U.S.-Israeli citizenship. *See* Dkt. 72 at 1 (Menachem Rivkin Decl. ¶ 1) (U.S. citizen residing in

Israel); Dkt. 52 at 1 (Yehudah Glick Decl. ¶ 1) (indicating that he was a U.S. citizen at the time

of the attack); Dkt. 66 at 1 (Naftali Moses Decl. ¶¶ 1–4) (indicating that Avraham Moses resided

in Israel at the time of the attack that killed him); Dkt. 76 at 1 (Naftali Shitrit Decl. ¶ 1) (dual

U.S.-Israeli citizen residing in Israel); Dkt. 39 at 1 (Shmuel Brauner Decl. ¶¶ 1, 6) (U.S. citizen

born in Israel and residing there at the time of the attack). The Court, accordingly, concludes

that Israeli law should govern.

1.   *Liability*

Having concluded that Israeli law applies, the Court will turn to whether the Israeli

plaintiffs have adequately alleged a claim for (1) negligence or (2) aiding and abetting. Dkt. 1 at

31 (Compl. ¶¶ 132–151). When applying foreign law, "the [C]ourt may consider any relevant

material or source, including testimony, whether or not submitted by a party or admissible under

the Federal Rules of Evidence." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 44

(D.D.C. 2016) (quoting Fed. R. Civ. P. 44.1). Although "the [C]ourt is not limited by material

presented by the parties," and "may engage in its own research," it is also "free to insist on a

complete presentation by counsel." Fed. R. Civ. P. 44.1 advisory committee's note to 1966

amendment. In support of the Israeli plaintiffs' entitlement to relief under Israeli law, Plaintiffs

have submitted the expert declaration of Dr. Boaz Schnoor, who holds L.L.D., L.L.M, and

L.L.B. degrees from Hebrew University and has "served as a consulting expert witness on issues

related to Israeli tort law and liability for terrorist attacks in a number of cases." Dkt. 34 at 2
(Schnoor Expert Rpt. ¶¶ 3–4).

In Dr. Schnoor's expert opinion, "Defendants would be held liable in tort to the Plaintiffs
under the applicable provisions of [Israel's] Civil Wrongs Ordinance [New Version] 5728-1968
('CWO')." Dkt. 34 at 3 (Schnoor Decl. ¶ 8). Dr. Schnoor's declaration asserts, in particular, that
Iran and Syria are directly liable to Plaintiffs under the doctrine of negligence for "[s]upplying
aid, support and assistance to terrorist organizations" because "a reasonable defendant would
foresee that such actions might result in terrorist attacks," causing harm to direct victims and
their family members. *Id.* (Schnoor Decl. ¶ 9c). According to Dr. Schor, "[t]he tort of
negligence provided for in the CWO consists of four elements: duty of care; breach of a duty of
care[;] . . . proximate cause (sometimes divided to cause-in-fact and legal causation); and harm."
*Id.* at 5 (Schnoor Decl. ¶ 15) (citations omitted); *see also* CWO § 35, 2 LSI (New Version) 14–
15 (1972). And "[i]t is noteworthy . . . that Israeli Law holds that the tort of negligence
encompasses not only negligent acts, but also intentional acts, as long as they are unreasonable
acts that caused foreseeable harm." *Id.* at 4 (Schnoor Decl. ¶ 13). Applying the above standard
to the Israeli plaintiffs' claims, the Court concludes that eleven of the thirteen Israeli plaintiffs
have adequately alleged a claim for negligence against Iran and Syria.

*First*, duty of care under Israeli law is "sometimes divided between the conceptual duty
of care and concrete duty of care." *Id.* at 5 (Schnoor Decl. ¶ 16). "According to Israeli tort
law[,]a duty of care (both conceptual and concrete) is presumed to exist whenever a reasonable
person could have foreseen that the conduct at issue could cause harm of the type alleged." *Id.* at
6 (Schnoor Decl. ¶ 17); *see also* CWO, § 36, 2 LSI (New Version) 15 (1972) ("[E]very person
owes a duty to all persons whom . . . a reasonable person ought in the circumstances to have

73

contemplated as likely in the usual course of things to be affected by an act, or failure to do an act."). The Court finds that the Israeli plaintiffs have demonstrated that Defendants were under a duty of care to Bracha Rivkin, Yehudah Glick, his foster children R.T. and T.T., Avraham Moses's step-siblings, and Shmuel Braunder's children because, as noted above, "their injuries were foreseeable consequences" of Iran and Syria's provision of material support to Hamas and PIJ. *see Fraenkel*, 248 F. Supp. 3d at 39.

*Second*, "[a] breach of the duty of care occurs when a party with a duty fails to take 'reasonable precautionary measures.'" *Id.* (citation omitted). Far from taking precautionary measures, Iran provided Hamas and PIJ with financing, weapons and training; Syria provided them with a safe haven from which to procure those tools and plan attacks; both actively encouraged terrorist operatives to carry out attacks against the civilian population of Israel. The Court, accordingly, concludes that Defendants breached their duty of care to the Israeli plaintiffs.

*Third*, the "[c]ause in fact is generally determined in Israel according to the 'but for' test." Dkt. 34 at 7 (Schnoor Decl. ¶ 21) (citations omitted). And legal causation is met "[i]f a reasonable person could have foreseen that a harm of the kind that happened might happen." *Id.* (Schnoor Decl. ¶ 22). Both types of causation are satisfied here. As noted above, Plaintiffs have demonstrated that, but-for the material support of Iran, Hamas and PIJ would not have had the economic resources or the training to carry out the attacks at issue. So, too, with Syria; the safe harbor provided by Syria was necessary for both groups to develop the operational capacity to carry out these attacks. And, it was certainly foreseeable that, by providing Hamas and PIJ material support and encouraging them to carry out terrorist attacks against civilians in Israel, Iran would cause serious injury or death to civilians in Israel and inflict mental and emotional anguish on their families.

74

*Finally*, the element of harm is defined by the CWO as "loss of life, or loss of, or detriment to, any property, comfort, bodily welfare, reputation, or other similar loss or detriment."  Dkt. 34 at 7 (Schnoor Decl. ¶ 23).  As noted above, the Israeli plaintiffs have submitted psychiatric evaluations attesting to the mental and emotional anguish they suffered as a result of their loved ones' injuries.  *See* Dkt. 35 (Strous Decl.).  The Court, accordingly, finds that they have adequately demonstrated harm.

The Court will, however, deny the motion for default judgment as to Y.A.L.B. and M.H.B., the children of Plaintiff Schmuel Brauner, who were born after the August 19, 2011 rocket attack that injured Schmuel.  With respect to these two plaintiffs, the Court is not satisfied—at least on the existing record—that Defendants owed these plaintiffs a duty of care *at the time of the attack*.  Courts in this district have, for example, held that after-born children cannot recover for solatium damages in similar cases brought under § 1605A of the FSIA.  *See, e.g.*, *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 14–15 (D.D.C. 2012).  Dr. Schnoor's declaration does not address this wrinkle, nor does he explain whether after-born children are owed a duty of care under Israeli negligence law.  Because it is Plaintiffs' burden to establish their right to relief on a motion for default judgment, the Court concludes that Plaintiffs have failed to present sufficient evidence that Y.A.L.B. and M.H.B. are entitled to solatium damages.

The Court will, accordingly, grant the motion for entry of a default judgment with respect to the eleven of the thirteen Israeli plaintiffs.  With respect to M.H.B and Y.A.L.B., the Court will deny the motion for default judgment without prejudice.  Plaintiffs may renew their motion after supplementing Dr. Schnoor's declaration with additional expert testimony on Israeli law to address the Court's concerns.

**CONCLUSION**

For the foregoing reasons, it is hereby **ORDERED** that the motion for default judgment, Dkt. 91, with respect to all a claims by M.H.B. and Y.A.L.B., the minor children of Schmuel and Nechama Brauner, and all claims by Daniella, Noa, and Dana Parnas, and A.P., is **DENIED** without prejudice.  It is further **ORDERED** that the motion for default judgment with respect to the remaining fifty-one Plaintiffs is **GRANTED** with respect to their claims against Syria, Iran, and MOIS.  The Court will **APPOINT** a special master to hear their damages claims and to report to the Court recommending the appropriate award as to those plaintiffs.  A separate order appointing a special master and setting the terms of that appointment will follow.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 31, 2020