**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TAYLOR FORCE, *et al.*, | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )    Civil Action No. 16-1468 (RDM) |
| | ) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**REPORT AND RECOMMENDATION OF SPECIAL**
**<u>MASTER REGARDING COMPENSATORY DAMAGES</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

BRIEF BACKGROUND ............................................................................2

FACTUAL FINDINGS/EXPERTS ...........................................................2

I.     MEDICAL EXPERTS ................................................................2

II.    DIRECT VICTIMS ...................................................................6

     A.     Estate of Taylor Force ......................................................6

     B.     Menachem Mendel Rivkin ................................................7

     C.     Yehuda Glick ....................................................................9

     D.     Estate of Richard Lakin .................................................11

     E.     Estate of Avraham David Moses .....................................12

     F.     Naftali Shitrit ..................................................................14

     G.     Shmuel Zev Shimon Brauner ...........................................17

III.   FAMILY MEMBERS OF DIRECT VICTIMS ........................19

     A.     Family of Taylor Force ...................................................20

         1.     Stuart Force – Father of Taylor Force .................20

         2.     Robbi Force – Mother of Taylor Force ...............21

         3.     Kristin Ann Force – Sister of Taylor Force .........22

     B.     Family of Menachem Mendel Rivkin ...............................24

         1.     Bracha Rivkin – Wife of Menachem Mendel Rivkin .........................24

         2.     S.S.R. – Child of Menachem Mendel Rivkin .......24

         3.     M.M.R. – Child of Menachem Mendel Rivkin .....25

         4.     R.M.R. – Child of Menachem Mendel Rivkin ......26

         5.     S.Z.R. – Child of Menachem Mendel Rivkin .......27

     C.     Family of Yehuda Glick ...................................................28

         1.     Estate of Yaffa Glick – Wife of Yehuda Glick .....28

         2.     Neriya David Glick – Child of Yehuda Glick ......30

         3.     Shlomo Glick – Child of Yehuda Glick ...............31

         4.     Hallel Glick – Child of Yehuda Glick .................31

         5.     Sachar Glick – Child of Yehuda Glick ................32

         6.     R.T. and T.T. – Foster Children of Yehuda Glick ..............33

     D.     Family of Richard Lakin ..................................................34

1. Micah Lakin Avni – Child of Richard Lakin ........................................34
2. Manya Lakin – Child of Richard Lakin ...............................................36
E. Family of Avraham David Moses ................................................................37
1. Rivkah Martha Moriah – Mother of Avraham David Moses ............37
2. Naftali Andrew Moses – Father of Avraham David Moses ...............39
3. David Moriah – Stepfather of Avraham David Moses ......................41
4. N.M. – Half-Sibling of Avraham David Moses.................................42
5. C.M. – Half-Sibling of Avraham David Moses.................................43
6. A.M. and O.D.M. – Half-Siblings of Avraham David Moses............44
7. Elisha Dan Moses – Brother of Avraham David Moses.....................45
8. Aviad Moriah – Stepbrother of Avraham David Moses .....................46
9. Chagit Gibor Moriah – Stepsister of Avraham David Moses.............46
10. Eitan Yoel Moriah – Stepbrother of Avraham David Moses .............48
11. Yifat Moriah – Stepsister of Avraham David Moses..........................49
12. Atara Nesia Moriah– Stepsister of Avraham David Moses................50
13. Tzur Gedaliah Moriah – Stepbrother of Avraham David Moses.........51
F. Family of Naftali Shitrit ...........................................................................52
1. Gila Rachel Shitrit– Mother of Naftali Shitrit ................................52
2. Yaakov Shitrit – Father of Naftali Shitrit .......................................54
3. Meiri Shitrit – Sibling of Naftali Shitrit..........................................55
4. Oshrat Shitrit – Sibling of Naftali Shitrit........................................56
5. N.S. – Sibling of Naftali Shitrit ......................................................57
6. Y.S. – Sibling of Naftali Shitrit ......................................................58
7. A.S. – Sibling of Naftali Shitrit ......................................................59
8. E.S. – Sibling of Naftali Shitrit.......................................................60
9. H.S. – Sibling of Naftali Shitrit ......................................................60
10. A.S./ E.S./ H.S. – Psychiatric evaluation. ......................................60
G. Family of Direct Victim Shmuel Zev Shimon Brauner ............................61
1. Nechama Brauner – Wife of Shmuel Zev Shimon Brauner ..............61
2. C.Y.B. – Minor Child of Shmuel Zev Shimon Brauner ...................63
3. Mordechai Brauner – Father of Shmuel Zev Shimon Brauner ..........63
4. Esther Chaya Brauner – Mother of Shmuel Zev Shimon Brauner ......64
DETERMINATION OF AMOUNT OF COMPENSATORY DAMAGES ................................65

I.      ECONOMIC LOSS UNDER THE FSIA ...................................................65

II.     ECONOMIC LOSS UNDER ISRAELI LAW ..........................................66

III.    ECONOMIC LOSS ANALYSIS ................................................................66

        A.      ECONOMIC LOSS DAMAGES:  DIRECT VICTIM TAYLOR
                FORCE ...........................................................................................67

        B.      ECONOMIC LOSS DAMAGES – DIRECT VICTIM SHMUEL
                BRAUNER ......................................................................................69

        C.      ECONOMIC LOSS – FAMILY MEMBER VICTIM NAFTALI
                MOSES ............................................................................................74

        D.      ECONOMIC LOSS - ESTATE OF FAMILY MEMBER VICTIM
                YAFFA GLICK ...............................................................................76

IV.     NON-ECONOMIC DAMAGES: DIRECT VICTIMS .............................82

        A.      Non-Economic Damages for Estates of Victims Killed in Terrorist
                Attack ..............................................................................................82

                1.      Estate of Taylor Force ...........................................................85

                2.      Estate of Avraham David Moses ...........................................85

                3.      Estate of Richard Lakin .........................................................86

        B.      Non-Economic Damages for Direct Victims Injured in Attacks ...................88

                1.      Non-Economic Damages for Injured Victim Shmuel Brauner ............88

                2.      Non-Economic Damages for Injured Victim Naftali Shitrit ...............91

                3.      Non-Economic Damages for Injured Victim Yehuda Glick ...............92

                4.      Non-Economic Damages for Injured Victim Menachem Rivkin. .......92

V.      NON-ECONOMIC/SOLATIUM DAMAGES CLAIMS OF FAMILY
        MEMBERS OF DIRECT VICTIMS .......................................................93

        A.      Determining the Amount of Solatium Damages:  General Approach and
                Factors .............................................................................................96

                1.      United States Nationals ...........................................................96

                2.      Israeli Citizens. .....................................................................98

        B.      Damages Recommendations for Family Members of Direct Victims ............99

                1.      Family of Taylor Force .........................................................100

                2.      Family of Menachem Mendel Rivkin .....................................100

                3.      Family of Yehuda Glick .........................................................102

                4.      Family of Richard Lakin .......................................................104

                5.      Family of Avraham David Moses ...........................................105

                6.      Family of Naftali Shitrit .........................................................108

7.     Family of Shmuel Zev Shimon Brauner ............................................111

VI.     PREJUDGMENT INTEREST..................................................................113

SUMMARY OF RECOMMENDATIONS ...................................................................116

## INTRODUCTION

This action is brought pursuant to the state-sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a).  The plaintiffs in this action are 51 individuals who claims injuries and damages resulting from terrorist attacks that they assert were supported by Iran, the Iranian Ministry of Intelligence and Security ("MOIS") and Syria (the defendants in this action).  This case involves six different terrorist attacks resulting in injuries to or murder of seven individual victims ("Direct Victims").  The remaining plaintiffs are family members of the Direct Victims.[1]

By Order dated June 9, 2020 the Court appointed the undersigned as Special Master to provide a report and recommendation on the valuation and determination of compensatory damages for each of the plaintiffs.  Order Appointing Special Master Deborah Greenspan, Dkt. 113.  The Order outlines the required responsibilities of the Special Master.  In fulfilling these responsibilities, I have reviewed relevant pleadings, the Court's order, the Court's Memorandum Opinion and Order dated May 31, 2020, the testimony provided by the plaintiffs (in the form of declarations), the reports and declarations provided by experts related to the physical and psychological injuries suffered by plaintiffs, the expert reports provided to support economic loss for certain victims, additional supporting documents including evidence of citizenship, photographs, and medical records.  My Report and Recommendation is based on the above-described information, evidence, and applicable case law.

---

[1] The original complaint listed 57 individual plaintiffs but the Court found that, on the current record, the claims of Plaintiff Danielle Parnas and her family do not meet the relevant requirements for damages and further found that the minor children M.H.B. and Y.A.L.B. (who are Israeli citizens) are not entitled to recover damages under applicable Israeli law.  The Court therefore declined to grant a default judgment as to the aforementioned claims.  The order appointing the Special Master expressly excludes the claims for which a default judgment was denied and accordingly this Report addresses the remaining 51 claims.  Order Appointing Special Master Deborah Greenspan, Dkt. 113.

## BRIEF BACKGROUND

Section 1605A(a) of the FSIA creates a private right of action for United States nationals, members of the U.S. armed forces, and United States government employees or contractors who are injured by terrorist acts carried out by officials, employees or agents of a foreign state.   28 U.S.C. § 1605A(a).  Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages and pain and suffering damages.

The amount of compensatory damages depends on the facts, circumstances, and nature of the injuries (or death) as well as the applicable law.  In evaluating the extent and nature of injuries, I am entitled to rely on uncontroverted factual allegations that are supported by sworn testimony – affidavit, declaration or deposition testimony – and expert reports.  Order Appointing Special Master Deborah Greenspan, Dkt. 113.

The first section of this Report sets forth factual findings with respect to each plaintiff. Next, I set forth the applicable legal standards and apply those standards to the factual findings to provide recommended damages awards for each plaintiff.

## FACTUAL FINDINGS/EXPERTS

### I.    MEDICAL EXPERTS

The plaintiffs have submitted multiple reports prepared by two medical experts. Since these reports apply to many of the individual plaintiffs, I have addressed their qualifications and credentials below.

**Dr. Alan Friedman**.  Plaintiffs have submitted reports prepared by Dr. Alan Friedman regarding several of the Direct Victims.  Dr. Friedman is the Assistant Director of the Department of Rehabilitation and Physical Medicine at Soroka University Medical Center, in Be'er Sheva,

Israel.  He is Board Certified by the American Board of Physical Medicine and Rehabilitation, the American Board of Internal Medicine, and the National Board of Medical Examiners.  Dr. Friedman generally examined emergency room, hospital and other medical records of the Direct Victims killed in the various attacks and conducted physical examinations of certain victims who were injured.  Dr. Friedman's findings for each Direct Victim are set forth below.  For the purposes for which the reports are offered – namely to identify the nature of the wounds, the likelihood that the victim experienced pain and was aware of the attack and imminence of death or possible death, and the causal relationship between the injuries and the long-term effect on the plaintiff,[2] I conclude that Dr. Friedman qualifies as an expert and that I may rely on these reports in making proposed factual findings.

Plaintiffs have also submitted reports prepared by Dr. Rael Strous for all of the family member plaintiffs and the living Direct Victims.  Reports of Dr. Strous, Dkt. 35.  Dr. Strous is a medical doctor specializing in psychiatry.  Dr. Strous is the Director of the Department of Psychiatry at Maayenei Hayeshua Medical Center in Bnei Brak, Israel.  He is a Full Professor Emeritus, Department of Psychiatry at the Sackler Faculty of Medicine at Tel Aviv University. He also maintains a private practice.  He received his medical degree from the University of Witwatersrand in Johannesburg, South Africa.  He completed his residency in psychiatry at Albert Einstein College of Medicine in the Bronx, New York.  He performed a clinical research fellowship in psychopharmacology at the Commonwealth Research Center, Massachusetts Mental Health Center affiliated with Harvard Medical School.  He has published approximately 150 peer-reviewed publications including several in the area of chronic Post-Traumatic Stress Disorder.  He

---

[2] Dr. Friedman's Board certification in rehabilitation is particularly pertinent to the assessment of the long-term and disabling effects of injuries.

has provided expert reports in numerous cases and has testified as an expert at trial.  He conducted

clinical interviews and psychiatric evaluations of  the adult plaintiff family members and living

Direct Victims.  He has provided reports for certain minor plaintiffs based on interviews with their

parents.  He has prepared written evaluations of each based on his examination and, in some cases,

review of testimony and medical documents.  His evaluations address the extent to which the

individual plaintiff has suffered and/or continues to suffer from any psychiatric disorders pursuant

to the diagnostic formulations provided by the Fifth Edition of the Diagnostic and Statistical

Manual of Mental Health Disorders. Specifically, he addresses the extent to which the individual

plaintiffs suffer from one or more of the following conditions:  Post-Traumatic Stress Disorder,[3]

---

[3] Post-Traumatic Stress Disorder ("PTSD") is a condition which develops from having been exposed to, or witnessing, life-threatening events. In addition, the traumatic event may be indirect, by hearing of a relative or close friend who has experienced the life-threatening event. Indirectly experienced death must be accidental or violent. PTSD is characterized by distinct types of symptoms. These symptoms include avoidance, re-experiencing the event, and hyper-vigilance. Avoidance is the active escape from situations that the PTSD victim associates with the event. Re-experiencing is reliving the memory of the event. Hypervigilance is a cluster of symptoms that includes exaggerated startled response, inability to fall asleep and inability to stay asleep. The disorder is also characterized by negative alterations in mood or cognitions which indicate a decline in someone's mood or thought patterns. This can include memory problems that are exclusive to the event, negative thoughts or beliefs about one's self or the world, distorted sense of blame for one's self or others related to the event, being stuck in severe emotions related to the trauma (e.g., horror, shame, sadness), severely reduced interest in pre-trauma activities and feeling detached, isolated or disconnected from other people. Due to their suffering and symptoms, educational and employment prospects for PTSD victims are often lowered. Some have difficulty interacting with others. Younger victims and females may be more likely to be susceptible to PTSD. Overall effects on PTSD patients from this illness are severe. Patients are easily distractible due to their exaggerated response to stimuli. Individuals face considerably lowered employment prospects and increased likelihood of difficulty in forming and maintaining interpersonal relationships. For those who are married or who are able to marry and have children the stress of childrearing will be compounded. The inability to relax and have a good time is extremely common with PTSD patients. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶¶ 13-17, dated January 31, 2018.

Persistent Complex Bereavement Disorder,[4] Major Depressive Disorder,[5] Persistent Depressive

Disorder,[6] Anxiety Disorder,[7] Obsessive Compulsive Disorder,[8] and Adjustment Disorders[9].

---

[4] Persistent Complex Bereavement Disorder (also known as Pathological Grief or Complicated Mourning), currently in the appendix of the DSM 5, refers to a description of the normal mourning process that leads to chronic or ongoing mourning. The term "Pathological Grief" is applied to people who are unable to get over their grief despite the passage of time. It can take most people up to several years to get past a serious loss especially when the loss is associated with a violent and unexpected death. The person may experience intrusive distressing preoccupation with the deceased and wish to be reunited with the deceased. They may feel a sense of futility about the future, difficulty acknowledging the death, excessive irritability, bitterness or anger about the unfairness of the death and, most significantly, impaired social/occupational functioning. A pathological grief reaction is usually diagnosed after a long time (one or more years) has passed and the grieving person is not improving.  Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 12, dated January 31, 2018.

[5] Depression (major depressive disorder or clinical depression) is a common but serious mood disorder. It is a real illness and affects people in different ways. It causes severe symptoms that affect how a person feels, thinks, and handle daily activities, such as sleeping, eating, or working. To be diagnosed with depression, the symptoms must be present for at least two weeks. It is a condition where an individual experiences persistent feeling of sadness and worthlessness and a lack of desire to engage in formerly pleasurable activities. Other symptoms of depression include feelings of guilt, helplessness and hopelessness, appetite or weight changes, sleep changes, anger or irritability, loss of energy, self-loathing and reckless behavior. Clinical depression poses a high risk of accidental injury, self-harm and suicide. Depression can also suppress the immune system and weaken the body, making you more susceptible to physical ailments and chronic illness. Depression can happen at any age.  Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 18, dated January 31, 2018.

[6] Persistent Depressive Disorder (previously known as Dysthymic Disorder) is a chronic (long-lasting), mild form of depression. However, calling it "mild" is misleading; because it can last for years and it can be just as debilitating as a more acute episode of major depression (clinical depression), even leading to thoughts of, or attempts at, suicide. Many of the symptoms of dysthymia are the same as those of major depression; however, they may be less severe or intense. Dysthymia also has some symptoms that may not occur with major depression. The hallmark of dysthymia is the length of time that it persists. In adults, dysthymia is diagnosed when the symptoms continue for two or more years; in children or teens, the symptoms last for a year or more. Dysthymia is a serious condition that needs to be treated. Dysthymia may include the experience of the following symptoms: sad mood, difficulty falling sleeping (or sleeping too much), increased or decreased appetite or weight, feelings of worthlessness, feelings of hopelessness, thoughts of suicide, anxiety, decreased motivation, loss of interest (anhedonia), irritability or anger, restlessness (especially in children) and vague physical symptoms. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 19, dated January 31, 2018.

[7] The essential feature of anxiety disorder is excessive anxiety and worry (apprehensive expectation) about a number of events or activities. The intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event. The individual finds it difficult to control the worry and to keep worrisome thoughts from interfering with attention to tasks at hand. During the course of the disorder, the focus of worry may shift from one concern to another. The worries are excessive and typically interfere significantly with functioning. Individuals with anxiety disorder report distress due to constant worry and related impairment in social, occupational, or other important areas of functioning. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 20, dated January 31, 2018.

[8] Obsessive-compulsive disorder (OCD) is an anxiety disorder in which people have recurring, unwanted thoughts, ideas or sensations (obsessions) that at times may make them feel driven to do something repetitively (compulsions). The obsessive thoughts and repetitive behaviors can significantly interfere with a person's daily activities and social interactions. For people with OCD, thoughts are persistent and routines are rigid and not doing them causes great distress. In most cases. People with OCD know or suspect their obsessions are not true. Even if they recognize their obsessions are irrational, those suffering with OCD struggle keeping their focus off the obsessions or stopping the compulsions. A diagnosis of OCD requires the presence of obsession and/or compulsions that are time-consuming,

Dr. Strous is qualified to provide an expert opinion on the mental health and on various psychiatric disorders noted above pertinent to these claims and circumstances.  I conclude, therefore, that I may rely on the expert reports of Dr. Strous in recommending entitlement to and the amount of damages.  Dr. Strous' findings are addressed in the factual findings regarding the individual plaintiffs.

## II.    DIRECT VICTIMS

Three of the seven Direct Victims were killed in the terrorist attacks.  The other four Direct Victims were injured.  The circumstances of the death or injury of each Direct Victim are detailed below.

### A.    Estate of Taylor Force

Taylor Force, a United States citizen[10] and a veteran, was a graduate student in an MBA program at Vanderbilt University.  Declaration of Stuart Force, Dkt. 44 at ¶ 6.  He was on a school trip to Israel in March 2016.  *Id.* at ¶ 7.  He was walking with classmates, on his way to dinner, when he was attacked and stabbed fatally by two terrorists.  *Id.* at ¶¶ 11, 12.

The circumstances of Mr. Force's death are detailed in a report prepared by Dr. Alan Friedman.  Expert Report of Dr. Friedman of Taylor Force, Dkt. 46, Exhibit 1.  Dr. Friedman states that, according to the EMS report, Mr. Force was alive but unconscious when he was found.  *Id* at

---

cause major distress, and impair work, social or other important function. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 21, dated January 31, 2018.

[9] Adjustment disorder is an emotional and behavioral reaction which develops within 3 months of a life stress. The response is stronger or greater than what would be expected for the type of event that occurred. For a diagnosis of adjustment disorder, a person's symptoms must be severe enough to affect his or her work or social life. Symptoms may vary and include agitation, depressed mood, anxious mood and physical complaints. The main goal of treatment is to relieve symptoms and help the person return to a similar level of functioning as before the stressful event occurred. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶ 22, dated January 31, 2018.

[10] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 6.

1.  The EMS team performed CPR, but Mr. Force was pronounced dead when he arrived at the hospital.  *Id* at 2.  Based on the autopsy report, Dr. Friedman found that Mr. Force had two stab wounds on the left aspect of his neck and that those wounds severed the main blood vessels and injured the trachea and right lung.  *Id* at 1.  Dr. Friedman found (again, based on the autopsy report) that the cause of death was loss of blood – hypovolemic irreversible shock.  *Id* at 2.  Dr. Friedman concludes that the blood in the lungs proves that Mr. Force was alive during the attack.  *Id.*  Dr. Friedman's report also concludes that Mr. Force received a non-fatal facial wound before he received the fatal wound in the neck.  *Id* at 2.  The location of the facial wound leads Dr. Friedman to conclude that Mr. Force must have been aware of the attack – presumably because he would have seen the attacker coming directly at his face.  *Id.*  Because Mr. Force first received a non-fatal wound, Dr. Friedman opines that Mr. Force was alive and experienced pain and suffering during the attack.  *Id.*

### B.      Menachem Mendel Rivkin

Menachem Mendel Rivkin, a United States citizen,[11] was stabbed and injured by a terrorist while on his way to dinner with his wife on January 27, 2016.  Mr. Rivkin provided a declaration describing the attack.  Declaration of Menachem Mendel Rivkin, Dkt. 72.  He states that the attacker lunged out of nowhere and stabbed him two times.  *Id.* at ¶ 3.  He learned later that the attacker was a 17-year-old Arab from Bir Nabala.  *Id.*  (The expert report of Arieh Dan Spitzen states that this attack was a Hamas terror attack that was part of a wave of terror attacks that began in September 2015 and continued through the end of 2016.  Spitzen Report, Dkt. 33, at ¶ 166, 182.)  Mr. Rivkin immediately felt weak and thought he was going to die.  Declaration of Menachem

---

[11] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 26.

Mendel Rivkin, Dkt. 72 at ¶ 4.  He was rushed by ambulance to the hospital and into surgery.  *Id.* at ¶¶ 5-6.  He woke up about one and a half days later.  *Id.* at ¶ 7.  He was told that his left main pulmonary artery was damaged in the attack and he suffered massive internal bleeding.  *Id.* at ¶ 8.  He was in the ICU for four days and experienced unbearable pain; he could not perform even the most minor tasks.  *Id.*  ¶ 9.  He was transferred to the rehabilitation ward – where he feared for his life.  *Id.* at ¶ 10.  For three months after his release from the hospital he was at home because of his weak physical and emotional state.  *Id.* at ¶ 12.  He states that the attack changed him completely.  *Id.* at ¶ 14.  He does not feel safe.  *Id.* at ¶ 15.  He often experiences disabling pain and he continues to have some breathing difficulties although he has had some improvement.  *Id.* at ¶ 14.  The attack haunts him and he experiences flashbacks.  *Id.* at ¶ 15.  He states that his children have been traumatized: his second youngest (R.R.) expressed fear and gets nervous when he and his wife leave the house.  *Id.*  Another child, S.R., has become obsessive, insists on checking to see that every door is locked and becomes anxious around Arabs and strangers.  *Id.*  The older children have been seriously affected:  M.M.R. is worried that he will not be the same father as before and feels vulnerable and less confident.  *Id.* at ¶ 21.  S.S.R. is afraid around Arabs, avoids public transportation and public places and has withdrawn from social interactions.  *Id.* at ¶ 22.

Dr. Alan Friedman provided a report about the effects of the attack on Mr. Rivkin.  Expert Report of Dr. Friedman for Menachem Mendel Rivkin, Dkt. 73, Exhibit 1.  Dr. Friedman's report is based on a review of Mr. Rivkin's hospital medical records, reports from outpatient visits after his discharge, and Mr. Rivkin's statement.  Dr. Friedman's report lists multiple diagnoses based on Mr. Rivkin's injuries – including multiple scars that cause pain, pain and inability to lie on his back or left side, shortness of breath on mild exertion and sensory loss.  *Id.* at 4. He concludes that while Mr. Rivkin is now functional, he suffered and continues to suffer from significant

neuropathic pain, which impedes his daily activities. *Id.* at 4-5. Mr. Rivkin now has only one lung and Dr. Friedman notes that this puts Mr. Rivkin at extreme risk of pulmonary failure. *Id.* at 5. Dr. Friedman opines that the symptoms and limitations that Mr. Rivkin now suffers are causally related to the attack and are permanent. *Id.*

Dr. Rael Strous conducted a formal psychiatric evaluation of Mr. Rivkin. Dr. Strous Evaluation of Menachem Mendel Rivkin, Dkt. 35, Exhibit 38. Based on his review of various medical records, the examination, and testing, Dr. Strous diagnosed Mr. Rivkin with PTSD. *Id.* at page 7. Dr. Strous states that Mr. Rivkin exhibits signs of depression and anxiety along with PTSD. Dr. Strous concludes that Mr. Rivkin's mood and anxiety issues affect many areas of his personal and interpersonal functioning, will not resolve in the short term and will continue to affect Mr. Rivkin for a long time. *Id.*

### C.    Yehuda Glick

Yehuda Glick is a dual Israeli and United States citizen[12] who was shot and injured during an assassination attempt in Jerusalem. Mr. Glick provided declaration testimony detailing the attack and his injuries. Declaration of Yehuda Glick, Dkt. 52. On October 29, 2014, Mr. Glick was heading to his wife's car after leaving a conference. *Id.* at ¶ 17. A man pulled up on a motorbike and said something; Mr. Glick moved toward the man so he could hear. *Id.* at ¶¶ 18-19. He then heard the man say: "I am shooting you because you are an enemy of Al Aqsa." *Id.* at ¶ 30. Mr. Glick was shot four times in the center of his body. *Id.* at ¶ 21. He walked a bit and then had to lie down. *Id.* He realized at that time that his life was in danger. *Id.* He was evacuated to the hospital in critical condition with wounds in his chest, abdomen, and hand. *Id.* at ¶ 22. The

---

[12] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 7. The record indicates that Mr. Glick gave up his United States citizenship after the terror attack when he was elected to the Israeli Knesset. Minute Order, Signed by Judge Randolph D. Moss on 08/06/2019.

shooting caused injury to his liver, spine, and intestines.  *Id.* at ¶ 24.  The bullets punctured a lung and injured one of his hands.  *Id.*  He was in a medically induced coma for ten days and underwent nine surgeries.  *Id.* at ¶ 25-26.  He lost part of one lung and a 20-centimeter section of his bowel. *Id.* at ¶ 25.  He believes that this was an attempt to assassinate him because of his activity for human rights and for freedom to pray at the Temple Mount which was not open to the Jewish people.  *Id.* at ¶ 26.  He spent 25 days in the hospital – and recalls being anxious, irritable, unable to sleep, and in intense pain.  *Id.* at ¶¶ 28-30.  He then spent several months in rehabilitation during which he endured continuous intense pain.  *Id.* at ¶ 32.  The attack changed him emotionally and physically.  *Id.* at ¶ 36.  He has to have a bodyguard, he worries about the future, he gets emotional, he is unable to concentrate, he cannot sit upright in a chair, he has sleep problems, and he suffers from flashbacks and anxiety.  *Id.* at ¶¶ 37-41.  He is nervous when he goes out. He has constant pain in his arms, back and abdomen.  *Id.* at ¶¶ 44, 46.

Mr. Glick explains that his family has been devastated.  His wife was severely affected by the attack – and suffered a stroke after a second attempted suicide.  *Id.* at ¶ 49. She spent 6 months in a vegetative state and passed away on January 1, 2018.  *Id.*  This loss has been devastating and one that Mr. Glick states he is unlikely to overcome.  *Id.* at ¶ 50.  His whole family is suffering. *Id.* at ¶ 52.

Dr. Friedman prepared a report based on a physical examination of Mr. Glick and an analysis of Mr. Glick's medical records, including the records from the emergency room when Mr. Glick first arrived at the hospital, intermediate hospital records from surgery, records from other treatments, office visit notes, procedure notes and tests.  Expert Report of Dr. Friedman for Yehuda Glick, Dkt. 53, Exhibit 1.  Dr. Friedman reports that Mr. Glick was shot point blank four times.  *Id.* at 3.  He had multiple surgeries resulting in the removal of two right lung lobes, resection

of 20 cm of intestine, and repairs of left wrist and arm fractures. *Id.* The bullets struck his spine, vertebra, and seven ribs and he suffered from bilateral rib fractures. *Id.* He received physical and occupational therapy for six months. *Id.* He could not return to normal activity for six months. *Id.* He continues to have significant pain and weakness, particularly in the chest, right shoulder, and back. *Id.* at ¶ 4. He reports shortness of breath on exertion and needs to rest after climbing two flights of stairs. *Id.* Dr. Friedman diagnosed Mr. Glick with pain, decreased range of motion in the right shoulder and left elbow, decreased sensation in the chest wall, painful scars, rotator cuff injury, shortness of breath, and rib fractures. *Id.* at 5-6. Dr. Friedman opines that these injuries and their effects are causally related to the attack on Mr. Glick of October 29, 2014. *Id.* at 6.

Dr. Rael Strous conducted a formal psychiatric evaluation of Yehuda Glick. Dr. Strous Evaluation of Yehuda Glick, Dkt. 35, Exhibit 16. Dr. Strous reports that Mr. Glick remains interested and active in social, occupational and political life. *Id.* at 4. At the time of his evaluation by Dr. Strous, Mr. Glick was a member of the Israeli Knesset (parliament). *Id.* at 1. Dr. Strous found, however, that Mr. Glick continues to experience anxiety and that his testing scores indicate mild depression, mild anxiety and moderate to severe PTSD. *Id.* at 4-6. Based on testing, Dr. Strous diagnosed Mr. Glick with Post-Traumatic Stress Disorder and concluded that Mr. Glick is 'suffering quietly.' *Id.* at 6. Dr. Strous opines that Mr. Glick will continue to suffer from his anxiety issues for a long period of time. *Id.*

### D.    Estate of Richard Lakin

Richard Lakin, who was a United States citizen,[13] was attacked on bus 78 in Jerusalem on October 13, 2015, when two terrorists boarded the bus and then shot and stabbed passengers. Expert Report of Dr. Friedman for Estate of Richard Lakin, Dkt. 56, Exhibit 1. Mr. Lakin was

---

[13] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 10.

conscious when he arrived at the hospital.  He underwent multiple surgeries and did not regain consciousness after the initial surgery.  He died two weeks after the attack.  *See* Declaration of Manya Lakin, Dkt. 54.

Dr. Friedman submitted a report that summarized Mr. Lakin's injuries and medical treatment as follows:  Mr. Lakin was shot in the head and stabbed in the abdomen.  The intake notes from the hospital state that Mr. Lakin was "brought [in] conscious breathing spontaneously with active bleeding from the head and abdomen and unstable hemodynamically."  Expert Report of Dr. Friedman of Richard Lakin, Dkt. 56, Exhibit 1.  Mr. Lakin was taken immediately to surgery where several procedures were performed including a pancreatectomy.  *Id.*  The next day, he had an exploratory laparotomy and partial gastrectomy.  *Id.*  He remained intubated and in intensive care.  *Id.*  He then developed acute renal failure and severe liver failure.  *Id.*  On October 18, 2015 he underwent another operation including a gastrojejunostomy.  *Id.*  He was treated with multiple transfusions, but he continued to deteriorate and on October 27, 2015, he passed away.  *Id.*  Dr. Friedman states that this information was obtained from:  the emergency room notes of October 13, 2015 (Hadassah University Hospital); CT scans of the chest, abdomen and pelvis; CT scan of the head and cervical spine dated October 13, 2015; an angiogram dated October 13, 2015; and CT scan of head and chest dated October 18, 2015.  *Id.* at 1-2.  Dr. Friedman opined that, assuming that the medical records are accurate – based on a reasonable degree of medical certainty – Mr. Lakin experienced pain and suffering prior to losing consciousness as a result of his wounds.  *Id.* at 2.

### E.     Estate of Avraham David Moses

Avraham David Moses, a 16-year-old student, was shot to death by a terrorist in March of 2008 at the Mercaz HaRav Yeshiva (a religious high school).  Avraham Moses was a United States

citizen.[14]  A description of the attack was provided in the declaration of Arieh Dan Spitzen.  Spitzen Report, Dkt. 33.  Colonel Spitzen is an expert in Palestinian affairs and terror groups.  He served as the Department Head for Palestinian Affairs (at the West Bank and later for the Administered Territories which includes Gaza) at the rank of Colonel.  *Id.* at page 138.  He states that on March 6, 2008, a 26-year-old terrorist entered the Mercaz HaRav Yeshiva in Jerusalem and massacred students.  *Id.* at ¶ 188.  He first shot through the windows at students and then continued to the library where Avraham was studying.  *Id.* at ¶ 190. He described eyewitness reports that the students were shot while attempting to hide between bookshelves.  *Id.* at ¶ 191.  According to Colonel Spitzen, Avraham was shot at close range and likely was hiding for 7 to 8 minutes listening to the terrorist approach his location before he was shot.  *Id.* at ¶ 228.

Plaintiff Naftali Shitrit was present in the library that evening and was shot and injured. He provided a declaration that includes a description of the events pertinent to the claim of the Estate of Avraham Moses.  Declaration of Naftali Shitrit, Dkt. 76.  As set forth in more detail below, he described hiding in the book stacks, and realizing that the gunman was going systematically through the stacks and shooting those he found hiding.  *Id.* at ¶¶ 6-7.  Mr. Shitrit described hearing gunshots, then shouts and screams and then silence from the nearby stacks.  *Id.*

Avraham's mother Rivkah Martha Moriah provided a declaration in which she described viewing her son's body and the information she obtained about the attack.  She states that Avraham had been shot multiple times in the body and the back of the neck.  Declaration of Rivkah Moriah, Dkt. 63 at ¶ 52.  She described learning that Avraham was found huddled with his friend – in a position that indicated that the two boys were trying to protect each other.  *Id.* at ¶ 46.

---

[14] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 17.

Plaintiff David Moriah, Avraham's stepfather, provided a declaration describing his relationship with Avraham and recounting conversations with some of Avraham's friends who were also in the library and lived through the attack. Declaration of David Moriah, Dkt. 60. Although there is no direct testimony from the two individuals identified in Mr. Moriah's declaration, the information provided is entirely consistent with the descriptions of the events provided by other testimony. According to Mr. Moriah's declaration, one friend stated that the students heard loud bursts and knew that they were gunshots. *Id.* at ¶ 49. At that point, the library became silent – and then everyone tried to run away and hide. *Id.* at ¶ 50. While the boys hid, they continued to hear shots. *Id.* at ¶ 52. They knew that the terrorist had entered the library and realized he was shooting column by column in the library stacks. *Id.* at ¶ 54. Another friend provided a similar description of hiding and hearing the terrorist move about the library and shooting. He recalled seeing pools of blood and corpses when he finally was able to leave his hiding place. *Id.* at ¶ 62.

From the descriptions provided in pertinent declaration testimony, and the details of the attack outlined by Colonel Spitzen, it is clear that Avraham Moses would have been aware of the attack and would have experienced intense fear as he waited for the terrorist to reach his hiding spot.

### F.    Naftali Shitrit

Naftali Shitrit, a United States citizen,[15] was injured in the March 2008 attack on the Mercaz HaRav Yeshiva that resulted in the death of Avraham Moses. Naftali Shitrit was 15 years old at the time. Naftali Shitrit provided declaration testimony describing the attack and his injuries as well as the long-term effect of the injuries. Declaration of Naftali Shitrit, Dkt. 76. He recalls

---

[15] *See* Dkt. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 36.

sitting in the library at Mercaz HaRav Yeshiva.  *Id.* at ¶ 5.  He heard shots – thinking at first that they were firecrackers.  *Id.*  When he realized that they were not firecrackers, he hid in the stacks. *Id.* at ¶ 6.  He realized that the gunman was systematically going from one stack to the next.  *Id.* at ¶ 7. He heard shots, shouts and screams and then silence from the stacks.  *Id.*  The gunman finally reached his hiding place.  *Id.* at ¶ 8.  Naftali was shot many times.  *Id.* at ¶ 9-10.  He described the feeling as an electric current going through his body.  *Id.* at ¶¶ 11.  He was stuck in a corner on the floor and was too weak to shout for help.  *Id.* at ¶ 19.  He was very scared.  *Id.* at ¶ 15.  Eventually, after the terrorist was killed, Naftali was evacuated from the site.  *Id.* at ¶ 21.  He lost consciousness in the ambulance.  *Id.* at ¶ 22.  When he arrived at the hospital, he was taken immediately to the operating room.  *Id.* at ¶ 23. The doctor told him that he arrived at the hospital just in time; he would not have lasted much longer.  *Id.* at ¶ 24.  He was sedated for a week after the surgery.  *Id.* at ¶ 26.  He spent two weeks in the intensive care unit on a ventilator and hooked up to drains.  *Id.* at ¶ 34.  He spent about two weeks in the surgical ward after he was released from the ICU.  *Id.* at ¶¶ 37-38.  He was allowed home for the weekend but suffered an attack that left him paralyzed. *Id.* at ¶¶ 39-40.  He could not stand up.  *Id.* at ¶ 42.  After a number of months, he was allowed to use a wheelchair.  *Id.* at ¶ 43.  He spent about a year in physical therapy and had further surgery in the United States.  *Id.* at ¶¶ 45-46.

He did not understand the extent of his injuries initially – but slowly began to appreciate the drastic change in his abilities and his life:  he has a permanent limp and balance issues as a result of an injury to the leg; he is unable to run; he has a nerve injury in his right calf that causes weakness and also prevents him from running; he suffers from constant back pain; he has scars all over the body.  *Id.* at ¶ 49.  He had to wear a stoma bag for a time.  *Id.*  He suffered from urological problems.  *Id.*  He has limited ability to participate in sports or hikes.  *Id.*  He will not be able to

serve in a combat unit in the army – which will affect him socially and culturally. *Id.* He has difficulty standing for a long period of time. *Id.* He cannot carry anything heavy. *Id.* His injuries affect his interactions and activities with his wife and family. *Id.* He is no longer able to do the` activities he used to enjoy. *Id.* He has missed some job opportunities because of his physical limitations. *Id.* at ¶ 51.

Plaintiff submitted a report prepared by Dr. Alan Friedman, who examined Naftali Shitrit in 2017. Expert Report of Dr. Friedman for Naftali Shitrit, Dkt. 77, Exhibit 1. Dr. Friedman also reviewed medical records including hospital notes and records from various office visits during the period 2008 through 2011. Dr. Friedman diagnosed Mr. Shitrit with numerous conditions based on physical examination: Status post multiple gunshot wounds; diffuse pain including neuropathic and somatic pain, status post tibial nerve laceration, right and left common peroneal nerve neuropathy, right sciatic neuropathy, right tibial neuropathy, gait abnormality, lower extremity weakness, lower extremity sensory abnormality including numbness, lumbar strain with decreased range of motion, cervical strain with decreased range of motion, evidence of lumbar radiculopathy, multiple scars, atrophy of right leg and left thigh, bilateral shoulder pain, status post liver laceration, status post colon surgery, ureter laceration with multiple surgical procedures. *Id.* at 7.

Dr. Friedman concludes that while Mr. Shitrit is currently functional, his weaknesses and pain will make it difficult to obtain any employment that requires repetitive lifting or bending. *Id.* Dr. Friedman notes that Mr. Shitrit could develop spinal arthritis or stenosis and that he is at higher risk of developing chronic back pain. *Id.* Dr. Friedman also notes that the current conditions could degrade and that the sensory neuropathy creates a risk of unattended wounds. *Id.* Dr. Friedman opines that the injuries are permanent and causally related to the shooting in 2008. *Id.* at 8.

Mr. Shitrit was also evaluated by Dr. Rael Strous.  Dr. Strous Evaluation of Naftali Shitrit, Dkt. 35, Exhibit 44.  Based on an examination and psychiatric evaluation, Dr. Strous diagnosed Mr. Shitrit with PTSD and Persistent Depressive Disorder, Moderate severity, late onset, with pure dysthymic syndrome (meaning it is chronic and long lasting).  *Id.* at 6, 7.  Dr. Strous concludes that he does not expect Mr. Shitrit's mood disorders – which affect many areas of his life – to resolve in the short term.  *Id.* at 6.

### G.    Shmuel Zev Shimon Brauner

Shmuel Brauner is a United States citizen[16] who was injured in a rocket attack. Mr. Brauner provided declaration testimony describing the circumstances of the attack, his injuries and the effect of the injuries.  Declaration of Shmuel Brauner, Dkt. 39.  Mr. Brauner was attending services at his synagogue on August 19, 2011.  *Id.* at ¶ 6.  After rockets landed on the synagogue, he ran with others to a nearby building.  *Id.* at ¶ 7.  Before he got to the building, another rocket landed and he was hit by shrapnel that entered his back and exited through his stomach.  *Id.*  He was also hit in his right leg and knee.  *Id.*  He described the pain as excruciating.  *Id.* at ¶ 8. He was very scared.  *Id.*  He heard people describing his condition as serious or critical.  *Id.* at ¶ 9. When he arrived at the medical center, he was taken into the operating room immediately.  *Id.* at ¶ 10.  He became more fearful when he was told that if he did not sign the consent for surgery, he would die in ten minutes.  *Id.*  His left kidney and part of his stomach were removed in surgery.  *Id.* at ¶ 11. The surgeons sutured lacerations on his small intestine.  *Id.*  He was in critical condition.  *Id.* at ¶ 12.  He remained in the hospital for ten days, leaving only because he was afraid of infections.  *Id.* He experienced unbearable pain.  He was in rehabilitation for about a month.  *Id.*  He was very weak and was unable to get out of bed or out of a chair by himself.  *Id.*  He became depressed and

---

[16] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 2.

spent six months in psychological rehabilitation.  *Id.* at ¶ 15.  Two months after the attack he had another surgery to remove shrapnel from his foot.  *Id.* at ¶ 16.  He continues to have terrible back pain that worsens if he bends or lifts something.  *Id.* at ¶ 18.  He has a large scar on his abdomen and small scars on other parts of his body.  *Id.* at ¶ 19.  He continues to have pain and numbness in his feet and legs.  *Id.* at ¶ 20-21.  He had physical therapy treatments every week.  *Id.* at ¶ 23.

The injuries have affected his life significantly:  he is embarrassed by his body, his digestive system does not work properly, he has no motivation, and he cannot concentrate.  *Id.* at ¶¶ 24-26.  Before the attack he was studying to become a religious judge.  *Id.* at ¶ 26.  But his injuries prevent him from continuing those studies.  *Id.*  He is no longer able to help around the house and he has little patience for his children.  *Id.* at ¶¶ 27-28.  He is afraid to leave his apartment and he feels stressed all the time.  *Id.* at ¶ 30-31.  His social interactions have changed.  *Id.* at ¶ 32.  He has flashbacks and was treated for Post-Traumatic Stress Disorder.  *Id.* at ¶¶ 33-34.  He is unable to support his family financially.  *Id.* at ¶ 37.  He described himself as permanently disabled with severe physical, psychological and emotional injuries.  *Id.* at ¶ 38.

Dr. Friedman prepared a report based on an examination of Mr. Brauner and a review of the medical records of Mr. Brauner's treatment.  Expert Report of Dr. Friedman for Shmuel Brauner, Dkt. 41, Exhibit 1.  Dr. Friedman reports that at the time of the examination (April 20, 2017) Mr. Brauner was experiencing pain in his low back, feet, right leg and knee, chest, and abdomen.  *Id.* at 2-3.  He also reports that Mr. Brauner had experienced significant weight loss since the attack.  *Id.* at 3.  Based on his examination, Dr. Friedman diagnosed Mr. Brauner with chronic thoracic pain, chronic lumbar pain, bilateral L5 radiculopathy, probably multilevel right lumbosacral radiculopathy, right knee pain, right thigh pain, status – post multiple shrapnel wounds, sensory loss in the lower limbs, status – post nephrectomy, abdominal pain, asthma, and

chest pain.  *Id.* at 4.  Dr. Friedman opines that the loss of one kidney might cause problems and that Mr. Brauner's back pain will make it difficult for him to obtain any employment that requires lifting or bending.  *Id.* at 5.  Dr. Friedman's conclusion – that he describes as having a reasonable degree of medical certainty – is that Mr. Brauner's current condition is the result of the injuries sustained in the missile attack.  *Id.*

Plaintiff also submitted a report by Dr. Rael Strous.  Dr. Strous Evaluation of Shmuel Brauner, Dkt. 35, Exhibit 5.  Dr. Strous conducted a clinical interview and formal psychiatric evaluation of Mr. Brauner.  *Id.* at 1.  Dr. Strous also reviewed various materials submitted in the case, a report by Mr. Brauner's wife, and a report by Dr. Ponovarsky, a psychiatrist.  *Id.* at 6. Based on psychological testing, Dr. Strous concludes that Mr. Brauner suffers from severe depression, severe anxiety and severe PTSD.  *Id.* at 7.  Dr. Strous diagnosed Mr. Brauner with Post-Traumatic Stress Disorder, Persistent Depressive State Disorder of moderate severity and Anxiety Disorder. *Id.* at 8.  Dr. Strous does not believe Mr. Brauner's symptoms will resolve in the short term and concludes that his mood and anxiety issues will continue to affect him for a long period of time. *Id.*  Dr. Strous further states that Mr. Brauner will never achieve his objective of becoming a religious court judge both because he has missed critical years of training and because of his psychological injuries.  *Id.*  He concludes that Mr. Brauner will never achieve the occupational level that he could have attained before the attack.  *Id.*

## III.    FAMILY MEMBERS OF DIRECT VICTIMS

Most of the family members of the Direct Victims have provided declaration testimony about their experience, their relationship with the Direct Victims, their injuries, and the effect of the death or injury of the Direct Victims on their daily lives.[17]

---

[17] The children of Direct Victim Menachem Rivkin, S.S.R., M.M.R., R.M.R., and S.Z.R., the foster children of Direct Victim Yehuda Glick, R.T. and T.T., the half siblings of Avraham Moses A.M. and O.D.M., siblings A.S., E.S., and

A.     **Family of Taylor Force**

1.     **Stuart Force – Father of Taylor Force**

Stuart Force is the father of Taylor Force.  Stuart Force submitted declaration testimony describing the effect of Taylor's death on himself and his family.  Declaration of Stuart Force, Dkt. 44.  Stuart Force is a United States citizen.[18]  On the day Taylor died, Stuart had sent a message telling his son to be careful but received no reply.  *Id.* at ¶¶ 7-8.  Several hours later, he received a call from the Chaplain at Vanderbilt University where Taylor was enrolled as a student.  *Id.* at ¶ 10.  The chaplain informed Stuart that his son Taylor had been attacked and stabbed to death in Israel.  *Id. at* ¶ 12.  When he arrived home, he had to tell his wife.  *Id.* at ¶¶ 14-15.  Stuart described the difficult task of informing the family and in particular Taylor's sister.  *Id.* at ¶¶ 17-18.  He described the memorial services, the task of cleaning out his son's apartment and the numerous messages from family and friends.  *Id.* at ¶ 23.  Stuart states that he takes Ambien to help him sleep and takes anti-anxiety medication during the day.  *Id.* at ¶ 29. He has been seeing a therapist to help cope with the grief.  *Id.*  The pain of Taylor's loss will never leave but the family has sought to support causes that Taylor would support as a way to honor his memory.  *Id. at* ¶ 32.  Stuart attached to his declaration several photos including family photos and news media photos showing the aftermath of the attack.  These photos are particularly gruesome and show the immense amount of blood on the ground at the site of Taylor's stabbing.  Exhibits to the Declaration of Stuart Force, Dkt. 44, Exhibits 1 through 21.  Stuart saw these photos at the time of Taylor's death and they significantly increased his pain and suffering.  *Id.* at ¶ 36.

---

H.S. of Direct Victim Naftali Shitrit, and the minor child of Direct Victim Shmuel Brauner, C.Y.B. – did not provide declaration testimony. Their claims are supported by the testimony of other family members and expert reports that are based on information provided by family members.  The half siblings of Direct Victim Avraham Moses – C.M. and N.M. – did not provide declaration testimony but did undergo psychiatric evaluation in support of their claims.

[18] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 5.

Dr. Strous provided a report of his examination of Stuart Force.  Dr. Strous Evaluation of Stuart Force, Dkt. 35, Exhibit 9.  Dr. Strous reports that Stuart Force thinks about Taylor's death every day and still cannot believe that this tragic event occurred.  *Id.* at 3. The loss of Taylor is unbelievably painful "anew" every day.  *Id.* His life has been forever changed.  *Id.*  He feels he is just going through the motions.  *Id.*  His initial shock and disbelief were profound.  *Id.*  The savagery and suddenness of Taylor's death limits his ability to heal.  *Id.* at 4.  He reports flashbacks, experiences palpitations when he thinks of the murder, he cries often, he does not enjoy life as he once did.  *Id.*  He suffers guilt because when Taylor asked him whether it was okay to travel to Israel, Stuart told him to make his own decision.  *Id.* at 5.  Dr. Strous concludes that Stuart Force has signs and symptoms of pathological grief and that the loss of his son irreversibly affected his life.  *Id.* at 7.  Dr. Strous does not believe that these feeling of grief that affect Stuart Force's personal and interpersonal functioning will resolve; rather, the daily feelings of grief will continue to affect Mr. Force indefinitely.  *Id.*  Dr. Strous diagnosed Stuart Force with Persistent Complex Bereavement Disorder (moderate to severe) with traumatic bereavement; Partial PTSD; and Persistent Depressive Disorder; moderate severity, late onset, with pure dysthymic syndrome.  *Id.* at 8.

### 2.    Robbi Force – Mother of Taylor Force

Robbi Force is the mother of Taylor Force and is a United States citizen.[19] She submitted declaration testimony describing the events of the day of Taylor's death and the resulting effect of the loss of her son on her and the rest of her family.  Declaration of Robbi Force, Dkt. 43.  Her husband Stuart informed her that Taylor had been stabbed to death while visiting Israel.  *Id.* at ¶ 6.  She and Stuart had to undertake the extremely difficult task of informing other family members

---

[19] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 4.

including Taylor's sister Kristin. *Id.* at ¶ 10-11. Because of the nature and location of the attack, they had to address multiple inquiries and deal with logistical issues immediately. *Id.* at ¶ 13. They received numerous calls from the government regarding the autopsy and the transfer of Taylor's body back to the United States. *Id.* The decisions that they had to make brought 'unbearable sadness.' *Id.* at ¶ 14. They had to answer calls from the media. *Id.* Robbi states that Taylor is the first thing she thinks about when she wakes up. *Id.* at ¶ 17. She has dreams involving Taylor. *Id.* Taylor's death has affected the family forever. *Id.* at ¶ 20. Robbi continues to see a therapist. *Id.* Although their lives have been changed forever, they have focused on supporting those in need in his honor. *Id.* at ¶ 24.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Robbi Force. Dr. Strous Evaluation of Robbi Force, Dkt. 35, Exhibit 8. Dr. Strous reports that Robbi Force experiences flashbacks, feels guilt and could never visit the site of her son's death. *Id.* at 4. She misses Taylor deeply. *Id.* She saw a psychiatrist for a time but stopped because the pain was too deep. *Id.* Dr. Strous found that Robbi Force suffers from Post-Traumatic Stress Disorder (partial); Persistent Complex Bereavement Disorder (severe) with traumatic bereavement; and Persistent Depressive Disorder; moderate severity, late onset, with pure dysthymic syndrome (essentially chronic). *Id.* at 7. He concluded that these feeling of grief – affecting her personal and interpersonal functioning - will continue to affect her indefinitely. *Id.*

### 3.     Kristin Ann Force – Sister of Taylor Force

Kristin Force is the older sister of Taylor Force and is a United States citizen.[20]   She provided testimony in a declaration that describes the events of the day of Taylor's death and the effect of his death on her and her family. Declaration of Kristen Force, Dkt. 42. Her testimony

---

[20] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 3.

demonstrates that she had an extremely close relationship with her brother Taylor and that he was her closest confidant. *Id.* at ¶ 10. She describes the strong bond she had with Taylor and her view that he was an extension of herself. *Id.* at ¶ 12. When she learned of his death, she collapsed on the ground and had to call a friend to help her get up and go home. *Id.* at ¶ 8. She described the memorial services and the task of cleaning her brother's apartment. *Id.* at ¶ 12 & 15. She was scheduled to take a new job at the time of her brother's death but had to defer that action. *Id.* at ¶ 14. She eventually moved to London for her new job and while she had difficulty moving so far away from her parents, she felt that she owed it to Taylor to continue with her plans. *Id.* at ¶ 17. At the time of her declaration, she was seeing a grief therapist at least once a week. *Id.* at ¶ 18. She takes anti-depressant medication. *Id.* at ¶ 19. She describes the grief as all-consuming and bottomless. *Id.* She continues to feel anger. *Id.* at ¶ 20. She worries about her parents as they are getting older and have had to make decisions without the benefit of both of their children. *Id.* at ¶¶ 21-22. She and her family will never get over Taylor's death. *Id.* at ¶ 23.

Plaintiff submitted a report prepared by Dr. Rael Strous. Dr. Strous Evaluation of Kristen Force, Dkt. 35, Exhibit 7. Dr. Strous conducted a clinical interview and formal psychiatric evaluation of Kristin Force. *Id.* at 1. Dr. Strous found that Kristin suffered devastating emotional pain following the death of her brother and that she clearly expressed the irreversible change in her life. *Id.* at 6. Dr. Strous diagnosed Kristin Force with severe Persistent Complex Bereavement Disorder with traumatic bereavement; Post-Traumatic Stress Disorder; and Persistent Depressive Disorder. *Id.* Dr. Strous concluded that the deep feeling of grief – which affects Kristin's personal, interpersonal, and occupational functioning – will continue for a long time and likely will not resolve in the short term. *Id.*

### B.      Family of Menachem Mendel Rivkin

#### 1.      Bracha Rivkin – Wife of Menachem Mendel Rivkin

Bracha Rivkin is an Israeli citizen and the wife of Direct Victim Menachem Rivkin.  She submitted a declaration in support of her claim.  Declaration of Bracha Rivkin, Dkt. 71.  She described the stabbing attack on her husband – and states that she continues to be traumatized and gripped with fear on a daily basis.  *Id.* at ¶ 3.  *Id.*  She worries about going out and fears that any time she leaves the house she will not return.  *Id.*  She becomes anxious.  *Id.*  She imagines terrorists shooting.  *Id.*  She has flashbacks and nightmares.  *Id.*  Her husband has nervous outbursts and is no longer the same man.  *Id.* at ¶ 15.  The children are constantly afraid.  *Id.* at ¶¶ 13, 18-21.

Bracha Rivkin submitted a report prepared by Dr. Rael Strous.  Dr. Strous Evaluation of Bracha Rivkin, Dkt. 35, Exhibit 36.  Dr. Strous conducted an interview and formal psychiatric evaluation of Mrs. Rivkin.  He reports that since the attack, Mrs. Rivkin is hypervigilant, experiences anxiety and nightmares, is scared, has flashbacks and feels guilt.  *Id.* at 3.  She feels that she 'lost her life,' is impatient, has sleep dysfunction, and she struggles to enjoy her normal activities.  *Id.*  Dr. Strous concludes that she has mood and anxiety issues along with social dysfunction.  *Id.* at 6.  Dr. Strous diagnosed Mrs. Rivkin with Post-Traumatic Stress Disorder and Anxiety Disorder NEC (not elsewhere classified).  *Id.*  He found that her life has been significantly affected and that her anxiety issues will continue to affect her for a long period of time.  *Id.* at 6.

#### 2.      S.S.R. – Child of Menachem Mendel Rivkin

S.S.R. is the minor child of Menachem and Bracha Rivkin. S.S.R. was approximately 12 years old at the time of the attack on Menachem. S.S.R. is a United States national.[21] Bracha Rivkin and Menachem Rivkin described the reactions of their children to the attack on their father.  Bracha

---

[21] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 30.

states in her declaration that S.S.R. has been extremely affected and suffers from PTSD. Declaration of Bracha Rivkin, Dkt. 71 at ¶ 19.  Mrs. Rivkin states that S.S.R. has withdrawn socially and is hypervigilant when outside.  *Id.* at ¶ 20.  This behavior has further affected social functioning.  *Id.* Mrs. Rivkin describes S.S.R. as reacting to the presence of Arabs.  *Id.*

In his declaration, Menachem Rivkin describes the effect of his stabbing on S.S.R. Declaration of Menachem Mendel Rivkin, Dkt. 72 at ¶¶ 20, 22.  Menachem describes S.S.R. as confused and worried when Menachem was in the hospital.  *Id.*  According to Menachem, S.S.R. is afraid around Arabs and avoids public places.  *Id.*  S.S.R. is worried about Menachem and has withdrawn from social interaction.  *Id.*

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of S.S.R. Dr. Strous Evaluation of S.S.R., Dkt. 35, Exhibit 40.  Dr. Strous found that S.S.R. experienced certain long-term consequences as a result of Menachem's stabbing including fear of Arabs, fear of going outside, fear of public transport, fear when Menachem needs medical tests.  *Id.* at 2.  Dr. Strous found that S.S.R. has signs and symptoms of dysthymia (chronic depressed mood), anxiety, and PTSD.  *Id.* at 4.  Dr. Strous further found that S.S.R. exhibited changes in behavior after the stabbing including social withdrawal and anxiety in public spaces.  *Id.*  Dr. Strous diagnosed S.S.R. with Post-Traumatic Stress Disorder, partial and Adjustment Disorder with mixed anxiety and depressed mood.  *Id.* at 4.  Dr. Strous concludes that the anxiety issues will continue to affect S.S.R. for a long period of time.  *Id.*

### 3.    M.M.R. – Child of Menachem Mendel Rivkin

M.M.R. is the child of Menachem and Bracha Rivkin.  M.M.R. is a United States national[22] and an Israeli national.  M.M.R. was approximately 10 years old at the time of the attack on

---

[22] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 25.

Menachem.  Bracha Rivkin provided a declaration testimony regarding the effect on M.M.R. of the attack on Menachem.  Declaration of Bracha Rivkin, Dkt. 71 at ¶ 19.  Mrs. Rivkin states that M.M.R. was extremely affected by the attack and suffers from PTSD and anxiety.  *Id.* at ¶ 21. Mrs. Rivkin states that M.M.R. suffered from nightmares and was afraid to leave the house for months. M.M.R. is easily triggered and suffers flashbacks.  *Id.* M.M.R. lost interest in studies and 'looks around' for terrorists at school.  *Id.*

In his declaration, Menachem Rivkin states that M.M.R. was seriously affected by the attack.  *Id.* at ¶ 21. M.M.R. is worried that Menachem will not be the same 'father.'  Declaration of Menachem Mendel Rivkin, Dkt. 72 at ¶ 21.  M.M.R. feels vulnerable, less confident, and needy. *Id.*

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of M.M.R. Dr. Strous Evaluation of M.M.R., Dkt. 35, Exhibit 37.  Dr. Strous found that M.M.R. experienced Post-Traumatic symptoms, including nightmares, fear of leaving the home, fear of the site of the attack, flashbacks, palpitations, anxiety and hypervigilance.  *Id.* at 3.  M.M.R. feels that the stabbing has become the central focus of life.  *Id.*  Dr. Strous diagnosed M.M.R. with Post-Traumatic Stress Disorder (partial) and Adjustment Disorder with anxiety.  *Id.* at ¶¶ 4-5.  Dr. Strous concludes that because M.M.R. experienced this trauma at such an early age, the anxiety issues will continue for a long period of time.  *Id.* at 4.

### 4.     R.M.R. – Child of Menachem Mendel Rivkin

R.M.R. is a younger child of Menachem and Bracha Rivkin.  R.M.R. is a United States citizen[23] and was approximately 7 years old at the time of the attack.  Bracha Rivkin states in her declaration that R.M.R. is anxious and constantly worries in the presence of Arabs and strangers.

---

[23] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 27.

R.M.R. worries about being locked in a house with no way to escape.  Declaration of Menachem Mendel Rivkin, Dkt. 72 at ¶ 18.  R.M.R. is not comfortable being left alone.  *Id.*  Menachem Rivkin's declaration also describes the trauma experienced by his children.  He states that R.M.R. is nervous when he and his wife leave the house.  R.M.R. is fearful when outside and is afraid that Menachem will die.  *Id.*

Dr. Rael Strous provided a report of his 'psychiatric impressions' of R.M.R.  Dr. Strous Evaluation of R.M.R., Dkt. 35, Exhibit 39.  The report is based on an interview with the child's father Menachem Rivkin.  *Id.* at 1. (Dr. Strous did not conduct a formal interview of R.M.R. because of concerns that the process could cause harm to the child.)  *Id.* Based on the interview, Dr. Strous reports that R.M.R. has become more frightened, is careful not to lock doors  (because he feels the need to have an escape route) and talks more about death and loss.  *Id.* at 2.  Based on the interview, Dr. Strous states that R.M.R. is afraid to go out alone, tries to get away from strangers, and is afraid to stay in bed alone.  *Id.*  Dr. Strous concluded that R.M.R. experienced disruption and upheaval and that he expects that the repercussions of Menachem's injury will continue to affect R.M.R. for a long period of time.  *Id.* at 3.  Dr. Strous did not provide any diagnosis.

### 5.    S.Z.R. – Child of Menachem Mendel Rivkin

S.Z.R. is a child of Menachem Rivkin.  S.Z.R. was about 4 years old at the time of the attack.  S.Z.R. is a United States citizen.[24]  S.Z.R. suffers from essentially the same anxiety issues as R.M.R.  *Id.* at 3.  S.Z.R. is obsessed with locking all the doors.  *Id.*  S.Z.R. also does not want to be left home alone.  *Id.* at ¶ 18.  In his declaration, Menachem Rivkin provided additional information about the effect of his injuries on S.Z.R.  He states that S.Z.R. has become obsessive

---

[24] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 29.

and shows anxiety in the presence of Arabs and strangers.  Declaration of Menachem Mendel Rivkin, Dkt. 72 at ¶ 19.

Dr. Rael Strous provided a report giving his psychiatric impressions of S.Z.R. based on an interview with Menachem.  Dr. Strous Evaluation of S.Z.R., Dkt. 35, Exhibit 39 at 1.  (Dr. Strous did not conduct a formal interview of S.Z.R. because of concerns that the process could cause harm to the child.)  Dr. Strous confirms that his opinions are stated within a reasonable degree of medical certainty.  *Id.*  Based on the interview, Dr. Strous reports that S.Z.R. is obsessive and makes sure to lock the house to ensure that thieves and terrorist cannot get in.  *Id.* at 3.  S.Z.R. asks many questions about death and Arabs.  *Id.*  S.Z.R. is afraid in the presence of Arabs and is more anxious. *Id.*  Dr. Strous concluded that the trauma of Menachem's injuries caused disruption and upheaval in the child's life.  *Id.*  Dr. Strous concludes that the repercussions of Menachem's injuries will continue to affect S.Z.R. for a long period of time.  *Id.* at 3.

### C.   Family of Yehuda Glick

#### 1.   Estate of Yaffa Glick – Wife of Yehuda Glick

Yaffa Glick was the wife of Direct Victim Yehuda Glick.  She was a citizen of Israel.[25] Yaffa Glick passed away on January 1, 2018.  Yehuda Glick provided declaration testimony about the effects of the terror attack on his wife.  Declaration of Yehuda Glick, Dkt. 52.  He states that Yaffa suffered an extreme traumatic response and that she experienced severe anxiety and depression.  *Id.* at ¶ 47.  Yaffa took an overdose of anti-depressants in 2016 and she recovered at home.  *Id.* at ¶ 48.  In 2017 she again attempted suicide – this time by hanging – and suffered a severe stroke.  *Id.*  She remained in a vegetative state for six months and then passed away.  *Id.* at

---

[25] The record contains conflicting information about the citizenship of Yaffa Glick.  Counsel for Plaintiffs confirmed in email correspondence to the Special Master that Yaffa Glick was an Israeli citizen.

¶ 49.   Yehuda believes – and states that physicians agreed – that these actions were directly connected to the depression Yaffa experienced as a result of the attack.  *Id.*

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Yaffa Glick after her first suicide attempt.  Dr. Strous Evaluation of Yaffa Glick, Dkt. 35, Exhibit 15. Dr. Strous' Report contains the information from his interview with Yaffa Glick.  She reported that she was sitting in the car waiting for her husband to finish putting his materials in the car when she heard the shots.  She hid under the steering wheel – believing she was going to be the next target.  When she emerged from the car, she saw her husband lying on the ground and thought he was dead.  Based on the interview, Dr. Strous reports that Yaffa was in intense shock when she found her husband lying on the ground after the attack.  *Id.* at 2.  She felt helpless because she was not able to help him.  *Id.*  She realized that she was developing symptoms of PTSD and she was not able to function or return to work for six months.  *Id.* at 3.  Her anxiety was compounded by additional tragic events – including the death of friends in yet another terror attack.  *Id.*  She eventually saw at least two psychiatrists but felt that they did not help.  *Id.*  She reported that she took an overdose of medication due to overwhelming anxiety and depression.  *Id.* at 3-4.  She simply wanted to stop the emotional suffering.  *Id.* at 4.  Dr. Strous concluded that Yaffa Glick suffered from Post-Traumatic Stress Disorder, Major depressive disorder, single episode, severe without psychotic features.  *Id.* at 8.  Dr. Strous reports that after his initial evaluation, Ms. Glick attempted suicide by hanging.  *Id.* at 7.  She was revived and taken to the hospital.  *Id.*  The diagnosis was 'suicide attempt' and anoxic brain damage with background diagnoses of posttraumatic stress disorder and depression.  *Id.* at 7.  Dr. Strous concluded that Ms. Glick had a very poor prognosis and would not work again.  As he was completing his report, Dr. Strous learned that Ms. Glick had passed away.  *Id.* at 7-8.  He concluded, that within a reasonable degree

of medical certainty, Ms. Glick's suicide attempts and her resulting death are likely a direct result of the shooting terror attack on her husband in 2014. *Id.* at 8.

### 2. Neriya David Glick – Child of Yehuda Glick

Neriya Glick is the son of Yehuda Glick. He provided declaration testimony in support of his claim. Declaration of Neriya Glick, Dkt. 48. He is a dual United States and Israeli citizen. *Id.* at ¶ 1; *see also* Memorandum Opinion and Order, Dkt. 111, page 29. He went to the hospital to be with his father when he learned of the shooting. Declaration of Neriya Glick, Dkt. 48 at ¶ 12. He stayed by his father's side – because he was afraid of another attack. *Id.* at ¶ 17. He felt as though everything has become "a mess." *Id.* at ¶ 20. His marriage suffered because he was away. *Id.* at ¶ 21. He had to begin his army service just two weeks after the shooting. *Id.* at ¶ 24. He had difficulty sleeping and cried a lot. *Id.* at ¶¶ 27-28. He was withdrawn socially. *Id.* at ¶ 29. He was not able to assimilate properly into his army unit. *Id.* at ¶ 30. He is depressed, anxious, and remains in constant fear for his father. *Id.* at ¶ 34. His mother's suicide attempt, subsequent stroke and death caused additional trauma. *Id.* at ¶ 35, Exhibit 36.

Dr. Rael Strous conducted a formal psychiatric evaluation of Neriya Glick. Dr. Strous Evaluation of Neriya Glick, Dkt. 35, Exhibit 11. He found that Mr. Glick suffered substantial depression and anxiety following the shooting. *Id.* at 5. These mood changes affected his marital, social, and occupational functions. *Id.* Dr. Strous diagnosed Neriya Glick with Adjustment disorder with mixed anxiety and depressed mood and Persistent Depressive Disorder: moderate severity, late onset with pure dysthymic syndrome. *Id.* at 6. Dr. Strous opined that due to the intensity of his reaction to his father's shooting and his mother's suicide attempt, these mood and anxiety issues will continue to affect Mr. Glick for a long period of time. *Id.*

### 3.      Shlomo Glick – Child of Yehuda Glick

Shlomo Glick is a dual United States and Israeli citizen.  Declaration of Shlomo Glick, Dkt. 50, ¶ 1. He is the son of Yehuda and Yaffa Glick.  He provided declaration testimony in support of his claim.  *Id.*  Like his siblings, he rushed to the hospital to be at his father's side when he learned of the shooting.  *Id.* at ¶ 7.  He helped his brothers guard his father's hospital room.  *Id.* at ¶ 13.  He was afraid that there would be another attempt on his father's life.  *Id.* at ¶ 11.  He spent three months at his father's side after the attack.  *Id.* at ¶ 14.  He had difficulty sleeping.  *Id.* He was frightened.  *Id.*  When he started his army service, he felt guilty leaving his father.  *Id.* at ¶ 16.  His personality has changed.  *Id.* at ¶ 18.  He is more 'closed.'  *Id.* He needs quiet and privacy more than he did before.  *Id.*  His mother's suicide attempt and subsequent death caused additional shock.  *Id.* at ¶ 26.  He feels that he has much on his shoulders and will never again be carefree. *Id.* at ¶ 24.

Dr. Rael Strous conducted a formal psychiatric evaluation of Shlomo Glick.  Dr. Strous Evaluation of Shlomo Glick, Dkt. 35, Exhibit 14.  Dr. Strous concluded that Shlomo Glick suffered from mild to moderate depression after his father's shooting and that the event led to changes in his mood and anxiety levels which in turn affected his studies, social life, and military service.  *Id.* at 5.  Dr. Strous diagnosed Shlomo Glick with Adjustment disorder with mixed anxiety and depressed mood.  *Id.* at 6.  Dr. Strous believes that these mood issues will continue to affect Mr. Glick for a long period of time.  *Id.*

### 4.      Hallel Glick – Child of Yehuda Glick

Hallel Glick provided declaration testimony in support of his claim.  Declaration of Hallel Glick, Dkt. 47.  Hallel Glick is a dual United States and Israeli citizen.  *Id.* at ¶ 1.  When he learned that his father had been shot, he immediately went to the hospital where he learned that his father was close to death.  *Id.* at ¶ 8.  He stayed at the hospital along with his brother to ensure his father's

safety.  *Id.* at ¶ 11.  He remained on edge, anxious and worried for six months after the shooting.  *Id.* at ¶ 16.  His social and religious life suffered.  *Id.* at ¶ 17.  Although he began to function normally after a year, he has never regained the happy state he experienced before the shooting.  *Id.* at ¶ 18.  He lives in fear of a 'next time'.  *Id.* at ¶ 19.  The shooting caused him to question his religious beliefs and field of study.  His mother's attempted suicide and subsequent death caused additional trauma.  *Id.* at ¶ 23.  He feels a deep despair about what has happened to his family.  *Id.* at ¶ 25.

Dr. Rael Strous conducted a formal psychiatric evaluation of Hallel Glick.  Dr. Strous Evaluation of Hallel Glick, Dkt. 35, Exhibit 10.  He found that Hallel Glick suffered significant anxiety and depression following his father's shooting and the situation was worsened by his mother's suicide attempt.  *Id.* at 6.  Dr. Strous diagnosed Mr. Glick with Adjustment disorder with mixed anxiety and depressed mood and Post-Traumatic Stress Disorder (partial).  *Id.*  Dr. Strous expects that these issues – which affect Mr. Glick's personal and interpersonal functioning – will continue for a long time.  *Id.*

### 5. Sachar Glick – Child of Yehuda Glick

Shachar Glick is the child of Yehuda Glick.  (Shachar Glick is identified in the complaint as a minor but is now an adult.)  He provided declaration testimony in support of his claim.  Declaration of Shachar Glick, Dkt. 49.  Shachar Glick is a dual United States and Israeli citizen.  *Id.* at ¶ 1.  He states that he is constantly afraid of another attack on his father.  *Id.* at ¶¶ 7-8.  For more than a year after the attack he was anxious.  *Id.* at ¶ 9.  For six months after the attack he had nightmares and was unable to attend school.  *Id.* at ¶ 10.  He knew that his mother had a traumatic response to the shooting.  *Id.* at ¶ 15.  He was in shock after his mother went into a vegetative state.  *Id.* at ¶ 17.  Since his mother's death, he is filled with deep sorrow.  *Id.* at ¶ 19.  He believes he has

changed as a person and that his family has changed:  they used to have a happy house and now there is only sadness.  *Id.* at ¶ 20.

Dr. Rael Strous conducted a formal psychiatric evaluation of Shachar Glick.  Dr. Strous Evaluation of Shachar Glick, Dkt. 35, Exhibit 13.  Dr. Strous found that Mr. Glick suffered significant anxiety symptoms following his father's shooting and that while there has been improvement, he still suffers from chronic residual adjustment symptoms.  *Id.* at 4-5.  Dr. Strous diagnosed Shachar Glick with Adjustment disorder with mixed anxiety and depressed mood.  *Id.* at 5.  Dr. Strous concluded that due to the anxiety and the changes in his life, he does not expect that Mr. Glick's anxiety and mood issues will resolve in the short term.  *Id.*

### 6.    R.T. and T.T. – Foster Children of Yehuda Glick

Yehuda Glick has two foster children.  Declaration of Yehuda Glick, Dkt. 52 at ¶ 5.  In his declaration, Yehuda Glick states that the two foster children are going through hardships at school and that their grades have gone down since his wife passed away.  *Id.* at ¶ 54. At the time of the shooting, Yehuda and Yaffa Glick had been caring for both children for 10 years.  Dr. Strous Evaluation of R.T. and T.T., Dkt. 35, Exhibit 12.[26]  Both foster children are Israeli citizens.  *See* Memorandum Opinion and Order, Dkt. 111, page 29.

Dr. Rael Strous provided a 'psychiatric impression' of the two foster children.  Dr. Strous Evaluation of R.T. and T.T., Dkt. 35, Exhibit 12. at 1.  Dr. Strous based his report on an interview with Yehuda Glick.  *Id.*  He concluded that speaking with the children could cause them harm and therefore did not perform a clinical examination or a psychiatric evaluation.  *Id.*

---

[26] Counsel for plaintiffs confirmed in email correspondence to the Special Master that the foster children have been with the Glick family for 10 years.

**R.T.**  Based on the interview, Dr. Strous reports that there was considerable disruption in the household after the shooting and R.T. had to be cared for by another foster family.  *Id.* at 2. R.T.'s schooling was affected.  *Id.*  R.T. became withdrawn and received psychotherapy.  *Id.* R.T. initially had trouble sleeping and remained in therapy for behavioral and mood issues. R.T. suffered a setback when Yaffa Glick passed away.  *Id.*

**T.T.**  According to the interview with Mr. Glick, T.T.'s academic performance was affected by the shooting.  *Id.* at 5.  T.T. required counseling and expressed feelings of worry and anxiety while Mr. Glick was in the hospital.  *Id.*  Mr. Glick got a dog for T.T. to help with expressing warmth and caring.  *Id.*  While this helped, Mr. Glick reports that T.T. has not returned to a normal pre-shooting state.  *Id.*

Dr. Strous concluded that both children were affected by the serious injury and near death of their foster father.  *Id.*  The trauma included the disruption and upheaval in the lives of the two foster children.  Dr. Strous concluded that the trauma and disruption of the family "can be noted in their varying degrees of anxious and depressive behavior…"  *Id.* at 3.  He concludes that Mr. Glick's injury and its effects on the family and their lives coupled with the death of their foster mother are traumatic events that will continue to affect R.T. and T.T. for a long period of time.  *Id.*

D.    **Family of Richard Lakin**

1.    **Micah Lakin Avni – Child of Richard Lakin**

Micah Lakin is the son of Direct Victim Richard Lakin and a United States citizen.[27]  Micah Lakin provided declaration testimony in support of his claim.  Declaration of Micah Lakin, Dkt. 55.  Micah was in a business meeting when he received a call from his mother advising that there had been a terror attack and she had not been able to reach Micah's father – Richard.  *Id.* at ¶ 3.

---

[27] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 9.

34

Micah left the meeting and tried to reach his father. *Id.* After about thirty calls to his father's phone, a nurse answered and advised that Richard was in surgery fighting for his life. *Id.* at ¶ 5. Micah called his mother and sister and they all headed to the hospital. *Id.* at ¶ 6. Micah recalls that the paramedics stated that Richard was conscious when they arrived and even tried to fight them off, apparently thinking that they were terrorists. *Id.* at ¶ 8. He recalls his father as peaceful and loving and every day he envisions the scene of his father being shot and stabbed. *Id.* at ¶ 9. The brutal manner of his death will haunt Micah forever. *Id.* The vision of his father lying in the hospital with tubes haunts him and it was grueling to watch his dad in agony. *Id.* at ¶ 11. After the attack and his father's death, Micah experienced fear and panic attacks that were debilitating. *Id.* at ¶ 12. He continues to experience panic attacks when in Jerusalem. *Id.* at ¶ 13. He experiences sleep disorders. *Id.* at ¶ 14. He often wakes up with nightmares. *Id.* He experiences stress when he learns of any terror attack. *Id.* at ¶ 15. His business has suffered because of his sleep deprivation and lack of focus. He spends considerable time obsessed with the issue of terror incitement and writes, makes movies, lobbies for legislation and speakers on this issue. *Id.* at ¶ 16. His wife and children have been traumatized. *Id.* at ¶¶ 17, 19. All of his children had very close relationships with their grandfather and miss him terribly. *Id.* at ¶ 20.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Micah Lakin. Dr. Strous Evaluation of Micah Lakin, Dkt. 35, Exhibit 18. Dr. Strous concluded that Micah Lakin has signs and symptoms of pathological/complicated grief and that his chronic grief response has affected his social and occupational functions. *Id.* at 7. Dr. Strous diagnosed Micah Lakin with Persistent Complex Bereavement Disorder; (severe) with traumatic bereavement and Post-Traumatic Stress Disorder (partial). *Id.* at 7-8. Dr. Strous believes that the feelings of grief,

that affect Micah's personal and interpersonal functioning, will continue to affect him for a long time. *Id.* at 7.

### 2.    Manya Lakin – Child of Richard Lakin

Manya Lakin is the daughter of Direct Victim Richard Lakin.  She submitted declaration testimony in support of her claim.  Declaration of Manya Lakin, Dkt. 54.  She is a citizen of the United States.[28]  She was at work when she learned of the terrorist attack.  *Id.* at ¶ 3. Her father did not respond to her calls or to the calls placed by her mother and brother.  *Id.* at ¶ 4.  She kept calling and finally realized that something must have happened to him.  *Id.* at ¶ 6.  She learned from her brother that someone answered her father's phone and reported that her father had been stabbed and seriously wounded.  *Id.* at ¶ 8.  She traveled to the hospital and learned her father was in surgery and that his condition was serious.  *Id.* at ¶¶ 9-10. Her father fought for life for two weeks.  *Id.* at ¶ 14.  He was comatose and on life support.  *Id.*  She met the paramedic who treated her father in the ambulance.  *Id.* at ¶ 16.  The paramedic told her that her father was conscious when he was put into the ambulance.  *Id.*  The family stayed at the hospital until her father succumbed to his wounds.  *Id.* at ¶¶ 15, 17, & 18.  When she thinks of her father, she thinks of the moments of terror he experienced and imagines him being slaughtered.  *Id.* at ¶ 21.  She was unable to function for months following her father's death.  *Id.* at ¶ 22.  She could not stop thinking of the fear that her father experienced.  *Id.*  Since the terror attack the family feels insecure and fearful of another attack.  *Id.* at ¶¶ 3-24.  Her father was an inseparable part of her life and the lives of her children.  *Id.* at ¶ 28.  Her father played an active role in helping to raise the children after her divorce.  Her children have been greatly affected:  her daughter felt guilty because she had an argument with her grandfather shortly before the attack.  *Id.* at ¶ 29. She was sad that her

---

[28] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 8.

grandfather was not there when she graduated from high school. *Id.* Manya continues to experience extreme sadness and feels ongoing pain and loss.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Manya Lakin. Dr. Strous Evaluation of Manya Lakin, Dkt. 35, Exhibit 17. He concluded that Ms. Lakin exhibits signs and symptoms of mild depression and anxiety as well as pathological/complicated grief. *Id.* at 1. He reports that she suffered overwhelming pain and devastation at the loss of her father. *Id.* at 7. He diagnosed her with persistent complex bereavement disorder (severe) with traumatic bereavement, Post-Traumatic Stress Disorder (partial) and persistent depressive disorder; mild severity, late onset, with pure dysthymic syndrome. *Id.* He concludes that the deep feelings of grief affect her personal and occupational functioning and will not resolve in the short term. *Id.*

### E.    Family of Avraham David Moses

#### 1.    Rivkah Martha Moriah – Mother of Avraham David Moses

Rivkah Martha Moriah, the mother of Direct Victim Avraham Moses, provided declaration testimony in support of her claim. Declaration of Rivkah Martha Moriah, Dkt. 63. Rivkah Moriah is a dual United States[29] and Israeli citizen. Rivkah Moriah had two children with Naftali Moses (Avraham and Elijah Dan). *Id.* at ¶ 3. After her divorce from Naftali Moses, she married David Moriah and had two more children – N.M. and C.M. *Id.*

When she heard about the attack on the school, she tried calling Avraham – but got no answer. She tried calling Avraham's friend Segev and there was no answer. *Id.* at ¶ 11. She called the school counselor and was told Avraham had not yet been located. *Id.* at ¶¶ 16, 17. She made several calls attempting to learn the fate of her son. When she arrived at the yeshiva, she learned

---

[29] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 15.

her son was dead. *Id.* at ¶ 45. She states that she learned that Avraham and his friend Segev had been in the library together and were so immersed in their work that they had to be told to run for their lives by other students. *Id.* at ¶¶ 46-47. They ran together and were pursued by the attackers. *Id.* at ¶ 47. Their bodies were found covering and embracing each other. *Id.* at ¶ 46. Rivkah was able to view her son's body: *Id.* at ¶ 51. He had been shot multiple times in the body and in the back of the neck. *Id.* at ¶ 52. Rivkah states that her son and his friend would have been in indescribable fear: they knew what was happening and because the library was the last place the terrorists went, they would have heard others being shot and killed.

She provides extensive testimony in her declaration about her feelings of grief and loss. *Id.* at ¶ 57. She describes the devastating effect of the death of Avraham on the family. She describes herself as feeling broken and alone. *Id.* at ¶ 56. After her son's death, she feared for the safety of her other children. *Id.* at ¶¶ 64-65. She does not allow them to go on certain types of trips or outings because of her fear. *Id.* at ¶ 65. After Avraham's death, she felt she operated in a fog and it was difficult to get the children to school. *Id.* at ¶¶ 66, 75. She was unable to perform her job. *Id.* at ¶ 69. She calculates her loss of earnings including future earnings at $199,930. *Id.* at ¶ 70. She dropped her plan to go to medical school and instead is studying to become a math teacher. *Id.* at ¶ 71. She feels that she is not being the type of mother her children need. *Id.* She suffers from depression and severe grief. *Id.* at ¶ 75. She has been in therapy. *Id.* She is now divorced and lives with her three remaining sons. *Id.* at ¶ 76. She feels grief every day. *Id.* at ¶ 83. Her family will never know complete joy. *Id.* at ¶ 81. She feels the loss at celebrations, holidays and days of remembrance. *Id.* When Avraham died, the world lost a future scholar and leader. *Id.* at ¶ 82.

Ms. Moriah submitted a report prepared by Dr. Rael Strous.  Dr. Strous Evaluation of Rivkah Moriah, Dkt. 35, Exhibit 28.  Dr. Strous conducted a clinical interview and formal psychiatric evaluation of Ms. Moriah.  *Id.* at 1.  Dr. Strous reports that Rivkah Moriah was unable to describe the enormity of the disaster:  the event was so catastrophic and so terrible that she felt powerless and that she could not fight her inner devastation.  *Id.* at 3.  Even nine years after the event, her grief was still immensely strong.  *Id.* at 5.  Dr. Strous notes that Rivkah underwent regular therapy from November 2011 until April 2015.  *Id.* at 6.  The report of the therapist indicated that Rivkah suffered from debilitating insomnia, anxiety, and heavy grief.  *Id.*  Dr. Strous concludes that Rivkah has signs and symptoms of depression, anxiety, PTSD and severe complicated grief.  *Id.* at 9.  Dr. Strous' report indicates that Rivkah Moriah suffers from social, occupational and family dysfunctional behavior.  *Id*. at 9.  Dr. Strous concluded that her mood and prolonged grief will continue to affect her indefinitely.  *Id.*  Dr. Strous diagnosed Ms. Moriah with Persistent Complex Bereavement Disorder, (severe) with traumatic bereavement; Post-Traumatic Stress Disorder (partial) and Persistent Depressive Disorder, moderate severity, late onset with pure dysthymic syndrome.  *Id.*

### 2.    Naftali Andrew Moses – Father of Avraham David Moses

Naftali Moses is the father of Avraham Moses.  He is a citizen of the United States[30] and resides in Israel.  Naftali provided declaration testimony regarding the events of the day of his son's death.  Declaration of Naftali Moses, Dkt. 66.  He heard about an attack at the school that his son attended and rushed to Jerusalem.  *Id.* at ¶¶ 6, 14-16.  He spent hours attempting to find out what had happened to his son.  When he arrived at his son's school, he learned from the Rabbi that his son had been killed.  *Id.* at ¶ 29.  He states that he learned that his son was in the library

---

[30] *See Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 20.

along with other children.  *Id.* at ¶ 30.  The children were hiding but the terrorists simply walked through the library shooting into the stacks and into the hiding places.  *Id.*

He describes the heart-wrenching pain and helplessness he feels knowing that his son was so brutally murdered.  *Id.* at ¶ 31.  He is haunted by the thought of the fear his son must have felt. *Id.*  At the time of his son's death, Mr. Moses was finishing his doctorate and mapping out an academic career.  *Id.* at ¶ 32.  After the murder, he was emotionally unable to follow his career path.  *Id.* at ¶ 33.  The media attention worsened the situation.  *Id.* at ¶ 36.  He wrote a book in an effort to cope with the loss.  *Id.* at ¶ 37.  His then-wife Leah went into a deep depression and had frequent anxiety attacks.  *Id.* at ¶ 39.  Mr. Moses states that Leah had not required psychiatric care prior to Avraham's murder.  *Id.* at ¶ 40.  Mr. Moses assumed many of the household chores and care for the children.  *Id.* at ¶ 41.  Leah's condition worsened and she decided to leave the marriage. *Id.* at ¶ 43.  Leah's condition continued to decline, and the children lived with Mr. Moses full time. *Id.* at ¶ 44.  The children were traumatized and Mr. Moses was unable to maintain professional work.  *Id.* at ¶¶ 46-49.  He has given up hopes of an academic career.  The family continues to suffer and the children lost stability and innocence.  A.D. – one child – says that the children lost their childhood because of the murder.  *Id.* at ¶ 47.  Another child, O.D., has had difficulty forming friendships and as a teenager has assumed the role of a caregiver for Leah.  *Id.* at ¶ 48.  His son lost his only full sibling – leaving him under-motivated.  *Id.* at ¶ 49.  He states that the family has fallen apart and that they live today with memories and pain.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Naftali Moses.  Dr. Strous Evaluation of Naftali Moses, Dkt. 35, Exhibit 31.  Dr. Strous concluded that Mr. Moses has signs and symptoms of pathological complicated grief and that the loss led to a marked change in his mood and behavior.  *Id.* at 5-6.  Dr. Strous reports that Naftali Moses relates

that he is 'still picking up the pieces' of the family.  *Id.* at 3.  He reports that he was particularly

close to Avraham and spent considerable time studying with Avraham.  *Id.*  Dr. Strous concludes

that Mr. Moses suffered profound pain at the loss of his son and that the deep feelings of grief,

which affect areas of personal and interpersonal functioning, will not resolve and will continue to

affect him indefinitely.  *Id.* at 6.  Dr. Strous concludes further that Mr. Moses is no longer able to

work in his chosen profession.  *Id.*  Dr. Strous diagnosed Mr. Moses with Persistent Complex

Bereavement Disorder; (moderate to severe) with traumatic bereavement.  *Id.*

### 3.       David Moriah – Stepfather of Avraham David Moses

David Moriah is a United States national.[31]  He provided declaration testimony in support

of his claim.  Declaration of David Moriah, Dkt. 60.  David Moriah married Rivkah Moriah in

2002 and Rivkah's two sons from her previous marriage (Avraham and Elisha) lived with them

for half of each week.  *Id.* at ¶ 45.  David Moriah has six children from a previous marriage and,

of course, Avraham lived with these children during the half of each week when Avraham resided

with Rivkah and David Moriah.  *Id.* at ¶ 4.  David Moriah avers that he had a close relationship

with his stepson Avraham:  He cared for Avraham – preparing dinner and telling him stories.  He

spent 'special time' with Avraham to help him work through feelings of frustration.  *Id.* at ¶ 8.

David states that Avraham found it hard to deal with his mother's divorce from his biological

father and learned to discuss his feelings with his stepfather.  *Id.* at ¶ 9.  David Moriah took on the

task of helping Avraham with his homework and studying.  *Id.* at ¶ 11.  He helped Avraham prepare

for his bar mitzvah.  *Id.* at ¶ 16.  David Moriah and Rivkah Moriah had two children together

(N.M. and C.M.).  *Id.* at ¶ 21.  Avraham was attached to them and helped care for and raise them.

---

[31] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 13.  Note that the term 'nationality' on a United States passport refers to both citizens and non-citizens.

*Id.* David Moriah studied with Avraham on a regular basis and on the day of the attack, David was unable to attend the scheduled session. *Id.* at ¶ 26. David feels that had he gone to the session, Avraham might have gone home with him and escaped the attack. *Id.* After learning of the attack, he tried calling Avraham. *Id.* at ¶ 28. He learned from the head of the Yeshiva that Avraham had been killed. *Id.* at ¶ 32. He recounts the pain of learning the manner of Avraham's death and the stress on him, the family and his marriage. *Id.* at ¶¶ 74, 79, & 84. He lost focus and was unable to finish projects. *Id.* at ¶ 83. He states that his wife became moody and distrustful and while they tried therapy, they eventually divorced.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of David Moriah. Dr. Strous Evaluation of David Moriah, Dkt. 35, Exhibit 23. Dr. Strous observed that Mr. Moriah experienced some signs of Post-Traumatic Stress Disorder and significant grief following Avraham's death. *Id.* at 7. The persistent grief affected aspects of his social and occupational functioning and was directly related to the breakup of his marriage to Rivkah. *Id.* Dr. Strous opined that Mr. Moriah would not resolve his long-term grief issues in the short term and that these issues will continue to affect him for some time. *Id.* Dr. Strous diagnosed Mr. Moriah with Persistent Complex Bereavement Disorder (moderate) with traumatic bereavement. *Id.*

### 4.    N.M. – Half-Sibling of Avraham David Moses

N.M. did not provide declaration testimony but did undergo an evaluation with Dr. Rael Strous. Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of N.M. Dr. Strous Evaluation of N.M., Dkt. 35, Exhibit 26. N.M is a United States national.[32] N.M. is the child of Avraham's mother and stepfather David Moriah and therefore shared a household with

---

[32] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 14.

Avraham during the period of each week when Avraham lived with his mother Rivkah. *See* Declaration of David Moriah, Dkt. 60 at ¶¶ 5, 7, 8, 10. N.M. was four years old at the time of Avraham's death. Dr. Strous Evaluation of N.M., Dkt. 35, Exhibit 26 at 1. Although N.M. does not remember the events of the day of Avraham's murder, N.M. reports grief and difficulty living in a family that has experienced such a loss. *Id.* at 1-2. N.M. has mood changes and is hypervigilant. *Id.* at 2. N.M.'s mother reports that N.M. is scared of death and dying and illness. *Id.* at 3. In addition to the loss of a brother, N.M. experienced a mother who was very depressed and anxious. *Id.* at 3-4. N.M. reports being identified as the sibling of one who died in a terror attack. *Id.* at 2. Dr. Strous reports that N.M. has suffered grief and that growing up in these circumstances has affected N.M.'s mood and world view. *Id.* at 4. Dr. Strous diagnosed N.M. with persistent depressive disorder; moderate severity, late onset with pure dysthymic syndrome. *Id.* at 4. Dr. Strous believes that grief and mood issues will affect N.M. for a long time. *Id.*

### 5. C.M. – Half-Sibling of Avraham David Moses

C.M. did not provide declaration testimony. C.M. is a United States national.[33] Dr. Rael Strous provided psychiatric "impressions" of C.M. based on an interview with Rivkah Moriah – mother of C.M. Dr. Strous Evaluation of C.M., Dkt. 35, Exhibit 22 at 1. C.M. is the child of Rivkah and David Moriah. C.M. was two years old when Avraham was killed. *Id.* Although C.M. has no direct memory of Avraham, Mrs. Moriah reported to Dr. Strous that C.M.'s life has been affected by the murder. *Id.* Mrs. Moriah believes that C.M. is chronically depressed and exhibits anxiety. *Id.* at 2. C.M. is receiving treatment from mental health professionals. *Id.* Mrs. Moriah attributes C.M.'s problems to growing up in an intensely grieving family. *Id.* Dr. Strous gave a diagnostic formulation: he states that C.M. appears to exhibit a form of Unspecified Anxiety

---

[33] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 12.

Disorder and that many aspects of growing up in the shadow of an intensely grieving family will continue to affect C. M.  *Id.*

### 6.     A.M. and O.D.M. – Half-Siblings of Avraham David Moses

A.M. and O.D.M. are children of Avraham's father Naftali Moses and Leah, the woman he married after his divorce from Rivkah (Avraham's mother).  Both children are United States nationals.[34]  Dr. Rael Strous provided psychiatric impressions of A.M. and O.D.M. based on an interview with their father Naftali Moses.  Dr. Strous Evaluations of A.M. and O.D.M., Dkt. 35, Exhibit 27.  Dr. Strous did not conduct a direct examination of A.M. and O.D.M. because the children had expressed reluctance to undergo a psychiatric evaluation.  *Id.* at 1.  Dr. Strous states that there is no reason to believe that the information provided by Naftali Moses is not accurate and that his opinions are therefore stated with a reasonable degree of medical certainty.  *Id.*  Dr. Strous reports that A.M. was only 3 when Avraham died.  *Id.* at 2.  A.M. expressed to Naftali that the death of Avraham essentially robbed A.M. of a childhood.  A.M. feels embittered and a double sense of loss because A.M. has lost a brother and has only a few memories of him.

Dr. Strous reports that O.D.M. was around 6 when Avraham died.  O.D.M. recalls being close to Avraham and his death caused O.D.M. to question their family's faith.  *Id.* at 2.  O.D.M. has moved schools many times and has difficulty with friendships.  *Id.*  O.D.M. is 'distant' from other members of the family and depends on therapy.  *Id.*

Dr. Strous states that both of these children exhibit a form of complicated grief and persistent complex bereavement disorder.  *Id.* at 2-3.

---

[34] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibits 16 and 19.

### 7. Elisha Dan Moses – Brother of Avraham David Moses

Elisha Dan Moses is the full brother of Direct Victim Avraham David Moses. Elisha Dan Moses submitted a declaration in support of his claim. Declaration of Elisha Dan Moses, Dkt. 65. Elisha Moses is a United States national.[35] Elisha was about 11 years old when his brother Avraham was murdered. *Id.* at ¶¶ 1, 3. Elisha was with his father when they learned of the attack that resulted in the death of Avraham. *Id.* at ¶ 7. He accompanied his father traveling to hospitals, making calls, and finally going to the yeshiva trying to find out what happened to Avraham. *Id.* at ¶¶ 9, 11, 12, 18. He thinks about how life would be had Avraham not been killed. *Id.* at ¶ 23. He misses Avraham every day. *Id.* at ¶ 24. After Avraham died, Elisha became the "eldest". *Id.* at ¶ 25. He is jealous of people with older brothers. *Id.* at ¶ 27. Even 9 years later, there is an emptiness in the house. *Id.* at ¶ 28. He states that he loves Avraham. *Id.* at ¶ 32. He states that he and his siblings suffered severe psychological, emotional, and financial injuries. *Id.* at ¶ 33. He worries that another tragedy will befall his family. *Id.*

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Elisha Dan Moses. Dr. Strous Evaluation of Elisha Dan Moses, Dkt. 35, Exhibit 30. Dr. Strous observed that Elisha Moses has signs of mild depression with signs of pathological grief. *Id.* at 5. According to Dr. Strous, Elisha remains distant and emotionally numb. *Id.* Dr. Strous diagnosed Elisha Moses with Persistent Complex Bereavement Disorder; (moderate) with traumatic bereavement. *Id.* at 5-6. Dr. Strous concludes that the effect of the murder of his brother has affected Elisha Moses' relationships and that these effects will continue for a long period of time. *Id.* at 5.

---

[35] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 18.

### 8.      Aviad Moriah – Stepbrother of Avraham David Moses

Aviad Moriah submitted declaration testimony in support of his claim.  He is United States citizen.[36]  He is the son of David Moriah and became a stepbrother to Avraham David when his father married Avraham's mother.  Declaration of Aviad Moriah, Dkt. 58 at ¶ 3.  He was close in age to Avraham and when he spent time at his father's house, his primary relationship was with Avraham.  *Id.*  He was 14 years old at the time of the attack.  Dr. Strous Evaluation of Aviad Moriah, Dkt. 35, Exhibit 20.  After Avraham's death, he tried to repress the event and avoided having direct communications about the murder.  He felt that the family was trying to recapture Avraham through him because he was so close in age.  Declaration of Aviad Moriah, Dkt. 58 at ¶ 13.  He feels that his life has taken on a significant weight.  *Id.* at ¶ 14.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Aviad Moriah.  Dr. Strous Evaluation of Aviad Moriah, Dkt. 35, Exhibit 20.  Dr. Strous reports that Aviad felt helpless on the day of the attack while they awaited news of Avraham.  *Id.* at 2.  Aviad became withdrawn, and closed.  *Id.*  He felt apathetic.  *Id.*  He experienced flashbacks.  *Id.* at 3.  Dr. Strous concludes that Aviad suffered anxiety and depression but that appears to have resolved over time.  *Id.* at 5.  Despite the improvement, Dr. Strous states that some residual evidence of pathological grief has remained and that will not resolve in the short term.  *Id.* at 5.  Dr. Strous diagnosed Aviad Moriah with Persistent Complex Bereavement Disorder (mild) with traumatic bereavement.  *Id.* at 6.

### 9.      Chagit Gibor Moriah – Stepsister of Avraham David Moses

Chagit Gibor (Moriah) submitted declaration testimony in support of her claim.  Declaration of Chagit Moriah, Dkt. 59.  She is an Israeli citizen.  *Id.* at ¶ 1.  She was living with

---

[36] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 11.

her father when he married Avraham's mother and thus shared a household with Avraham for a number of years. *Id.* at ¶ 6-7. Avraham was ten years old when he moved into the household. *Id.* at ¶ 8. She indicated she had a close relationship with Avraham: *Id.* When she got married, Avraham gave a speech to bless the new couple. *Id.* at ¶ 10. When she learned of the terror attack and that it had involved students at the Yeshiva, she became concerned about Avraham's safety and called her father and started calling all the hospitals. *Id.* at ¶ 12-17. She finally learned of Avraham's death at 1 am. *Id.* at ¶ 19. The day of the funeral is a 'blur'. *Id.* at ¶ 22. She recalls she did not sleep or eat much during the week-long Shiva and that she cried a lot. *Id.* at ¶ 23. When she went back to school, she had a panic attack. *Id.* at ¶ 25. She reports that after Avraham was killed, Rivkah (Avraham's mother) became depressed and angry. *Id.* at ¶ 54. She could not visit her father because he was dealing with Rivkah's grief. *Id.* at ¶ 55. She says it is still hard to speak about Avraham. *Id.* at ¶ 61.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Chagit Gibor (Moriah). Dr. Strous Evaluation of Chagit Moriah, Dkt. 35, Exhibit 21. He reports that Chagit described her relationship with Avraham as particularly close and that she experienced profound mourning when he died. *Id.* at 2. She experienced anxiety for months after the attack and she became fearful of Arabs and potential terror attacks. *Id.* at 3. She still feels that everyone looks suspicious. *Id.* She continues to feel insecure and has crying episodes. *Id.* at 4. Dr. Strous diagnosed her with Persistent Complex Bereavement Disorder (mild) with traumatic bereavement and Persistent Depressive Disorder, mild to moderate severity, late onset with pure dysthymic syndrome. *Id.* at 7. In Dr. Strous' opinion, despite some improvement, the mood and long-term grief issues will continue to affect Chagit Moriah for a long period of time. *Id.*

### 10.    Eitan Yoel Moriah – Stepbrother of Avraham David Moses

Eitan Moriah  submitted declaration testimony in support of his claim.  Declaration of Eitan Moriah, Dkt. 61.  Eitan is an Israeli citizen.  *Id.* at ¶ 1.  He was 14 when his father married Avraham's mother.  *Id.* at ¶ 5.  He and Avraham grew up as typical brothers.  *Id.* at ¶ 6.  He was the older brother and supported and guided Avraham.  *Id.*  On the night of the attack, Eitan stayed home with the younger children while his parents went to look for Avraham.  *Id.* at ¶ 12. When he learned Avraham had been killed, he could not accept it.  *Id.* at ¶ 14.  He did not sleep that night. *Id.* He kept imagining the attack and Avraham's last moments.  *Id.* at ¶ 15.  The murder changed everything.  *Id.* at ¶ 17.  He returned to his Army unit but found it difficult to do his job.  *Id.* at ¶ 18-19.  His family changed for the worse – the environment was extremely stressful.  *Id.* at ¶ 21. His relationship with his stepmother became more difficult.  *Id.* at ¶ 22.  He watched Rivkah become more obsessed with the memory of her son.  *Id.* at ¶ 26.  He argued with his stepmother. *Id.* at ¶ 29.  Eventually he left the house.  *Id.* at ¶ 30.  He now suffers from anxiety in daily situations.  *Id.* at ¶ 35.  He has two children and is overprotective because he imagines the same events happening to them.  *Id.* at ¶ 36.

Dr. Rael Strous conducted a clinical interview and psychiatric evaluation of Eitan Moriah. Dr. Strous Evaluation of Eitan Moriah, Dkt. 35, Exhibit 24.  Dr. Strous reports that Eitan was taking care of the younger children while his father searched for Avraham on the night of the attack.  *Id.* at 2.  Eitan returned to his army service two weeks after the funeral and reports that everything was different.  *Id.*  He was preoccupied with his loss and was transferred to a less active military unit.  *Id.* at 2-3.  He had difficulty functioning and felt that 'the worst' was going to happen each day.  Home life was very stressful due to the pain from the loss.  *Id.* He feels he has lost the close family life he once had; that he has lost his calm attitude; he gets stressed easily and the upheaval  has  affected  his  relationships  with  friends.   *Id.*   He  experienced  nightmares  and

flashbacks and is hypervigilant in public places.  *Id.* at 4.  Dr. Strous concludes that Eitan suffered anxiety and depression after the loss of Avraham and that while he has improved, the long-term grief issues will continue to affect Eitan for some time.  *Id.* at 7.  Dr. Strous diagnosed Eitan Moriah with Persistent Complex Bereavement Disorder (mild) with traumatic bereavement and Post-Traumatic Stress Disorder (partial).  *Id.*

### 11.    Yifat Moriah – Stepsister of Avraham David Moses

Yifat Moriah Cohen submitted declaration testimony in support of her claim.  Declaration of Yifat Moriah Cohen, Dkt. 62.  She is the stepsister of Direct Victim Avraham David Moses.  *Id.* at ¶ 1.  She is an Israeli citizen.  *Id.* at ¶ 2.  She was 19 years old when Avraham Moses was murdered.  *Id.* at ¶ 4.  She learned of Avraham's death when her mother contacted her at around 1 am on the night of Avraham's death.  *Id.* at ¶ 7.  She describes the loss of Avraham as complicated and painful.  *Id.* at ¶ 10.  She reports that her pain was magnified because one of her closest friends had also lost a brother in the attack.  *Id.* at ¶ 12.  She states that Avraham was 'dear' to her and that they had a special connection.  *Id.* at ¶ 13.  Avraham was about 10 years old when his mother married Yifat's father.  *Id.*  They used to play together.  *Id.*  She states that the loss of Avraham had a strong impact on her life.  *Id.*  She states that she went from a person who was full of life and vitality to someone who was shrunken, frightened and weak.  *Id.* at ¶ 15.  She cut herself off from friends and family.  *Id.* at ¶ 23.  Her anxieties began to take over her life – so that she spent days confined to her bedroom.  *Id.* at ¶ 24.  She began to see a therapist.  *Id.* at ¶ 27.  She continued to have emotions of fear and guilt.  *Id.* at ¶ 30.  She had to move from an apartment because of her fear of Arab workers.  *Id.*  She feels therapy has saved her life and she still is not fully rehabilitated.  *Id.* at ¶ 4 & 37.  She was never able to complete her studies.  *Id.* at ¶ 42.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Yifat Cohen (Moriah).  Dr. Strous Evaluation of Yifat Moriah Cohen, Dkt. 35, Exhibit 25.  Dr. Strous

found that Yifat exhibited signs and symptoms of significant depression, anxiety and partial Post-Traumatic Stress Disorder.  *Id.* at 6.  He states that Avraham's sudden and violent death led to marked changes in Yifat's mood and anxiety levels.  *Id.*  He states that her mood and long-term grief issues will continue to affect her for a long period of time.  *Id.*  Dr. Strous diagnosed Yifat with persistent complex bereavement disorder (mild) with traumatic bereavement; Post-Traumatic Stress Disorder (partial) and persistent depressive disorder, mild to moderate severity, late onset with pure dysthymic syndrome.  *Id.*

### 12.    Atara Nesia Moriah– Stepsister of Avraham David Moses

Atara Moriah (Katz) submitted declaration testimony in support of her claim.  Declaration of Atara Moriah, Dkt. 57.  Atara Moriah is an Israeli citizen.  *Id.* at ¶ 1.  She was home caring for her siblings when she received word of the terror attack at the Yeshiva.  *Id.* at ¶ 6.  She immediately informed her parents.  *Id.* at ¶ 7.  She stayed up all night waiting for word.  *Id.* at ¶ 8.  Her parents arrived home early in the morning with the news that Avraham had been killed.  *Id.* at ¶ 9.  Avraham entered her life six years before the attack – when her father married Avraham's mother.  She felt like his older sister even though they were close in age.  *Id.* at ¶ 10.  Her family fell apart after the death of Avraham.  *Id.* at ¶ 14.  Avraham's mother  experienced fits of rage that left the rest of the family tense, stressed, and worried.  *Id.* at ¶ 15.  Her relationship with her father grew more distant because he was trying to cope with Rivkah's grief.  *Id.* at ¶ 16.  She barely finished her schooling that year.  *Id.* at ¶ 17.  She did not have the benefit of a stable family to return to after high school and national service.  *Id.* at ¶ 19.  She finally started therapy and the emotions she had repressed came to the surface – overtaking her life.  *Id.* at ¶ 20-21.  She continues to have anxiety and she developed eating disorders.  *Id.* at ¶ 22-23.  Even setting a wedding date was complicated:  one of the only dates available was just a few days before the memorial for Avraham.  *Id.* at ¶ 24. This caused controversy in the family and resulted in a negative spiral.  *Id.* Eventually

her father and stepmother divorced.  *Id.*  She still experiences anxiety and even purchased a gun –
but the gun made her even more fearful.  *Id.* at ¶ 27.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Atara
Moriah.  Dr. Strous Evaluation of Atara Moriah, Dkt. 35, Exhibit 19.  His report outlines Atara's
own statements: the news of Avraham's death was unbelievable, overwhelming, and resulted in a
pain that was indescribable.  *Id.* at 2.  She was one year older than Avraham and they spent a great
deal of time together.  *Id.*  They discussed Harry Potter books.  *Id.*  She was seriously affected by
his death. *Id.* at 2-3.  She did not function well in learning, she was late for class, she wanted to
flee from the house because of the stress, her social life was affected, she experienced nightmares
and flashbacks, she is hypersensitive to loud noise, her pain is particularly intense around
anniversaries.  *Id.* at 3.   Dr. Strous concludes that Atara suffered significant psychological
symptoms following Avraham's death and despite improvement, her mood and long-term grief
issues will continue to affect her for a long period of time.  *Id.* at 6.  Dr. Strous diagnosed Atara
with Persistent Complex Bereavement Disorder (mild) with traumatic bereavement; and Persistent
Depressive Disorder, mild severity, late onset with pure dysthymic syndrome.  *Id.*

### 13.  Tzur Gedaliah Moriah – Stepbrother of Avraham David Moses

Plaintiff Z.G.M. (Tzur Gedaliah Moriah) was a minor when this action was filed but is now
an adult.  Tzur Moriah provided declaration testimony in support of his claim.  Declaration of Tzur
Moriah, Dkt. 64.  Tzur Moriah is an Israeli citizen.  *Id.* at ¶ 1.  He was nine years old when Avraham
was murdered.  *Id.* at ¶ 3.  He remembers Avraham as gentle, kind, and studious.  *Id.*  He states
that Avraham's murder set off a process of 'deterioration.'  *Id.* at ¶ 5.  He is fearful, he worries,
and he finds it hard to express himself without getting stressed.  *Id.* at ¶ 6-7.  He has repressed his
memories of and the experiences that he shared with Avraham.  *Id.* at ¶ 9.  The household has been
very affected by the loss.  *Id.* at ¶ 10.  He states that Avraham's mother (Rivkah) had mood swings

and anger.  *Id.*  He was afraid to visit his father because of Rivkah's anger.  He lost interest in hobbies and had an increased fear of terror attacks.  *Id.* at ¶ 14-16.  Since the attack he has met with psychologists weekly.  *Id.* at ¶ 17.  His studies suffered but he has finally entered into a yeshiva.  *Id.* at ¶ 18 & 21.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Tzur Moriah.  Dr. Strous Evaluation of Tzur Moriah, Dkt. 35, Exhibit 29.  Dr. Strous reports that Tzur Moriah actively tried to repress the memory of his brother.  *Id.* at 2.  Tzur's studies were affected and Tzur felt his social life was affected.  *Id.*  Dr. Strous observed that Tzur exhibits signs and symptoms of anxiety and partial Post-Traumatic Stress Disorder.  *Id.* at 6.  The death of his brother led to changes in mood and anxiety.  *Id.*  Dr. Strous opined that Tzur Moriah's anxiety and long-term grief issues will continue to affect him for a long time.  Dr. Strous diagnosed Tzur Moriah with persistent complex bereavement disorder (mild) with traumatic bereavement; Post-Traumatic Stress Disorder (partial); and Anxiety disorder (NEC) (in partial remission).  *Id.*

### F.    Family of Naftali Shitrit

### 1.    Gila Rachel Shitrit– Mother of Naftali Shitrit

Gila Shitrit is the mother of Direct Victim Naftali Shitrit and a United States citizen.[37]  She provided declaration testimony in support of her claim.  Declaration of Gila Shitrit, Dkt. 74.  She was at home when she heard about the attack on the news.  *Id.* at ¶ 6.  She called her son, but he did not answer.  *Id.* at ¶ 9.  People started to congregate at her home and she then realized something might have happened to Naftali.  *Id.* at ¶ 10.  She then received a call from the yeshiva informing her that Naftali had been injured.  *Id.* at ¶ 16.  She and her husband Yaacov traveled (separately) to the hospital.  *Id.* at ¶ 17-18.  There was an unidentified teenager in surgery and the Shitrit family

---

[37] See Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 31.

and another family were both waiting for news. *Id.* at ¶ 19, 22. The doctors took a photo of the child in surgery and that is how the family was able to identify Naftali. *Id.* at ¶ 25. The son of the other family was among those killed. *Id.* at ¶ 26. The doctors told Gila and Yaacov that the situation was extremely critical. *Id.* at ¶ 29. Naftali was in extremely serious condition after the surgery and Gila described the following week as unbearably difficult. *Id.* at ¶ 32. Naftali woke up a week after surgery and was then able to explain what happened. *Id.* at ¶ 36-37. It was a very difficult time; Gila and Yaacov had to find caregivers for the younger children so that they could stay with Naftali. *Id.* at ¶ 41-42. Naftali was allowed to go home but then started having seizures and had to go back to the hospital. *Id.* at ¶ 46-47. Naftali had to be in the hospital and a rehabilitation center for a long time. *Id.* at ¶ 49. The parents' need to be with Naftali had a significant effect on the family. *Id.* at ¶ 50-51. The family moved to Jerusalem to be near Naftali once they learned that his recovery would take a long time. *Id.* at ¶ 53. This was very difficult for the other children. *Id.* at ¶ 53-55. Then Naftali traveled to the United States for surgery. *Id.* at ¶ 63. When Naftali finally was able to walk with a walker the family moved back to their home. *Id.* at ¶ 66, 70. Gila eventually had to give up her job. *Id.* at ¶ 79-80. Gila reports that Naftali's siblings suffered greatly. *Id.* at ¶ 83-90. Gila states that she suffered severe psychological, emotional, and financial injuries. *Id.* at ¶ 91.

Dr. Rael Strous conducted a clinical interview and a formal psychiatric evaluation of Gila Shitrit. Dr. Strous Evaluation of Gila Shitrit, Dkt. 35, Exhibit 42. Dr. Strous observed that Gila Shitrit has signs and symptoms of PTSD and that she has problems in aspects of her life and social and occupational difficulties. *Id.* at 7. Dr. Strous diagnosed Gila Shitrit with Post-Traumatic Stress Disorder (partial) and Adjustment disorder with mixed anxiety and depressed mood. *Id.* Dr. Strous

states that Gila Shitrit expresses that her life has been severely affected and that while she has improved, many 'scars' remain that will continue to affect her for a long period of time. *Id.*

### 2.    Yaakov Shitrit – Father of Naftali Shitrit

Yaakov Shitrit, the father of Direct Victim Naftali Shitrit, provided a declaration in support of his claim.  Declaration of Yaakov Shitrit, Dkt. 80.  He is a citizen of Israel.  *Id.* at ¶ 1.  He was at home when he heard a radio report of the attack in which his son was injured.  *Id.* at ¶ 6. Although he had not received word from his son, he had a 'bad feeling' and decided to travel to Jerusalem to look for his son.  *Id.* at ¶ 7.  His declaration relates the same sequence of events as the declaration of Gila Shitrit.  Yaakov states that he learned eventually that Naftali almost did not survive the ambulance ride and that there were 30 doctors involved in his surgery.  *Id.* at ¶ 18-21. After the surgery, Naftali was transferred to intensive care – where his parents saw him for the first time.  *Id.* at ¶ 24.  He was not breathing on his own.  *Id.* at ¶ 26.  Yaakov describes a period of hope and despair.  *Id.* at ¶ 25.  It was hard to see his son in such a condition.  *Id.*  He spent two months in the United States when his son needed surgery that could only be performed there.  *Id.* at ¶ 27.  They moved to Jerusalem for three years to be close to the rehabilitation services that Naftali needed.  *Id.* at ¶ 28.  The family incurred significant financial expenses by moving to Jerusalem and acquiring equipment needed to care for Naftali.  *Id.* at ¶ 29-30.  Yaakov states that he was not able to work for nearly 10 months and that his wife was not able to work for the first year of Naftali's recuperation.  *Id.* at ¶¶ 31, 38.  Yaakov states that the family incurred expenses totaling $338,363.83.[38]  *Id.* at ¶¶ 27, 29, 30, 35.  This entire period was very stressful for the family.

---

[38] Plaintiff Yaakov Shitrit does not seek recovery of these expenses in the Complaint or Amended Complaint (Complaint, Dkt. 1; Amended Complaint, Dkt. 115) or in the Proposed Findings and Conclusions (Dkt. 87). Accordingly, I have not considered these expenses in my recommendations.

*Id.* at ¶ 25.  Yaakov states that he suffered severe psychological, emotional, and financial injuries and his children suffered severe psychological and emotional injuries.  *Id.* at ¶ 43.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Yaakov Shitrit.  Dr. Strous Evaluation of Yaakov Shitrit, Dkt. 35, Exhibit 47.  Dr. Strous reports that Yaakov suffered from tension, that he was unable to enjoy anything, he was uncomfortable being the center of attention, becomes withdrawn at anniversaries or reminders of his son's injury.  *Id.* at 3.  He reports occasional flashbacks, experiences guilt, became hypervigilant, startles at noises, and gets anxious.  *Id.*  Dr. Strous concludes that Yaakov has signs and symptoms of depression and PTSD that have repercussions for his family and occupational life.  *Id.* at 6.  Dr. Strous diagnosed Yaakov with Post-Traumatic Stress Disorder; and Adjustment disorder with mixed anxiety and depressed mood.  *Id.* at 6-7.  Dr. Strous believes that the effects of his son's severe injuries sustained in the terror attack will continue to affect Yaakov for a long period of time.  *Id.* at 6.

### 3.     Meiri Shitrit – Sibling of Naftali Shitrit

Meiri Shitrit is the brother of Direct Victim Naftali Shitrit.   Meiri Shitrit provided declaration testimony in support of his claim.  Declaration of Meiri Shitrit, Dkt. 75.  Meiri is a United States citizen.[39]  He was 16 years old when his brother Naftali was seriously injured in the terror attack.  *Id.* at ¶ 4.  The day after the attack his parents went to be with Naftali and he and his siblings went to their grandparents' home.  *Id.* at ¶ 9-12.  As the oldest child, he needed to support his younger siblings – but he did not know Naftali's condition.  *Id.* at ¶ 14.  He was very scared.  *Id.*  He recalls visiting Naftali the following week in the intensive care unit at the hospital.  *Id.* at

---

[39] *See* Exhibit Doc. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 35.

¶ 15.  Naftali was covered with tubes and was non-responsive.  *Id.*  Meiri broke down crying in the hospital.  *Id.* at ¶ 17.  As Naftali was recovering, Meiri traveled with him to physical therapy treatments.  *Id.* at ¶ 21.  He recalls that Naftali would break down with pain and became angry which was out of character.  *Id.*  Meiri did not have a normal family life after Naftali was injured.  *Id.* at ¶ 22.  He saw facets of his parents he had never seen before.  *Id.* at ¶ 26.  His entire adolescence was affected by the attack and the ongoing effects of Naftali's injuries.  *Id.* at ¶ 28.  He states that he suffered severe psychological and emotional injuries as a result.  *Id.* at ¶ 30.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Meiri Shitrit.  Dr. Strous Evaluation of Meiri Shitrit, Dkt. 35, Exhibit 43.  Dr. Strous reports that Meiri felt he had to ignore his own needs and to focus only on Naftali.  *Id.* at 2.  During the period of Naftali's rehabilitation, Meiri went 'through the motions" of studying and put his own emotional needs on hold.  *Id.*  Meiri went to psychotherapy for several years.  *Id.* at 3.  His depression deepened and he was prescribed antidepressant medication.  *Id.*  Dr. Strous concludes that Meiri has signs and symptoms of depression, anxiety and PTSD and that the terror attack on his brother led to changes in mood, personality and emotional development.  *Id.* at 5.  As of the date of the interview with Dr. Strous (nearly 10 years after the attack), Meiri was still undergoing treatment for depression.  *Id.*  Dr. Strous believes that the mood issues will continue to affect Meiri for a long period of time.  *Id.* at 6.  Dr. Strous diagnosed Meiri with Major Depressive Disorder; moderate severity, late onset, with pure dysthymic syndrome.  *Id.*

### 4.    Oshrat Shitrit – Sibling of Naftali Shitrit

Oshrat Shitrit is the sister of Direct Victim Naftali Shitrit.  She provided declaration testimony in support of her claim.  Declaration of Oshrat Shitrit, Dkt. 79.  She is a United States

citizen[40] and was 12 years old when Naftali was injured in the terror attack. *Id.* at ¶ 3. Her description of the events and the family's move and return to their hometown echoes that of her sister Noya. *Infra* at 5. Oshrat states that her childhood was affected by the attack and that she had to cope with not having her parents around when she needed them. *Id.* at ¶ 17. Her bat mitzvah was scheduled to be held two weeks after the attack and was postponed for 8 months. *Id.* She states she has suffered severe psychological and emotional injuries. *Id.* at ¶ 18.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Oshrat Shitrit. Dr. Strous Evaluation of Oshrat Shitrit, Dkt. 35, Exhibit 46. Dr. Strous' report states that Oshrat felt she had to grow up faster than most children and that her family suffered significant adverse effects as a result of the attack. *Id.* at 2. She feels life would have been very different. *Id.* She feels tension and anxiety when she speaks of the attack. *Id.* at 3. Certain songs trigger a reaction as well. *Id.* Dr. Strous concludes that Oshrat suffered depression, anxiety, and PTSD in the past leading to changes in her mood and anxiety levels. *Id.* Dr. Strous states that while she functions normally now, she has residual emotional scars that will affect her for a long time. *Id.* Dr. Strous diagnosed her with Post-Traumatic Stress Disorder (partial) *Id.*

### 5.    N.S. – Sibling of Naftali Shitrit

Noya Shitrit is a United States citizen.[41] She is currently 19 years old and the sister of Naftali Shitrit. Noya Shitrit provided a declaration in support of her claim. Declaration of Noya Shitrit, Dkt. 78. Noya was 9 years old when Naftali was injured by the terror attack. *Id.* at ¶ 3. Noya first learned that Naftali had been injured the morning after the attack. *Id.* at ¶ 7. At first, she assumed that the injuries were minor, but later she realized that Naftali's injuries were very

---

[40] *See* Dkt. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 38.

[41] *See* Dkt. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 37.

serious. *Id.* at ¶ 8-10.  She went to visit Naftali along with her siblings. *Id.* at ¶ 12.  He was hooked

up to machines and Noya remembers it as a scary and stressful experience. *Id.* at ¶ 13.  She recalls

feeling that she was 'without' parents because she was cared for by a baby-sitter while her parents

stayed with Naftali. *Id.* at ¶ 15.  She recalls moving with the family to Jerusalem so her parents

could be near Naftali and then returning home after two years. *Id.* at ¶¶ 18, 22.  She states that it

was hard to return and that her friends had forgotten her. *Id.*  She believes her childhood was

affected by the terror attack and Naftali's serious injuries: *Id.* at ¶ 25.  She was away from her

parents, uprooted, and was afraid for her brother. *Id.*  She states that as a result she suffered severe

psychological and emotional injuries. *Id.* at ¶ 26.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Noya

Shitrit.  Dr. Strous Evaluation of Noya Shitrit, Dkt. 35, Exhibit 45.  Dr. Strous reports that Noya

developed serious fears of death in the 6th grade and further developed anxieties in the 7th grade –

leading to withdrawal from social activity. *Id.* at 2.  She was treated by a psychologist and a

psychiatrist and received medications. *Id.*  She was told by a psychologist that the anxieties were

related to the terror attack. *Id.* at 2-3.  Dr. Strous states that Noya Shitrit suffered significant

anxiety and obsessive symptomology related to her brother's 'near death'. *Id.* at 5.  Although she

has improved with treatment, Dr. Strous believes that her anxiety issues will continue to affect her

for a long period of time. *Id.*  Dr. Strous diagnosed her with Obsessive Compulsive Disorder and

Anxiety Disorder NEC. *Id.*

### 6.    Y.S. – Sibling of Naftali Shitrit

Plaintiff Y.S. (Yedidya Shitrit) was a minor when this action was filed but is now an adult.

Y.S. has submitted a declaration in support of his claim.  Declaration of Yedidya Shitrit, Dkt. 81.

Y.S. is a United States citizen.[42] Y.S. was in second grade when Naftali was injured in the attack. *Id.* at ¶ 5.  Y.S. had a very hard time when the family moved to Jerusalem.  *Id.* at ¶ 10-11.  He continues to have an acute reaction when the terror attack is mentioned.  *Id.* at ¶ 19.  He is studying currently in the same Yeshiva where Naftali was injured.  *Id.* at ¶ 20.  He says being in the same place can feel traumatizing.  *Id.*  He remembers the time after the attack as a period when his parents were busy and he feels his childhood was affected by the attack.  *Id.* at ¶ 21-22.  He states that he suffered psychological and emotional injuries.  *Id.* at ¶ 23.

Dr. Rael Strous conducted a clinical interview and formal psychiatric evaluation of Y.S.  Dr. Strous Evaluation of Yedidya Shitrit, Dkt. 35, Exhibit 48.  Dr. Strous states that there are no current signs or symptoms of depression, anxiety, or PTSD.  *Id.* at 5.  Dr. Strous notes, however, that Y.S. had trouble adjusting at the time and that difficulty had an effect on Y.S.'s quality of life.  *Id.*  Dr. Strous diagnosed Y.S. with Adjustment disorder with mixed anxiety and depressed mood (in remission).  *Id.*

### 7.  A.S. – Sibling of Naftali Shitrit

A.S. was 6 years old when Naftali was injured in the terror attack.  A.S. is a United States citizen.[43] A.S.'s mother, Gila Shitrit, provided declaration testimony about the effects of the injuries to Naftali on A.S.  Declaration of Gila Shitrit, Dkt. 74 at ¶ 88.  A.S. never adjusted to the new school and was affected by academic challenges after the move.  *Id.*  The school in Jerusalem did not provide math training and when the family moved back home, A.S. required extra assistance to achieve the level of training appropriate for the grade level.  *Id.* A.S. suffered emotionally and lost self-esteem as a result of the upheaval.  *Id.*

---

[42] *See* Dkt. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 39.

[43] *See* Dkt. 84, Supplemental Declaration of Robert J. Tolchin, Exhibit 33.

### 8.      E.S. – Sibling of Naftali Shitrit

E.S. was three years old at the time of the attack on Naftali.  E.S. is a United States citizen.[44]
Gila, the mother of E.S., provided statements about the effect of Naftali's injuries on E.S.
Declaration of Gila Shitrit, Dkt. 74.  Gila states that the move to a new nursery environment was
hard on E.S. and that E.S. became irritable and rebellious in kindergarten.  *Id.* at ¶ 89.  Gila states
that E.S. had to be placed in afternoon day care because she and her husband were so busy with
Naftali.  *Id.*  Gila states that E.S. has never recovered.  *Id.*  E.S. continued to 'act out' even after
the family reunited.  *Id.* E.S. has difficulty remaining calm.  *Id.*  Gila states that E.S. has become a
healthy teenager but that E.S. missed out on important aspects of childhood and that the need to
care for Naftali resulted in failure to provide certain kinds of care to E.S.  *Id.*

### 9.      H.S. – Sibling of Naftali Shitrit

H.S. is the youngest sibling of Naftali Shitrit.  H.S. is a United States citizen.[45] H.S. was
born a few months after the attack.  Declaration of Gila Shitrit, Dkt. 74, at ¶ 3.  Gila, the mother
of H.S., states that H.S. never had the opportunity to play with Naftali.  *Id.* ¶ 90.  H.S. was often
left with a babysitter.  *Id.* H.S. did not spend as much time with Gila as the other children.  *Id.*

### 10.      A.S./ E.S./ H.S. – Psychiatric evaluation.

Dr. Rael Strous interviewed Gila Shitrit – the mother of the three minor children.  Dr.
Strous Evaluation of Gila Shitrit, Dkt. 35, Exhibit 41.  The family decided not to expose the young
children to the trauma of discussing their brother's injuries through a formal psychiatric evaluation.
*Id.* at 1.  Dr. Strous provided opinions based on that interview and states that these opinions are
within a reasonable degree of medical certainty.  *Id.*

---

[44] *Id.* at Exhibit 34.

[45] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 32.

A.S. was affected by the family's move to Jerusalem.  *Id.* at 2.  A.S. was not able to progress in the new school and when the family moved back home, A.S. was playing catchup at school. *Id.* According to Gila, this led to bitterness and lowered self-esteem.  *Id.*  Gila believes that A.S. suffered emotionally and that the moves had an adverse effect on A.S. socially.  *Id.*

E.S. was three years old at the time of the terror attack.  *Id.*  Dr. Strous reports that according to Gila, E.S. did not do well with the family's move and had considerable behavioral problems in school.  *Id.*  E.S. had to be put in afternoon 'care' because the parents were occupied with Naftali. *Id.*  Gila reports that E.S. is more stubborn and irritable than a normal child of the same age.  *Id.* Once the family returned home, the problems seemed to resolve.  *Id.*  Gila feels that E.S. missed important aspects of childhood.  *Id.*

H.S. was born after the attack.  Gila reported to Dr. Strous that she was extremely stressed at the time of H.S.'s birth and that this was not an ideal situation in which to raise a child.  *Id.* at 3.  H.S. was often left with a babysitter when Gila was visiting Naftali.  *Id.*

Dr. Strous concludes that all three of the minor children appear to have been affected by the injury to their brother.  *Id.*  The trauma to the family unit and the upheaval in their lives have had an effect. *Id.*  Dr. Strous expects that the repercussions of growing up in a family undergoing this trauma will affect these children for a significant period of time.  *Id.*

G.  **Family of Direct Victim Shmuel Zev Shimon Brauner**

1.  **Nechama Brauner – Wife of Shmuel Zev Shimon Brauner**

Nechama Brauner is a United States citizen[46] and the wife of Direct Victim Shmuel Brauner.  She provided declaration testimony in support of her claim.  Declaration of Nechama Brauner, Dkt. 38.  Nechama Brauner married Shmuel Brauner in 2010.  *Id.* at ¶ 3.  When her

---

[46] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 2.

husband was injured by the rocket attack in 2011, Mrs. Brauner was a kindergarten teacher and the couple's first child was 8 months old. *Id.* at ¶ 6. She screamed and cried when she learned her husband had been injured. *Id.* at ¶ 8. She is traumatized still by the image of her husband connected to medical machines. *Id.* at ¶ 10. She had to take care of her husband's basic needs when he was able to leave the hospital. *Id.* at ¶ 13. She continues to have flashbacks and suffers from anxiety. *Id.* at ¶ 15. She does not sleep properly and will not go the place where her husband was injured. *Id.* at ¶ 16. She describes Shmuel as a changed person. *Id.* at ¶ 18. Since the attack he has become self-absorbed, negative and irritable. *Id.* She has to do everything for him and because she needs to care for him and their four children, she was forced to quit her job and was not able to return to her studies to become a bookkeeper. *Id.* at ¶ 19-20. She describes herself as both mother and father to the children. *Id.* at ¶ 20. The family lives on social security income from the government. *Id.* at ¶ 23. She says that her husband's inability to participate in family life has been stressful for the children. *Id.* at ¶ 26-29.

Plaintiff submitted a report prepared by Dr. Rael Strous. Dr. Strous Evaluation of Nechama Brauner, Dkt. 35, Exhibit 2. Dr. Strous conducted a clinical interview and a formal psychiatric evaluation of Nechama Brauner. *Id.* at 1. Dr. Strous concluded that Nechama Brauner has signs and symptoms of PTSD, depression, and anxiety. *Id.* at 6. Dr. Strous states that the attack and resulting injuries to Shmuel Brauner resulted in a major upheaval to Mrs. Brauner's personal, family, and occupational life. *Id.* She was unable to continue in her desired career path and spends all her time caring for her husband. *Id.* at 6-7. Dr. Strous diagnosed Mrs. Brauner with Post-Traumatic Stress Disorder and Adjustment disorder with mixed anxiety and dressed mood. *Id.* at 7. He states that he does not expect her mood and anxiety issues will resolve in the short term and that they will continue to affect her for a long period of time. *Id.* at 7.

### 2.      C.Y.B. – Minor Child of Shmuel Zev Shimon Brauner

Dr. Rael Strous provided a report on his psychiatric impressions of Mr. Brauner's child C.Y.B. who was less than 1 year old at the time of the attack.  Dr. Strous Evaluation of C.Y.B., Dkt. 35, Exhibit 6.  C.Y.B. is an Israeli citizen.  *See* Memorandum Opinion and Order, Dkt. 111, page 32.  Dr. Strous' evaluation is based on an interview with the child's mother.  Dr. Strous Evaluation of C.Y.B., Dkt. 35, Exhibit 6 at 1.  (The Brauners decided not to subject the child to a formal psychiatric examination.  *Id.*)  Mrs. Brauner reports that C.Y.B. is immature and insecure. *Id.* at 2.  C.Y.B. clings to her and gets upset because Shmuel is not able to attend celebrations at school.  *Id.*  Mrs. Brauner believes that the child lacks a young father figure that would do the normal things fathers do with their children.  *Id.*  Dr. Strous states that the child 'appears' to have been affected by the father's injuries – and that the repercussions of growing up with a dysfunctional father will continue to affect the child for a long period of time.  *Id.* at 5.

### 3.      Mordechai Brauner – Father of Shmuel Zev Shimon Brauner

Mordechai Brauner is the father of Direct Victim Shmuel Brauner.  Mordechai Brauner provided declaration testimony in support of his claim.  Declaration of Mordechai Brauner, Dkt. 37.  He is a United States national, born in Israel.[47]  He states that he was traumatized and overwhelmed by Shmuel's injuries and was anxious about whether his son would survive.  *Id.* at ¶ 11-12.  Since the attack that injured his son, he is anxious about the safety of his children and grandchildren.  *Id.* at ¶ 15.  He becomes nervous when security in Israel becomes tense; during these times, his anxiety increases and he suffers from flashbacks.  *Id.* at ¶ 16.  He states he has difficulty sleeping and suffers from chronic stress.  *Id.* at ¶ 17.

---

[47] *See* Declaration of Robert J. Tolchin, Dkt. 82, Exhibit 1.

Plaintiff submitted a report prepared by Dr. Rael Strous.  Dr. Strous Evaluation of Mordechai Brauner, Dkt. 35, Exhibit 4.  Dr. Strous conducted a clinical interview and formal psychiatric evaluation.  *Id.* at 1.  Dr. Strous states that Mr. Brauner exhibits signs of depression, anxiety, and PTSD.  *Id.* at 5.  Dr. Strous diagnosed Mr. Brauner with Post-Traumatic Stress Disorder (partial) and Adjustment disorder with mixed anxiety and depressed mood.  *Id. D*r. Strous does not expect Mr. Brauner's mood and anxiety issues to resolve in the short term.  *Id.* at 5.

### 4.     Esther Chaya Brauner – Mother of Shmuel Zev Shimon Brauner

Esther Brauner is the mother of Shmuel Brauner.  She submitted declaration testimony in support of her claim.  Declaration of Esther Brauner, Dkt. 36.  Esther Brauner is a United States citizen.[48]  When she learned her son had been injured in a rocket attack, she was almost hysterical and could not stop crying.  *Id.* at ¶ 8.  It was very difficult for her to see her son so injured and to see how fundamentally his life had changed.  *Id.* at ¶ 2.  Before the attack, Shmuel was lively, active and friendly.  *Id.* at ¶ 13.  He is a different person now – quiet, introverted, and depressed. *Id.* at ¶ 14.  Esther states that she continues to suffer from anxiety and that she is nervous when she hears a siren.  *Id.* at ¶ 15.  She is tense and has heart palpitations.  *Id.* at ¶ 18.  She is so fearful that she tried to have a secure room built in her apartment.  *Id.* at ¶ 19.

Plaintiff submitted a report prepared by Dr. Rael Strous.  Dr. Strous Evaluation of Esther Brauner, Dkt. 35, Exhibit 3.  Dr. Strous conducted a clinical interview and formal psychiatric evaluation of Esther Brauner.  *Id.* at 1. He found that the injury to her son led to mood changes and anxiety that have not resolved.  *Id.* at 5.  Dr. Strous diagnosed Esther Brauner with Adjustment disorder with mixed anxiety and depressed mood.  *Id.* at ¶ 5-6.  Dr. Strous found that Esther

---

[48] *Id.*

Brauner suffered emotionally following her son's injury. *Id.* at ¶ 5. He expects that her mood and anxiety issues will continue to affect her for a long period of time. *Id.*

## DETERMINATION OF AMOUNT OF COMPENSATORY DAMAGES

## I.   ECONOMIC LOSS UNDER THE FSIA

"Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct." *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (Syrian Arab Republic was liable to citizens' estates and families, under FSIA, for economic losses) (citing 28 U.S.C. § 1605A(c)); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 401-02 (D.D.C. 2015); *Valore v. Islamic Republic of Iran,* 700 F. Supp. 2d 52, 83 (D.D.C. 2010).

Economic loss damages must be supported by credible evidence, and may be proven by the submission of a forensic economist's expert report that is based on reasonable data and assumptions. *Roth*, 78 F. Supp. 3d at 402 (citing *Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 24 (D.D.C. 2009)). "In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)); *see also Thuneibat*, 167 F. Supp. 3d at 48-49 (accepting economic loss  in expert reports based on data provided by the National Center for Health Statistics and information submitted by the immediate family members and calculated the "loss of wages and employee benefits" offset personal consumption and applied a discount rate of 1.25 percent per year "based on the rate of return on U.S. Treasury Bills); *Belkin*, 667 F. Supp. 2d at 24 (awarding economic damages based on conclusion that expert testimony was based on reasonable assumptions about plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits).

## II.      ECONOMIC LOSS UNDER ISRAELI LAW

Economic loss analysis under Israeli law employs generally the same types of calculations and standards that typically are applied and approved in FSIA cases.  Under the law of Israel, "[t]he tortfeasor must compensate the dependents of the deceased for the loss of the economic support to which they had an expectation, had the deceased remained alive." *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 161 (D.D.C. 2009).  To do this the court must determine the decedent's earning capacity and calculate the amount of support his dependents would have received.  *Id.* (internal citation omitted).  "In calculating earning capacity, courts in Israel subtract the expenses that the injured party would have incurred had he remained alive during the lost years." *Id.* (internal quotations omitted); *see also Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 243 (D.D.C. 2012).  Courts have accepted computations of economic loss prepared by experts applying principles and calculations that mirror the calculation methodology typically employed in FSIA cases decided under the law of the applicable United States jurisdiction.  *See id.*

## III.      ECONOMIC LOSS ANALYSIS

Plaintiffs have submitted expert reports detailing the economic loss of the Estate of Taylor Force, Direct Victim Shmuel Brauner; Family Member Victim Naftali Moses; and the Estate of Family Member Victim Yaffa Glick.  Family Member Victim Rivkah Moriah has submitted a claim for economic loss but has not submitted an expert report.  Plaintiffs have not submitted any economic loss claim or analysis for deceased Direct Victims Richard Lakin and Avraham Moses and do not seek economic loss recovery for injured Direct Victims Yehuda Glick or Menachem Rivkin.

The expert economic loss reports were all prepared by Michael Soudry, at Eco-Stat LLC. Michael Soudry received his Masters of Business Administration with a major in Finance from Hebrew University of Jerusalem in 1993.  *See* Economic Loss Report of Taylor Force, Dkt. 45. From 1991 – 1993 he was employed as an economist/researcher at the Prime Minister's Office in Jerusalem Israel.  From 1993 to 1995 he was employed as an economist and assistance fiscal officer at the Israeli Economic Mission in New York. Since 1995 he has been employed as a forensic economist at Eco-Stat LLC. At Eco-Stat he is responsible for advising attorneys and insurance companies about the extent of economic loss in cases of injury or death.  He has prepared economic loss reports for matters tried in state and federal courts in the United States.  He has served as an expert witness in over 40 cases that went to trial and has given deposition testimony in more than 50 cases.  He prepared over 150 economic loss reports for individuals seeking compensation from the September 11 Victims Compensation Fund.  Based on his academic credentials, his career experience and extensive record as an expert witness, I conclude that Mr. Soudry is qualified to provide an expert report on the economic loss suffered by the victims.

### A.      Economic Loss Damages:  Direct Victim Taylor Force

Taylor Force was 28.7 years old when he was killed on March 8, 2016.  He was an MBA student at Vanderbilt University's Owen Graduate School of Management.  He was expected to graduate in 2017.  Plaintiff submitted a report prepared by Mr. Soudry that sets forth an analysis of the economic loss suffered by the Estate of Taylor Force.  Economic Loss Report of Taylor Force, Dkt. 45.  In computing economic loss, Mr. Soudry has estimated that Mr. Force would have entered the work force at a starting salary of $120,560 per year.  This amount is derived from data obtained from the Vanderbilt website that provides information about salaries of recent graduates, as well as additional resources.  The Vanderbilt website states that 2017 graduates received an

average salary of $113,000 plus a signing bonus of approximately $24,000.  Vanderbilt University

Owen Graduate School of Management, <u>Vanderbilt MBA 2017 Employment Report</u>,

https://cdn.vanderbilt.edu/vu-web/owen/wp/2018/10/26075054/2017-MBA-Emp_FINAL-PRO

D_ FINAL.pdf (last accessed on 01/14/2021).

Although Mr. Force was still pursuing his degree at the time of his death, it is appropriate

to apply the average earnings of a recent Vanderbilt MBA graduate to determine future lost wages:

Mr. Force was only one year away from graduation and clearly had been pursuing career

opportunities in his chosen field.  The trip to Israel was intended as a career development

opportunity.  Declaration of Stuart Force, Dkt. 44, ¶ 6.  There is no evidence to suggest that Mr.

Force would have opted for a different career path and the data provided is unbiased and verifiable.

Based on the current data in the Vanderbilt website, the starting salary applied by Mr. Soudry is

reasonable and in fact a bit conservative.

Mr. Soudry's analysis assumes that Mr. Force would have started working July 1, 2017 (a

few months after Mr. Force would have graduated).  Mr. Soudry computes earnings for each year

until the end of the expected life of Mr. Force's mother (the younger of his two parents).  (Mr.

Force's expected work life – based on standard work life tables published in the Journal of Forensic

Economics, is longer than his mother's statistical life expectancy.) [49]  In each year, the wages are

increased by a wage growth factor of 2.2% – which is based on the average wage growth for the

past ten years.  In each year, Mr. Soudry reduces the computed wage loss to account for statistical

---

[49] It is reasonable to utilize the life expectancy of the younger parent since the parents are the beneficiaries of the
estate.  *Moore-McCormack Lines, Inc. v. Richardson*, 295 F.2d 583, 589 (2d Cir. 1961) (using the life expectancy of
decedent's younger parent); *see also Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 278, 338
(D.D.C. 2006) (concluding that wrongful death recovery was for the benefit of parents); *see also* South Carolina Code
Ann. § 15–51–20 (stating that the beneficiaries in a wrongful death action are the spouse and children of the decedent,
and if there is no spouse or child, then the parents of the decedent).

periods of unemployment, taxes that would have been owed, and personal consumption.[50]  After

applying these factors, Mr. Soudry computes a loss for each year and after the first year of loss,

reduces that total to present value as of 2017 at a discount rate of 4%.  (The discount rate recognizes

the earning capacity of a lump sum award.)  The discount rates applied is actually higher than the

yield on U.S. Treasuries in 2017 and thus can be viewed as a conservative rate.  The total economic

loss amount as computed by Mr. Soudry and reduced to present value is $584,230.00.

The analysis is consistent with generally accepted practices for the computation of lost

earnings and is based on reasonable and reliable data and applies appropriate assumptions.

Accordingly, I recommend an award of economic loss to the Estate of Taylor Force in the amount

of $584,230.

### B.      Economic Loss Damages: Direct Victim Shmuel Brauner

Plaintiff submitted an economic loss report prepared by Michael Soudry at Eco-Stat LLC.

Economic Loss Report of Shmuel Brauner, Dkt. 40.  As stated above, Mr. Soudry is qualified to

provide an expert report on the economic loss suffered by Mr. Brauner.  Mr. Soudry assumes,

based on the psychiatric report of Dr. Rael Strous, that Mr. Brauner is not able and will not be able

to work.  Mr. Soudry notes that if Mr. Brauner's condition were to improve in the future so that he

could enter the labor force, his economic loss would be lower.  There is no documentation in the

record that indicates that Mr. Brauner's condition has improved or will improve.

At the time of the attack, Mr. Brauner was 1.5 years into a 6-year program in which he was

studying to become a Judge in the Jewish court.  The economic loss calculations assume that Mr.

Brauner would have completed those studies and that he would have become a Judge when he was

---

[50] The present value discount starts as of January 2018 (i.e. approximately 6 months after the economic loss
computation starts) reflecting an assumed trial date of December 2017.

eligible to do so at age 30.  The economic loss calculations thus start in 2021.  Mr. Soudry calculates the economic loss based on the salary for a Judge as set forth in a schedule of salaries from the Israeli Ministry of Finance.  Economic Loss Report of Shmuel Brauner, Dkt. No. 40, Exhibit 3.[51]

The calculations apply the published starting salary and adds to that amount longevity pay after seven years (based on a pay schedule from the Israeli Ministry of Finance).  The calculations apply a growth rate of 2% – which is based on the growth rate in the Israeli labor force for the past ten years and data on the increases in Judge's salaries in 2016 and 2017.[52]  The calculations start with an annual salary for each year – calculated as stated above – and then apply certain reductions based on statistical rates of unemployment and expected obligations for taxes.  The annual calculations are continued until Mr. Brauner would reach age 67 which is the retirement age for men in Israel based on the National Insurance Institute of Israel.  The resulting amounts are discounted to net present value using a 3.1% discount rate – which is based on the yield on the 30-year Israeli Government bonds as of 2018.  Economic Loss Report of Shmuel Brauner, Dkt. 40, Exhibit 1 at page 5.  The future economic losses are adjusted to present value as of 2018 when the report was prepared.  *Id.* at page 1.  Mr. Soudry's report does not include any factor for mitigating income that Mr. Brauner might receive, although the report notes that if any such income were to be paid to Mr. Brauner, that income would reduce the economic loss.  There is no documentation in the record indicating that Mr. Brauner has any relevant mitigating income.

---

[51] The salary information is included as an exhibit to the Soudry report along with a certificate confirming the accuracy of the translation from Hebrew to English.  The salary information was obtained from a website:  www.mof.gov.II.

[52] The ten-year growth rate as stated in the Soudry report is 2.5%.  The salary increases for Judges were 1.5% and 2.5% in 2016 and 2017 respectively.  Economic Loss Report of Shmuel Brauner, Dkt. 40, Exhibit 1 at page 5.

Mr. Soudry also computes the value of Mr. Brauner's lost household services.  This calculation is based on information indicating that Mr. Brauner can no longer perform services he used to provide to the household including management of family finances, home repairs, assistance with cooking, cleaning, and child-care.  Mr. Soudry calculates the replacement costs of the lost household services from 2018 (the date of the report) until Mr. Brauner reaches 75 years of age, his expected life span.  Economic Loss Report of Shmuel Brauner, Dkt. 40, Exhibit 1 at page 7.  The calculations assume that Mr. Brauner performed the lost household services for 7 hours per week.  To calculate the annual lost household services, Mr. Soudry multiplies the total number of hours (at the 7 hour per week rate) by the minimum hourly wage in Israel.  To calculate the total loss, Mr. Soudry applies a 2% annual increase to the hourly rate used and discounts the resulting amount to present value using a 3.1% discount rate.

Mr. Soudry computes the economic loss from lost earnings on a present value basis as $1,862,613 and the value of lost household services on a present value basis at $108,124.  As noted, the losses are adjusted to present value as of 2018.  Economic Loss Report of Shmuel Brauner, Dkt. 40, Exhibit 1 at pages 8, 10.

The economic loss analysis is consistent with generally accepted methodology and practices for computing lost future wages and relies on documented, reliable, and reasonable data. The household services analysis also applies a reasonable and appropriate methodology.  I note that the calculation of household services does not reduce the number of hours at the point in time when childcare would no longer be needed.  However, the various other tasks noted could certainly account for 7 hours per week and the calculation uses a modest hourly rate.  Accordingly, I conclude that the household services loss calculation is reasonable.

There are two issues to resolve regarding the computation of lost wages: first, the calculation depends on a determination that Mr. Brauner is totally disabled so that he cannot work. Second, the calculation assumes that Mr. Brauner would have completed his six years of schooling and entered the work force as a Judge at age 30 – nine years after the attack.

The economic loss analysis relies on the report of Dr. Rael Strous to support the determination that Mr. Brauner is unable to return to work due to the psychological effects of the attack.  As outlined above, Dr. Strous conducted a clinical interview of Mr. Brauner and reviewed pertinent materials and records in formulating his opinion.  Dr. Strous Evaluation of Shmuel Brauner, Dkt. 35, Exhibit 5.  Dr. Strous reviewed Mr. Brauner's discussion of the attack, his subsequent medical treatment and physical condition at the time.  Dr. Strous also reviewed Mr. Brauner's prior psychiatric treatment – noting that Mr. Brauner had previously been diagnosed with PTSD by two different physicians and that a third physician had developed a regimen of medications to treat the condition.  He notes that Mr. Brauner underwent two years of treatment at Tel Hashomer hospital including both medication and psychotherapy and that Mr. Brauner continues to take medications.  Dr. Strous notes a report by Dr. Ponovarsky (a psychiatrist) concluding that Mr. Brauner had decreased cognitive function and decreased general function.  As previously noted, Dr. Strous diagnosed Mr. Brauner with Post-Traumatic Stress Disorder, persistent depressive disorder, moderate severity late onset with pure dysthymic syndrome (essentially a chronic condition); and anxiety disorder.  Dr. Strous concluded that despite the treatment he has received and continues to receive, Mr. Brauner will not be able to achieve his original goal of becoming a judge due to the ongoing profound psychological injuries.

The detailed report provided by Dr. Strous strongly supports the determination that Mr. Brauner is unable to work and is likely to remain unable to work in the long-term.  It is further

clear that the disabilities from which Mr. Brauner suffers are due to the experience of and injuries sustained in the missile attack. The psychological injuries are in addition to the physical injuries resulting from the attack and those injuries also prevent Mr. Brauner from working as stated in the report of Dr. Friedman. Expert Report of Dr. Friedman of Shmuel Brauner, Dkt. 41, Exhibit 1.

Based on the evidence submitted, it is clear that Mr. Brauner was a motivated student and that he had embarked deliberately on a course of study that would lead to an appointment as a judge in the religious court. Based on declaration testimony of Mr. Brauner, coupled with independent research, the selection of religious court judges is based on completion of the rigorous studies and also takes into consideration family involvement in religious studies and governance. Mr. Brauner states in declaration testimony that he went to a school called Yagdil Torah, and that everyone who graduates from that school becomes a Dayan (religious court judge) if they so desire. He also is part of a prominent religious family: His grandfather is a rabbi in the City of Ashdod and serves as a Dayan, and his brother is a Dayan. Mr. Brauner states that he was told that if he completed his studies, he was guaranteed a job as a Dayan. His declaration states that he was 'tapped' to become a Judge. Declaration of Shmuel Brauner, Dkt. 39 at ¶ 26. In his supplemental declaration, Mr. Brauner stated that "[p]rior to the terror attack, [he] was a top student in [his] religious community." Supplemental Declaration of Shmuel Brauner, Dkt. 116 at ¶ 2. While it cannot be stated with absolute certainty that Mr. Brauner would indeed have received such an appointment, based on the uncontroverted evidence, it is reasonable to apply the assumption that he would have achieved the position in evaluating future lost income. *See e.g., Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 144-45 (D.D.C. 2018) (court awarded economic loss for 18-year-old decedent victim by relying on his anticipated earnings after graduation and entry into the work force). Accordingly, it is reasonable to base the economic loss forecast on the

salary and other data pertinent to religious judges in Israel and to commence the loss calculations as of the date when Mr. Brauner would have been eligible to begin serving as a religious judge. Accordingly, I recommend an economic loss award of $1,862,613 for lost future wages and $108,124 for the value of household services that Mr. Brauner can no longer perform.

### C.   Economic Loss Damages:  Family Member Victim Naftali Moses

Naftali Moses seeks to recover economic loss on the ground that the psychiatric injuries resulting from the death of his son render him unable to work.

Mr. Moses' declaration testimony describes his inability to follow his academic career path after the death of his son and his increasing role with respect to the care of the children who were traumatized by Avraham's murder.  As discussed above, Plaintiff has submitted a psychiatric report prepared by Dr. Rael Strous, who conducted a full evaluation of Naftali Moses.  Dr. Strous Evaluation of Naftali Moses, Dkt. 35, Exhibit 31.  Dr. Strous' report recounts Mr. Moses' own view of the long-term effects of the loss of his son.  He did not complete his postdoctoral studies, he was not able to deliver important lectures, and he never did any work in his field after his studies.  Dr. Strous concludes with a "reasonable degree of certainty" that Mr. Moses was not able to work in his chosen profession due to the attack and that his inability to work appears to be permanent.  *Id.*   Dr. Strous' evaluation coupled with the testimony of Mr. Moses provides a sufficient basis to conclude that Mr. Moses was not able to resume his career path after the death of his son and that the ongoing deep grief and trauma to the family support the conclusion that it is at best unlikely that Mr. Moses would be able to obtain consistent work in the future.  Based on the uncontroverted expert testimony and the factual record established by the declaration testimony of Mr. Moses, it is reasonable to conclude that the emotional injuries that Mr. Moses has suffered and continues to suffer render him incapable of gainful employment.  Thus, an award of economic damages is appropriate. Courts in this district have awarded economic loss damages to family

members of direct victims where the documented injuries resulting from the attack on the direct victim results in such loss and where the economic loss is properly supported and documented. *See e.g., Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (court awarded $2,035,000 in economic damages to account for the plaintiff's diminished earning capacity as a result of his emotional distress, his chronic depression and the self-destructive behavior that was triggered by his father's kidnapping and subsequent trauma).

Plaintiff Naftali Moses submitted an economic loss report prepared by Michael Soudry of Eco-Stat LLC.  Economic Loss Report of Naftali Moses, Dkt. 68, Exhibit 1.  Mr. Soudry's report calculates lost future wages, noting that Dr. Strous had concluded that Mr. Moses will not be able to maintain consistent gainful employment in the future in light of the psychological and emotional injuries resulting from his son's murder.

Mr. Soudry estimated Mr. Moses's annual earnings based on the salary of a first year University lecturer as of 2009 – the year after his son's death.[53]  The analysis assumes that the salary would have increased based on seniority for the next 11 years.  (The increases are based on published Wage Tables for Israeli University Academy Staff, 2014.)  Mr. Soudry then applies a wage growth rate based on the average earnings growth rate for Israeli University staff of 1.4% per year.  Mr. Soudry applies a 5.6% reduction to the earnings to account for statistical periods of unemployment.  He further reduces the earnings to account for projected income taxes.  The resulting annual losses are computed at nominal value through January 2, 2018 (which was the assumed trial date). Mr. Soudry computes future losses through an assumed retirement age of 67.

---

[53] The economic loss report measured lost earnings beginning in 2009, "following the date of Mr. Moses's injury." *See* Economic Loss Report of Naftali Moses, Dkt. 68, Exhibit 1 at page 6.

The future losses are discounted to present value at the rate of 1.8% (which is based on the yield of a ten-year Israeli Government bond).

This methodology yields total past losses of $322,531 and total future losses adjusted to present value as of January 2, 2018, of $456,154 – for a total loss of $778,686. *Id*. at pages 6-7. The economic loss calculation is consistent with generally accepted practices and methodology, applies reasonable values based on reliable and verifiable source data, and further applies appropriate reductions and discounts again based on documented reliable source data. Accordingly, I recommend accepting the past and future economic loss amounts computed by Mr. Soudry and awarding economic loss to Mr. Moses in the aggregate amount of $778,686.

### D. Economic Loss Damages: Estate of Family Member Victim Yaffa Glick

The estate of Yaffa Glick seeks an award of economic loss based on Yaffa Glick's inability to work and subsequent death. As noted above, Dr. Strous concluded, after a full psychiatric evaluation, that Yaffa Glick suffered from Post-Traumatic Stress Disorder and Major depressive disorder. Dr. Strous further attributed her two suicide attempts and resulting death to the trauma and psychological injuries she suffered as a result of her husband's injuries. This conclusion is consistent with the declaration testimony of Mr. Glick and of the Glick children. Based on the uncontroverted testimony of the family members and the uncontroverted expert report of Dr. Strous, I conclude that it is reasonable and appropriate to attribute Mrs. Glick's initial inability to work and subsequent death to the injuries she suffered as a result of the terrorist attack on her husband.

As discussed above, a family member of a direct victim of a terrorist attack may recover economic loss damages provided that the evidence shows that the loss results from the attack and that the amount of the loss is supported and properly documented under the standards of both

Israeli and United States "federal" law.  Accordingly, it is appropriate and reasonable to consider an award of economic loss to the estate of Yaffa Glick.

The Estate of Yaffa Glick has submitted an economic loss calculation and report prepared by Michael Soudry of Eco-Stat LLC.  Economic Loss Report of Yaffa Glick, Dkt. 51, Exhibit 1. At the time of her husband's injuries, Yaffa Glick was employed as a social worker.  To calculate economic loss, Mr. Soudry first determines Yaffa Glick's actual earnings from August through October of 2014 (the three-month period just before Mr. Glick was attacked on October 29, 2014). Mr. Soudry calculates lost earnings through the point at which Mrs. Glick would have reached age 62 based on retirement data from the National Insurance Institute of Israel.[54]  Mr. Soudry then applies a wage growth factor to the future earnings stream:  Mr. Soudry applies the actual wage growth rates for public workers in Israel for each of the years 2016, 2017, 2018 and 2019.  After 2019, Mr. Soudry applies a growth rate of 1.75% which is the rate that was actually experienced in 2017, 2018 and 2019.  Mr. Soudry adjusts the resulting amounts by a factor of 5.6%[55] to account for statistical periods of risk of unemployment. He further reduces the amounts to account for taxes:  He applies an average income tax rate of 17.1% using data from the Israel Tax Authority. Finally, he reduces the calculated losses after 2018 to a net present value amount using a discount rate of 1.8%.  The discount rate is based on the Israeli Government 10-Year Bond yield.  Using the above methodology, Mr. Soudry calculates 'pretrial' economic losses (i.e. for the period from October 29, 2014 through May 31, 2018) at $72,285 and post-trial economic losses (i.e. for June 1, 2018 through 2029) at $229,663 on a present value basis.  The total computed economic loss is $301,947 present value as of 2018.  The economic loss calculation is consistent with generally

---

[54] Mr. Soudry subtracts from the calculated lost earnings Mrs. Glick's actual earnings in June and July of 2015.

[55] This amount is based on data from Historical Unemployment Statistics in Israel, Israel Central Bureau of Statistics.

accepted principles and methodology under both federal law and Israeli law, is based on reliable and verifiable source data, applies appropriate growth rates and reductions[56], and adopts a reasonable retirement date based on available data reflecting the retirement ages for women in Israel in the same age cohort as Yaffa Glick.  Accordingly, I recommend an award of economic loss to the estate of Yaffa Glick in the amount of $301,947.

### E.    Economic Loss Damages: Family Member Victim Rivkah Moriah

Rivkah Moriah, mother of Direct Victim Avraham David Moses, seeks an award of economic loss because she was unable to perform her former job after Avraham's death.  She testified that she could not continue to perform her prior job because it required 'cheerful' engagement with people.  Declaration of Rivkah Moriah, Dkt. 63 at ¶ 69.  She remained unemployed and unable to work until October 2018 when she attempted to work as a part time math teacher after taking the necessary coursework.  Supplemental Declaration of Rivkah Moriah, Dkt. 118 at ¶¶ 2-3.  She was able to maintain that job for the school year but found it too emotionally difficult to be around children and subsequently ended up with a different job as a personal assistant.  *Id.* at ¶¶ 3-5.  She left that job in September 2020 because her employer required an assistant to work full time.  *Id.* at ¶ 7.  She states that because the emotional effects of the brutal murder of her son have been so devastating to her and her children and there is so much extra energy she has to put into her family and herself, that even if she could return to work, she does not think she would be emotionally able to work more than part time.  *Id.* ¶ 11.

---

[56] I note that this calculation does not deduct a self-consumption factor, which is typical where the award will be paid to an estate of a deceased victim.   I assume that the expert report does not deduct this factor because Yaffa Glick was alive when the report was prepared.  In this case, given the size of the family, the self-consumption factor would be modest and I note that the calculations include a significant percentage deduction for assumed future income taxes – a deduction that is not always employed in economic loss computations    *See generally,* Ruble, Patton and Nelson, Personal Consumption Tables 2011-12, Journal of Legal Economics 21 (1), 2014.

To support a claim for lost wages, the plaintiff must show either a disability of some sort (physical or psychological) (*see e.g., Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 69 (D.D.C. 1998)); or that the individual had to give up work to care or search for family members (as a result of the terror attack) (*see Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 271 (D.D.C. 2020)).

Ms. Moriah has not submitted an expert report to support her claim for economic loss.  In her original declaration she submitted a calculation of her past and future projected economic loss. Declaration of Rivkah Moriah, Dkt. 63 at ¶ 70.  I will address the computation of "past loss" and projected future loss separately.

**Past Wage Loss.**  There is abundant evidence to support a finding that Ms. Moriah and the family as a whole were devastated by the loss of Avraham, that Ms. Moriah suffers from long term profound grief and PTSD, and that the need to care for the other children and attempt to resurrect their lives effectively precluded employment for the period of time between Avraham's death and the date of her declaration at the end of 2017.  Although the expert psychiatric evaluation does not include a finding that the psychological injuries preclude all work, the diagnoses and the observations that Ms. Moriah suffers from occupational dysfunction provide support for a claim of lost wages – at least for a defined period of time.  The claimed past lost wages through the end of 2017 total $100,564 (applying the exchange rate set forth in Ms. Moriah's declaration[57]).  She calculates this past loss  simply by multiplying her former monthly wage by the number of months

---

[57] The monthly salary is documented with pay stubs which are in Hebrew.  Based on a review of online information about the factors included in Israeli pay stubs, it appears that the monthly amount that Ms. Moriah applies in her calculation is slightly lower than the net monthly pay she received.  (There are certain deductions for taxes and insurance.)  Note also that Ms. Moriah's declaration references an exchange rate of 0.287 (the precise rate that she appears to have applied in the calculations is 0.286507), which is reasonable. *See* Israeli Sheqel to US Dollar Spot Exchange Rates for 2017, https://www.exchangerates.org.uk/ILS-USD-spot-exchange-rates-history-2017.html (last accessed on 04/22/2021).

of claimed loss (from March 2008 through December 2017).  This simple calculation, which is based on reliable documentation, provides reasonable grounds upon which to award economic loss for the period of past loss.[58]  Accordingly, I recommend an economic loss award for Rivkah Moriah for lost wages from the date of her son's death to the date upon which she finalized her original declaration in the amount of $100,564.  Based on Rivkah Moriah's supplemental declaration testimony, the period of unemployment continued for the same reasons through September 2018.  Accordingly, the amount of past lost wages may be increased to reflect this additional period.  I apply the same assumptions to the additional 8-month period – resulting in additional loss in the amounts of $7,736.  The total past loss for 2008 through September 2018 is $108,300.

**Future Wage Loss.**  Based on the expert report outlining Ms. Moriah's ongoing psychological injuries and Ms. Moriah's uncontroverted testimony, it is reasonable to consider an award of lost future wages.  As noted, Ms. Moriah had provided her own calculation of lost future wages – based on her income before the loss of her son and applying simple assumptions about remaining work life and discount rates.  Declaration of Rivkah Moriah, Dkt. 63 at ¶ 70.  To calculate a future projected loss, she applied the same monthly wages to a standard work life period.  She based the duration of the loss calculation on the retirement age published by the State of Israel Institute of National Insurance.  *Id.* at ¶ 70; Exhibit 4.  After calculating a total amount, she reduced it to present value  using a discount rate of 1.8%.  She then applied a factor of 0.287 to convert the total  to United States dollars.  That calculation is based on reasonable and reliable data and assumptions, although it  lacks some elements typically found in an expert economic loss

---

[58] *See e.g., Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164 (D.D.C. 2019) (awarding economic damages to a sibling and parent, finding that the sibling neglected his consulting business and incurred travel expenses to advocate for his brother's  release and that the parent lost income because she resigned her job as a teacher in Istanbul to help her son's cause).

report – such as a discount for unemployment risk, and an increase for wage growth. The total amount requested in the original declaration for future wage loss was 346,819 nis, which would be $99,366 using the conversion rate Ms. Moriah applied for the period from January 1, 2018 through retirement. Clearly, if this calculation were to be used as a basis for determining future wage loss, it would have to be adjusted to take into account the wages she earned for work performed during 2018-2020 and Ms. Moriah's testimony that she likely could manage a part time job. *See* Supplemental Declaration of Rivkah Moriah, Dkt. 118 at ¶ 11.

To adjust the claimed future economic loss to account for actual earnings during the period and the amount allocated to past loss, I first subtract from the total set forth in the original declaration the amount computed above for the 8-month period during 2018 that I have allocated to the past loss computation ($7,736). I then subtract the amount she actually earned through September 2020. (According to her supplemental declaration and exhibits, she appeared to earn $18,188 for 2018-2019, and 35,348 nis in 2020, which would equal $10,283 using an average 2020 exchange rate of 0.2909 – *see* Israeli Shekel to US Dollar Spot Exchange Rates for 2020, https://www.exchangerates.org.uk/ILS-USD-spot-exchange-rates-history-2020.html (last accessed on 04/22/2021).) After those subtractions, the projected future wage loss submitted by Ms. Moriah totals $63,159.

Based on Ms. Moriah's declaration testimony, it is reasonable to assume that she would be able to work "part-time." Using this assumption, the claim of future lost wages would be reduced to $31,580.

The remaining issue is whether the computation provided in Ms. Moriah's declaration, adjusted as noted above, is a sufficiently reliable basis upon which to award future lost wages. As noted, the calculation lacks some of the typical adjustments – both increases and decreases – that

are applied in calculations of future lost wages.  To evaluate the reasonableness of Ms. Moriah's approach, I tested the calculations applying adjustments including wage growth, reduction for unemployment risk, and tax obligations.  To conduct this test, I applied the following factors: a 2.5% annual wage growth (Source: Israel Central Bureau of Statistic, Table 12.36, Employee Jobs, Wages and Average Wages per Employee Job), a 5.6% risk of unemployment (consistent with the rate applied by Mr. Soudry with respect to the loss computations for other victims), and an assumed tax rate.[59]  The computation nearly equaled the computation presented by Ms. Moriah – and in fact resulted in a slightly higher projected loss.  Although courts have typically relied on expert reports to support a claim for lost future wages, this simplified approach is, in this case, not unreasonable. Accordingly, I recommend an award of lost future wages applying the adjustments noted above in the amount of $31,580.

## IV.    NON-ECONOMIC DAMAGES: DIRECT VICTIMS

### A.    Non-Economic Damages for Estates of Victims Killed in Terrorist Attack

In evaluating the recommended amount of 'pain and suffering' damages for the estates of Direct Victims killed in the attack, I must take into consideration and be guided by multiple prior decisions in this district awarding damages to victims of terrorism.  The analysis must recognize the basic principle that such damage awards should be generally consistent to the extent the circumstances can be appropriately characterized as similar.  *See e.g., Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014).  As the courts have recognized, it is always difficult to place a dollar value on pain and suffering.  It is even more difficult in the case of terrorist attacks resulting in the death of the victim where one must often infer the nature and duration of pain and suffering

---

[59] *See* Santander, *Israel: Tax System*, https://santandertrade.com/en/portal/establish-overseas/israel/tax-system (last accessed on 04/21/2021).

from autopsy reports, emergency room notes, and analysis of the nature, type and timing of wounds leading to death. Decisions in previous cases provide important guidance, but, of course, each case must be analyzed based on the facts and evidence and each case presents unique circumstances.

The analysis begins with the basic guideposts outlined in the body of case law in this circuit: If there is evidence of conscious pain and suffering before death,[60] even if for a very short period of time, then pain and suffering damages may be awarded to a victim killed in the terrorist attack. The amount of damages is based on multiple factors including the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death. In general, courts in this district have concluded that an award of $1 million in pain and suffering for a victim who lives for a few seconds or minutes after sustaining injuries is appropriate. But there is some variation in the decisions and courts take into consideration the individual facts of each case in determining the appropriate award. *See Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000) ($1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112-13 (D.D.C. 2000) ($1 million for pain and suffering endured while victim of assassination fought with his attacker, a period of less than four minutes); *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C.2006) ("When the victim endured extreme pain and suffering for a period of several hours or less, courts in these [terrorism] cases have rather uniformly awarded $1 million."). Pain and suffering

---

[60] Courts generally have not awarded pain and suffering damages for a deceased victim where the death was instantaneous and the evidence does not show that the victim had any awareness of impending death or experienced pain or fear before death. *See Roth*, 78 F. Supp. at 402 ("Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous . . . Also, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death.")

damages are not limited to physical pain, but also take into account mental anguish based on the conscious knowledge of imminent death. *See Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 81–82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent."); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 157 (D.D.C. 2010) (Victim was "entitled to additional compensation in the amount of $1,000,000 for the portion of his life that he spent facing certain death alone"); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (award of $500,000 to the estate of the executed victim "for the pain and suffering he endured prior to being singled out for execution" and an additional $1 million for "the several minutes of anguish and pain [the victim] endured as and immediately after being shot by [a terrorist] and thrown from the [air]plane"). If the victim lives for a longer period of time and experiences conscious pain and suffering, then the award can be significantly greater. *See e.g., Peterson II*, 515 F. Supp. 2d at 53, and Report of Special Master Pursuant to Order of Reference Concerning Counts CXCVII-CC (197-200), *Peterson II* Dkt 78 at 5-6 (award of $7 million for victim who suffered burns and traumatic skull injury in an attack and remained alive for 7 days); *Wultz*, 864 F. Supp. 2d 24, 38 ($8 million awarded for victim injured in a bombing attack and who lived for four weeks, and was generally fully alert during this period).[61]

---

[61] In some cases, courts have approved significantly higher awards, that generally are based on the relative egregiousness of the circumstances. For example, *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 221, 266 (D.D.C. 2008) ($18,000,000 in pain and suffering damages to victim who survived just a few minutes after a plane bombing.); *Gates*, 580 F. Supp. 2d at 72-74 (D.D.C. 2008) (in this extreme case, the Court awarded $50,000,000 for pain and suffering to each of two victims who were publicly decapitated – but slowly so that "each man suffered unimaginable mental and physical agony.")

1.     **Estate of Taylor Force.**

The Estate of Taylor Force seeks a non-economic award of $1.5 million.  *See* Proposed

Findings and Conclusions, Dkt. 87 at ¶ 178.  The expert report of Dr. Friedman supports an award

of 'pain and suffering' damages to the Estate of Taylor Force.  Dr. Friedman opined – based on

his review and analysis of the medical records – that Taylor Force would have been aware and

conscious of the attack and that Mr. Force first suffered non-fatal wounds to the face before the

fatal wound.  Dr. Friedman further states that although Mr. Force would have lost consciousness

quickly after the final wounds, it was not instantaneous.  Dr. Friedman further states that the cause

of death was bleeding into the lungs resulting in suffocation.  Dr. Friedman states that it is likely

that Mr. Force suffered from extremely uncomfortable shortness of breath prior to losing

consciousness.

Taylor Force undoubtedly suffered severe anguish at the initial attack and then endured

significant pain and suffering during the further attack until death and therefore an award of pain

and suffering damages is appropriate.   The period of time between the initial attack and

unconsciousness was only a matter of seconds or perhaps a minute or two.  In general, as noted

above, courts have awarded $1 million for  a short period of conscious fear, pain, and suffering

and I recommend an award of  $1 million in pain and suffering damages for the Estate of Taylor

Force.  While the attack and the injuries were undoubtedly horrific, they are not more extreme than

other cases where victims lived for a short period of time (measured in minutes) after a terror

attack.

2.     **Estate of Avraham David Moses**

The Estate of Avraham Moses seeks an 'upward adjustment' of $500,000 from the baseline

award of $1 million for pain and suffering for victims who live for a very short period of time after

sustaining injuries in a terrorist attack.  In this case, I agree that an upward adjustment is warranted:

in many cases upward adjustments are based on factors such as the brutality of treatment while the victim was still alive or the extreme nature of the circumstances. *See e.g., Fritz v. Islamic Republic of Iran*, 2018 WL 5046229 (D.D.C. Aug. 13, 2018), report and recommendation adopted as modified, 324 F. Supp. 3d 54 (D.D.C. 2018) (basing award in part on brutal torture during period of captivity); *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019) (awarding upward adjustment based on brutal treatment and torture and terror experienced by the victim during a period of captivity). Courts have also awarded upward adjustments for the fear and terror a victim experiences when faced with certain execution – even if the victim has not been subjected to brutal beatings or torture. In this case, the Direct Victim Avraham David Moses – only 16 years old – was trapped in a hiding place and unquestionably experienced extreme fear, terror, and mental anguish listening to the shooter coming closer and closer as he murdered other students – knowing that the murderer would soon reach his location. It is reasonable to conclude that he suffered intense fear and anguish for a period of close to 10 minutes. The fact that he was so young makes the circumstances more extreme. The description of the horrific wounds and the testimony from another victim of that same attack, Naftali Shitrit, supports a conclusion that in addition to extreme terror, Avraham would have suffered intense pain from the multiple gun shots that ended his life. *See e.g., Stethem*, 201 F. Supp. 2d at 81 (where the 23-year-old victim had his arms tightly bound, was beaten in the head and shoulders repeatedly with a pistol or an armrest and bled profusely, but "never lost consciousness altogether" – even after he was shot in the head, plaintiff was heard saying "Oh, God – indicating that he was aware of what was happening"). Under these circumstances, I recommend an upward adjustment of $500,000 for a total award of $1.5 million.

### 3.     Estate of Richard Lakin

The Estate of Richard Lakin seeks a non-economic pain and suffering award of $8 million. Richard Lakin was severely injured in the attack, and ultimately passed away about two weeks

later after undergoing multiple invasive surgeries and other procedures in an attempt to save his life.  The evidence establishes that Mr. Lakin was aware of the attack and despite his horrific injuries remained conscious.  In fact, the declaration of Mr. Lakin's child, Micah Lakin, indicates a report from paramedics that Mr. Lakin tried to fight off rescuers apparently thinking that they were more terrorists.  Declaration of Micah Lakin, Dkt. 55 at ¶ 8.[62]  The expert report of Dr. Friedman states that Mr. Lakin was conscious when he arrived as the hospital.  Dr. Friedman opined that based on a reasonable degree of medical certainty, Mr. Lakin would have experienced pain and suffering prior to losing consciousness.  There is no evidence in the record that Mr. Lakin regained consciousness after his initial surgery upon arrival at the hospital. In fact, the testimony of Manya Lakin establishes that he was comatose and on life support during this two-week period. Declaration of Manya Lakin, Dkt. 54 at ¶ 14.

The submission of the Estate suggests that this amount represents an upward adjustment from a baseline award of $5 million.  The $5 million amount is often cited by courts as a 'baseline' for victims injured by terrorist attacks who will endure pain and suffering long after the incident.  *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 60 (D.D.C. 2018); *see generally Hamen*, 407 F. Supp. 3d 1.  While this amount has been cited in the context of pain and suffering awards to estates of deceased victims who lived in and were conscious of excruciating pain for days or weeks after an attack (*see e.g., Wultz*, 864 F. Supp. 2d at 38 (awarding $8 million to D. Wultz for 27 days of pain and suffering before death where the victim was "fully alert" during most of this period)), or where the victim suffered brutal torture for some period of time (hours ranging to weeks) (*see e.g., Hamen*, 407 F. Supp. 3d at 7 (awarding $5 million in pain and suffering for the

---

[62] While this is not direct testimony, it is consistent with the information in the hospital records that Mr. Lakin was still conscious at the time he arrived at the hospital.

abuse and torture he endured for 16 days before his ultimate death)), it has not been considered a baseline where the victim experienced short term conscious pain before death.  Courts have typically described the baseline amount in such situations, as noted above, as $1 million.

Here the record does not establish that Mr. Lakin experienced conscious pain and suffering during the two weeks of hospitalization.  Accordingly, the non-economic loss must be evaluated with reference to the cases that involved conscious pain and suffering for multiple minutes or up to an hour.  Based on the record, I recommend a pain and suffering award for the Estate of Richard Lakin of $1.5 million, which represents a 50% upward adjustment from the baseline.  I recommend this upward adjustment because Mr. Lakin (who was 76 years old) was conscious throughout the duration of the attack which was exceptionally brutal and resulted in horrific wounds including a gunshot wound to the head and multiple stab wounds in the abdomen and other sensitive areas of the body.  Despite these terrible wounds, he remained conscious for a substantial period of time after the attack perhaps up to an hour – long enough to engage with the medical team and be transported to the hospital.  Expert Report of Dr. Friedman for Richard Lakin, Dkt. 56, Exhibit 1, page 1. Mr. Lakin was unquestionably in horrific pain during this period of time.  Under these circumstances, I believe it is appropriate to increase the award by 50% to $1.5 million.

**B.      Non-Economic Damages for Direct Victims Injured in Attacks**

The case law outlines general considerations and ranges of values for victims who have been injured but not killed in terrorist attacks.  In general, the cases have identified a 'baseline' award that may be increased or decreased based on the severity of the injuries and the duration of their effect on the victim.  Where the victim survives a terrorist attack but suffers from substantial injuries, the courts have adopted a baseline award of $5 million for pain and suffering – subject to upward or downward adjustment to account for the circumstances, duration, and severity of injuries. *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d, 24, 37-38 (D.D.C. 2012).  There are

many situations that have warranted an upward adjustment from the $5 million baseline.  *See e.g.,*

*Peterson II,* 515 F. Supp. 2d at 54-56, (outlining relevant examples: $12 million for plaintiff who

was rendered a quadriplegic; $9 million for victim with skull/face fracture, crushed arms, broken

leg and two collapsed lungs; $8 million for plaintiff with skull fracture and who was buried alive

for 4 days; $8 million for skull fracture, brain bruise and broken bones; $7.5 million for plaintiff

who lost sight in one eye and also had shrapnel injuries; $7 million for plaintiff with significant

shrapnel injuries, severe burn and damaged eardrum); *Valore*, 700 F. Supp.2d at 84 ($7.5 million

for injuries consisting of burns on 90% of the body, severe chest wounds, a leg that was split open

and metal and glass embedded in the body); *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d

19, 25 (D.D.C. 2017) (*Cohen II*), abrogated on other grounds by *Goldstein v. Islamic Republic of*

*Iran*, 383 F. Supp. 3d 15 (D.D.C. 2019) (awarding $7 million to child who had permanently

damaged eye, disfigurement, loss of vision resulting in psychological trauma and permanent

impairment); *Frost v. Islamic Republic of Iran*, 2019 WL 5110604, at *27 (D.D.C. 2019), report

and recommendation adopted in part, rejected in part, 419 F. Supp. 3d 112 (D.D.C. 2020)

(awarding, for post captivity period when victims experienced disability and ongoing effects of

injuries, $9.25 and $9.5 million for victims who  were  diagnosed with PTSD and established

"long-term, painful physical and mental injuries that have had and  will continue to have a

significant impact on their lives and ability to engage in normal activities and meaningful

employment"); *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 181-82 (D.D.C. 2019)

(awarding $7 million  in compensatory damages for pain and suffering where victim had extensive

shrapnel wounds requiring 100 stitches and a perforated eardrum, hearing loss, and glass and

shrapnel embedded in his body; awarding $9 million in pain and suffering damages where  victim's

injuries resulted in the loss of bone structure in his right sinus area, scars across his face and

difficulty using his hand); *Wamai,* 60 F. Supp. 3d at 93 (D.D.C. 2014), aff'd sub nom. *Owens v. Republic of Sudan*, 924 F3d 1256 (D.C. Cir. 2019) (awarding $7.5 million where victim suffered skull fracture, destruction of right eye, damage to left eye, spent months in a coma,  experienced memory and cognition problems, endured multiple surgeries, skin grafts, physical therapy, vocational rehabilitation, speech and cognitive therapy, and psychotherapy for depression; awarding $7.5 million  for victim who suffered deep shrapnel wounds to  legs and stomach, ruptured lungs, permanently impaired hearing and lung function, and suffers from chronic back and shoulder pain); *Gill v. Islamic Republic of Iran*, 239 F. Supp. 3d 88, 105 (D.D.C. 2017) (awarding $7.5 million  to victim who  was shot in the leg, spent 5 days in the hospital, was in extreme discomfort, and whose injuries will have lifelong effects).

### 1.    Non-Economic Damages for Injured Victim Shmuel Brauner

Plaintiff Shmuel Brauner seeks a non-economic pain and suffering award of $12 million. Plaintiff Brauner suffered extensive shrapnel wounds that resulted in permanent physical injuries: he lost one kidney and part of his stomach; he suffered damage to his legs and feet, abdomen and back.  He continues to suffer from severe pain in multiple parts of his body and still experiences numbness in his feet and legs.  Despite years in therapy, plaintiff Brauner also suffers from severe, ongoing psychological injuries.  Dr. Strous diagnosed plaintiff Brauner with severe depression, anxiety, and Post-Traumatic Stress Disorder.  He has not been able to continue his studies and is effectively fully disabled.  Mr. Brauner's own testimony reflects the significant effect the injuries have had on his life – he is unable to socialize, was unable to continue the studies he had pursued vigorously, he is unable to enjoy his children, he has no patience, he has lost enjoyment of life.

Based on the severity and permanent disabling nature of both the physical and psychological injuries, I recommend a non-economic award of $8.25 million.  This amount

accounts for the severity and long-term disabling effect of both the physical and psychological injuries as compared to the range of awards outlined in *Peterson II* and *Valore* described above.[63]

### 2. Non-Economic Damages for Injured Victim Naftali Shitrit

Plaintiff Naftali Shitrit seeks non-economic damages in the amount of $12 million. Naftali Shitrit suffered grievous wounds in the shooting at the Yeshiva. He was only 15 years old at the time. He experienced the terror and anguish of being trapped while the terrorist shooter murdered his fellow students – facing what he likely and reasonably believed would be certain death. His injuries were severe, and he spent two years in rehabilitation and recovery. *See generally* Declaration of Gila Shitrit, Dkt. 74. As a result of his injuries he has permanent physical impairments – including chronic pain, weakness in multiple parts of his body, sensory impairment, gait abnormalities, and multiple scars. Dr. Friedman found that Mr. Shitrit's injuries limit his employment options and that the conditions could deteriorate and cause more significant disability. Dr. Strous found that Mr. Shitrit suffers from psychological injuries that are unlikely to resolve.

Based on the uncontroverted evidence, I recommend a non-economic award of $8 million for Mr. Shitrit's injuries. In making this recommendation, I have considered not only the nature, severity, and duration of the physical and psychological injuries and their permanent disabling effects, but also Mr. Shitrit's young age at the time of the attack and the long period of recovery. Not only did he experience intense terror and anguish while waiting for what he felt was certain death, his injuries prevented him from engaging in the typical social, developmental, and physical activities of a normal teenaged boy. His life changed radically and irrevocably at the young age of 15.

---

[63] The requested amount of $12 million is equal to the award provided in *Peterson II* to a victim rendered a quadriplegic. Mr. Brauner's condition is quite serious but not equivalent to quadriplegia.

### 3.      Non-Economic Damages for Injured Victim Yehuda Glick

Plaintiff Yehuda Glick seeks a non-economic award of $12 million. Yehuda Glick suffered serious gunshot wounds and had to undergo multiple significant surgeries. He described months of intense pain after the shooting and he continues to experience pain from the injuries. He spent six months in initial recovery and then another six months in rehabilitation. He continues to experience constant pain. Although he has been able to return to work and maintain his career, Mr. Glick, like the other plaintiffs, continues to experience psychological injuries. He suffers from anxiety and PTSD. He employs a bodyguard when he goes out; he cannot concentrate, he reports that he cannot sleep, and he has flashbacks. In evaluating an award of non-economic damages in this case, it is appropriate to take into consideration the death of Mr. Glick's wife Yaffa as a result of the emotional injuries she suffered. The family, in Mr. Glick's words, has been devastated.

Based on the uncontroverted evidence, I recommend a non-economic award of $8 million to Mr. Glick. While Mr. Glick is able to continue work, the extreme devastation to his family coupled with the ongoing physical pain and psychological injuries supports this increase over the baseline award.

### 4.      Non-Economic Damages for Injured Victim Menachem Rivkin.

Plaintiff Menachem Rivkin seeks non-economic damages of $12 million. Mr. Rivkin was severely injured in the stabbing attack and described the pain during the initial phase of recovery as unbearable. He spent 4 days in the intensive care unit and another 4 days in the cardiothoracic surgery ward. Expert Report of Dr. Friedman, Dkt. 73, Exhibit 1, page 2. Thereafter he spent months confined to his home for rehabilitation and therapy. He lost one lung which puts him at risk for further illness or injury. He continues to suffer from neuropathic pain which impedes his daily activities. He suffers from depression, anxiety, and PTSD. He is obsessive about locking

doors and security.  Dr. Strous has concluded that the anxiety disorder and other psychological effects will remain with Mr. Rivkin indefinitely.

Based on the uncontroverted evidence, I recommend a non-economic award for Mr. Rivkin of $7 million.  This amount is consistent with precedent for non-economic awards for victims suffering physical injuries of similar severity and duration coupled with long-term psychological injuries.  *Compare Gill, supra.*

## V.    NON-ECONOMIC/SOLATIUM DAMAGES CLAIMS OF FAMILY MEMBERS OF DIRECT VICTIMS

**UNITED STATES CITIZENS OR NATIONALS**:  Section 1605A(c) expressly provides for solatium damages to immediate family members of the victims.  Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort.  *See Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.  Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).

The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*"). Immediate family also includes half-siblings. "Siblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would[.]"  *Peterson II*, 515 F. Supp. 2d at 52.  *See also Valore*, 700 F. Supp. 2d at 79 (quoting *Peterson II*, 515 F. Supp. 2d at 52); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75, 79 (D.D.C. 2010) (half-blood siblings are presumed to recover as would a full blood sibling); *accord Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014) ("Half-blood siblings are presumed to recover at the same level as full-blood

siblings would, unless the evidence indicates that such individuals did not have a close relationship with the victim") (internal citation omitted).

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan v. Hezbollah,* 213 F. Supp. 3d 27, 38 (D.D.C. 2016) ("[t]he guidelines emerging from prior decisions begin with the presumption that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages") (internal citations omitted); *Roth*, 78 F. Supp. 3d at 403 ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish . . .  As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages") (internal citations omitted).

A close relative need not be present at the attack in order to be eligible for solatium damages.  *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (*Cohen I*) ("[s]olatium claims are typically brought by family members who were not present or injured themselves"); *id*. at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it"); *Ben–Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 56–57 (D.D.C. 2008).  Accordingly, an immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages – provided that the relationship is sufficiently close.

The concept of immediate family may include stepparents, stepsiblings, and stepchildren and in some cases, others living in the household, provided that these individuals functioned as

family members equivalent to biological parents, children, or siblings.  *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (noting that non-family members have  been recognized as "immediate family members" for solatium damages when they "were members of the victim's household, and they were viewed as the functional equivalents of immediate family members."); *Valore*, 700 F. Supp. 2d at 79-80 (finding non-adoptive stepfather entitled to damages where the stepfather considered victim to be his son and vice versa, and where the victim and stepfather acted as a natural family); *Heiser II*, 659 F. Supp. 2d at 29 (recognizing non-adoptive stepfathers as functionally the same as biological fathers where they lived in the same household while the victims were minors and the stepfathers treated the children as their own sons financially, emotionally and socially); *Fritz*, 2018 WL 5046229, at *22 (awarding solatium damages to the stepparents and stepsiblings of two direct victims where the record reflected close relationships with each victim and his family); *Frost*, 2019 WL 5110604, at *28 (same).

**ISRAELI CITIZENS**.  For purposes of determining liability and entitlement to damages, the district court found that the claims of the Israeli citizens who are immediate family members of the victims should be evaluated under Israeli law.  Memorandum Opinion and Order, Dkt. 111, at page 70-72.  The district court concluded that the Israeli citizens (with the exceptions noted above at fn. 1) have established a claim for damages under Israeli law.  *Id.*

Israeli law provides for damages for emotional distress provided that the emotional harm is documented and severe.  Declaration of Dr. Shnoor, Dkt. 34 at ¶ 59; *see also Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 43 (D.D.C.), aff'd in part, rev'd in part sub nom. *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affs.*, et al., 892 F.3d 348 (D.C. Cir. 2018) ("Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily

function").  The discussion below addresses the entitlement of each of the family members who are Israeli citizens to damages for emotional distress under the applicable standard.

### A. Determining the Amount of Solatium Damages: General Approach and Factors

#### 1. United States Nationals.

There is a significant body of case law in this Circuit addressing solatium damages to family members of victims of terrorist attacks.  The amount of damages for solatium varies depending on whether the victim was killed or injured, and on other factors including "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."  768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) ("*Oveissi I*").  In *Heiser I*, the court conducted a survey of decisions of the district courts in the District of Columbia circuit and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed."  466 F. Supp. 2d at 269 (footnotes omitted).  Courts have often applied these amounts as guideposts in evaluating damages and have concluded that these amounts, while relevant, are neither mandatory nor applicable in all cases.  *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018).

Similarly, courts in this district have developed a range of values that serve as guideposts for solatium damages where the victim was injured.  Several courts have awarded solatium damages to family members of living victims that range from $4 million for a spouse of the victim, $2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  *See e.g.,*

*Anderson v. Islamic Republic of Iran,* 839 F. Supp. 2d 263, 266 (D.D.C. 2012). Courts have differed with respect to the proper amount to be awarded to children of victims. Some courts have found that $1.5 million is appropriate for children of a surviving victim who was physically injured. *Taylor v Islamic Republic of Iran*, 881 F. Supp. 2d 19, 23 n.3 (D.D.C. Aug. 2, 2012); *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23 (D.D.C. 2014); *Akins v. Islamic Republic of Iran,* 332 F. Supp. 3d 1, 43 (2018). Other decisions – applying reasoning that seems compelling and logical – have concluded that $2.5 million for children is a more appropriate amount. *See Onsongo v. Republic of Sudan,* 60 F. Supp. 3d 144, 151 (D.D.C. 2014) ("Children of injured victims will thus be awarded $2.5 million."); *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 50 (D.D.C. 2014), aff'd in part, vacated in part sub nom. (same); *Owens v. Republic of Sudan,* 71 F. Supp. 3d 252, 260 (D.D.C. 2014) ("[T]his Court has previously held that children of deceased and injured victims should receive awards akin to those given to parents (*i.e.*, $5 million where the victim died, and $2.5 million where the victim suffered injury); *see also Cohen v. Iran,* 268 F. Supp. 3d 19, 26 (awarding children baseline $2.5 million plus enhancement); *Hamen*, 407 F. Supp. 3d at 9 (adopting Special Master's recommended award of $6.5 million to children of deceased victim as a 30% enhancement of a $5 million award).

Courts typically have awarded higher amounts of solatium damages – both in cases involving the death of the victim and in cases involving injured victims – where there are more extreme circumstances, such as where a family member is under medical care for depression or where the testimony makes clear that the family member continues to experience and feel the loss and change or where the family member is aware that the victim suffered horribly while captive or was present at the attack. *See*, *e.g.*, *Sheikh v. Republic of Sudan*, 2020 WL 5203496, at *9 (D.D.C. Aug. 31, 2020) ("In general, factors that recommend the awarding of an enhancement

include "evidence establishing an especially close relationship between the plaintiff and decedent …; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"): *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 11 (D.D.C. 2020) (awarding 20% enhancement where sibling spent months assisting injured brother and as a result lost his job and marriage); *see also Thuneibat*, 167 F. Supp. 3d 22 (upward departures of 25% where parents suffered ongoing depression requiring medication and siblings suffered emotional and behavioral effects; noting also that family members at the scene of the attack may be awarded an additional amount – characterized as a separate component of damages). *Flanagan v. Islamic Republic of Iran,* 87 F. Supp. 3d 93 (D.D.C. 2015) (25% upward departure where relatives suffered from persistent complex bereavement-related disorder and PTSD following victim's death"); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (awarding additional amount to spouse who was present at the scene of the attack); *Estate of Brown v. Islamic Republic of Iran,* 872 F. Supp. 2d 37 (D.D.C. 2012) (upward departure where sibling suffered nervous breakdown and was prescribed medication for approximately one year).

The award must therefore be determined with reference to the baseline framework values but taking into consideration the particular facts of each case.

### 2.    Israeli Citizens.

District courts evaluating damages awards for intentional infliction of emotional distress (IIED) claims under Israeli law have noted that "such awards in Israel are typically lower than those in the United States." *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009). There is no evidence in the record in this case, however, regarding the ranges of damages for IIED claims under Israeli law. Under these circumstances, it is appropriate to apply the federal law framework to evaluate solatium damages for the plaintiffs who are Israeli citizens. *See*

*Thuneibat,* 167 F. Supp. 3d at 47 ("[g]iven the lack of the information regarding the proper calculation of solatium damages under Jordanian law, the Court will, in the interest of justice, analyze damages awards under the federal Section 1605A framework") (internal quotations omitted); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1087 (N.D. Ill. 2014) (applying federal law to award damages where the plaintiffs "failed to provide the Court with relevant material pertaining to damages award for mental injury under Israeli law"); *Oveissi v. Islamic Republic of Iran* ("Oveissi II"), 768 F. Supp. 2d 16, 25-26 (D.D.C. 2011) (applying French law to tort actions and federal law to damages award); *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 212-13 (D.D.C. 2008) (applying New York law to tort claims and federal law to damages award); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59-60 (D.D.C. 2006) (applying Florida and Virginia state law to tort claims and federal law to damages award).

Accordingly, the damages evaluations set forth below address the underlying requirement of proof of severity of harm under Israeli law but apply the general framework under U.S. federal law to determine the amount of damages for each such eligible plaintiff.

### B.    Damages Recommendations for Family Members of Direct Victims.

As discussed above, most of the family members of the Direct Victims have provided competent and informative declaration testimony regarding their relationship with the victim and the effects of the victim's death or injuries on their emotional and psychological health.  In addition, the adult family members (and some of the minors) have been evaluated for psychological and emotional injuries by the expert psychiatrist.  In some cases, young minor family members did not provide declaration testimony and the information about their relationships with the victim has been provided in declaration testimony of other family members.

And in some cases, as discussed, the expert psychiatrist has rendered 'impressions' of the psychological injuries of minor family members based on interviews with their parents.

Following are my recommendations regarding solatium damages and the basis for each proposed award.

### 1.   Family of Taylor Force

The testimony establishes that Taylor Force's parents and sister all had a deep and extremely close relationship with Taylor.  Each of the surviving family members expressed eloquently the extreme effect that Taylor's death has had on them personally and on the family as a whole.  Each of them continues to suffer daily and to experience ongoing, deep grief.  All of the members of Taylor Force's family have been diagnosed with multiple psychological and emotional injuries that have been determined to be chronic and that will affect them essentially for the remainder of their lives.

The plaintiffs seek a 50% upward adjustment from the *Heiser* framework amounts.  I concur that an upward adjustment is warranted based on the evidence of ongoing psychological and emotional injuries as well as the testimony of ongoing, daily pain and grief.  An analysis of the case law and comparable cases (noted above) indicates, however, that a 25% enhancement would be appropriate.  Accordingly, I recommend solatium damages awards for each of Stuart and Robbi Taylor of $6,250,000 and a solatium damages award for Kristin Taylor of $3,125,000.

### 2.   Family of Menachem Mendel Rivkin

The testimony establishes that the family of Menachem Rivkin has a normal, close, familial relationship and that each member of the family experienced pain, grief, and emotional injuries resulting from the effects of the terrorist attack.  I address the circumstances of each family member separately:

**Bracha Rivkin, Spouse of Direct Victim Menachem Rivkin** – Bracha Rivkin was traumatized by the attack on her husband and continues to suffer from anxiety, fear and stress. Dr. Strous diagnosed her with PTSD and anxiety.[64] Bracha Rivkin is an Israeli citizen and the uncontroverted evidence establishes the severity of injury necessary to permit recovery under Israeli law. She therefore should be entitled to a damages award consistent with the *Heiser* framework. Under the *Heiser* framework the baseline award for the spouse of an injured victim is $4 million. Plaintiffs have requested a 50% enhancement of that baseline amount. The diagnoses of ongoing psychological and emotional injuries support an enhancement over the baseline amount and, in addition, the fact that Mrs. Rivkin was present at the attack supports a further enhancement (one that some courts have characterized as a separate award). Accordingly, I recommend a 30% enhancement for a solatium award for Bracha Rivkin of $5,200,000.

**Children of Menachem Rivkin** – All of the children of Direct Victim Menachem Rivkin are United States nationals. None of the children provided any direct testimony – but their parents' declarations describe the effects of the attack on the family and on each child. The two older children underwent psychiatric evaluation by Dr. Strous.

**Child S.S.R.** – The uncontroverted evidence from the psychiatric evaluation demonstrates that S.S.R has signs and symptoms of chronic depressed mood, anxiety, and PTSD, exhibited changes in behavior after the stabbing including social withdrawal and anxiety in public spaces and has been diagnosed with Post-Traumatic Stress Disorder, partial and Adjustment disorder with mixed anxiety and depressed mood. Accordingly, I recommend a 25% enhancement over the *Heiser* baseline solatium award for S.S.R. for a total of $ 3,125,000.

---

[64] In the proposed findings, Plaintiffs suggested an award of $2 million for Bracha Rivkin but then later suggested an award of $6 million (which includes a 50% enhancement over the baseline $4 million award for the spouse of an injured victim). Proposed Findings and Conclusions, Dkt. 87, ¶¶ 219, 299.

**Child  M.M.R.** – The uncontroverted evidence demonstrates that M.M.R. was significantly affected by the attack on Menachem Rivkin.   The psychiatric exam showed that M.M.R. experienced Post-Traumatic symptoms, including nightmares, fear of leaving the home, fear of the site of the attack, flashbacks, palpitations, anxiety and hypervigilance.  M.M.R. has been diagnosed with Post-Traumatic Stress Disorder (partial) and Adjustment Disorder with anxiety.  Accordingly, I recommend a 25% enhancement over the *Heiser* baseline solatium award for M.M.R. for a total of $3,125,000.

**Children S.Z.R. and R.M.R**. – The younger children of Menachem Rivkin (ages 7 and 4 at the time of the attack) have been affected by the injuries to and attack on their father.  The report of expert Dr. Strous indicates that the children have experienced upheaval and disruption in their lives as a result of the attack.  There is no indication of any diagnoses of significant, ongoing psychological injuries.  Accordingly, I recommend that each of these two children be awarded the *Heiser* baseline amount for solatium damages for children of injured victims of $2,500,000.

### 3.        Family of Yehuda Glick

The testimony establishes that the attack on and injuries to Yehuda Glick has had an extreme impact on the family. Yehuda Glick's wife Yaffa Glick attempted suicide and passed away.  The children experienced the trauma of the injuries to their father and then the subsequent traumatic loss of their mother as a result of the attack on her husband.

**Estate of Yaffa Glick** – Yaffa Glick was an Israeli citizen.  The uncontroverted evidence shows that Yaffa Glick not only suffered intense psychological pain but that her death is directly attributable to the terrorist attack.[65]   Her estate is entitled, therefore, to an award of solatium

---

[65] Yaffa Glick's estate is not eligible to claim damages for her death as a 'direct victim' because she was not a United States national.

damages under Israeli law.  The *Heiser* baseline award for solatium damages for the spouse of an injured victim is $4 million.  The plaintiff has suggested an enhancement of 50% of the *Heiser* baseline value.  Given the extreme circumstances, I agree that it is appropriate to award a significant enhancement.  In recommending an enhancement, I have considered the extreme pain and suffering that lead to an initial suicide attempt, the pain of recovery from that attempt, and then the pain that compelled Mrs. Glick to seek again to end her life.  I have also considered the fact that Mrs. Glick was present at the attack, experienced the fear of imminent death or injury because she thought she would be the next victim, and found her husband lying on the ground unresponsive.  These additional circumstances warrant a further enhancement in the award.  I recommend an enhancement – taking into account both of these extreme factors – of 60% of the baseline – for an award of $ 6.4 million.

**Children of Yehuda Glick, Neriya, Shlomo, Hallel, and Sachar** – The uncontroverted evidence demonstrates that all four children suffered significant psychological and emotional injuries and devastation – first from witnessing the injuries to their father and fearing a future attack and then from the devastating loss of their mother.  Each of the children has been diagnosed with ongoing psychological and emotional injuries and each of the children have expressed the profound grief and loss they have experienced all attributed to the attack on their father.  Plaintiffs have requested a 50% enhancement over the *Heiser* baseline amount of $2,500,000.  Under these extreme circumstances, I agree that such an enhancement is warranted.  Accordingly, I recommend an award of $3,750,000 for each of the children of Yehuda Glick.

**Foster Children of Yehuda Glick** – The minor foster children of Yehuda Glick – R.R. and T.T. – experienced disruption and upheaval as result of the attack on Mr. Glick.  The foster children had lived with the Glick family for 10 years – and accordingly, under the case law may

be considered immediate family members for purposes of the FSIA. The uncontroverted evidence shows that the foster children have suffered significant emotional and psychological damage: they had to be removed from the home they had known for years and placed in alternative homes after the attack; then they suffered the loss of Mrs. Glick – who was effectively their mother. Dr. Strous Evaluation of R.T. and T.T., Dkt. 35, Exhibit 12 at page 2. The expert concluded that the two children suffer from anxious and depressive behavior. The uncontroverted evidence thus supports an award of solatium damages under Israeli law. Because the record does not contain a fulsome diagnosis of emotional injury, I do not recommend an enhanced award. Accordingly, I recommend solatium awards for each of the foster children at the *Heiser* baseline amount of $2,500,000.

### 4. Family of Richard Lakin

Plaintiffs Manya and Micah Lakin – adult children of victim Richard Lakin – each provided declaration testimony detailing the trauma, grief, and pain of seeing their father lying in the hospital bed hooked up to medical equipment, watching him undergo surgery after surgery and finally seeing him deteriorate into death. The evidence shows that Richard Lakin was a central figure in the family. In particular, he played a key role in helping Manya Lakin raise her children – who have been traumatized by his death. The psychiatric evaluations evidence that both plaintiffs continue to suffer from psychological and emotional injuries.

Plaintiffs have requested a 50% enhancement of the typical solatium award for children. I agree that an enhancement is warranted here: the plaintiffs not only suffered the loss of their father under violent circumstances – they also watched him die slowly from horrific wounds – as they kept vigil at the hospital. They continue to suffer from psychological injuries diagnosed by the expert psychiatrist. In this case I recommend an enhancement of 25% over the baseline value of

$5 million for a solatium award for the child of a deceased victim.  Accordingly, I recommend a solatium award for each of Micah and Manya of $6,250,000.[66]

### 5. Family of Avraham David Moses

Avraham David Moses was part of an extended family that includes parents, stepparents, siblings, stepsiblings and half-siblings.  Plaintiffs have requested a 50% enhancement over the *Heiser* framework awards for each of the family members.

**Parents Rivkah Moriah and Naftali Moses** – The testimony establishes that Avraham's parents Rivkah Moriah and Naftali Moses have been devastated by the death of their son.  They clearly established their close familial relationship and have established through expert testimony that they suffer from permanent disabling psychological injuries resulting from his violent death.  These ongoing conditions are more severe than those reported in the cases that resulted in a 25% enhancement over the *Heiser* framework for relatives of victims killed in the terrorist attack.  Accordingly, I recommend a 50% enhancement over the baseline award established in the *Heiser* framework – resulting in a recommended award of $7,250,000 for each of Rivkah Moriah and Naftali Moses.

**Stepfather David Moriah** – David Moriah's testimony establishes that he had a strong 'father/son' relationship with Avraham, he studied with Avraham, he helped Avraham address his feeling of distress over his biological parents' divorce.  The testimony thus establishes the requisite relationship that warrants solatium damages.  The expert report also establishes that David Moriah continues to experience grief and has been diagnosed with complex bereavement disorder.  In this case, I recommend a 25% enhancement over the *Heiser* baseline consistent with other cases where

---

[66] I note that the plaintiffs requested an award of $4.5 million.

the family member has been diagnosed with the same or similar long-term psychological injury.  I therefore recommend an award of $6,250,000.

**Brother Elisha Dan Moses** – The testimony establishes that Elisha Dan Moses had a very close relationship with Avraham.  Elisha Dan Moses was still very young when his older brother was killed.  Not only did he lose his brother, he lost his childhood and his family.  He was thrust into the role of the 'eldest' child and suffered yet another family upheaval:  His mother and stepfather got divorced after Avraham's death (the second divorce and family trauma that Elisha Dan Moses experienced).  The expert testimony establishes that Elisha Dan suffers from long-term psychological injuries.  Accordingly, I recommend a 25% enhancement over the baseline solatium award of $2.5 million for a total amount of $3,125,000.

**Stepsiblings Aviad, Chagit, Eitan, Yifat, Atara, and Tzur** – Aviad Moriah is a United States national.  The other stepsiblings are Israeli citizens.[67]  All of the stepsiblings of Avraham Moses have presented uncontroverted testimony establishing the close familial relationship that is necessary to support a claim for solatium damages under both United States and Israeli law.  All of the stepsiblings have presented expert reports establishing psychological and emotional injuries resulting from the violent death of Avraham and the subsequent disruption of the extended family – and therefore qualify for solatium damages under both United States and Israeli law.[68]

The emotional injuries vary but each of the individual siblings has presented evidence of ongoing, long-term injuries.  Because each stepsibling has established the requisite predicate for an award of damages under the applicable law and because each has established psychological injuries through expert evaluation and examination, each of the stepsiblings is entitled to solatium

---

[67] There is no information in the record that would suggest that stepsiblings would not be entitled to the same solatium damages as other siblings under Israeli law.

[68] *Force v. Islamic Republic of Iran* (2020) WL 2838527, at 81

damages.  In accordance with the precedent in this circuit, the amount of damages for all the stepsiblings may be based on the *Heiser* framework.  Based on the pertinent precedent, the stepsiblings can be awarded an enhancement over the baseline award.  Accordingly, I recommend solatium awards for each of the stepsiblings in the amount of $3,125,000 (a 25% enhancement over the baseline).

**Half Siblings N.M., C.M., A.M., and O.D.M.** – Avraham had four half siblings – N.M., C.M., A.M., and O.D.M.  All are United States nationals.  At the time of Avraham's death, the youngest was 2 years old (C.M.) and the oldest was 6 (O.D.M.)  The youngest children do not remember Avraham or the events of the day of his death.  One child – N.M. (who was four years old at the time of Avraham's death) has been diagnosed after psychiatric clinical evaluation with persistent depressive disorder.  The other three children have been diagnosed with Anxiety disorder or complex bereavement syndrome (based on information provided by their parents).  One child, C.M. is under the care of mental health professionals.  The expert report attributes these emotional and psychological injuries to the effects on the family of Avraham's death – in short, the children suffer from these injuries because they grew up in an intensely grieving family that ultimately disintegrated.

Courts have awarded solatium damages to children who were too young to experience the immediate effects of the murder of their family member but suffered from the long-term effects of the loss.  *Bathiard v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 72513, at *17-18 (D.D.C. 2020) (awarding solatium damages where plaintiff  "was only 11 months old at the time of her father's death").  The uncontroverted evidence – both from declaration testimony of the parents and from psychiatric impressions or evaluation by Dr. Strous – shows that each child has experience a long-term effect resulting from the effects on the family dynamic as a result of the

murder of Avraham. Essentially, each of these children has grown up in a family that has experienced and continues to experience extreme grief and family dissolution. Accordingly, each child has established the basis for an award of solatium damages. I recommend solatium awards for half siblings O.D.M., C.M. and A.M. at the *Heiser* amount of $2,500,000. I recommend a modest enhancement for N.M. who has been diagnosed after a formal psychiatric examination with persistent depressive disorder that has been determined to be long-term and chronic. Accordingly, I recommend an enhancement of 25% over the *Heiser* amount for N.M. for a total award of $3,125,000.

### 6.      Family of Naftali Shitrit

Naftali Shitrit's mother and siblings are all United States citizens or nationals. Yaakov Shitrit, the father of Direct Victim Naftali, is an Israeli citizen.

The declaration testimony of the Shitrit family establish that the family was significantly affected by the terror attack on Naftali Shitrit. All of the adult family members have provided declaration testimony establishing their close relationship with Naftali and the severe stress and disruption that the family experienced as a result of Naftali's near fatal injuries, long recovery, and permanent disabilities. The testimony shows that Naftali's siblings all experienced disruption in their lives – affecting their social and educational development. The older siblings provided declaration testimony of the trauma of seeing Naftali in the hospital hooked up to tubes and equipment when he was still unconscious. Naftali's mother Gila described the trauma of not knowing the fate of her son after learning of the attack at his Yeshiva. She described the pain of caring for him for years during and after his hospitalization. The younger siblings were affected in a different way: they experienced the trauma of the family situation and were affected by the grief. All of the adult family members underwent psychiatric evaluation and have presented expert

reports detailing their psychological injuries.  Plaintiffs have requested an enhancement of 50% over the *Heiser* baseline amounts for each of the family members.

**Parents Gila and Yaakov Shitrit** – Both parents have provided evidence of their close relationship to their son, their dedication to his recovery, the emotional and psychological trauma they suffered and the financial sacrifices they made to care for their son.  Both have established the prerequisites for recovery under United State and Israeli law.  Both have been diagnosed after evaluation by the expert with long-term psychological injuries.  Gila Shitrit was forced to stop working as a result of her son's injuries.

Based on the applicable case law, and taking into consideration the long-term care required to assist in Naftali's recovery, and the nature of the diagnoses of ongoing psychological and emotional injuries, I recommend an enhancement of 25% over the *Heiser* amount.  Accordingly, I recommend solatium awards for each of Gila and Yaakov Shitrit of $3,125,000.

**Siblings Meiri, Oshrat, Noya, and Yedidya Shitrit** – Each of the siblings has presented evidence sufficient to establish the necessary close familial relationship that supports an award of solatium damages. Each of the siblings has presented an expert report documenting the results of a psychiatric evaluation.  The evidence shows that the long-term effects of the injuries vary and therefore I address each sibling individually.

**Meiri Shitrit** – The uncontroverted evidence shows that Meiri has ongoing psychological injuries that require treatment even 10 years after the attack.  Accordingly, in light of the applicable case law, I recommend an enhancement of 25% over the *Heiser* value for a total award of $1,562,500.

**Oshrat Shitrit** – The uncontroverted evidence shows that Oshrat had suffered some effects of Naftali's injuries but now functions normally.  Based on the applicable case law, I recommend an award for Oshrat of the baseline *Heiser* value of $1,250,000.

**Noya Shitrit** – The evidence shows that Noya had significant psychological injuries and has improved as a result of ongoing treatment.  The uncontroverted evidence indicates that the psychological injuries remain a concern and therefore I recommend an enhancement of 25% over the *Heiser* amount for an award of $1,562,500.

**Y.S**. – The evidence shows that Y.S. was certainly affected by Naftali's injuries but now functions normally.  Accordingly, I recommend an award in the amount of $1,250,000 consistent with the *Heiser* framework.

**Minor Child Siblings** – Minor child E.S. was 3 years old at the time of the terror attack.  Minor child A.S. was 6 years old.  The testimony of Gila Shitrit (their mother) and the report of the expert (whose determination is based on the statements of Gila) both indicate that the young siblings have suffered disruption in family life and will continue to experience the emotional effects of the trauma that the family experienced.  Certainly, both of these children have been affected by the events that nearly killed their brother.  There is no basis in the record, however, to provide an enhanced award for these children.  Accordingly, I recommend awards consistent with the *Heiser* framework for each of E.S. and A.S. in the amount of $1,250,000.  *See e.g., Amduso*, 61 F. Supp. 3d at 51 (where the Court awarded the two-year-old child of an injured victim the same amount as her two older children); *see also Amduso et al v. Republic of Sudan et al*, Case 1:08-cv-01361-JDB, Report of Special Master John Aldock on Evitta Francis Kwimbere, Document 135, page 6.

**After born child sibling, H.S.** – The youngest sibling, H.S. was born a few months after the attack. The evidence does not indicate any particular emotional or psychological injury to H.S. Generally, courts have not awarded solatium damages to children born after the event that caused injury or death to a family member. *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 375 (D.D.C. 2020) ("Courts in this district have, for example, held that after-born children cannot recover for solatium damages in similar cases brought under § 1605A of the FSIA"). There are few exceptions, and those exceptions are based on extraordinary circumstances. *See e.g., Goldstein* (court awarded solatium damages at a lower amount than the *Heiser* framework because the child was born 2 days after the attack and the uncontroverted evidence showed that the attack caused the child's mother to go into premature labor). There is no evidence in this record to find such an 'extraordinary' circumstance. The testimony focuses on the fact that H.S.'s mother was busy with Naftali and therefore was not able to spend as much time with the child. This does not provide the sort of extraordinary compelling situation that would form the basis for an award to a child born after the attack. Accordingly, I do not recommend an award of solatium damages for H.S.

### 7.      Family of Shmuel Zev Shimon Brauner

Each of the adult members of the Brauner family presented declaration testimony establishing their close relationship with Shmuel Brauner and the long-lasting effects of his injuries on the family in general and on each of them in particular. Each of the adult family members has also undergone a psychiatric evaluation establishing ongoing and significant psychological injuries caused by the attack on Shmuel Brauner.

**Nechama Brauner** – wife of Shmuel Brauner. Mrs. Brauner's uncontroverted testimony establishes the close relationship with her husband and the devastating effect of his injuries on her personal, family, and occupational life. The injuries to Shmuel Brauner fundamentally changed

their relationship from that of husband and wife to caregiver and patient.  Mrs. Brauner had to give up her own career and now also functions as both mother and father to their children.  Mrs. Brauner has been diagnosed with significant long-term injuries.  Based on the uncontroverted evidence of ongoing psychological injuries and the dramatic and permanent alteration in her work life and family relationships, I recommend an enhanced solatium award of 25% above the *Heiser* baseline – for a total award of $5,000,000.

**Parents of Shmuel Brauner** – Esther Chaya Brauner and Mordechai Brauner.  The uncontroverted testimony of both of Shmuel Brauner's parents establishes their close familial relationship and the fear and anxiety they experienced when learning of their son's injuries and experiencing the long-term debilitating nature of those injuries.  Both parents testified to the fundamental and permanent changes in their son – who went from being a studious and outgoing person to someone who cannot work and who at a young age needs and will continue to need care to perform normal tasks.  Both parents have been diagnosed after psychiatric examination with long-term psychological and emotional injuries.  Based on the evidence on long-term psychological injuries, I recommend an enhanced solatium award consistent with the case law of 25% over the *Heiser* baseline amount.  Accordingly, I recommend awards for Mordechai and Esther Brauner of $3,125,000 each.

**Child of Shmuel Brauner, C.Y.B.** – C.Y.B. is an Israeli citizen and was less than a year old at the time of the attack.  The testimony of the mother establishes that C.Y.B. has experienced significant effects resulting from attack because of the inability of Shmuel to engage in normal functions of a father and because of the general family dynamic.  Although C.Y.B. did not undergo a formal psychiatric examination, the expert opined that the lack of an affectionate functioning father figure has repercussions on C.Y.B. and will continue to affect the child in the future.

Although the record is somewhat sparse, the uncontroverted testimony and expert review establish a familial relationship and an ongoing significant emotional effect that is sufficient to support a solatium claim under Israeli law.  Accordingly, I recommend a solatium award for C.Y.B. in the *Heiser* baseline amount of $2,500,000.

## VI.    PREJUDGMENT INTEREST

The plaintiffs were permitted to amend their complaint in order to request prejudgment interest.  This Court has previously confirmed that prejudgment interest may be appropriate in cases brought under the FSIA.  *See Fritz*, 324 F. Supp. 3d at 63-65.  Several decisions in this Circuit have held that prejudgment interest is appropriate on pain and suffering and solatium awards and past economic loss.  *See id.* at 64 (awarding prejudgment interest on the past economic loss of the direct victims as well as the non-economic pain and suffering and solatium damages suffered by the victims' estates and families); *Wamai*, 60 F. Supp. 3d at 98 ("[p]rejudgment interest is appropriate on the whole award, including pain and suffering and solatium" and past economic loss, but not on present economic loss); *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014) ("[p]rejudgment interest is appropriate on the whole award, including pain and suffering and solatium"); *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 46 (D.D.C. 2014) (same as *Wamai*); *Mwani v. Al Qaeda*, 2014 WL 4749182, at *13 (D.D.C. 2014) (awarding prejudgment interest on compensatory but not punitive damages).  As the court in *Wamai* reasoned:

> Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

60 F. Supp. 3d at 98.   I recommend that, consistent with precedent, prejudgment interest be awarded starting from the date of the respective attacks through the date of final judgment at the applicable federal prime rate.   *Id.*; *see also Sheikh*, 485 F. Supp. 3d at 274-75; *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *19-20 (D.D.C. 2020); *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250-51 (D.D.C. 2020); *Kinyua*, 466 F. Supp. 3d at 12; *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n. 10-12.[69]

I have provided such a calculation below through the end of April 2021 for the Court's convenience.   Prejudgment interest is calculated at the prime rate for each year between the respective incidents and the entry of final judgment using the methodology described in *Fritz, supra*, 324 F. Supp. 3d at 64, 67 n. 2.   A multiplier was calculated using the Federal Reserve's data for the average annual prime rate from March 8, 2016 through April 2021 for the Estate of Taylor Force and his family members, from January 27, 2016 through April 2021 for Menachem Mendel Rivkin and his family members, from October 13, 2015 through April 2021 for the Estate of Richard Lakin and this family members, from October 29, 2014 through April 2021 for Yehuda Glick and his family members, from August 19, 2011 through April 2021 for Shmuel Brauner and his family members, and from March 6, 2008 through April 2021 for the Estate of Avraham Moses and his family members, and for Naftali Shitrit and his family members.   *See* Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at https://www.federalreserve.gov/datadownload/

---

[69] I note that some courts have declined to award prejudgment interest, concluding that the compensatory awards provide full compensation for pain and suffering. *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), aff'd, 554 F. App'x 16 (D.C. Cir. 2014) (deciding that the plaintiffs were already fully compensated from the pain and suffering and solatium damages); *Roth*, 78 F. Supp. 3d at 404 (holding that "the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing"); *Thuneibat*, 167 F. Supp. 3d at 48 (holding that "the solatium damages awarded are complete and prejudgment interest is not necessary to make the plaintiffs whole").

Choose.aspx?rel=H15 (last accessed on 04/22/2021).  Consistent with *Fritz*, I estimated that rate

from January through April 2021 to be 3.25%, which is the current rate.

       To calculate the multiplier, I multiplied $1.00 by the prime rate in the respective years of

the attacks and added that amount to $1.00, yielding $1.64 for 2008, $1.46 for 2011, $1.31 for

2014, $1.28 for 2015, and $1.25 for March 2016 and $1.26 for January 2016. Then, I took that

amount and multiplied it by the prime rate in the year of the attack and added that amount to the

respective dollar amounts (aforementioned).  I continued this iterative process through the end of

April 2021.  As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the

base damages amount includes both the prejudgment interest and the base damages amount; in

other words, applying the multiplier calculates not the prejudgment interest but the base damages

amount plus the prejudgment interest, or the total compensatory damages award."  *Wamai*, 60 F.

Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12.

## SUMMARY OF RECOMMENDATIONS

| | SOLATIUM DAMAGES / PAIN AND SUFFERING | PJI ON PAIN AND SUFFERING / SOLATIUM DAMAGES | TOTAL ECONOMIC LOSS | PJI ON PAST ECONOMIC LOSS ONLY | TOTAL WITHOUT PJI | TOTAL WITH PJI |
|---|---|---|---|---|---|---|
| **Estate of Taylor Force** | $1,000,000 | $251,032 | $584,230 | $3,297 | $1,584,230 | $1,838,559 |
| Stuart Force | $6,250,000 | $1,568,950 | - | - | $6,250,000 | $7,818,950 |
| Robbi Force | $6,250,000 | $1,568,950 | - | - | $6,250,000 | $7,818,950 |
| Kristin Ann Force | $3,125,000 | $784,475 | - | - | $3,125,000 | $3,909,475 |
| **Menachem Mendel Rivkin** | $7,000,000 | $1,790,700 | - | - | $7,000,000 | $8,790,700 |
| Bracha Rivkin | $5,200,000 | $1,330,234 | - | - | $5,200,000 | $6,530,234 |
| S.S.R. | $3,125,000 | $799,420 | - | - | $3,125,000 | $3,924,420 |
| M.M.R. | $3,125,000 | $799,420 | - | - | $3,125,000 | $3,924,420 |
| R.M.R. | $2,500,000 | $639,536 | - | - | $2,500,000 | $3,139,536 |
| S.Z.R. | $2,500,000 | $639,536 | - | - | $2,500,000 | $3,139,536 |
| **Yehuda Glick** | $8,000,000 | $2,458,387 | - | - | $8,000,000 | $10,458,387 |
| Estate of Yaffa Glick | $7,000,000 | $2,151,088 | $301,947 | $22,213 | $7,301,947 | $9,475,249 |
| Neriya David Glick | $3,750,000 | $1,152,369 | - | - | $3,750,000 | $4,902,369 |
| Shlomo Glick | $3,750,000 | $1,152,369 | - | - | $3,750,000 | $4,902,369 |
| Hallel Glick | $3,750,000 | $1,152,369 | - | - | $3,750,000 | $4,902,369 |
| S.G. | $3,750,000 | $1,152,369 | - | - | $3,750,000 | $4,902,369 |
| R.T. | $2,500,000 | $768,246 | - | - | $2,500,000 | $3,268,246 |
| T.T. | $2,500,000 | $768,246 | - | - | $2,500,000 | $3,268,246 |

| | | | | | |
|---|---|---|---|---|---|
| **Richard Lakin Estate** | $1,500,000 | $421,936 | - | - | $1,500,000 | $1,921,936 |
| Micah Lakin Avni | $6,250,000 | $1,758,065 | - | - | $6,250,000 | $8,008,065 |
| Manya Lakin | $6,250,000 | $1,758,065 | - | - | $6,250,000 | $8,008,065 |
| **Avraham David Moses Estate** | $1,500,000 | $961,096 | - | - | $1,500,000 | $2,461,096 |
| Rivka Martha Moriah | $7,250,000 | $4,645,295 | $179,552 | $69,510 | $7,429,552 | $12,144,357 |
| Naftali Andrew Moses | $7,250,000 | $4,645,295 | $778,686 | $206,655 | $8,028,686 | $12,880,637 |
| David Moriah | $6,250,000 | $4,004,565 | - | - | $6,250,000 | $10,254,565 |
| N.M. | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| C.M. | $2,500,000 | $1,601,826 | - | - | $2,500,000 | $4,101,826 |
| Z.G.M. | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| O.D.M. | $2,500,000 | $1,601,826 | - | - | $2,500,000 | $4,101,826 |
| A.M. | $2,500,000 | $1,601,826 | - | - | $2,500,000 | $4,101,826 |
| Elisha Dan Moses | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Aviad Moriah | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Chagit Gibor Moriah | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Eitan Yoel Moriah | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Yifat Moriah | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Atara Nesia Moriah | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| **Naftali Shitrit** | $8,750,000 | $5,606,391 | - | - | $8,750,000 | $14,356,391 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Gila Rachel Shitrit | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Yaakov Shitrit | $3,125,000 | $2,002,282 | - | - | $3,125,000 | $5,127,282 |
| Meiri Shitrit | $1,562,500 | $1,001,141 | - | - | $1,562,500 | $2,563,641 |
| Oshrat Shitrit | $1,250,000 | $800,913 | - | - | $1,250,000 | $2,050,913 |
| N.S. | $1,562,500 | $1,001,141 | - | - | $1,562,500 | $2,563,641 |
| Y.S. | $1,250,000 | $800,913 | - | - | $1,250,000 | $2,050,913 |
| A.S. | $1,250,000 | $800,913 | - | - | $1,250,000 | $2,050,913 |
| E.S. | $1,250,000 | $800,913 | - | - | $1,250,000 | $2,050,913 |
| H.S. | $0 | $0 | - | - | $0 | $0 |
| **Shmuel Zev Shimon Brauner** | $8,000,000 | $3,676,611 | $1,970,737 | - | $9,970,737 | $13,647,348 |
| Nechama Brauner | $5,000,000 | $2,297,882 | - | - | $5,000,000 | $7,297,882 |
| C.Y.B. | $2,500,000 | $1,148,941 | - | - | $2,500,000 | $3,648,941 |
| Mordechai Brauner | $3,125,000 | $1,436,176 | - | - | $3,125,000 | $4,561,176 |
| Esther Chaya Brauner | $3,125,000 | $1,436,176 | - | - | $3,125,000 | $4,561,176 |

Dated: April 23, 2021

Respectfully submitted,


By:  *s/ Deborah E. Greenspan*
     Deborah E. Greenspan, Esq.
     Special Master