## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TAYLOR FORCE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*<br><br>*Defendants*. | Civil Action No. 16-1468 (RDM) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs claim injuries and damages resulting from terrorist attacks in Israel between March 6, 2008 and March 8, 2016.[1]  The first of these attacks was a March 2008 shooting at Merkaz HaRav Yeshiva, a religious high school in Jerusalem: the attacker shot to death 16-year-old Avraham David Moses, Dkt. 33 at 87 (Spitzen Decl. ¶ 227), and left 15-year-old Naftali Shitrit in critical condition, *id.* at 74 (Spitzen Decl. ¶ 193); Dkt. 76 at 2 (Shitrit Decl. ¶ 7–12). Seven years later, in October 2015, Richard Lakin was attacked in Jerusalem by two Hamas operatives, who boarded the bus Lakin was riding and stabbed and shot the passengers trapped inside.  Dkt. 33 at 33 (Spitzen Decl. ¶ 85).  Lakin was shot in the head and stabbed in the stomach; he succumbed to his injuries two weeks after the attack.  *Id.* at 34 (Spitzen Decl. ¶ 87).

---

[1] This opinion does not address damages as to Bracha Rivkin, Yehuda Glick, Shmuel Brauner, or the plaintiffs whose claims are tied to their direct injuries.  For reasons given in this Court's July 5, 2022 memorandum opinion, Dkt. 124, the Court must first decide how to proceed with respect to the claims of these Plaintiffs in light of the Court's conclusion that the waiver of sovereign immunity found in 28 U.S.C. § 1605A does not apply to acts of *attempted* extrajudicial killing. *See* Dkt. 124 at 20.  For present purposes, the Court's references to "Plaintiffs" excludes these individuals.

In March 2016, Taylor Force was walking with classmates in the Port of Jaffa when he was fatally stabbed by two terrorists.  *Id.* at 50–51 (Spitzen Decl. ¶ 129).

The estates of Taylor Force, Richard Lakin, and Avraham David Moses, as well as Naftali Shitrit and family members of each direct victim, filed this suit against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), and the Syrian Arab Republic ("Syria"), alleging that their injuries were caused by Iran and Syria's provision of material support to the terrorist organization Hamas.  Dkt. 114-1 at 6–7 (Amended Compl. ¶¶ 33–35).  Plaintiffs effected service on the Defendants, Dkts. 15, 20, but no Defendant answered or otherwise appeared in this action, Dkts. 21–22.  Plaintiffs moved for entry of default judgment, Dkt. 91, and this Court granted that motion on May 31, 2020, Dkt. 111, concluding that Plaintiffs properly invoked the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a), as well as the cause of action provided for by that same statute.  Dkt. 111 at 41.

For assistance in evaluating Plaintiffs' damages, the Court referred the case to a special master, Deborah E. Greenspan, to prepare a report and recommendation regarding compensatory, but not punitive, damages.  *See* Dkt. 113.  The Special Master's resulting report lays out the effects that the attacks had on each of the victims and their families and carefully analyzes Plaintiffs' claims for damages under the applicable framework for state-sponsored terrorism cases.  *See* Dkt. 119.  The Court thanks the Special Master for her excellent assistance.  In response to the Special Master's report, Plaintiffs filed a notice indicating that they have "no objections" to her recommendations.  Dkt. 120 at 1.

As explained below, the Court adopts, with minor modification, the Special Master's proposed findings and recommendations as to the Plaintiffs whose damages the Court addresses today and awards those Plaintiffs punitive damages.

## ANALYSIS

As an initial matter, the Court agrees with and adopts the Special Master's findings of fact as to the estates of Taylor Force, Richard Lakin, and Avraham David Moses, as well as Naftali Shitrit and the family members of each of the four direct victims, all of which are well-explained and supported by the record.  Tracking the Special Master's report, the Court will first review her conclusions with respect to the economic and non-economic damages that those findings support and will then turn to the question of punitive damages, which (consistent with the Court's referral, Dkt. 113 at 1) is not addressed in the Special Master's report.  The Court concludes with the question of prejudgment interest.

### A.     Economic Damages

The estate of Taylor Force and the parents of Avraham David Moses, Naftali Moses and Rivkah Moriah, seek economic damages to account for lost income as a result of the attacks. "Section 1605A explicitly provides that foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained as a result of the foreign state's conduct."  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 48 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(c)).  Economic damages are typically "not hard to quantify," but must be proven with "competent evidence."  *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015).

At the outset, the Court considers the class of plaintiffs who may recover such economic damages under Section 1605A.  This Court has most frequently awarded economic damages to

direct victims of terror attacks, as well as to their estates, to compensate for the lost earning capacity of the direct victim herself.  *See, e.g.*, *id.*; *Fritz v. Islamic Republic of Iran*, 324 F. Supp.3d 54, 59–60 (D.D.C. 2018).  On at least one occasion, moreover, this Court has stated that economic loss damages under Section 1605A are available *exclusively* to direct victims and that such damages "are not included in the category of damages recoverable by family members of victims." *Mwila v. Islamic Republic of Iran*, 33 F. Supp. 3d 36, 41 (D.D.C. 2014); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010) (indicating that family members can recover solatium damages for their emotional injury, while direct victims can recover economic damages).  Despite that observation, the Court is persuaded that family members may, at least at times, recover for economic loss.

Starting, as this Court must, with the language of Section 1605A itself, *see Kiewit Power Constructors Co. v. Sec'y of Lab.*, 959 F.3d 381, 395 (D.C. Cir. 2020), it is clear that the statute does not distinguish between the categories of plaintiffs who may seek economic damages. Rather, Section 1605A provides broadly that, in any action under the FSIA, "damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  And solatium damages, which "are by their very nature unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, cannot themselves account for the quantifiable economic losses—including a loss of personal income—that plaintiffs may suffer as a result of a family member's injury or death.

Consistent with this view, several decisions of this Court have concluded that family members of victims can recover economic damages if they can establish lost income stemming from the injury or death at issue.  *See, e.g.*, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (awarding economic loss damages to a son whose emotional distress and

chronic depression resulted from his father's kidnapping); *Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 139 (D.D.C. 2019) (awarding economic damages to a sister for her lost wages during her brother's captivity); *see also Selig v. Islamic Republic of Iran*, No. 19-cv-02889, 2021 WL 5446870, at *19 (D.D.C. Nov. 22, 2021) (contemplating the availability of economic loss damages for a victim's daughter but declining to award her damages because her proffered calculations lacked the requisite "indicia of reliability").

In accord with the statutory text and these decisions, the Court concludes that economic damages are available to Force's estate as well as to Moses's parents—to the extent that each Plaintiff can establish those damages through "competent evidence." *Moradi*, 77 F. Supp. 3d at 71. The Court will address the claims of each Plaintiff in turn.

1. *Economic Loss Damages for the Estate of Taylor Force*

Taylor Force's estate seeks economic damages to account for Force's lost income following his death. Dkt. 87 at 66–67 (Proposed Findings of Fact ¶ 230). To substantiate this claim, Force's estate proffers economic loss computations by forensic economist Michael Soudry. *See* Dkt. 87 at 66–67 (Proposed Findings of Fact ¶ 230); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (stating that economic loss damages may be proven by the submission of such an expert report). The Court, in turn, evaluates the expert's calculations while considering the "reasonableness and foundation of the assumptions relied upon." *Id.* (citing *Reed*, 845 F. Supp. 2d at 214).

As the Special Master observes, Soudry holds a Master of Business Administration with a major in Finance from Hebrew University of Jerusalem and is employed at Eco-Stat LLC, where he advises attorneys and insurance companies about the extent of economic loss resulting from injury or death. Dkt. 119 at 72. The Special Master also notes that Soudry has served as an

expert witness in over 40 cases and that he has prepared over 150 economic loss reports for individuals seeking compensation from the September 11 Victims Compensation Fund.  *Id.*  In the view of the Special Master, Soudry is qualified as an expert for the purpose of determining economic loss.  *Id.*  The Court agrees.

As to the economic loss calculation, the Special Master concludes that Soudry's assumptions were "appropriate" and that his analysis was "consistent with generally accepted practices for the computation of lost earnings and [was] based on reasonable and reliable data." *Id.* at 74.  Accordingly, the Special Master recommends that the Court adopt Soudry's proposal as the award of economic loss for Force's estate.  *Id.*   The Court agrees and will adopt Soudry's recommendation and award economic loss damages to the estate of Taylor Force in the amount of $584,230.

2.     *Economic Loss Damages for Naftali Moses*

Naftali Moses, the father of Avraham David Moses, seeks to recover economic damages on the grounds that his psychological injuries, resulting from his son's murder, render him unable to work.  In assessing Moses's request for damages, the Special Master notes that Moses has submitted a psychiatric report prepared by Dr. Rael Strous, who concluded with a "reasonable degree of certainty" that Moses was unable to work in his chosen profession due to the murder and that his inability to work appears to be permanent.  Dkt. 35-31 at 6 (Strous Decl.).   The Special Master determines that it is "reasonable" to conclude that Moses's emotional injuries render him incapable of gainful employment.  Dkt. 119 at 79.  The Court again agrees.

To calculate his economic loss, Moses submits a report by Michael Soudry, the same forensic economist who assessed the economic loss to Force's estate, Dkt. 68, and who the Court

6

has already qualified as an expert.  The Special Master concludes that Soudry's calculation of past and future lost income is "consistent with generally accepted practices and methodology" and applies reasonable values, reductions, and discounts "based on reliable and verifiable source data."  Dkt. 119 at 81.  The Special Master thus recommends that the Court award economic loss damages and adopt Soudry's proposal as to the amount of those damages.  *Id.*  The Court agrees and will award economic loss damages to Moses in the amount of $778,686.

       3.    *Economic Loss Damages for Rivkah Moriah*

Lastly, Rivkah Moriah, mother of Avraham David Moses, seeks an award of economic loss damages due to her inability to perform her job after her son's murder.   In support, Moriah submits a report prepared by Dr. Strous, explaining that Moriah suffered from immense grief due to her son's death, resulting in insomnia, anxiety, depression, and PTSD.  Dkt. 35-28 at 9 (Strous Decl.).   Moriah avers that, after the attack, she could not continue to perform her prior job because it required "cheerful" engagement with people.  Dkt. 63 at 14–15 (Moriah Decl. ¶ 69).  As a result, she remained unemployed and unable to work from the time of her son's death in March 2008 until October 2018, when she reentered the work force as a part-time math teacher and then worked as a personal assistant.  Dkt. 118 at 1 (Moriah Decl. ¶¶ 2–6).  She left her personal-assistant position in September 2020, however, because her employer required her to work full time—a task that remains too difficult due to the emotional suffering she and her children have experienced since her son's murder.  *Id.* at 2 (Moriah Decl. ¶¶ 7, 11).  In light of Dr. Strous's report and Moriah's declarations, the Special Master finds that the effects of Moses's murder effectively precluded Moriah from employment between March 2008 and September 2018.  Dkt. 119 at 84–85.  The Special Master further concludes that, based on Dr.

Strous's expert report, it would be reasonable to consider an award of lost future wages.  *Id.* at 86.

Unlike Force's estate and Naftali Moses, Moriah does not proffer a report from a forensic expert to support her claim for economic loss.  Instead, she submits a declaration calculating her own past and future projected economic loss.  Dkt. 63 at 15 (Moriah Decl. ¶ 70).  As to her past losses, Moriah multiplies her former monthly wage by her months of unemployment, a "simple calculation" that the Special Master concludes was "based on reliable documentation" and "provides reasonable grounds upon which to award economic loss for the period of past loss."  Dkt. 119 at 84–85.  As to her future wage loss, the Special Master notes that Moriah's calculation is "not unreasonable" in this circumstance, especially because the Special Master herself "tested the calculations applying adjustments including wage growth, reduction for unemployment risk, and tax obligations."  *Id.* at 87.  The Special Master accordingly recommends that the Court award Moriah $108,300 in past loss damages and $31,580 in future loss damages.  *Id.* at 84–87.  Given the Special Master's careful scrutiny of Moriah's calculations, the Court agrees and will award economic loss damages to Moriah in the amount of $139,880.

## B.     Non-Economic Damages

Shitrit and the estates of Force, Lakin, and Moses each seek non-economic damages for the pain and suffering that resulted from the respective terrorist attacks, while family members of all four victims seek solatium damages.  The Court considers each request in turn.

### 1.     *Non-Economic Damages for Naftali Shitrit*

Plaintiff Naftali Shitrit seeks $12 million in non-economic damages for his pain and suffering resulting from the March 2008 attack.  Dkt. 87 at 55–56 (Proposed Findings of Fact ¶

188).  In assessing this request, the Special Master notes that Shitrit—who was 15 years old at the time of the shooting—suffered severe injuries that led to two years of rehabilitation and recovery as well as numerous permanent physical impairments that "limit his employment options" and "could deteriorate and cause more significant disability."  Dkt. 119 at 96.  The Special Master also explains that Shitrit "experienced the terror and anguish" of being trapped while his classmates were murdered, leaving him with "psychological injuries that are unlikely to resolve."  *Id.*  In light of Shitrit's young age and the severity and duration of his physical and psychological injuries, the Special Master recommends a non-economic award of $8 million.  *Id.*

The Court agrees.  "Pain and suffering awards for surviving victims are determined based on factors including the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 186 (D.D.C. 2013) (quotation marks omitted).  In calculating the amount of damages, the Court must "ensure that individuals with similar injuries receive similar awards."  *Id.* (quotation marks omitted).  In the interest of uniformity, judges in this district have developed a general framework for assessing pain and suffering damages for victims of terror attacks, "awarding a baseline of $5 million to individuals suffering severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain."  *Id.* (citing *Valore*, 700 F. Supp. 2d at 84).  "An upward adjustment to the $7 to $12 million range may be appropriate 'in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead.'"  *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 53 (D.D.C. 2020) (quoting *Valore*, 700 F. Supp. 2d at 84).  This Court, for

example, awarded $7.5 million to Terrance Valore, a soldier who survived a bombing with "burns cover[ing] 90% of his body," "severe hole-like wounds passing through his chest; pieces of metal, concrete, and glass embedded in his body; and his leg split open." *Valore*, F. Supp. 2d at 84. The Court awarded $9 million to Jeffrey Nashton, the survivor of a Beirut suicide bombing who suffered "a skull fracture," numerous other shattered and broken bones, "two collapsed lungs," "internal bleeding," and continued to live with "lasting and severe psychological problems from the attack." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 56 (D.D.C. 2007); *cf. id.* at 55 (awarding $12 million to a victim whose injuries resulted in permanent quadriplegia).

An upward departure from the $5 million baseline is similarly warranted here. Shitrit suffered six gunshot wounds that lacerated his liver, colon, left ureter, and femoral artery; was intubated and required to use an ostomy bag for several months; underwent numerous surgeries; and suffered seizures and a stroke. Dkt. 77-1 at 1 (Friedman Decl.). Even after the conclusion of his acute rehabilitation, Shitrit has suffered from the severe psychological effects of the attack as well as a "permanent limp and balance problems," a loss of feeling in his right leg, "constant back pain," scars throughout his body, and urological and intestinal problems. Dkt. 76 at 5–6 (Shitrit Decl. ¶ 49). Given the similarities between the nature of Shitrit's injuries and those of Valore and Nashton, the $8 million award recommended by the Special Master here is appropriate. The Court will, accordingly, award $8 million in non-economic damages to Shitrit.

2.   *Pain and Suffering for the Estate of Taylor Force*

As to the estate of Taylor Force, the Special Master recommends an award of $1 million to compensate for Force's pain and suffering. Dkt. 119 at 90. Victims who die instantaneously in a terrorist attack typically cannot recover damages for pain and suffering, *Roth*, 78 F. Supp. at 402, but this Court has awarded such damages to victims who live for a short period of time after

10

sustaining injuries.  "The Court typically awards $1 million to a victim who survives a few minutes to a few hours after the bombing."  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 38 (D.D.C. 2012).  Substantially more damages may be warranted in circumstances where the victim survives for days to months after the attack and continues to suffer throughout.  *See, e.g.*, *Peterson*, 515 F. Supp. 2d at 53 (awarding $7.5 million in pain and suffering damages to the estate of a serviceman who endured eight days of pain and suffering).

As to Taylor Force, the Special Master notes that Force "would have been aware and conscious of the attack" as it occurred and that, even after suffering his final wounds, it is likely that he suffered from "extremely uncomfortable shortness of breath prior to losing consciousness."  Dkt. 119 at 90; *see also* Dkt. 46-1 at 2 (Friedman Decl.)  But because the period between the initial attack and unconsciousness was "only a matter of seconds or perhaps a minute or two," the Special Master does not recommend an upward departure from the $1 million this Court typically awards to the estates of plaintiffs who suffer briefly before death.  Dkt. 119 at 90.  The Court agrees and awards Force's estate $1 million in non-economic damages.

3.     *Pain and Suffering for the Estate of Richard Lakin*

Richard Lakin's Estate seeks non-economic damages in the amount of $8 million.  Dkt. 119 at 91.  As the Special Master notes, Lakin died two weeks after his attack, after undergoing multiple invasive surgeries and other procedures.  *Id.* at 91–92.  The declarations submitted by Lakin's estate indicate that he remained conscious throughout the attack and until he arrived at the hospital—likely about one hour—but that he never regained consciousness after his initial surgery.  *Id.* at 92; *see also* Dkt. 54 at 4 (Manya Lakin Decl. ¶ 16); Dkt. 55 at 2 (Micah Lakin Decl. ¶ 8).  The affidavits of his children confirm that Lakin died after two weeks on life support, during which he remained "comatose."  Dkt. 54 at 3–4 (Manya Lakin Decl. ¶ 14).  In light of

11

Lakin's relatively brief period of conscious suffering, the Court agrees with the Special Master that the appropriate baseline is $1 million, rather than the $5 million baseline that this Court employs for victims who survive terrorist attacks and continue to suffer long thereafter.  *See, e.g.*, *Fritz*, 324 F. Supp. 3d at 60.  While awards of up to $8 million have been awarded to a victim who remained "fully alert" to his pain and suffering for 27 days before his ultimate death, for example, *Wultz*, 864 F. Supp. 2d at 38, the record does not establish that Lakin suffered a similar fate before his ultimate death.

There is perhaps a closer question as to whether the Special Master's recommended $500,000 enhancement above the $1 million baseline is warranted, given the Special Master's acknowledgement that Lakin was only conscious for "up to an hour" after the attack.  Dkt. 119 at 93.  The Special Master indicates that "the record does not establish that Mr. Lakin experienced conscious pain and suffering during the two weeks of hospitalization," but recommends an award of $1.5 million on the basis that "Mr. Lakin was unquestionably in horrific pain" for one hour before his descent into unconsciousness.  *Id.*  Although this Court has most frequently awarded $1 million in damages to victims who "endure[] extreme pain and suffering for a period of *several hours or less*," *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) (emphasis in original) (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006)), the Court agrees that an upward departure to $1.5 million is warranted here, given the especially horrific circumstances of Lakin's death.   Lakin was trapped inside a bus with two terrorists who systematically attacked the passengers therein, Dkt. 33 at 33 (Spitzen Decl. ¶ 85); was both shot in the head and stabbed in the stomach, *id.* at 34 (Spitzen Decl. ¶ 87); and continued to suffer at least until his hospitalization, Dkt. 54 at 4 (Manya Lakin Decl. ¶ 16); Dkt. 55 at 2 (Micah Lakin Decl. ¶ 8).  *See, e.g.*, *Estate of Doe*, 943 F. Supp. 2d at 186 (indicating that

"the severity of the pain immediately following the injury" is relevant to the amount of pain and suffering awarded); *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 7 (D.D.C. 2019) (concluding that the fear of imminent death is "a reasonable component of damages").  In light of Lakin's immense pain and suffering during and after the attack, the Court awards $1.5 million in non-economic damages to Lakin's estate.

      4.     *Pain and Suffering for the Estate of Avraham David Moses*

As to Avraham David Moses's estate, the Special Master recommends an upward adjustment of $500,000 from the "baseline award of $1 million in for pain and suffering for victims who live for a very short period of time after sustaining injuries in a terrorist attack." Dkt. 119 at 90.  The Court notes that, unlike for Lakin and Force, the record lacks any evidence that Moses was conscious after the initial shooting.  Nevertheless, the record indicates that Moses was alerted to the attack before his death, when he heard shouts and bursts of gunfire outside the building and sought to hide under a "table/shelf" near the library entrance.  Dkt. 111 at 38 (citing Dkt. 33 at 87 (Spitzen Decl. ¶ 227)).  As this Court previously determined, Moses and his friend were likely in their hiding space for seven to eight minutes before they were killed at close range while huddled together.  *Id.*

"This court has repeatedly recognized that the fear and distress caused by knowing that one's death is imminent is a reasonable component of damages, as is the physical pain associated with a brutal murder."  *Hamen*, 407 F. Supp. 3d at 7.  But it is less clear "how to best measure that extraordinary form of injury," *id.*, especially where the record is devoid of evidence of post-injury "conscious pain," *Owens*, 71 F. Supp. 3d at 259 (denying a victim any pain-and-suffering damages given the evidence of relatively immediate death).  In cases where hostages have been held in advance of certain death, the Court has awarded $1 million in pain-and-suffering damages "for the portion of . . . time that [the victim] faced certain death alone." *Surette v.*

*Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 (D.D.C. 2002).   Drawing on such analogous

cases, and departing from the Special Master's recommendation on this question, this Court

awards Moses's estate $1 million in non-economic damages for the pain and suffering Moses

experienced before he was shot.

5.     *Solatium for Family Members*

Family members of each of the four victims seek solatium damages in various amounts.

Dkt. 87 at 68–81.  Such damages are expressly provided for under Section 1605A(c) and are

intended to compensate for "the mental anguish, bereavement[,] and grief that those with a close

personal relationship to a decedent experience as the result of the decedent's death, as well as the

harm caused by the loss of the decedent."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8,

22 (D.D.C. 2009); *see also* 28 U.S.C. § 1605A(c).  "Solatium claims are typically brought by

family members who were not present or injured themselves."  *Cohen v. Islamic Republic of*

*Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) ("*Cohen I*").  There exists a "'presumption' that

family members in direct lineal relationship 'suffer compensable mental anguish[,] and

testimony proving a close emotional relationship will usually be sufficient to sustain an award of

solatium damages.'"  *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (alterations

omitted) (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290

(D.D.C. 2015)).

"Solatium damages, like damages for pain and suffering, are by their very nature

unquantifiable."  *Moradi*, 77 F. Supp. 3d at 72.  But, as with the latter, courts have identified

certain baselines that help ensure that similarly situated victims receive comparable awards.

Specifically, courts in this district have followed the framework set out in *Heiser I*, which

concluded that "courts typically award between $8 million and $12 million for pain and suffering

14

resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*") (footnotes omitted).  These amounts, however, are merely guideposts, and the Court may deviate depending on the specific circumstances of a given case.  *See Fraenkel v. Islamic Republic of Iran*, 892 F.2d 348, 361–62 (D.C. Cir. 2018).  Solatium damages are also available to family members of injured victims.  As the Special Master observes, solatium damages where the victim is still living typically range from $4 million for a spouse of the victim, $2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  Dkt. 119 at 101–02 (citing *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012)).  For children of victims, this Court has previously concluded that they "should receive awards akin to those given to parents (*i.e.*, $5 million where the victim died, and $2.5 million where the victim suffered injury)." *Owens*, 71 F. Supp. 3d at 260.

At the threshold, the Court notes that six of the plaintiffs seeking solatium damages are Israeli citizens, whose claims for compensatory damages are, as the Court has already determined, governed by Israeli tort law rather than by Section 1605A.  *See* Dkt. 111 at 72.  Typically, "damages would be calculated pursuant to the law under which liability was found," *Thuneibat*, 167 F. Supp. 3d at 47, which—for these plaintiffs—would be Israeli law.   However, the non-U.S. nationals, including Moses's step-siblings and Shitrit's father, did not submit evidence or analysis regarding the calculation of solatium damages under Israeli law.  Plaintiffs' Israeli law expert proffered his opinion solely as to whether Plaintiffs are entitled to recover damages, and not as to how much Plaintiffs should be awarded.  *See* Dkt. 34 (Schnoor Decl.).  Where this Court lacks information regarding the "proper calculation" of solatium damages

15

under foreign law, it will "default to the application of federal law." *Fraenkel*, 892 F.3d at 358;

*see also Thuneibat*, 167 F. Supp. 3d at 47 (applying the Section 1605A framework to damages

where liability was established under Jordanian law); *Oveissi v. Islamic Republic of Iran*, 768 F.

Supp. 2d 16, 25–26 (D.D.C. 2011) (applying the federal standard for solatium damages where

liability was established under French law).  The Court will, accordingly, apply the same *Heisler*

*I* framework to the Israeli citizens that it applies to the United States nationals.

Turning to the case at hand, each family member of the four victims has presented

evidence to the Court and the Special Master demonstrating his or her close relationship to the

respective direct victims and the grave loss he or she continues to bear.  *See* Dkt. 119 at 104–

117.  The record demonstrates that the three terrorist attacks at issue here, the resulting deaths of

Moses, Lakin, and Force, and the injuries to Shitrit have all inflicted profound emotional,

physical, and financial harm on the victim's families.  The Special Master has considered the

individual circumstances of each Plaintiff and has recommended an amount for each.  *See Id.*

Given the comprehensive evidence of devastating individualized grief and loss in the record, the

Court agrees with and will adopt the Special Master's recommendations regarding each of these

family members.[2]

---

[2] The Court furthermore notes its agreement with the Special Master's recommendation, Dkt.
119 at 116, that H.S., who was born nearly four months after the March 2008 attack, Dkt. 35-41
at 3 (Strous Decl.), should not be awarded solatium damages.  This Court has concluded that "a
plaintiff bringing an action under § 1605A must have been alive at the time of the attack in order
to collect solatium damages," *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15 (D.D.C.
2012), and has made exceptions only for "special circumstances," including for a case where the
child was born prematurely two days after the attack due to his mother's emotional shock,
*Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 23 (D.D.C. 2019).  Because the record
indicates no such special circumstances here, the Court concludes that H.S. is not entitled to
compensatory damages.  The Court further notes that Plaintiffs do not object to the Special
Master's recommendation as to H.S.  *See* Dkt. 120 at 1.

This includes the Special Master's recommendation to award damages to Plaintiffs who were step- or half-siblings of a victim or, in the case of David Moriah, the step-parent of a direct victim.  As the record shows, the murder of Avraham David Moses inflicted extraordinary suffering on all of his family members, including his step- and half-siblings and his step-father *Id.* at 110–13.  The Court acknowledges that the elements of a solatium claim are "indistinguishable from an IIED claim," *Valore*, 700 F. Supp. 2d at 85, and, as such, are traditionally limited to a victim's "immediate family," *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003).  Although decisions in this district have "adopted the strict meaning of 'immediate family,' defined as one's spouse, parents, siblings, and children," *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (internal citations omitted), the D.C. Circuit has recognized that "immediate family members" can include "members of the victim's household" who are "viewed as the functional equivalents of immediate family members," *Bettis*, 315 F.3d at 337.  Accordingly, this Court has awarded half-siblings, step-siblings, and step-parents solatium damages to the extent they were "treated like" a sibling or parent or acted as the "functional equivalent" thereof.  *Fritz*, 324 F. Supp. 3d at 63; *see also Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835, 2022 WL 2817730, at *42 (D.D.C. July 19, 2022) (applying the same "functional equivalent" test).

In this case, Moses's step-father and his step- and half-siblings have each established that they met the "functional equivalent" test.  David Moriah attests that Moses spent half of each week living with Moriah, Dkt. 60 at 5 (Moriah Decl. ¶ 21), and that, during those days of the week, Moriah prepared dinner for Moses, put him to bed at night, guided him on his schoolwork, cared for him when he was ill, and helped him process his parents' divorce, *id.* at 3–4 (Moriah Decl. ¶¶ 7–11); *see also* Dkt. 35-23 at 3–4 (Strous Decl.) (describing Moriah's time parenting

Moses over "six and a half years").  The record further indicates that Moses lived, for half of

each week, with his four younger half-siblings, N.M., C.M., A.M., and O.D.M.—with N.M. and

C.M. at his mother's house and A.M. and O.D.M. at his father's.  *See* Dkt. 60 at 5 (Moriah Decl.

¶ 21) (stating that Moses split his weeks between the homes of his two parents and that Moses

was "very attached" to N.M. and C.M. and "contributed significantly to taking care of them and

raising them"); Dkt. 66 at 8 (Naftali Moses Decl. ¶¶ 47–48) (detailing the effect that Moses's

death had on A.M. and O.D.M. and indicating that O.D.M. "would always eagerly await

[Moses's] arrival from school").  The record also shows that Moses's six step-siblings spent

substantial time with Moses throughout his mother's marriage to David Moriah and that each

step-sibling was the functional equivalent of his siblings.[3]  *See, e.g.*, *Fritz*, 324 F. Supp. 3d at 63

n.1 (concluding that a half-brother met the "functional equivalent" test even though they never

---

[3] It is not entirely clear from the step-siblings' declarations whether each step-sibling in fact
resided in the same household as Moses.  Some of his step-siblings do attest to living with David
Moriah, Moses, and Moses's mother.  *See, e.g.*, Dkt. 59 at 1 (Chagit Moriah Decl. ¶ 6) (stating
that Chagit chose to live with her father after her parents' divorce); Dkt. 61 at 1–2 (Eytan Moriah
Decl. ¶ 6, 10, 12) (recounting that Eytan returned "home" to find "commotion in [his] house"
when his father and step-mother heard about the attack at Mercaz HaRav; that he and Moses
"grew up as typical brothers, playing and fighting together;" that he "supported and guided
Avraham," "gave him advice," and would do "riddles and puzzles" with him for hours).  But
even those step-siblings whose declarations do not make explicit whether they lived with Moses
appear to have spent substantial time at their father's house, where they played with Moses,
mentored him, and otherwise took on the role of siblings.  *See* Dkt. 62 at 3 (Ifat Moriah Decl. ¶
13) (recounting that Ifat and Moses would "play together and talk to each other" after their
parents first married, and that they maintained a "deep and real connection of understanding");
Dkt. 57 at 2 (Atara Moriah Decl. ¶ 8–11) (indicating that Atara and Moses became part of a
"stable family unit" after their parents married, that she "felt like his older sister" and "watched
as he grew and eagerly read every book," and that she was at her father's house the night of
Moses's murder); Dkt. 64 at 2 (Tzur Moriah Decl. ¶ 9–10) (describing the time Tzur spent at his
father's house both before and after Moses's murder and the changes that resulted from his
death); Dkt. 58 at 1 (Aviad Moriah Decl. ¶ 3) (stating that Moses was "closer in age to [Aviad]
than all [his] other siblings" and that his "primary relationship" at his father's house was with
Moses); Dkt. 60 at 2 (David Moriah Decl.) (stating that Moses's step-siblings "accepted . . .
[Moses] as [a] brother[] and treated [him] with a lot of affection").  The Court, accordingly,
concludes that each step-sibling satisfied the "functional equivalent" test.

lived in the same household because their relationship was "sufficiently close" where the older

half-brother picked up the victim from school, assisted with his homework, attended his sporting

events, and was "profoundly affected by [his] death and was personally involved in the

aftermath").   The Court, accordingly, will adopt the Special Master's recommendation to award

solatium damages to each member of Moses's family.

### C.      Punitive Damages

Plaintiffs also seek punitive damages for each Plaintiff.  Dkt. 115 at 27, 29 (Amended

Compl. ¶¶ 131, 145); Dkt. 121 at 4–5 (Proposed Order and Judgment).[4]  Punitive damages

"serve to punish and deter the actions for which they [are] awarded," *Valore*, 700 F. Supp. 2d at

87, and are expressly contemplated by the FSIA, *see* 28 U.S.C. § 1605A(c).  Pursuant to this

Court's order, *see* Dkt. 113 at 1, the Special Master did not consider, and did not recommend, an

award of punitive damages.  Rather, the Court reserved this task for itself, which it takes up now.

In cases brought under the FSIA, courts have concluded that "[p]unitive damages are

warranted where defendants supported, protected, harbored, aided, abetted, enabled, sponsored,

conspired with, and subsidized a known terrorist organization whose modus operandi included

the targeting, brutalization, and murder of American citizens and others."  *Braun v. Islamic*

---

[4] Although Plaintiffs request punitive damages for every plaintiff, Dkt. 121 at 4–5 (Proposed Order and Judgment), and generally allege that, "[u]nder Israeli case law[,] a plaintiff harmed by an act of Negligence caused by intentional conduct is entitled to punitive damages," Dkt. 115 at 29 (Amended Compl. ¶ 145), they do not offer any evidence substantiating the availability of punitive damages under Israeli law.  Notwithstanding this omission, the Court takes judicial notice of declarations submitted in similar cases, which have supported the availability of punitive damages under Israeli law for "immoral and outrageous act[s]."  *See Henkin v. Islamic Republic of Iran*, No. 19-cv-1184, 2021 WL 2914036, at *10 (D.D.C. July 12, 2021) (quoting 19-cv-1184, Dkt. 56-2 at 22 (Gilead Decl. ¶ 64)); *see also Borochov v. Islamic Republic of Iran*, No. 19-cv-2855, 2022 WL 656168, at *21 (D.D.C. 2022) (describing Plaintiffs' Show Cause Response on the issue).  Accordingly, the Court awards punitive damages to both the U.S.-citizen plaintiffs and the Israeli-citizen plaintiffs in this case, to the extent they are awarded compensatory damages.

*Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017) (internal citations omitted). Here, the

Court has already concluded that "Iran provided Hamas . . . with significant support in the form

of arms and financial assistance, as well as training and technical expertise" and that Syria

similarly provided the group "with a safe operational base from which to run [its]

organization[]." Dkt. 111 at 6. From their bases in Syria, Hamas raised funds, trained

operatives, smuggled arms, and conducted their political and foreign relations activities. *Id.* at

16. The Court is, accordingly, persuaded that Plaintiffs are entitled to punitive damages.

In determining the amount of punitive damages to award, this Court typically considers

four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the

plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the

wealth of the defendants." *Fritz*, 324 F. Supp. 3d at 65 (quotation marks and citations omitted).

These factors militate in favor of a sizable award here. As to the first two factors, Iran and

Syria's actions enabled Hamas to carry out lethal acts of terror as part of a sustained effort to

instill fear in the people of Israel. Dkt. 111 at 6, 12–13. As to the third factor, "the need for

deterrence [is] clear," given the policies of both countries to provide material support to militant

groups for the purpose of harming Americans. *See Hekmati v. Islamic Republic of Iran*, 278 F.

Supp. 3d 145, 166 (D.D.C. 2017); *see also Thuneibat*, 167 F. Supp. 3d at 53 (describing Syria's

sponsorship of "known terrorists whose stated mission is to devastate those who support

Americans"); *Borochov v. Islamic Republic of Iran*, --- F. Supp. 3d --- , 2022 WL 656168, at *22

(D.D.C. Mar. 4, 2022) ("Deterrence is necessary because, time and again, courts in this district

have been confronted with families shattered by Iran- and Syria-backed terrorists."). Finally,

both Syria and Iran are sovereigns that have "substantial wealth." *See, e.g., Colvin v. Syrian*

*Arab Republic*, 363 F. Supp. 3d 141, 163 (D.D.C. 2019); *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

Plaintiffs ask for a fixed amount of $50 million in punitive damages for each family affected by the attacks.  Dkt. 87 at 82–83.  Their request has some basis in precedent, as judges in this district have at times awarded flat sums of up to $150 or $300 million in punitive damages to the families of each affected victim in a particular attack.  *See, e.g.*, *Thuneibat*, 167 F. Supp. 3d at 54 (collecting cases).  Yet notwithstanding the advantages of uniformity that such a flat-award method provides, the method also "limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury," *Borochov*, 2022 WL 656168, at *22 (quoting *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 142 (D.D.C. 2019)), especially where, as here, the Plaintiffs have suffered in distinct ways from multiple different terrorist attacks.

The Court therefore concludes that it is more appropriate to calculate punitive damages by applying, as this Court has in similar cases, a multiplier to a base amount (referred to as the "multiplicand").  *See Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, at *4 (D.D.C. May 18, 2022).  As to the multiplicand, some decisions have utilized the defendant's annual expenditures on terrorist activities, *see, e.g.*, *Valore*, 700 F. Supp. 2d at 88, while others have used the amount of compensatory damages already awarded, *see, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105–06 (D.D.C. 2017), and still others have considered both these factors together, *see, e.g.*, *Hekmati*, 278 F. Supp. 3d at 166–67.  But where, as here, "Plaintiffs have not provided sufficient evidence as to [the countries'] expenditures" and the underlying acts are not "as 'exceptionally' deadly or substantial as those in cases where the total-expenditures multiplicand has been used," "the appropriate multiplicand is the total

compensatory damages already awarded." *Hamen*, 407 F. Supp. 3d at 10; *cf. Valore*, 700 F. Supp. 2d at 57, 88 (using the total-expenditures multiplicand for claims arising from the Beirut bombing where 241 Americans were killed).

This leaves, then, the question of the appropriate multiplier.  Courts in this jurisdiction have frequently used a multiplier between one and five depending on various factors, including, among other things, whether the case involved exceptional circumstances, the perceived deterrence effect, and the nexus between the defendant and the injurious acts.  *See, e.g., Moradi*, 77 F. Supp. 3d at 73 (multiplier of one where Iranian authorities directly detained and tortured, but did not kill, plaintiff); *Hekmati*, 278 F. Supp. 3d at 167 (same); *Fritz*, 324 F. Supp. 3d at 65 (multiplier of two for a case involving hostage-taking and killing by terror organization the defendant supported); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 26, 50 (D.D.C. 2012) (multiplier of three for the bombing of the U.S.S. Cole where plaintiffs presented no evidence relating to defendant's expenditures on terrorist activities); *Haim*, 784 F. Supp. 2d at 3, 14 (multiplier of three for a suicide bombing that killed eight); *Valore*, 700 F. Supp. 2d at 88 (multiplier of five for victims of the Beirut bombing where plaintiffs presented expert testimony on the deterrence effect of punitive damages).

Turning to the case at hand, the Court concludes that a multiplier of two is appropriate. This Court has applied that multiplier in similar cases, where nations such as Iran or Syria have provided material support to a terrorist organization that later engaged in violent attacks and hostage-taking that injured or killed multiple people.  *See, e.g.*, *Fritz*, 324 F. Supp. 3d at 58 (killing of four servicemembers); *see also Hamen*, 407 F. Supp. 3d at 4, 11 (killing of a private contractor and holding another hostage for over six months).  The Court recognizes that it has, at times, applied a multiplier of three to shooting attacks, including to attacks that have resulted in

fewer fatalities than those at issue here.  *See, e.g.*, *Gill*, 249 F. Supp. 3d at 106.   However, at least one of those cases has begun from the premise that the range of multipliers spans "between three and, in exceptional cases, five," *id.* (quoting *Harrison*, 882 F. Supp. 2d at 50), rather than the appropriate range of one to five, *Fritz*, 324 F. Supp. 3d at 58.   To be sure, the underlying acts here are indisputably tragic and horrific.  But so too were the acts at issue in prior cases in which the Court has concluded a multiplier of two is appropriate.  *See, e.g.*, *id.*; *Hamen*, 407 F. Supp. 3d at 11.  Plaintiffs, moreover, have presented little evidence regarding the potential deterrence effect of a larger multiplier, *see Bluth*, 203 F. Supp. 3d at 26, particularly given the many billions of dollars in damages already awarded against Iran in similar cases.

The Court will, accordingly, award Plaintiffs punitive damages in an amount equal to two times their compensatory damages.  Consistent with other decisions in this circuit, the award of punitive damages will be apportioned among the estate and each individual Plaintiff "relative to their individual compensatory awards."  *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 28 (D.D.C. 2017) ("*Cohen II*").

**D.    Prejudgment Interest**

The final issue before the Court involves prejudgment interest.  Plaintiffs have requested, and the Special Master recommends, that the Court award Plaintiffs prejudgment interest on at least some portions of their economic and compensatory damages awards.  *See* Dkt. 119 at 119; Dkt. 115 at 31.  "The decision to award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations."  *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  "The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation."  *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997).  Accordingly,

"[p]rejudgment interest is an element of complete compensation." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 59 (D.D.C. 2012) (quoting *West Virginia v. United States*, 479 U.S. 305, 311–12 (1987)).

Although prejudgment interest has not always been uniformly awarded for noneconomic damages under FSIA, this Court has already considered this very issue in *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) and in *Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358 (D.D.C. May 18, 2022), and concluded that prejudgment interest was appropriate on both "past economic loss" and on the "non-economic pain and suffering and solatium damages suffered by the victims' estates and families." *Fritz*, 324 F. Supp. 3d at 64; *Schwartz*, No. 18-cv-1349, 2022 WL 1567358, at *5; *see also Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 274 (D.D.C. 2020) (adopting the same approach); *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 250 (D.D.C. 2020) (same).  The Court sees no reason to revisit that conclusion here and will, accordingly, award prejudgment interest on Plaintiffs' past economic loss and their non-economic pain and suffering and solatium damages.

 As for how the Court will calculate that interest, "[t]he D.C. Circuit has explained that the prime rate—the rate banks charge for short-term unsecured loans to creditworthy customers—is the most appropriate measure of prejudgment interest." *Fritz*, 324 F. Supp. 3d at 64 n.2; *see also Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996). Applying this rule, the Special Master calculates prejudgment interest at the average annual prime rate in each year from the date of the various attacks.  Dkt. 119 at 119.  The Court adopts the Special Master's methodology, as it has done in prior cases using this same approach, *see Fritz*, 324 F. Supp. 3d at 64 n.2, and updates the resulting prejudgment interest figures to account for the time that has passed since she issued her report in April 2021.

Lastly, the Court considers whether it should apply its punitive-damages multiplier before or after incorporating prejudgment interest into Plaintiffs' compensatory damages awards.  As this Court explained in *Schwartz*, the better approach is to apply the punitive-damages multiplier *after* completing the prejudgment interest calculation because, in the Court's view, prejudgment interest is necessary to provide complete recompense for Plaintiffs' compensatory damages, and because "the *total* compensatory damages already awarded" provides the basis for Plaintiffs' punitive damages.  *Hamen*, 407 F. Supp. 3d at 10 (emphasis added); *see, e.g.*, *Schwartz*, 2022 WL 1567358 at *6; *Ewan*, 466 F. Supp. 3d at 252 n.4 (indicating that "the starting figure for the Court's punitive damages calculation" already "includes prejudgment interest where applicable").  Most importantly, by proceeding in this manner, the Court can ensure that the punitive-damage multiplier applies to the entire compensatory loss and that the happenstance of when judgment is entered does not have a material effect on the ultimate value of the judgment.

## CONCLUSION

The Court will enter a separate order awarding damages to Plaintiffs as described above.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  July 27, 2022